IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| KANSAS CITY UNITED METHODIST ) | Chapter 11 |
| RETIREMENT HOME, INC., d/b/a ) | |
| KINGSWOOD SENIOR LIVING ) | Case No. 21-41049-11-CAN |
| COMMUNITY, ) | |
| ) | |
| Debtor. ) | |

### DECLARATION IN SUPPORT OF DEBTOR'S
### CHAPTER 11 FILING AND FIRST-DAY PLEADINGS

Undersigned Ross P. Marine, Chairman of the Board of the above-captioned Debtor,

hereby offers and makes this Declaration (1) to provide the Court with an overview of Debtor and

this Chapter 11 proceeding and (2) in support of the relief sought in the first-day pleadings filed

by Debtor.

### Background

1.     Debtor is a nonprofit corporation formed under the laws of the State of Missouri

and qualified as an organization under § 501(c)(3) of the Internal Revenue Code. Debtor is not

authorized to issue capital stock and, as a result, retains no equity holders. All corporate powers

of Debtor are vested in and exercisable by its board of directors.

2.     Debtor owns and operates a fully licensed continuing care retirement community

in Kansas City, Missouri known as the Kingswood Senior Living Community ("Kingswood").

Kingswood is located on approximately 30 acres and offers residents a full continuum of services

including independent living, assisted living, and skilled nursing and memory care on a single

campus.  Kingswood provides living accommodations and related healthcare and support services

to a target market of seniors aged 65 years and older.  Kingswood enables seniors to live and remain in the same location as they age and their needs change by providing various levels of support and care at the same facility.  Kingswood is currently comprised of approximately 275 residents.

3.      On August _____, 2021 (the "Petition Date"), Debtor filed its voluntary Petition for relief (the "Chapter 11 Case") with this Court under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Debtor operates its business and manages its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

4.      The fundamental purpose of the Chapter 11 Case involves the restructuring of the Bonds (defined below) on a consensual basis with the Bond Trustee (defined below). While the debt to the bondholders is restructured through the reorganization process, all other creditors with undisputed claims are designated to be paid in full.

## Financing

5.      The financing of the Debtor and its operations derive from the revenue bonds issued by the Industrial Development Authority of the City of Kansas City, Missouri (the "Issuer") in the amount of $51,770,000 (the "Bonds").  The Debtor is obligated to UMB Bank, N.A. in its capacity as master trustee and indenture trustee (the "Bond Trustee") for the benefit of the beneficial holders of the tax-exempt Bonds.  The Bonds were issued as the $51,770,000 Senior Living Facility Revenue Bonds (Kingswood Project) Series 2016 pursuant to that certain Bond Trust Indenture dated January 1, 2016 between the Issuer and the Bond Trustee (as amended and supplemented, the "Indenture").

6.      As security for its obligations with respect to the Bonds, the Debtor entered into: (i) that certain Master Trust Indenture (Amended and Restated) dated as of January 1, 2016 (the

"MTI") with the Bond Trustee, pursuant to which the Debtor granted the Bond Trustee a first priority lien on and security interest in substantially all of the Debtor's assets as described in the MTI; and (ii) that certain Deed of Trust and Security Agreement, dated as of January 1, 2016 (as supplemented and amended, the "Mortgage"), pursuant to which the Debtor granted the Bond Trustee a first priority lien on and security interest in substantially all of the Debtor's assets as described in the Mortgage, including but not limited to the real estate associated with the Facility and the improvements thereon, and all of the Debtor's equipment, furniture, fixtures and other personal property. The MTI, Bond Indenture, Loan Agreement and Mortgage together with any other document or agreement delivered as security for or relating to the Bonds or the Debtor's obligation under the foregoing documents are collectively referred to as the "Bond Documents." Pursuant to these grants, the Bond Trustee holds valid and perfected first priority liens and security interests in substantially all of the Debtor's real and personal property as security for its obligations associated with the Bonds (the collateral above and as further described in the Bond Documents, the "Prepetition Bond Collateral").

7.     Proceeds from the sale of the Bonds were loaned by the Issuer to the Debtor pursuant to that certain Loan Agreement dated January 11, 2016 between Debtor and Issuer (as amended and supplemented, the "Loan Agreement").  Proceeds of the Bonds were used by the Debtor to, among other things (i) finance, refinance, and reimburse the costs of certain facilities of Debtor described in the Indenture, (ii) refund certain bonds described in the Indenture, (iii) fund required debt service reserves for the Bonds, (i) fund interest on the Bonds, and (v) pay certain expenses relating to issuance of the Bonds.  The rights of Issuer under the Loan Agreement were assigned to the Bond Trustee under the terms of the Indenture.

### Bankruptcy Filing

8.      In the period of 2013 through 2015, Kingswood was faced with declining occupancy and financial performance due in part to its aging facilities and increased competition in the senior living market in the Kansas City metro area.  In order to address these problems, Kingswood (in consultation with, and on the recommendation of, Kingswood's then existing management company and other consultants) determined that its facilities needed to be upgraded, refurbished, renovated and expanded in order to succeed in a competitive market and increase occupancy, thereby boosting Kingswood's financial performance.

9.      In order to accomplish this enhancement of its facilities (the "*2016 Project*") and to refinance and restructure its then existing bond indebtedness, $51,770,000 Senior Living Facilities Revenue Bonds (Kingswood Project) Series 2016 (the "*Series 2016 Bonds*") were issued by The Industrial Development Authority of the City of Kansas City, Missouri (the "*Issuer*") pursuant to that certain Bond Trust Indenture (the "*Indenture*") dated as of January 1, 2016, between the Issuer and UMB Bank, N.A, as trustee (the "*Trustee*") to refinance and restructure the Series 1998 Bonds and to fund the cost of the 2016 Project.

10.      Due to numerous factors including delays in the completion of the 2016 Project, inadequate supervision by Kingswood's then existing management company, postponement of marketing needed to increase occupancy, and decreased capability to attract new residents as a consequence of the pandemic, Kingswood was unable to achieve its anticipated and forecast occupancy and performance goals and otherwise satisfy the performance and financial covenants applicable to the Series 2016 Bonds. As a result, its financial performance and cash position continued to deteriorate and, by the end of 2018, Kingswood defaulted under the terms and financial covenants of the 2016 Bonds.

11. As a result of this default, Kingswood and the Bond Trustee (acting at the direction of the holders of a majority of the aggregate principal amount of the Series 2016 Bonds) entered into a Forbearance Agreement dated as of August 9, 2019 (as amended, the "**Forbearance Agreement**") wherein, among other things, Kingswood's obligation to make the monthly debt service payments on the Series 2016 Bonds was deferred and Kingswood agreed to pursue a sale of its facilities, a restructuring/refinancing of the Series 2016 Bonds or some other transaction acceptable to the holders of a majority of the aggregate principal amount of the Series 2016 Bonds (the "*Directing Bondholders*"). During the period of the Forbearance Agreement and despite the deferral of its monthly debt service payments on the Series 2016 Bonds, Kingswood's cash position continued to deteriorate, thereby necessitating the planned restructuring of its 2016 Series Bonds as described below.

12. Debtor and the Bond Trustee entered into focused negotiations discussions to restructure the Series 2016 Bonds in order to rehabilitate Debtor's financial condition and reinvigorate its business operations. The parties reached full agreement on the terms and conditions for the restructuring of the Series 2016 Bonds through the issuance of Series 2021 Bonds described below. The parties also determined that the filing of the Chapter 11 Case would facilitate the restructuring of Debtor's bond obligations in the most efficient and binding manner. The proposed restructuring of the Debtor will have minimal impact on creditors, including the residents, other than the bondholders. All Residency Agreements will be assumed and the Debtor will pay all prepetition and admin claims in full. The Debtor's secured bond debt will be restructured so that upon emergence, the Debtor's liquidity will be enhanced and its debt service will be substantially reduced.

**First-Day Pleadings**

13.    Contemporaneously with the filing of the Chapter 11 Petition, Debtor filed the fol-

lowing "first day" pleadings:

a.    Motion for Entry of Interim and Final Orders Authorizing Use of Cash Col-
lateral and Providing Adequate Protection (the "Cash Collateral Motion");

b.    Motion for Authorization to Pay Prepetition Claims of Critical Vendors and
Contractors (the "Critical Vendor Motion");

c.    Application for Approval of Payment of Prepetition Payroll (the "Prepeti-
tion Payroll Application");

d.    Motion for Order Authorizing Maintenance of Cash Management System
and Continued Use of Certain Existing Bank Accounts, Investment and
Deposit Practices, and Certain Business Forms (the "Cash Management
Motion");

e.    Application for Determination of Adequate Assurance of Payment to Utili-
ties (the "Utilities Motion");

f.    Motion for Entry of an Order Authorizing the Debtor to Assume the Plan
Support Agreement (the "Plan Support Motion");

g.    Motion for Entry of an Order Authorizing the Implementation of Proce-
dures to Maintain and Protect Confidential Patient Information (the "Patient
Confidentiality Motion"); and

h.    Motion for Entry of Order Authorizing Debtor to (I) Escrow Post-Petition
Entrance Fees and (II) Refund Certain Resident Entrance Fees ("Entrance
Fee Motion").

Debtor seeks expedited consideration and approval of the first-day pleadings and offers this Dec-

laration in support as set forth below:

**Cash Collateral Motion**

14.    The Prepetition Bond Collateral includes the revenue stream, income, cash and

cash equivalents arising out of or related to Kingswood and otherwise constitutes "cash collat-

eral" within the meaning of 11 U.S.C. § 363(a) secured in favor of the Bond Trustee (the "Cash

Collateral"). Debtor submits that the Bond Trustee holds a first priority lien on the Cash Collateral.

15. The Debtor seeks authorization to use the Cash Collateral on the following principal terms:

    a.    <u>Authorization to Use Cash Collateral</u>. Debtor shall be authorized to use Cash Collateral solely to pay expenses in the amounts and at the times listed in the budget attached to the Cash Collateral Motion (the "Cash Collateral Budget"); <u>provided, however</u>, that the Debtor shall have authority to use Cash Collateral in excess of, and at times different from, the amounts set forth in the Cash Collateral Budget to the extent such a variance does not constitute a Termination Event (as defined in the Cash Collateral Motion).

    b.    <u>Duration</u>. The Debtor's authorization to use Cash Collateral shall last until the earlier of (i) a Termination Event, or (ii) the last day included in the Cash Collateral Budget.

    c.    <u>Adequate Protection</u>. The Debtor shall provide the Bond Trustee with the following forms of adequate protection (collectively, the "Adequate Protection") for any diminution in the value of the Cash Collateral and the other Prepetition Bond Collateral (as defined below) resulting from the Debtor's use thereof after the Petition Date (the "Diminution"):

        (1)    <u>Replacement Lien</u>. The Bond Trustee shall have a valid, perfected, and enforceable replacement lien and security interest (the "Replacement Lien") in (i) all assets of the Debtor existing on or after the Petition Date of the same type as the Prepetition Bond Collateral, together with the proceeds, rents, products, and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability, and priority of the liens and security interests of the Bond Trustee as of the Petition Date (the "Postpetition Bond Collateral"); and (ii) all other assets of the Debtor of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (the "Supplemental Collateral" and, collectively with the Postpetition Bond Collateral, the "Collateral"); <u>provided, however</u>, that actions for preferences, fraudulent conveyances or other avoidance power claims and any recoveries under Sections 542, 544, 545, 547, 548 (exclusive of transferees under Section 549, 550 and 553 of the Bankruptcy Code (collectively, the "Avoidance Actions") shall not be Postpetition Collateral. Further, the Replacement Lien

shall be subject and subordinate to the Carve Out for authorized professional fees and expenses as well as statutory fees of the United States Trustee (as defined in the Cash Collateral Motion) and any valid and perfected liens existing on the Petition Date ("Prior Liens").

(2)  Superpriority Claim. As additional adequate protection for any Diminution, the Bond Trustee shall have a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual (the "Secured Party Superpriority Claim"). The Secured Party Superpriority Claim shall be subject only to the Prior Liens and the Carve-Out and shall have priority, pursuant to Section 507(b) of the Bankruptcy Code, over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c)(following entry of the Final Order), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee, or any creditor in this Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

16.    The Cash Collateral Budget reflects the Debtor's anticipated revenues and expenses for the period covered therein. The expenses reflected in the Cash Collateral Budget primarily represent the operating costs in the amounts necessary to maintain Debtor's high quality of care, protect residents, preserve existing standards of health and human services during the pendency of the Chapter 11 Case, and effectuate the central goal of this reorganization proceeding of the restructuring of the Debtor's bond obligations. The Debtor will use the Cash Collateral to fund operating expenses and professional fees, as well as to fund insurance, taxes, and other ordinary course costs and expenses related to the Debtor's operations. The Debtor believes that the Cash Collateral Budget will be adequate (inclusive of professional fees and disbursements),

considering all available assets, to pay all administrative expenses due or accruing during the period covered therein.

17. The use of cash collateral as requested in the Cash Collateral Motion is absolutely vital to the operation of Debtor's business, protection of the resident community, and successful outcome of the Chapter 11 Case. Without the use of Cash Collateral on an immediate basis, the Debtor would suffer immediate and irreparable harm and would likely be required to cease operations. At a minimum, the Debtor's inability to use Cash Collateral would disrupt the Debtor's operations as a going concern and would otherwise disserve the best interests of the Debtor, its estate, or creditors, including the Bondholders and residents of Kingswood. Rather than pursuing the use of Cash Collateral on a non-consensual basis with the attendant risk and expense associated therewith, the Debtor has negotiated with the Bond Trustee for the consensual use of Cash Collateral on the terms set forth in the Cash Collateral Motion including the provision of adequate protection of the liens and security interests of the Bond Trustee in Cash Collateral and other Prepetition Bond Collateral. Given the consensual arrangements with the Bond Trustee for use of the Cash Collateral on a budgeted basis and the pressing need for Debtor to operate Kingswood through the use of Cash Collateral, good cause exists to grant the Cash Collateral Motion.

## **Critical Vendor Motion**

18. Debtor has identified specific creditors whose continuing and uninterrupted business relationships are indispensable to its ongoing operations (the "Critical Vendors"). Debtor undertook a careful evaluation of the prepetition amounts owing to the Critical Vendors and has determined the necessity of paying same in order to avoid any potentially devastating risk of disruption of business operations. Attached to this Motion is the list of seven Critical Vendors for which authorization is sought to implement payment on the designated prepetition claims. The list

of Critical Vendors is significantly comprised of food-related suppliers and medical-related sup-

pliers whose goods and services are clearly essential to the well-being of Kingswood residents,

indispensable to the discharge of Debtor's vital services to its resident community and otherwise

necessary for its ongoing business operations.

19.     Debtor contends that it is essential to effectuate payment to the Critical Ven-

dors to maintain the smooth operation of its business and to avoid disruption of its crucial rela-

tionships with the Critical Vendors. The prepetition amounts payable to the Critical Vendors will

in no way impair Debtor's liquidity or otherwise present any financial hardship for the bank-

ruptcy estate. Moreover, Debtor's Plan of Reorganization is providing for payment in full of all

allowed unsecured claims; therefore, the requested payment of Critical Vendors is essentially an

expedited payment on their prepetition claims that are designated to be paid in full.

### Prepetition Payroll Application

20.     Debtor retains a workforce of approximately 185 employees who are paid

biweekly. The last payroll payment prior to the filing of the Chapter 11 Case covered a period

through August 14, 2021.  Since the last payment of payroll, a period of three (3) days has tran-

spired until the Petition Date for which payroll obligations remain unpaid (the "Unpaid Prepeti-

tion Payroll"). The next payroll payment date is September 3, 2021.

21.     As a result of the timing of the bankruptcy filing, the forthcoming post-petition

September 3 payroll payment would include the Unpaid Prepetition Payroll.  That payroll period

extends from August 15 to August 28 (the "Payroll Period").  As the payment of prepetition obli-

gations is generally prohibited under bankruptcy law, Debtor seeks the Court approval for the

payment of the Unpaid Prepetition Payroll consisting of all employee compensation, benefits, and

applicable taxes of the Payroll Period.  The Unpaid Prepetition Payroll is comprised of the

amounts set forth in the Prepetition Payroll Application.  Debtor is requesting authorization to pay the Unpaid Prepetition Payroll in the total sum of $77,967.57.

22.     Debtor submits that payment of the employees is vital, indeed indispensable, to the smooth operations of the business and maintenance of the loyalty and confidence of Debtor's workforce. Any significant disruption in Debtor's workforce can undermine, indeed imperil, the prospects for a successful reorganization. Payment of the Unpaid Prepetition Payroll will in no way impair Debtor's liquidity or otherwise present any financial hardship for the bankruptcy estate. Moreover, Debtor's proposed Plan of Reorganization is providing for payment in full of all allowed unsecured claims; therefore, the requested payment of the Unpaid Prepetition Payroll is essentially an expedited payment of employee compensation that is otherwise designated to be paid in full.

## Cash Management Motion

23.     Debtor maintains a cash management system with two principal bank accounts at two separate financial institutions (the "Cash Management System") to process its revenues and expenses.  The Cash Management System operates as follows:

(a)     Debtor's revenue principally consists of resident monthly fees, Medicare and Medicaid payments, entrance fees, and government reimbursements (the "Revenue").  Payments of the Revenue to Debtor are received in the form of electronic transfers and paper checks (the "Payments").  The Payments are collected in the depository account at Country Club Bank (the "Depository Account"). Medicare, Medicaid and insurance receipts are set up for automatic deposit in the Depository Account.

(b)     Collected funds are transferred by ACH on a monthly or twice-monthly basis to the disbursement account at Bank of America (the "Disbursement Account").

(c)   Payments of operating expenses including vendors and contractors are drawn on the Disbursement Account through the issuance of checks. Payroll is funded through the Disbursement Account by automatic deductions at the direction of Debtor's payroll company, Paycor, for payment of the payroll, payroll taxes and fees.

24.   The Cash Management System is governed by procedures that are consistent with the normal and regular operation of the kind of cash management services maintained and utilized by Debtor.  The Cash Management System provides a reliable process for the financial operations of Debtor.

25.   Due to the nature and operation of the Cash Management System, it would be extremely difficult, disruptive, and expensive for Debtor to close its existing accounts and open new accounts.  Additionally, any disruption of the existing system would not only impair current operations, it would interrupt and delay financial reporting by Debtor to the Court because the existing internal accounting system is based on the availability of the data generated as a by-product of the existing Cash Management System.

26.   Maintaining Debtor's existing accounts and the Cash Management System will preserve business continuity and lessen the confusion among employees, vendors, and customers that often follows a Chapter 11 filing.  Opening new bank accounts would be unduly burdensome, disrupt Debtor's ongoing business operations during the initial stages of the reorganization process, and in several cases could take several weeks to complete.  Changing the electronic checks and deposit slips would require reprogramming certain printers and programs which would require unnecessary time and expense.  New electronic transfer instructions would have to be issued by Debtor for each of the accounts directing daily transfer to a newly established operating

account.  Electronic transfer instructions also would have to be issued for the new operating account to make disbursements to new payroll and account payable accounts.

27.    Unless Debtor is allowed to maintain its existing bank accounts and the Cash Management System, it will be unable to effect a smooth transition into the Chapter 11 Case. Maintenance of the existing accounts will not prejudice any party-in-interest.  The inability to maintain existing accounts will, however, prejudice Debtor, its suppliers, and employees as it would take approximately two weeks to receive new checks or in some cases would require time and expense in reprogramming certain printers and software.  The best interest of Debtor's estate, employees and creditors would be served by retention of the Cash Management System.

**Utilities Motion**

28.    Debtor's business retains seven (7) utility providers for gas, electricity, water, and phone service (the "Utility Providers").  Prior to the Petition Date, the Debtor spent an average of approximately $73,000 each month for the utility services in the three months preceding the Petition Date.  Debtor does not maintain any deposits with its Utility Providers.

29.    Debtor requests the Court to determine that Debtor is not required to post any deposit or otherwise provide any additional adequate assurance for the Utility Providers.  The supply of service to Debtor by the Utility Providers has not been conditioned heretofore on the placement of deposits.  Debtor was current on its utility payments as of the Petition Date and has no history of defaults in the payments to the Utility Providers.  Furthermore, Debtor has made provision for the ongoing payment of the Utility Providers in its budget attached to the Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Providing Adequate Protection (the "Cash Collateral Budget") filed on the Petition Date.

30.    Debtor also requests the Court to prohibit any Utility Provider from unilaterally refusing, discontinuing, or terminating utility services to Debtor.  Such action by a Utility Provider could precipitate substantial and possibly irreparable harm to the bankruptcy estate and the prospects for a successful reorganization.  Neither Debtor nor its creditors should be exposed to the pervasive damage that might result from any Utility Provider acting in its own self-interest to the detriment of this Chapter 11 proceeding.

### Plan Support Motion

31.    Prior to the bankruptcy filing, Debtor entered into discussions with the Bond Trustee for the restructuring of the Bonds, the Bond Claim, and the agreements and documents relating thereto.  Those discussions ultimately produced an agreement on the terms for restructuring of the Bonds and restated treatment of the Bond Claim.  Debtor thereby entered into the Plan Support Agreement (the "PSA") with the preponderant majority of holders of the Bonds (the "Consent Holders" as defined in the Plan Support Agreement attached as Exhibit "A" to the Plan Support Motion).

32.    The Plan Support Agreement contains the following material terms:

a.    Debtor will file its Plan of Reorganization (the "Plan") at the outset of the Chapter 11 Case, the terms of which incorporate the consensual restructuring of the Bonds as set forth in the term sheet (the "Term Sheet") attached as Exhibit 1 to the Plan Support Agreement.  Debtor will take all necessary and appropriate steps to expedite the process of solicitation of and voting on confirmation of the Plan.

b.    Subject to assumption under 11 U.S.C. § 365 or other bankruptcy court approval of the Plan Support Agreement, Debtor will take all necessary and appropriate actions consistent with the Plan Support Agreement and will adhere to its obligations thereunder.

c.    Consenting Holders shall direct the preparation of the 2021 Indenture, 2021 Amended and Restated Master Trust Indenture, 2021 Mortgage, and 2021 Loan Agreement (collectively, the "Restructured Bond Documents").  The

Restructured Bond Documents shall contain terms consistent with the Term Sheet.

d. Consenting Holders will not transfer any Bonds or bond claims unless the transferee agrees to execute the Plan Support Agreement or file a joinder.

e. Consenting Holders shall support the confirmation and implementation of the Plan.

The Restructured Bond Documents will provide additional capital for Debtor's operations and thereby stabilize Debtor's liquidity position. The revised payment structure of the Bond Claim as effectuated through the Restructured Bond Documents will promote the long-term financial stability of Debtor.

33. Debtor submits that the Plan Support Agreement and the restatement of the Bond Claim through the Restructured Bond Documents promote value maximization for the benefit of creditors and the estate. Approval of the Plan Support Agreement and its subsequent implementation will facilitate substantial creditor support for the reorganization effort and establish the pathway to a confirmable Plan. Importantly, the Plan Support Agreement eliminates significant uncertainty in the reorganization of the estate and, accordingly, facilitates confirmation of the Plan and will accelerate the Effective Date of the Plan, which provides for the payment of all allowed claims as set forth therein. The granting of this Motion is not intended to constitute any approval of the Plan nor impair the rights of creditors to raise any issues regarding confirmation. Rather, approval of the PSA enhances the opportunity for an expedited, successful confirmation process. Absent such approval, the carefully negotiated and constructed program for a consensual Plan confirmation process in this Chapter 11 Case would be thrown into disarray. Approval of the Plan Support Motion serves the best interests of all parties in this proceeding.

## Patient Confidentiality Motion

34.    Debtor provides health care services to its resident community and transmits health information in electronic form. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") creates a duty for health care providers to maintain the confidentiality of patient information. Debtor is therefore required to maintain the confidentiality of the health information of the Kingswood residents.

35.    Debtor believes that the requirements to maintain patient confidentiality under HIPAA may conflict with disclosure requirements under the Bankruptcy Code. In an effort to comply with both federal statutes, the Debtor proposes the following procedures to maintain patient confidentiality during the pendency of this Chapter 11 Case (the "Patient Confidentiality Procedures"):

    a.    The Debtor, with the assistance of its professionals, is authorized to prepare and maintain (i) a separate creditor matrix of the Patients (the "Patient Matrix"), and, if necessary, (ii) separate schedules of claims that may be asserted by and against the Patients (the "Patient Schedules");

    b.    The Debtor is not required to file the Patient Matrix and the Patient Schedules, but is permitted to file a redacted version of the Patient Schedules that redacts the names and addresses of the Patients and assigns a unique identification number to each of the Patients, *provided however*, that the Patient Matrix and the Patient Schedules may be reviewed by (i) this Court, (ii) the Office of the United States Trustee, (iii) any applicable state regulatory agency (through the respective state attorney general), and (iv) any other party in interest that obtains, after notice and a hearing, an order directing the Debtor to disclose the Patient Matrix and Patient Schedules to such party;

    c.    To the extent the Debtor is required to list Patients on any document filed with the Court, including, the list of the top 20 unsecured creditors, the Debtor is authorized to list such Patients by their assigned unique identification number on such document;

    d.    If the Debtor's HIPAA certified noticing and claims agent, serves any document upon any person listed on the Patient Matrix, the claims agent is

> authorized to note in the certificate of service that the parties served include individuals listed on the Patient Matrix; and

> e.     To the extent any Patient discloses his or her own "protected health information" ("PHI") (as such term is defined in HIPAA) in any pleading, proof of claim, notice, or other publicly available document, the Debtor and its professionals shall be permitted, and to the extent required by the Bankruptcy Code, the Bankruptcy Rules, or any other applicable law, rule, or court order, directed to include such PHI in any subsequent pleading, notice, document, list, or other public disclosure made in connection with this Chapter 11 Case, and such disclosure shall not be deemed to be a "wrongful disclosure" within the meaning of HIPAA or any regulation promulgated thereunder.

36.     Debtor submits that the Patient Confidentiality Procedures are well-designed to maintain the confidentiality of the health care information of Kingswood residents. Debtor requests the Court to grant the Patient Confidentiality Motion with the terms of the Patient Confidentiality Procedures in order to balance the need to protect patient information under HIPAA with the disclosure requirements of the Bankruptcy Code.

## Entrance Fee Motion

37.     Before a potential resident at Kingswood becomes a part of the community, the parties enter into an agreement (the "Residency Agreement") that sets forth, among other things, the resident's obligation to pay a fee to the Debtor to reserve the unit (the "Entrance Fee"), which may be fully or partially refunded to the resident, and the amount of monthly service fees ("Monthly Service Fees") that the resident must pay while living at Kingswood.

38.     The Debtor currently offers the choice of two residency plans, each evidenced by a different Residency Agreement. The "90% Refundable Plan" offers residents a 90% refundable contract upon resale of the unit, while under the "Traditional Plan," Entrance Fees amortize 4% per month starting with the first month of occupancy over a period of twenty-five months.

39.     Generally, the purpose of the Entrance Fee is to pay refunds to residents upon termination of a Residency Agreement in accordance with its terms, pay certain project costs, retire debt, and cover operating expenses of Kingswood. Prospective residents typically pay 10% of the Entrance Fee upon execution of a Residency Agreement, and the remaining balance prior to occupancy. Depending on the form of Residency Agreement selected and unit size, the Entrance Fees in 2021 paid by residents before they occupy a unit range from $30,000 to $395,000, and the monthly services fees range from $1,931 to $5,191. By its terms, each Residency Agreement terminates in the event of a resident's death, or if the resident vacates Kingswood by giving the Debtor written notice. The Debtor intends to assume all its Residency Agreements with existing residents at Kingswood pursuant to its proposed plan of reorganization (the "Plan").

40.     In order to protect residents and prospective residents pending confirmation of the Plan and assuage any concerns of prospective residents arising from Debtor's pending financial restructuring, the Debtor proposes the establishment of a separate escrow account (the "Escrow Account") pursuant to the terms of the Escrow Agreement, to which all Entrance Fees received after the Petition Date will be deposited. Further, the Debtor intends to amend the form of any new Residency Agreement with an addendum (the "New Residency Agreement Addendum") providing that residents who enter Kingswood post-petition ("New Residents") shall be entitled to refunds of their respective Entrance Fees, to the extent deposited in the Escrow Account, if during pendency of this case such resident becomes entitled to a refund of all or a portion of his or her Entrance Fee, regardless of whether the unit has been resold. In addition, pursuant to the terms of the Escrow Agreement, New Residents will be entitled to terminate their Residency Agreements under certain circumstances prior to the confirmation of the Plan.

41.   Under the Escrow Agreement, the Escrow Agent will hold all Entrance Fees received after the Petition Date (the "New Entrance Fees") in accordance with the instructions set forth in the Escrow Agreement, and shall not disburse or release any Entrance Fees except as follows (each, a "New Entrance Fees Release Date"):

   a.   <u>Transfer Upon Termination of Residency Agreement prior to Trigger Date</u>: If a New Resident terminates a Residency Agreement in accordance with the terms thereof prior to consummation of a restructuring or refinancing of all or substantially all of the Bonds is consummated (the "Trigger Date"), then within four (4) business days following the delivery of a notice from the Debtor to the Escrow Agent, the Escrow Agent shall release to the New Resident their portion of the escrowed Entrance Fees within fifteen (15) Business Days.

   b.   <u>Trigger Date Notice and Disbursement</u>:  The Debtor will provide notice to all New Residents who have signed Residency Agreements no later than fifteen (15) business days prior to the Trigger Date (the "Trigger Date Notice"). Following delivery of the Trigger Date Notice, each New Resident who has signed a Residency Agreement shall have until five (5) business days prior to the Trigger Date (the "Last Date") to provide notice to the Debtor of such resident's intent to terminate their New Escrow Agreement (a "Notice of Termination"). If a resident provides a Notice of Termination by the Last Date, the Debtor shall provide a notice to the Escrow Agent at least one business day prior to the Trigger Date identifying each resident who properly delivered a Notice of Termination. On the Trigger Date, all escrowed funds, other than those New Entrance Fees credited in the name of a New Resident that delivered a Notice of Termination by the Last Date, shall be disbursed to the Debtor subject to the lien of the Trustee.

   c.   <u>Transfer after the Trigger Date</u>:  If a New Resident has delivered a Notice of Termination by the Last Date and, no later than sixty (60) days after the Trigger Date, terminates the Residency Agreement in accordance with the terms thereof, including vacating occupancy of theirs at the Community, the Escrow Agent shall release the New Entrance Fees, less any Retained Sums, to the resident. Specifically, within fifteen (15) business days of the termination of the New Residency Agreement, the Debtor shall deliver a disbursement notice to the Escrow Agent for each resident who has complied with the termination requirements. Within four (4) business days after the delivery of such notice, the Escrow Agent shall release the funds owed to the resident. Any amounts remaining in the New Escrow Account ninety (90) days after the Trigger Date (that is, escrowed New Entrance Fees of residents who gave a Notice of Termination, but did not terminate their

New Residency Agreements in accordance with their terms), shall be released to the Debtor subject to the lien of the Trustee.

42.     Approximately once per month during this Chapter 11 Case, the Escrow Agent will provide the Debtor and the Bond Trustee with an accounting of the New Entrance Fees deposited into the Escrow Account. The Escrow Agent will also provide the contact number of the New Resident from whom the New Entrance Fee was collected, the amount of such Entrance Fees, and all disbursements from the Escrow Account. The Trustee shall have a continuing first priority perfected lien against the New Entrance Fees and all proceeds thereof, subject to the rights of the New Residents to such New Entrance Fees as set forth in the applicable Residency Agreements, the Escrow Agreement, and any order by the Court except that the Bond Trustee's lien shall be limited to the extent of the Debtor's right, title and interest to such funds.

43.     Approval of the Entrance Fee Motion authorizing the Debtor to enter into the Escrow Agreement is necessary and appropriate to reassure residents and prospective residents that their Entrance Fees and attendant refund rights will remain safe. Any doubt on the part of prospective residents that the Debtor will not be in a position to honor refund obligations could seriously undermine the Debtor's ability to attract new residents during this Chapter 11 Case, which is critical to the Debtor's business operations and successful reorganization. The Debtor is hopeful, however, that the relief sought in the Entrance Fee Motion will provide new Residents with comfort that during the bankruptcy, such New Residents can elect to leave Kingswood and receive a refund of their Entrance Fee to the extent provided for in their Residency Agreements. The Debtor believes that these modifications are critical to obtaining new Entrance Fees during this Case.

44.     The ability of a New Resident to elect to leave Kingswood is necessary to provide prospective residents with the peace of mind that, during the pendency of the Debtor's case, the residents are not held captive by their obligations under the Residency Agreements. Allowing prospective residents to have a "free look" at whether or not Kingswood is operating effectively while this case is pending should drastically increase the willingness of prospective residents to pay an Entrance Fee. Because Entrance Fees are critical to the Debtor's operations, the provision regarding the return of the Entrance Fees should be amended to encourage prospective residents to reside at Kingswood.

The foregoing Declaration is true and accurate to the best of my knowledge and belief.

   */s/ Ross P. Marine*
Ross P. Marine
Chairman of the Board

Dated:  August 18, 2021                McDOWELL, RICE, SMITH & BUCHANAN,
        Kansas City, Missouri          a Professional Corporation

By:  */s/ Jonathan A. Margolies*
     Jonathan A. Margolies                    MO#30770

605 West 47th Street, Suite 350
Kansas City, MO 64112
816/753-5400
Fax: 816/753-9996
jmargolies@mcdowellrice.com

*Proposed Counsel to the Debtor and
Debtor-in-Possession*

## CERTIFICATE OF SERVICE

On August 18, 2021, the above and foregoing was filed with the United States Bankruptcy Court for the Western District of Missouri using the CM/ECF Electronic court filing system with notification to all parties requesting electronic notification as well as service via e-mail or fax and United States Mail, postage prepaid, to:

Daniel Bleck, Esq.
Mintz, Levin, Cohn, Ferris,
  Glovsky and Popeo, P.C.
One Financial Center
Boston, MA  02111
E-mail:  dsbleck@mintz.com

Office of the United States Trustee
3440 Charles Evans Whittaker Courthouse
400 East 9th Street
Kansas City, MO  64106
Fax:  816/512-1967

*/s/Jonathan A. Margolies*
Attorney for Debtors