IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| KANSAS CITY UNITED METHODIST | ) | Chapter 11 |
| RETIREMENT HOME, INC., | ) | |
| | ) | Case No. 21-41049-11-CAN |
| Debtor. | | |

**DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated: August 18, 2021

## IMPORTANT INFORMATION FOR YOU TO READ

**Kansas City United Methodist Retirement Home, Inc., d/b/a Kingswood Senior Living Community (the "Debtor") is providing you with the information in this *Disclosure Statement for Debtor's Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, altered, revised or supplemented from time to time, the "Disclosure Statement") because you are a creditor entitled to vote on the *Debtor's Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, altered, revised or supplemented from time to time, the "Plan") or are otherwise a party in interest in the Debtor's chapter 11 case (the "Chapter 11 Case"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan. Nothing in this Disclosure Statement may be relied upon or used by any Person for any other purpose. The Debtor is soliciting your vote to approve the Plan.**

**The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Section 10 of the Plan. There is no assurance that the United States Bankruptcy Court for the Western District of Missouri (the "Court") will confirm the Plan or, if the Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or otherwise waived.**

**The Debtor is filing this Disclosure Statement and the accompanying Plan on the same day that it commences the Chapter 11 Case and will seek a scheduling order to set a hearing on 1) the approval of this Disclosure Statement and 2) the proposed solicitation procedures with regard to the Plan.**

**The Board of Directors of the Debtor has approved the transactions contemplated by the Plan and described in this Disclosure Statement. The Debtor believes that the compromises contemplated under the Plan are fair and equitable, maximize the value of the Estate and provide the best recovery to Holders of Claims. Most importantly, the proposed Plan leaves unimpaired the obligations owed to the residents under their agreements and the claims of trade creditors.**

**The Debtor, therefore, strongly recommends that all Holders of Claims whose votes are being solicited, submit votes to <u>accept</u> the Plan by returning their Ballots so as to be <u>actually received</u> by the Voting Agent no later than [●] at 5:00 p.m. (prevailing Eastern Time) pursuant to the instructions provided herein and on the Ballots. Pursuant to the Plan**

---

**THE DEADLINE TO VOTE ON THE PLAN IS [●], 2021 AT 5:00 P.M. (PREVAILING EASTERN TIME).**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT BEFORE THE VOTING DEADLINE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED HEREIN**

---

**Support Agreement, the Plan is currently supported by Holders of at least fifty percent (50%) of the Bond Claims.**

## DISCLAIMER

**IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE PLAN.**

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTOR BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 (BUT HAS NOT BEEN APPROVED BY THE COURT AS COMPLYING WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF**

CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, INCLUDING PROJECTED RECOVERIES TO CREDITORS, THE DEBTOR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTOR CANNOT ASSURE YOU THAT THE DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS THERETO, THAT IS ULTIMATELY APPROVED BY THE COURT IN THE CHAPTER 11 CASE (I) WILL CONTAIN ANY OF THE TERMS DESCRIBED IN THIS DISCLOSURE STATEMENT; OR (II) WILL NOT CONTAIN DIFFERENT, ADDITIONAL OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS DISCLOSURE STATEMENT.  THE DEBTOR URGES EACH HOLDER OF A CLAIM TO (I) READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT (INCLUDING THE PLAN AND THE MATTERS DESCRIBED AS "RISK FACTORS" BELOW); AND (II) TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY PRIOR TO DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN. YOU SHOULD NOT RELY ON THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED THE LIQUIDATION ANALYSIS DESCRIBED HEREIN. THE DEBTOR HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. THE DEBTOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE ANY CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIED ANY SUCH CLAIMS OR OBJECTIONS TO SUCH CLAIMS. HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, SECURITIES OR TAX ADVICE AND SHOULD CONSULT THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE DEBTOR RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE DEBTOR THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

## TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ........................................................................... 1

    **A.**    Introduction..................................................................................... 1

    **B.**    Overview of the Debtor's Recent Financial Challenges....................... 1

    **C.**    Proposed Refinancing Transaction. ................................................... 2

    **D.**    Purpose of the Disclosure Statement. ............................................... 5

    **E.**    The Solicitation Package................................................................. 5

    **F.**    The Plan. ...................................................................................... 6

II.   BACKGROUND INFORMATION ........................................................... 10

    **A.**    Overview of the Debtor's Business. ................................................ 10

    **B.**    Residency and Admission Agreements and Fees. ............................. 11

    **C.**    **Facility Description.**................................................................... 13

    **D.**    Organizational Structure of the Debtor............................................ 14

    **E.**    The Debtor's Prepetition Capital Structure...................................... 15

III.  THE CHAPTER 11 PLAN ...................................................................... 16

    **A.**    Treatment of Claims and Interests Under the Plan. .......................... 16

    **B.**    Cramdown. .................................................................................. 19

    **C.**    Means for Implementation of the Plan............................................. 19

    **D.**    Assumption of Executory Contracts and Unexpired Leases............... 29

    **E.**    Conditions Precedent to Confirmation and the Effective Date........... 30

    **F.**    Effect of Confirmation. ................................................................. 31

    **G.**    Modification, Revocation or Withdrawal of the Plan. ....................... 38

    **H.**    Retention of Jurisdiction. .............................................................. 38

    **I.**    Miscellaneous Provisions............................................................... 40

IV.   RISK FACTORS IN CONNECTION WITH THE PLAN............................ 43

    **A.**    Bankruptcy Considerations............................................................. 43

    **B.**    Risks Related to the Debtor's Business and Industry ........................ 44

    **C.**    Additional Factors ........................................................................ 49

V.    PLAN CONFIRMATION AND CONSUMMATION................................... 49

    **A.**    The Confirmation Hearing. ............................................................ 49

    **B.**    Plan Confirmation Requirements Under the Bankruptcy Code........... 50

VI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .......................................................................................................... 53

    A.   Chapter 7 Liquidation. ...................................................................... 53

    B.   Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code. .................... 54

VII.   CERTAIN FEDERAL TAX MATTERS RELATING TO THE PLAN .......................... 54

    A.   Introduction......................................................................................... 54

    B.   U.S. Federal Income Tax Consequences to the Debtor. ...................................... 55

    C.   U.S. Federal Income Tax Consequences to Holders of Claims......................... 56

    D.   U.S. Tax Consequences of Ownership of the Series 2021 Bonds. ..................... 57

    E.   Information Reporting and Backup Withholding. ............................................... 58

VIII.   RECOMMENDATION AND CONCLUSION............................................................. 58

## <u>EXHIBITS</u>

Exhibit A  Debtor's Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated August 18, 2021

Exhibit B  Plan Support Agreement, dated August 17, 2021

Exhibit C  2021 Bond Documents

Exhibit D  Financial Projections

Exhibit E  Liquidation Analysis

## I.  EXECUTIVE SUMMARY

This Executive Summary is only a general overview of the Disclosure Statement and the material terms of, and transactions proposed by, the Plan. This Executive Summary is qualified in its entirety by the more detailed discussions herein and the exhibits attached hereto, including the Plan. The Debtor urges all parties to read this Executive Summary in conjunction with the Disclosure Statement and the Plan. A copy of the Plan is attached hereto as **Exhibit A.**

### A.  Introduction.

The Debtor is a nonprofit corporation incorporated under the laws of the State of Missouri in 1972 for the purpose of developing and operating a retirement center in Kansas City, Missouri. In particular, the Debtor owns and operates a fully licensed continuing care retirement community ("CCRC") in Kansas City, Missouri, known as Kingswood Senior Living Community (the "Community"). The Community is located on approximately 30 acres and includes three distinct components to facilitate aging: (i) independent living, with 65 villa homes and 145 apartments; (ii) assisted living/memory care, with 57 beds in operation; and (iii) skilled nursing, with 65 beds in operation. The Debtor has contracted with GMSC Missouri, LLC ("Greystone") to provide certain management and marketing services for the Community.

As is discussed in greater detail herein, the Debtor has experienced increasing financial distress from slowed new occupancies and resulting cash flow shortfalls, causing it to fail to comply with its obligation to pay debt service. This problem was greatly exacerbated by the impact of the COVID-19 pandemic. The Debtor believes that the Plan, which is the result of extensive, arm's-length negotiations among (i) the Debtor, (ii) UMB Bank, N.A., as the Trustee for the Series 2016 Bonds, and (iii) the Holders of at least fifty percent (50%) of the Bond Claims (the "Consenting Holders"), provides the Debtor with a long-term resolution of its financial issues. In particular, the Debtor, the Trustee, and the Consenting Holders, as applicable, have agreed to the terms of a Plan Support Agreement (the "Plan Support Agreement"), a copy of which is attached hereto as **Exhibit B,** together with a refinancing of the Debtor's bond obligations (each defined and described below) that collectively provide for the following (the "Refinancing Transaction"):

1.  The funding of an additional $9,900,000 in new money bond financing comprised of $5,500,000 principal amount of new Series 2021A Bonds to refinance certain project costs and fund working capital and other expenses for the Community, and $4,400,000 principal amount of new Series 2021C Bonds to fund designated capital improvements for the Community; and

2.  An exchange of the outstanding Series 2016 Bonds in the aggregate outstanding principal amount of approximately $51,770,000, plus any accrued and unpaid interest thereon, for a pro rata share of (i) $27,000,000 principal amount of new Series 2021B Bonds and (ii) $12,050,000 principal amount of new Series 2021D Bonds (the "Bond Refinancing").

The Debtor submits this Disclosure Statement in connection with its solicitation of votes on the Plan.

### B.  Overview of the Debtor's Recent Financial Challenges.

As discussed in greater detail herein, the Debtor relies on revenue generated by existing and new residents to, among other things, maintain its day-to-day operations, service its debt obligations and honor its resident refund obligations. However, delays in the completion of the upgrade, refurbishment, renovation and expansion of Debtor's facilities funded in part with a portion of the proceeds of the Series 2016 Bonds (the "2016 Project"),  lack of attention by Kingswood's former management company, delays in undertaking the marketing needed to meet Debtor's anticipated occupancy and financial  performance goals and, as has become common in the senior living industry, and in particular among CCRCs, the inability to attract new residents during COVID-19, caused and exacerbated a severe liquidity crisis for the Debtor. The Debtor ultimately defaulted under the terms of the Series 2016 Bonds. As a result of this default and to preserve liquidity, Debtor and the Trustee (acting at the direction of the Consenting Holders) entered into a Forbearance Agreement dated as of August 9, 2019 (as amended and extended, the "Forbearance Agreement") wherein, among other things, Kingswood's obligation to make the monthly debt service payments on the Series 2016 Bonds was deferred, the Debtor ceased making payments on the Series 2016 Bonds ,and the Trustee agreed to forbear from exercising remedies under the 2016 Bond Documents.

## C.    Proposed Refinancing Transaction.

The proposed restructuring of the Debtor will have minimal impact on creditors other than the Bondholders and affiliates of the Debtor. Under the terms of the Plan, on the Effective Date the Residency Agreements will be assumed by the Reorganized Debtor and the Debtor will pay all pre-petition and administrative claims in full. The Debtor's secured bond debt (consisting solely of the Series 2016 Bonds) will be restructured so that upon emergence from bankruptcy, the Debtor's liquidity will be enhanced and its debt service will be substantially reduced, as set forth more fully in the following sections:

### 1.    Series 2021A Bonds (Federally Taxable) (New Money).

Certain of the Consenting Holders will purchase $5,500,000 principal amount of Series 2021A Bonds (Federally Taxable). Interest on the Series 2021A Bonds is expected to be included in gross income for federal income tax purposes.  The funds received from the purchase of these bonds will be used to refinance certain project costs and fund working capital and other expenses for the Community, as well as to fund a debt service reserve fund, a contingency fund, and certain costs of issuance.

The 2021A Bonds will bear interest at a fixed taxable rate of 10.0% per annum and mature 16 years from issuance. Interest will be payable semi-annually, and payments will be interest-only for the first 3 years. Annual principal payments will commence after the interest-only period, with such annual principal payments being based on a 13 year amortization schedule attached to the Plan Support Agreement. The Series 2021A Bonds will be secured by a first priority lien on all assets of the Reorganized Debtor *pari passu* with the Series 2021C Bonds, and senior to the Series 2021B Bonds and Series 2021D Bonds.

### 2.    Series 2021C Bonds (New Money)

2

Certain of the Consenting Holders will purchase $4,400,000 principal amount of Series 2021C Bonds. Interest of the Series 2021C Bonds is expected to be excludable from gross income for federal income tax purposes.   These bonds will be used to fund designated capital improvements for the Community, as well as to fund a debt service reserve fund, a contingency fund, and certain costs of issuance

The 2021C Bonds will bear interest at a fixed tax-exempt rate of 7.5% per annum and mature in 25 years from issuance. Interest will be payable semi-annually, and payments will be interest-only for the first 13 years. Annual principal payments will commence after the interest-only period, with such annual principal payments being based on a 12 year amortization schedule attached to the Plan Support Agreement. The Series 2021C Bonds will be secured by a first priority lien on all assets of the Reorganized Debtor *pari passu* with the 2021A Bonds, and senior to the Series 2021B Bonds and Series 2021D Bonds.

### 3.     The Restructured Bonds

The existing Series 2016 Bonds, which currently total $51,770,000 outstanding principal amount, will be exchanged for new Series 2021B Bonds and Series 2021D Bonds. Holders of the existing Series 2016 Bonds will receive in exchange for such bonds (a) ratable shares of Series 2021B Bonds in the principal amount of $27 million, and (b) ratable shares of Series 2021D Bonds in the principal amount of $12.05 million.

### a.     Series 2021B Bonds

The Series 2021B Bonds will be issued in the aggregate principal amount of $27,000,000 and bear interest at a fixed tax-exempt rate of 5.0% per annum.  Interest on the Series 2021B Bonds is expected to be excludable from gross income for federal income tax purposes. The final maturity of the Series 2021B Bonds will be 25 years from issuance. Payments on the Series 2021B Bonds shall be interest only for the first 13 years due and payable semi-annually. Annual principal payments will commence after the interest-only period, with such annual principal payments being based on a 12 year amortization schedule attached to the Plan Support Agreement. The Series 2021B Bonds will be secured by a lien on all assets of the Reorganized Debtor subordinated only to the liens securing the Series 2021A Bonds and Series 2021C Bonds, and senior to the lien securing the Series 2021D Bonds.

### b.     Series 2021D Bonds

The Series 2021D Bonds will be issued in the aggregate principal amount of $12,050,000 and bear interest at a fixed tax-exempt rate of 2.0% per annum. Interest on the Series 2021D Bonds is expected to be excludable from gross income for federal income tax purposes.  The final maturity of the Series 2021D Bonds will be 25 years from issuance. The Series 2021D Bonds will be structured as capital appreciation bonds.  Interest on the Series 2021D Bonds will be payable from Excess Cash pursuant to the Distribution Waterfall. Principal on the Series 2021D Bonds will also be payable semi-annually from Excess Cash with such available Excess Cash applied first to accrued interest then to principal.  As capital appreciation bonds, interest on the Series 2021D Bonds for which Excess Cash is not available on an interest payment date will accrete and be deemed additional principal of the Series 2021D Bonds.   The Series 2021D Bonds will be subordinate to the payment of the Series 2021A Bonds, Series 2021B Bonds, and Series 2021C

Bonds. The Series 2021D Bonds will be secured by a lien on all assets of the Reorganized Debtor subordinated only to the liens securing the Series 2021A Bonds, Series 2021B Bonds, and Series 2021C Bonds.

### 4.   The Series 2016 Bonds.

The entirety of the Series 2016 Bonds will be extinguished upon the issuance of and exchange for the Series 2021B Bonds and the Series 2021D Bonds.

### 5.   Sponsor Loans.

Upon the Effective Date, the Debtor's obligations to (i) Debtor's Wesley Fund, which has an outstanding principal amount due of $1,000,000 plus accrued interest, and (ii) the Kingswood Senior Living Community Foundation, which has an outstanding principal amount due of $80,000 plus accrued interest, will be waived.

### 6.   Plan Support Agreement

On August 17, 2021, the Debtor, the Trustee, and Consenting Holders entered into a Plan Support Agreement.  The Plan Support Agreement obligates the Debtor to, among other things, meet certain milestones regarding the preparation, filing and prosecution of the Chapter 11 Case, as well as take certain actions in support of confirmation of the Plan as contemplated in the Plan Support Agreement, subject to the exercise of its fiduciary duties.

The Plan Support Agreement also obligates the Trustee and the Consenting Holders to, among other things, support the Plan to the exclusion of any other resolution of the Chapter 11 Case and vote to accept the Plan, refrain from transferring their bonds or claims to parties who do not support the Plan, and refrain from certain actions that may interfere with the Chapter 11 Case or confirmation of the Plan.

### 7.   The Chapter 11 Case.

On August 18, 2021 in order to effect the transactions outlined in the Term Sheet and the Plan Support Agreement, the Debtor commenced the Chapter 11 case:

   **a.**   The Plan will provide for the following classes of Claims and Interests, and treatment of such Claims and Interests:

| Class | Claims and Interests | Status | Entitled to Vote |
|-------|---------------------|--------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 5 | Resident Refund Claims | Unimpaired | No (Deemed to Accept) |

   **b.**   All Executory Contracts and unexpired leases except for those expressly rejected under the Plan or motion filed by the Debtor prior to the Effective Date, will be assumed pursuant to section 365 of the Bankruptcy Code.

c.   The Debtor will release certain parties, including, without limitation, the Trustee, the Consenting Holders, and the Issuer (defined herein).

**D.     Purpose of the Disclosure Statement.**

The Debtor submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with: (i) the solicitation of votes on the Plan, and (ii) a hearing to consider confirmation of the Plan.

Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of a proposed chapter 11 plan of reorganization before soliciting acceptances of such proposed plan. The Debtor provides this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims because the Debtor is asking such Holders of Claims to vote to accept the Plan. This Disclosure Statement sets forth certain information regarding (i) the Debtor's prepetition operating and financial history; (ii) the Debtor's need to file for relief under chapter 11 of the Bankruptcy Code; (iii) the terms of the Plan; (iv) the manner in which distributions will be made under the Plan; (v) certain effects of confirmation of the Plan; (vi) certain risk factors associated with the Plan; and (vii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted. The Debtor believes that the confirmation and implementation of the Plan is in the best interests of the Debtor's Estate, Creditors and all other interested parties.

This Disclosure Statement is subject to the Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. **THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

**E.     The Solicitation Package.**

Only record holders of Claims in Class 3 as of the voting record date, [●], are entitled to vote on the Plan. Holders of Claims in Class 3 will receive a solicitation package consisting of the following materials (collectively, the "Solicitation Materials"):

- a form ballot (the "<u>Ballot</u>"), which shall include the voting instructions; and

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

**F.      The Plan.**

       **1.      Purpose and Effect of the Plan.**

Chapter 11 of the Bankruptcy Code allows a debtor to reorganize or to liquidate and wind up its affairs for the benefit of the debtor and its creditors. Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed, which typically remain in control of the debtor as a debtor-in-possession.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims against a debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the Court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 proceeding to negotiate the terms of a chapter 11 plan so that it may be confirmed. A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor. Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

       **2.      Feasibility of the Plan.**

In order to establish the feasibility of the Plan for purposes of section 1129(a)(11) of the Bankruptcy Code, the Debtor and its management team and advisors, have developed financial projections (the "<u>Financial Projections</u>") that are attached hereto as **<u>Exhibit D</u>**. The Financial Projections set forth the projected financial performance of the Reorganized Debtor over a defined period of time based upon a number of assumptions and factors.

       **3.      Analysis of Recoveries to Holders of Claims and Interests under the Plan and Recommendation of the Debtor.**

The Plan provides for a comprehensive restructuring of the Debtor's obligations under the Series 2016 Bonds and the 2016 Bond Documents (the "Existing Bond Obligations"). The treatment of Class 3 is the product of extensive negotiations between the Debtor, the Trustee and the Consenting Holders. The Consenting Holders support the treatment of Holders of Bond Claims in Class 3.

After a careful review of its current operations and liquidity, prospects as an ongoing business, and estimated recoveries to creditors in a sale scenario, the Debtor concluded that it will maximize recoveries to its stakeholders by reorganizing as a going concern through the Refinancing Transaction embodied in the Plan. The Debtor believes that any alternative to confirmation of the Plan, such as liquidation, a partial sale of assets, or a sale of all or substantially

6

all of its Assets, would result in materially lower recoveries for stakeholders, significant delays, protracted litigation, and greater administrative costs. For these reasons, the Debtor believes that its business and Assets have significant value that would not be realized in a forced sale or a liquidation, either in whole or in substantial part, and that the value of the Debtor's Estate is considerably greater as a going concern.

As set forth more fully below, the Debtor believes that the Plan provides the best recovery possible for its stakeholders and recommends that, if you are entitled to vote, you vote to accept the Plan.

### 4.    Classification and Treatment of Claims Under the Plan.

Certain Classes of Claims are Impaired under the Plan. The Debtor is seeking votes to accept the Plan from Holders of Claims in Class 3. For a description of the Classes of Claims and their treatment under the Plan, see Sections 3 and 4 of the Plan (Section 3 – Classification of Claims and Interests and Section 4 - Treatment of Claims and Interests).

Each Class of Claims, except Administrative Expense Claims, Accrued Professional Compensation Claims and Priority Tax Claims, are placed in the following Classes and will receive the following treatment under the Plan:

*Summary of Classification and Treatment of Claims Under the Plan*

| Class | Claims and Interests | Status | Entitled to Vote |
|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 5 | Resident Refund Claims | Unimpaired | No (Deemed to Accept) |

### 5.    Summary of Voting Requirements for Plan Confirmation.

#### a.    <u>In General.</u>

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan. Under the Bankruptcy Code, only Holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors that actually cast ballots vote to accept such plan. Those classes that are not impaired are not entitled to vote and are deemed to accept a plan. Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan. A class of interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained. Failure to deliver a *properly completed ballot* by the Voting Deadline (as defined below) will result in an abstention; consequently, the vote will neither be counted as an acceptance nor rejection of the Plan.

### 6.       Impaired Classes Entitled to Vote.

The Claims in Class 3 are Impaired under the Plan and Holders of such Claims in Class 3 are entitled to vote to accept or reject the Plan.

### 7.       Unimpaired Classes Deemed to Accept the Plan.

If a Creditor or Interest Holder holds a Claim included within a Class that is not Impaired under the Plan, under Bankruptcy Code section 1126(f), the Creditor or Interest Holder is deemed to have accepted the Plan with respect to such Claim and its vote of such Claim will not be solicited. Classes 1, 2, 4 and 5 are Unimpaired under the Plan.

### 8.       Classes Deemed to Reject the Plan and Do Not Vote.

Under Bankruptcy Code section 1126(g), Class 6 will receive no distributions on account of such Claims. Thus, Class 6 is deemed to have rejected the Plan and the vote of Holders of such Claims in Class 6 will not be solicited.

### 9.       Voting Deadline.

The Debtor has engaged Bankruptcy Management Solutions, Inc., d/b/a Stretto ("Stretto") as its voting agent (the "Voting Agent") to assist in the transmission of voting materials and tabulation of votes with respect to the Plan. If a Creditor holds a Claim classified as a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and submitted on time. The record date for determining which Creditors may vote on the Plan is [●], 2021 (the "Voting Record Date"). The voting deadline is [●] at 5:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").

### 10.       Voting Instructions.

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class, counting only those claims that actually vote to accept or to reject such plan.

The Voting Deadline for the Plan is [●] at 5:00 p.m. (prevailing Eastern Time). In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and timely delivered.

Most Holders of Claims related to the Bonds will submit votes by completing a Ballot and returning it to their specified bank, broker, nominee or other intermediary (a "Nominee"). Each Nominee may provide specific instructions to beneficial Holders of Claims related to the Bonds on how to complete and submit a Ballot. Such Holders will be instructed to return their Ballot to the Nominee to enable the Nominee to complete and submit a master Ballot to the Voting Agent so that it is received by the Voting Deadline. Beneficial Holders of Claims related to the Bonds should carefully follow the instructions that accompany their Ballot to ensure that it is properly received by the Nominee with sufficient time for the Nominee to complete a master Ballot that can be delivered to the Voting Agent by the Voting Deadline. Instructions for voting are more fully described in the Ballots.

Unless otherwise directed by the Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Debtor, following consultation with the Trustee, and such determination will be final and binding unless otherwise ordered by the Court. Once a party delivers a valid Ballot for the acceptance or rejection of the Plan, such party may not withdraw or revoke such acceptance or rejection without the Debtor's written consent or an order of the Court. The Debtor also reserves the right to reject any and all Ballots not in proper form, following consultation with the Trustee, if the acceptance of which would, in the opinion of the Debtor with the advice of its counsel, be unlawful.

The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot following consultation with the Trustee. Such interpretation (including the Ballot and the respective instructions therein) by the Debtor, unless otherwise directed by the Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Court) determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities are cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot timely received shall be deemed to reflect the voter's intent and shall supersede and revoke any earlier received Ballot. If you simultaneously cast inconsistent duplicate Ballots with respect to the same Claim, such Ballots shall not be counted.

## 11.    Additional Information.

If you have any questions about (i) the procedure for voting on your Claim, (ii) the package of materials that you have received, or (iii) obtaining or replacing a Ballot, the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent by (a) calling (800) 217-5709 (toll-free) or (949) 596-4307 (international); (b) writing to Stretto, Attn: Kingswood

Bond Vote, 410 Exchange, Suite 100, Irving, CA 92602; or (c) emailing at KingswoodBondVote@stretto.com.

### 12. The Confirmation Hearing.

Upon approval of this Disclosure Statement, the Debtor will seek to schedule a hearing on confirmation of the Plan on the earliest possible date. The Debtor will provide notice of the Confirmation Hearing to all necessary parties in accordance with applicable law.

The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Court and served on any master service list ordered by the Court and any entities which filed objections to the Plan, without further notice to parties in interest. The Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

### 13. Effect of Confirmation and Consummation of the Plan.

Following Confirmation, subject to Section 10 of the Plan, the Plan will be consummated on the Effective Date. Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Section 11 of the Plan will become effective. As such, it is important to read the provisions contained in Section 11 of the Plan very carefully so that you understand how confirmation and consummation of the Plan will affect you and any Claim you may hold against the Debtor so that you cast your vote accordingly.

Following the Effective Date, the Industrial Development Authority of the City of Kansas City, Missouri (the "Issuer") will issue the Series 2021A Bonds and the Series 2021C Bonds, the existing 2016 Bonds will be cancelled, and the Series 2021B Bonds and Series 2021D Bonds will be issued to the holders of the Series 2016 Bonds on a pro rata basis.

## II.    BACKGROUND INFORMATION

### A.    Overview of the Debtor's Business.

The Debtor was organized in 1972 as a Missouri nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Internal Revenue Code (the "IRC") as an organization described in section 501(c)(3) of the IRC. The Debtor owns and operates a fully licensed continuing care retirement community, or CCRC, known as Kingswood Senior Living Community, which is situated on approximately 30 acres in Kansas City, Missouri. Generally, CCRCs provide senior citizens with a full range of living accommodations and healthcare services during their retirement years, from independent living to skilled nursing care. As such, CCRCs allow seniors to live in the same location as their healthcare needs change over time. In addition, CCRCs provide residents with various social and entertainment outlets for all stages of retirement life.

The Community currently includes three distinct components to facilitate aging: (i) independent living, with 65 villa homes and 145 apartments; (ii) assisted living/memory care units,

with 57 beds in operation; and (iii) skilled nursing, with 65 beds in operation. The 145 apartments include studio, one-bedroom and two-bedroom independent living apartments. The assisted living/memory care units include 26 one-bedroom assisted living units, four (4) two-bedroom assisted living units and 23 memory care studio units.

### B.    Residency and Admission Agreements and Fees.

### 1.    Residency Agreements.

Before occupying the Community, each independent living resident is required to execute with the Debtor a Residency Agreement ("Residency Agreement"). The Residency Agreement provides the terms and conditions that each independent living unit resident must abide by while residing at the Community, and also outlines the resident's obligations regarding the payment of Entrance Fees ("Entrance Fees"), the resident's rights to a refund of such Entrance Fees, and other monthly charges that may be due to the Debtor during the duration of the resident's stay in independent living at the Community (referred to herein as the "Monthly Service Fees").  In addition each Residency Agreement describes the additional fees and terms of transfer applicable to a transfer to assisted living, memory care or skilled nursing.  The Residency Agreements (other than independent living rental agreements which are available on smaller independent living apartments) require the resident to provide the Debtor with: (1) an entrance fee; (2) monthly service fees (including an additional fee for an independent living unit occupied by more than one person); and (3) fees for any optional services requested by the resident.  Prior to a transfer to assisted living, memory care or skilled nursing, a resident with Residency Agreement is required to qualify for the transfer and must enter into an admission agreement for the assisted living, memory care or skilled nursing admission, which admission agreement details, as applicable, the fees payable monthly under the assisted living/memory care admission agreement or the daily fees payable under the skilled nursing admission agreement.  Direct admissions to assisted living, memory care or skilled nursing are also available to individuals that are not a resident with Residency Agreement.

The Debtor currently offers prospective independent living residents the choice of two entrance fee residency plans, each evidenced by a different Residency Agreement. The residency plans primarily differ with regard to the required Entrance Fee, the Monthly Service Fees, and the amount that potentially can be refunded thereunder.

The terms of each form of Residency Agreement (and admission agreement) that the Debtor currently offers are summarized as follows:

| Residency Agreement/Admission Agreement Types | |
|---|---|
| **Contract Type** | **Description** |
| 90% Return of Capital | • Resident receives 90% refund of the entrance fee upon resale of the unit<br>• After one year, resident receives a 10% discount in the assisted living apartments or skilled nursing units |
| Traditional | • Entrance fee amortizes 4% per month starting with the first month of occupancy (prior contracts allowed for amortization starting with the 13th month of occupancy) |

| | • Resident receives a 10% discount in the assisted living apartments or skilled nursing units |
|---|---|
| Independent Living Rental | • No entrance fee and provides for payment of monthly fees on a monthly basis<br>• Provides for a termination fee for terminating before one year.<br>• Initial term is one year - after initial one year term the rental agreement is on a month to month basis |
| Assisted Living/Memory Care/Skilled Nursing | • For Assisted Living/Memory Care/Skilled Nursing admission agreements there is no entrance fee payable (beyond any entrance fee previously paid under an independent living Residency Agreement)<br>• Assisted Living/Memory Care admission agreements provide for payment of monthly fees and Skilled Nursing admission agreements provide for the payment of daily fees |

The Debtor has historically offered other Residency Agreements, different from the above, with different amortization rates, refund amounts and refund payment terms (the "Prior Residency Agreements"), but any such agreements are no longer offered to new residents. As of the Petition Date, approximately 25 residents have Prior Residency Agreements.

### 2.    Entrance Fees.

Generally, Entrance Fees are used to pay for refunds, certain project costs, retire debt, cover operating expenses, and generate investment income for the benefit of the Community and its residents. Prospective independent living residents typically pay ten percent (10%) of the Entrance Fee upon execution of a Residency Agreement, and the remaining balance prior to or at occupancy. The Entrance Fees range from $34,448 to $395,000, depending upon the Residency Agreement and independent living apartment or villa selected. Residents may terminate their Residency Agreement and the financial results of the termination vary depending on when the resident terminates the agreement and the type of agreement.

If a resident cancels its Residency Agreement within 7 days of the later of (i) the execution of such agreement, (ii) payment of the first installment of the Entrance Fee or (iii) the resident's receipt of the most current Annual Statement, the resident will receive the Entrance Fee paid, less an amount which is equal to any cost specifically incurred by the Debtor at the resident's request with 45 days of receipt of the notice. Additionally, a resident may terminate their Residency Agreement prior to occupancy due to death, illness, incapacity or a change in physical, mental or physical conditions and receive a full refund of the Entrance Fee paid within 60 days. If the resident cancels their Residency Agreement for any other reason prior to occupancy (or following occupancy), the Debtor will attempt to obtain a new resident. The refundable portion of the entrance fee paid by the resident will be paid (less a $1,000 administrative fee, any cost incurred by the Debtor and certain set offs of unpaid amounts due Debtor) within 60 days following occupancy of the residence by a new resident and receipt of the total entrance fee due from the new resident. The terms of any refund rights are outlined in the Residency Agreements.

### 3.    Monthly Fees.

12

In addition to the Entrance Fee, the Debtor also charges residents a Monthly Service Fee. For independent living residents under a Residency Agreement, the Monthly Service Fees range from $1,874 to $5,353 per month, depending upon the Residency Agreement and unit selected. The Debtor reviews Monthly Service Fees periodically and adjusts them as necessary to meet the Community's financial requirements.

### 4.     Treatment of Residency Agreements Under the Plan.

Pursuant to the Plan, the Debtor intends to assume all Residency Agreements as of the Effective Date of the Plan. Accordingly, the Plan will not affect the Debtor's existing or former residents.

### C.     Facility Description.

### 1.     Types of Units

The Community is a CCRC located on approximately thirty (30) acres in south Kansas City, Missouri, near the Missouri/Kansas state line, which bifurcates the Kansas City metropolitan area. The Community is located near shopping, restaurants, banks, places of worship, hospitals, public transportation and other conveniences. The Community includes 65 villas, 145 independent living apartments (comprised of studio, one-bedroom and two-bedroom independent living apartments), 57 assisted living/memory care beds in operation (comprised of 26 one-bedroom assisted living units, four (4) two-bedroom assisted living units and 23 studio memory care units) and a skilled nursing facility with 65 beds in operation (licensed for 86 beds). All facilities, other than the Villas, are in a cluster of two and four-story buildings containing approximately 461,629 square feet, surrounded by lawns, gardens, drives, walkways and fronted by a fountain. All villas are located adjacent to these buildings.

### 2.     Community Features

At the Community, residents have access to a two-story common building that contains a comfortable lobby with fireplace, parlor, dining room, gift shop, library, beauty/barber shop, swimming pool, chapel, activity/meeting rooms, central laundry, a resident laundry in each building, and a welcome center to greet prospective residents.  Residents also have access to a fitness area, wellness clinic and home health services.

### 3.     Services and Amenities

The following services and amenities are generally included provided to residents of the Community pursuant to their Residency Agreements:

- Use of an independent living unit (apartment or villa);
- Monthly dining credits;
- Bi-weekly housekeeping services;
- Bi-weekly flat laundry services;

13

- All utilities (except telephone, cable and internet);

- Use of all common areas;

- Participation in various activities;

- Scheduled transportation services; and

- A discount on the fees payable for assisted living/memory care and the skilled nursing (these discounts are not offered under independent living rental agreements).

A resident may purchase optional services, including:

- Additional housekeeping;

- Laundry service for personal items;

- Catering for special occasions;

- Tray service

- Additional resident/guest meals; and

- Carport parking.

**D.      Organizational Structure of the Debtor.**

**1.      Corporate Governance.**

The Debtor is a nonprofit corporation formed under the laws of the State of Missouri exempt from federal income taxes pursuant to Section 501(c)(3) of the IRC, and is governed by a self-perpetuating Board of Directors ("Board of Directors" or "Directors") who serve without compensation. None of the members of the Board of Directors of the Debtor or any affiliated entity has an ownership interest in the assets of the Debtor. The Debtor's Board consists of 11 Directors, five of which are currently residents of the Community. The Board of Directors takes such actions and performs such duties and responsibilities as may be authorized by law and the Debtor's by-laws. No part of the net earnings of the Debtor may be used for the benefit of or be distributed to the Directors of the Debtor or of any affiliated entity or other private individuals, nor does any person involved in the management of the Debtor have any proprietary interest in the Debtor.

**2.      Services by Greystone.**

**a.      Management Services**

On December 1, 2020, the Debtor entered into a Management and Marketing Services Agreement (the "Management Agreement") with GMSC Missouri, LLC ("Greystone"), a Texas limited liability company and a wholly-owned subsidiary of GMSC, LLC, under which Greystone provides management services for the Debtor from December 1, 2020 through November 30, 2025.

14

### b. Marketing.

In addition to management services, Greystone also provides marketing advisory services for the Debtor pursuant to the Management Agreement.

For its services, Greystone is paid: (a) a monthly Management Fee equal to the greater of (i) 2.375% of Gross Operating Revenues (defined in the Management Agreement) or (ii) Twenty-Seven Thousand Five Hundred and No/100 Dollars ($27,500.00) (the "Minimum Base Fee"); (b) a monthly Marketing Fee in an amount equal to 2% of entrance fees collected from move-in activities; and (c) a Financial Advisory Fee equal to $7,500.00 per month through the bond restructuring. Greystone acts as an independent contractor in the performance of its obligations under the agreement. Pursuant to the Plan Support Agreement, the term of the Management Agreement will be extended to December 31, 2026.

### 3. Regulatory Agencies.

The CCRC industry nationwide is regulated by various state and federal agencies. Specific components of the Community are licensed and regulated by the Missouri Department of Health and Senior Services (MO-DHSS) and the Missouri Department of Social Services. In addition, as a participant in the Medicare and Medicaid Programs, the Debtor is subject to certification by the United States Department of Health and Human Services' Centers for Medicare and Medicaid Services.

### E. The Debtor's Prepetition Capital Structure.

### 1. Assets and Liabilities

As of June 30, 2021, on a book value basis, the Debtor had approximately $49.9 million in assets consisting of approximately: (i) $1.9 million in cash and cash equivalents; (ii) $417,402 in accounts receivable; (iii) $374,216 of deferred entrance fee receivables; (iv) $40.7 million in fixed assets; (v) $4.8 million of restricted cash; and (vi) $1.7 million of other assets, net of accumulated amortization and depreciation.

As of June 30, 2021, the Debtor had approximately $91.1 million of liabilities, net of accumulated amortization of non-refundable entrance fees, deferred financing costs and original issue premium, which consisted of approximately: (i) $1.3 million of trade accounts payable; (ii) $3.9 million of current resident refund obligations; (iii) $30.9 million in future entrance fee liabilities; and (iv) $ 54.5 million of long-term municipal bond obligations.

### 2. Existing Long-Term Municipal Bond Obligations

In November 2016, the Issuer issued the Series 2016 Bonds in the principal amount of $51,770,000 for the benefit of the Debtor. The Series 2016 Bonds bear interest at rates from 5.75% to 6.00% depending on the maturity, with a final maturity date of November 15, 2051. Interest is payable semiannually on each May 15 and November 15. As of the Petition Date, accrued and unpaid principal and interest on the Series 2016 Bonds was $56,374,112.19. As set forth in Sections I.C.3. and III.C.2. hereof, the obligations related to the Series 2016 Bonds will be

restructured pursuant to the Plan. The Consenting Holders agreed to support the proposed restructuring set forth in the Plan, pursuant to the Plan Support Agreement.

## III.   THE CHAPTER 11 PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>.**

The Claims against the Debtor are divided into Classes according to their seniority and other criteria. The Classes of Claims for the Debtor and the funds and other property to be distributed under the Plan are described more fully below.

**THE DEBTOR BELIEVES THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTOR'S ASSETS. ADDITIONALLY, THE DEBTOR BELIEVES THAT THE PLAN AVOIDS SIGNIFICANT HARDSHIP TO RESIDENTS THAT WOULD OTHERWISE OCCUR AS A RESULT OF A LIQUIDATION.**

### A.   Treatment of Claims and Interests Under the Plan.

#### 1.   Administrative and Priority Claims.

##### a.   <u>Administrative Expense Claims</u>.

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code and except to the extent that a Holder of an Allowed General Administrative Claim and the Debtor before the Effective Date or the Reorganized Debtor after the Effective Date agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash: (a) if such Allowed General Administrative Claim is based on liabilities that the Debtor incurred in the ordinary course of business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claim and without any further action by any Holder of such Allowed General Administrative Claim, on the later of the Effective Date or the date such Allowed General Administrative Claim becomes due or as soon as reasonably practicable thereafter; (b) if such Allowed General Administrative Claim is based on liabilities other than as set forth in (a) above, if such Allowed General Administrative Claim is due on or prior to the Effective Date, on the Effective Date, or, if such Allowed General Administrative Claim is not due as of the Effective Date, on the date that such Allowed General Administrative Claim becomes due or as soon as reasonably practicable thereafter; (c) if a General Administrative Claim is not Allowed as of the Effective Date, on the date that is no later than thirty (30) days after the date on which an order allowing such General Administrative Claim becomes a Final Order of the Court or as soon as reasonably practicable thereafter; or (d) at such time and upon such terms as set forth in a Final Order of the Court.

##### b.   <u>Administrative Expense Claims Bar Date</u>.

To be eligible to receive Distributions under the Plan on account of an Administrative Expense Claim that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Court on or before the Administrative Expense Claims Bar Date. Any Administrative Expense Claim that is not asserted in accordance herewith shall be deemed disallowed under the Plan and shall be forever barred against the Debtor, the Debtor's Estate, or any of the Debtor's Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

## 2.      Accrued Professional Compensation Claims.

All Professionals seeking payment of Accrued Professional Compensation Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Case by the date that is forty-five (45) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Court within five (5) Business Days after the date that such Claim is Allowed by order of the Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Reorganized Debtor. Any Accrued Professional Compensation Claim that is not asserted in accordance with Section 2.1 of the Plan shall be deemed disallowed under the Plan and shall be forever barred against the Debtor, the Debtor's Estate, or any of its Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

## 3.      Priority Tax Claims.

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by a Holder of an Allowed Priority Tax Claim and the Debtor, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full in Cash of the Allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

## 4.      United States Trustee Statutory Fees.

The Debtor and the Reorganized Debtor, as applicable, will pay fees payable under 28 U.S.C § 1930(a), including fees, expenses, and applicable interest payable to the United States Trustee, for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

## 5.      Classification of Claims and Interests.

Except as set forth in the Plan, all Claims against and Interests in the Debtor are placed in a particular Class. The Debtor has not classified Administrative Expense Claims, Accrued Professional Compensation Claims, and Priority Tax Claims.

The following table classifies Claims against and Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a

particular Class only to the extent that the Claim or Interest qualifies within the description of that
Class and shall be deemed classified in a different Class to the extent that any remainder of such
Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in
a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and
has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is
treated hereunder as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of the Plan (including its Distribution provisions),
classified Claims shall receive the treatment described in Section 4 of the Plan. The Plan will not
provide any Distributions on account of a Claim to the extent that such Claim has been disallowed,
released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including,
without limitation, payments by third parties.

The following table designates the Classes of Claims against and Interests in the Debtor
and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to
vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to
reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote |
|-------|---------------------|--------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 5 | Resident Refund Claims | Unimpaired | No  (Deemed to Accept) |

### 6.       Treatment of Claims and Interests.

#### a.       Other Priority Claims (Class 1).

This Class consists of all Allowed Other Priority Claims against the Debtor. Except to the
extent that a Holder of an Allowed Other Priority Claim against the Debtor has agreed to a different
treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other
Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as
reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim
becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or
arrangement between the Debtor and the Holder of the Allowed Other Priority Claim against the
Debtor.

#### b.       Other Secured Claims (Class 2).

This Class consists of all Other Secured Claims against the Debtor. In full satisfaction of
an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the
Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim shall receive,
at the sole and exclusive option of the Reorganized Debtor: (a) Cash equal to the amount of such
Claim; or (b) the collateral securing its Allowed Other Secured Claim, (c) Reinstatement of its

Allowed Other Secured Claim; or (d) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code.

### c.        Bond Claims (Class 3).

This Class consists of the Bond Claims against the Debtor. The Bond Claims are Allowed in the aggregate amount of $ 56,374,112.19.  Unliquidated, accrued and unpaid fees and expenses of the Trustee and its professionals incurred through the Petition Date and not paid during the Chapter 11 Case are also part of, and shall be added to, the aggregate amount of the Bond Claims. Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of the Bond Claims, including the Bondholder Deficiency Claim, which shall be waived upon the Effective Date, each Holder of a Bond Claim shall receive its ratable share of the Series 2021B Bonds and Series 2021D Bonds on the Effective Date or as soon as practicable thereafter. Accordingly, Class 3 Claims are Impaired.

### d.        General Unsecured Claims (Class 4).

This Class consists of all General Unsecured Claims against the Debtor. Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtor agrees to a different treatment of such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, the Debtor will pay an amount equal to 100% of the Allowed Amount of such Class 4 Claim, in each case subject to all defenses or disputes the Debtor may assert as to the validity or amount of such Claims. Any claims attributable to or held by the Debtor's Wesley Fund and the Kingswood Senior Living Community Foundation (the "Foundation"), two sources of donor funding of the Debtor, will be waived, released, and discharged by agreement of the parties. Accordingly, Class 4 Claims are Unimpaired.

### e.        Resident Refund Claims (Class 5).

This Class consists of all refunds of entrance fees due and payable as the Effective Date or due and payable thereafter pursuant to Residency Agreements. In full satisfaction of an Allowed Resident Refund Claim, on the later of the Effective Date or the date on which the Resident Refund Claim becomes due and payable, each Holder of an Allowed Resident Refund Claim shall receive payment of 100% of the Allowed Amount of such Class 5 Claim in accordance with the existing Residency Agreement. Accordingly, Class 5 Claims are Unimpaired.

### B.        Cramdown.

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtor may request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to reject, the Plan.

### C.        Means for Implementation of the Plan.

#### 1.        Refinancing Transactions.

19

On the Effective Date, the Debtor, the Reorganized Debtor or any other entities may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of refinancing, exit financing, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law; and (d) all other actions that the Debtor or the Reorganized Debtor, as applicable, determines are necessary or appropriate.

The Confirmation Order shall and shall be deemed to, under both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

## 2.     2021 Bond Documents.

The Reorganized Debtor shall be authorized to enter into the 2021 Bond Documents on the Effective Date. On the Effective Date, and following the consummation of the Refinancing Transaction, the 2021 Bond Documents shall constitute legal, valid, binding, and authorized obligations of the Issuer, the Reorganized Debtor and the Trustee, as applicable, enforceable in accordance with their terms. The financial accommodations to be extended under the 2021 Bond Documents are being extended and shall be deemed to have been extended in good faith and for legitimate business purposes and are reasonable and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the 2021 Bond Documents or that otherwise secure the Series 2021 Bonds (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the 2021 Bond Documents, (c) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Reorganized Debtor, the Trustee, or any of Holders of Series 2021 Bonds), having the priority set forth in the 2021 Bond Documents and subject only to such Liens and security interests as may be permitted under the 2021 Bond Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtor, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings

and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

On the Effective Date, the Reorganized Debtor shall cause the Issuer to issue the Series 2021 Bonds, the primary economic terms of which are described below.[1]

### a.    Series 2021A Bonds.

| | |
|---|---|
| **Principal:** | $5,500,000 on the terms and conditions set forth in the 2021 Bond Documents. |
| **Rate of Interest and Payment Terms:** | The Series 2021A Bonds will bear interest at a fixed rate of 10.0% per annum with the final maturity 16 years from issuance. Payments on the Series 2021A Bonds shall be: (i) interest only for the first 3 years (through FY2024) due and payable semi-annually; and (ii) principal will start amortizing beginning FY 2025 over a 13 year period, and structured to level debt service. |
| **Final Maturity Date:** | Sixteen (16) years from the date of issuance. |
| **Collateral:** | The Series 2021A Bonds will be secured by a first priority lien on all assets of Reorganized Debtor, *pari passu* with the Series 2021C Bonds. |

### b.    Series 2021B Bonds.

| | |
|---|---|
| **Principal:** | Holders of the Series 2016 Bonds will receive in exchange for such bonds ratable shares of Series 2021B Tax-Exempt Bonds in the principal amount of $27,000,000 |
| **Rate of Interest and Payment Terms:** | Interest on the Series 2021B Bonds will accrue at a rate of 5.0% per annum with the final maturity 25 years from issuance. Payments on the Series 2021B Bonds shall be: (i) interest only for the first 13 years (through FY2034) due and payable semi-annually; and (ii) principal payments shall commence in FY2035. |
| **Final Maturity Date:** | Twenty-five (25) years from issuance. |
| **Collateral:** | The Series 2021B Bonds will be secured by a lien on all assets of the Reorganized Debtor, junior only to the liens securing the Series 2021A Bonds and the Series 2021C Bonds but senior to the Series 2021D Bonds. |

---

[1] The information set forth in the accompanying chart is solely for summary purposes. To the extent there is any discrepancy between the information set forth in the chart and the 2021 Bond Documents, the 2021 Bond Documents, copies of which are attached hereto as <u>Exhibit C</u>, control.

c.    **Series 2021C Bonds.**

**Principal:**           $4,400,000 on the terms and conditions set forth in the 2021 Bond Documents.

**Rate of Interest and Payment Terms:**    The Series 2021C Bonds will bear interest at a fixed rate of 7.5% per annum with the final maturity 25 years from issuance. Payments on the Series 2021C Bonds shall be: (i) interest only for the first 13 years (through FY2034) due and payable semi-annually; and (ii) principal shall commence in FY2035.

**Final Maturity Date:**    Twenty-five (25) years from issuance.

**Collateral:**          The Series 2021C Bonds will be secured by a first priority lien on all assets of Reorganized Debtor, *pari passu* with the Series 2021A Bonds..

d.    **Series 2021D Bonds.**

**Principal:**           Holders of the Series 2016 Bonds will receive in exchange for such bonds ratable shares of Series 2021D Capital Appreciation Bonds in the principal amount of $12,050,000.

**Rate of Interest and Payment Terms:**    Interest on the Series 2021D Bonds will accrue at a rate of 2.0% per annum. The Series 2021D Bonds shall mature 25 years from issuance. Payments on the Series 2021D Bonds shall be subordinate to the payment of the Series 2021A Bonds, Series 2021B Bonds, and Series 2021C Bonds. The Series 2021D Bonds will be payable from Excess Cash pursuant to the Distribution Waterfall, with available Excess Cash applied first to accrued interest then to principal. See IIIO.C.2.e. below.

**Final Maturity Date:**    Twenty-five (25) years after issuance.

**Collateral:**          The Series 2021D Bonds will be secured by a lien on all assets of the Reorganized Debtor, junior to the liens securing the Series 2021A Bonds, the Series 2021B Bonds, and the Series 2021C Bonds.

e.    **Distribution Waterfall under the Bond Documents.**

Reorganized Debtor shall deposit, or cause to be deposited to the Revenue Fund (as defined in the 2021 Indenture), upon receipt thereof, all Gross Receipts (as defined in the 2021 MTI) in the form of cash, checks, or negotiable instruments, which are applied on the first (1st) Business Day of each calendar month, amounts in the Revenue Fund shall be transferred or deposited, as applicable, by the Trustee in the following order of priority (the "*Distribution Waterfall*"):

- First, to the Reorganized Debtor for deposit to the Operating Fund (as defined in the 2021 Indenture) the amounts necessary for the Reorganized Debtor to pay in the upcoming month: (i) budgeted operating expenses for the upcoming month, including without limitation for costs of operating, managing, maintaining and improving the Facilities, budgeted capital expenses (after funds in the Series 2021C Repair and Replacement Project Fund -as defined in the 2021 Indenture- have been fully disbursed), including costs for the refurbishment of Independent Living Units (as defined in the 2021 Indenture) as is necessary for occupancy or reoccupancy of the Independent Living Units; (ii) the refunding of Entrance Fees (as defined in the 2021 MTI); and, (iii) payments on Non-Recourse Indebtedness (as defined in the 2021 MTI) (the amount to be deposited form the Revenue Fund to the Operating Fund in any given month shall take into account any unapplied amount deposited in the Operating Fund from the Revenue Fund for such purpose in a prior month or any amount of the Remaining Series 2021A Funds (as defined in the 2021 Indenture) remaining on deposit in the Operating Fund, but excluding from the calculation of the amount to be deposited in the Operating Fund from the Revenue Fund the amount of any Excess Cash released to the Reorganized Debtor pursuant to Section 408(b)(viii)(b) of the 2021 Indenture that remains in the Operating Fund), as certified by Reorganized Debtor (in a certificate setting forth in reasonable detail the projected application of the amount so certified) delivered to the Trustee no later than seven (7) Business Days prior to the first (1st) Business Day of such month;

- Second, to the Series 2021A Interest Account and the Series 2021C Interest Account of the Bond Fund (as such terms are defined and described in the 2021 Indenture) in an amount equal to 1/6th of the interest due on the next interest payment date of the respective bonds;

- Third, to the Series 2021B Interest Account of the Bond Fund (as such terms are defined and described in the 2021 Indenture) in an amount equal to 1/6th of the interest due on the next interest payment date for the Series 2021B Bonds;

- Fourth, commencing December 2024 and monthly thereafter until the Series 2021A Bonds are satisfied in full, to the Series 2021A Principal Account of the Bond Fund (as such terms are defined and described in the 2021 Indenture) in an amount equal to 1/12th of the principal due on the next principal payment date for such bonds;

- Fifth, commencing December 2034 and monthly thereafter until the Series 2021C Bonds are satisfied in full, to the Series 2021C Principal Account of the Bond Fund (as such terms are defined and described in the 2021 Indenture) in an amount equal to 1/12th of the principal due on the next principal payment date for such bonds;

- Sixth, commencing December 2034 and monthly thereafter until the Series 2021B Bonds are satisfied in full, to the Series 2021B Principal Account of the Bond Fund (as such terms are defined and described in the 2021 Indenture) in an amount equal to 1/12th of the principal due on the next principal payment date for such

bonds;

- Seventh, after no Series 2021C Bonds are Outstanding under the 2021 Indenture, to the Series 2021B Account of Debt Service Reserve Fund (as such terms are defined and described in the 2021 Indenture) the amount necessary to make the amount therein equal the Debt Service Reserve Requirement (as defined in the 2021 Indenture) for the Series 2021B Bonds; and

- Eighth, any remaining amounts (such remaining amounts referred to as "Excess Cash") after (x) application of paragraphs First to Seventh above (disregarding any such paragraph pursuant to the provisions of which application has not yet commenced) and (y) in excess of an amount equal to 100 Days Cash on Hand (as defined in the 2021 MTI), which shall continue to be held in in the Revenue Fund, shall be transferred (i) 70% of the Excess Cash to the Series 2021D Account of the Bond Fund (as such terms are defined and described in the 2021 Indenture) to pay interest due on the next Interest Payment Date (as defined in the 2021 Indenture) and then to pay principal of the Series 2021D Bonds, and (ii) 30% of the Excess Cash to the Reorganized Debtor to be spent solely on expenses related to the Facilities in accordance with Section 5.14 of the 2021 Loan Agreement.

**f.       Additional Security for Series 2021 Bonds.**

The Bond Documents establish certain Debt Service Reserve Funds with the Trustee, subject to the Trustee's lien under the Series 2021 Bond Documents, to secure payment of the Series 2021A Bonds, the Series 2021B Bonds and the Series 2021C Bonds, respectively. The Series 2021A Debt Service Reserve Fund shall be funded in the amount of $500,000 from the proceeds of the Series 2021A Bonds, and the Series 2021C Debt Service Reserve Fund shall be funded form the proceeds of the Series 2021C Bonds in the amount of $400,000. Certain proceeds of the Series 2016 Bonds will provide an initial deposit to the Series 2021B Debt Service Reserve Fund with the balance of the Series 2021B Debt Service Reserve Requirement (to be equal to the least of 10% of the proceeds of the Series 2021B Bonds, 125% of average annual debt service on the Series 2021B Bonds and maximum annual debt service on the Series 2021B Bonds) funded from the above-reference Distribution Waterfall.

The Series 2021 Bonds also will be secured by the 2021 Deed of Trust providing a lien on real property and other assets of the Reorganized Debtor.

**3.       Series 2016 Bonds**

The entirety of the Series 2016 Bonds will be extinguished.

**4.       No Further Corporate Action.**

The issuance of the Series 2021 Bonds for distribution under the Plan is authorized without the need for further corporate action, and all of the Series 2021 Bonds issued or issuable under the Plan shall be duly authorized and validly issued under the Plan. The Reorganized Debtor shall cause to be delivered customary legal opinions and other documents in connection with the issuance of the Series 2021 Bonds, in form and substance acceptable to the Trustee, including, without limitation, (i) the Opinion of Bond Counsel described in the 2021 Bond Documents, and (ii) a lender's title policy with respect to the real property securing the Reorganized Debtor's obligations under the 2021 Bond Documents, and the first mortgage position of the Trustee, subject to such exceptions as are reasonably acceptable to the Trustee.

## 5.    Continued Corporate Existence.

Except as otherwise provided in the Plan, the Debtor shall continue to exist as of the Effective Date as a separate corporate Entity, with all the powers of a corporation under the applicable law in the jurisdiction where the Debtor is incorporated or formed and under the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be under the Plan and require no further action or approval.

## 6.    Vesting of Assets in the Reorganized Debtor.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, including the Liens and security interests granted under the 2016 Bond Documents as such Liens and security interests continue to secure the obligations related to the 2021 Bond Documents, on the Effective Date, all property in the Estate, all Causes of Action, and any property acquired by the Debtor under the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

## 7.    Cancellation of Agreements, Security Interests, and Other Interests.

On the Effective Date, except to the extent otherwise specifically provided in the Plan, including to the extent certain of the 2016 Bond Documents continue in existence pursuant to their amendment and restatement pursuant to the 2021 Bond Documents, all notes, instruments, certificates, and other documents evidencing the 2016 Bonds, shall be cancelled and the obligations of the Debtor or the Reorganized Debtor thereunder or in any way related thereto shall be discharged and the agents and Trustee thereunder shall be automatically and fully discharged from all duties and obligations thereunder. Except to the extent certain security interests and Liens continue in existence pursuant to the 2021 Bond Documents, all existing security interests and/or Liens and/or any other Secured Claims shall also be automatically released, discharged, terminated, and of no further force and effect as of the Effective Date. Notwithstanding the foregoing, following confirmation of the Plan or the occurrence of the Effective Date, to the extent that the 2016 Bond Documents do not otherwise remain in effect pursuant to the 2021 Bond Documents, any credit document or agreement that governs the rights of any Holder of a Bond

25

Claim shall continue in effect for purposes of (1) allowing Holders of such Allowed Claims to receive distributions under the Plan; (2) allowing and preserving the rights of the agents or representative of Holders of such Claims to make distributions on account of such Allowed Claims, as provided in the Plan; (3) preserving all exculpations in favor of the Trustee; (4) allowing the Trustee to enforce any rights and obligations owed to it under the Plan or the Confirmation Order, including the ability of the Trustee to be compensated for fees and reimbursed for expenses, including expenses of its professionals, to assert its charging lien, to enforce its indemnity and other rights and protections with respect to and pursuant to the 2016 Bond Documents; and (5) permitting the Trustee to appear and be heard in the Chapter 11 Case, or in any proceeding in the Court or any other court.

## 8.    Exemption from Registration Requirements; Trading of Securities.

The offering, issuance, and distribution of Series 2021 Bonds issued under the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act under section 3(a)(2) and 3(a)(4) of the Securities Act of 1933, as amended and under section 1145(a)(1) of the Bankruptcy Code. Any and all Series 2021 Bonds issued under the Plan will be freely tradable under the Securities Act by the recipients thereof.

## 9.    Organizational Documents.

Subject to Section 6.1 of the Plan, the Reorganized Debtor shall enter into such agreements to the extent necessary to implement the terms and provisions of the Plan.

## 10.    Exemption from Certain Transfer Taxes and Recording Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any Entity under, in contemplation of, or in connection with the Plan or under: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 11.    Board and Officers of the Reorganized Debtor.

As of the Effective Date, the members of the Board of Directors and officers of the Debtor as of the Petition Date shall remain in their current capacities as directors and officers of the Reorganized Debtor unless otherwise disclosed in the Plan Supplement or prior to the

26

commencement of the Confirmation Hearing, in each case subject to the ordinary rights and powers of the Board of Directors to remove or replace the officers in accordance with the Reorganized Debtor's organizational documents and any applicable employment agreements that are assumed pursuant to the Plan. From and after the Effective Date, each officer of the Reorganized Debtor shall serve pursuant to the terms of the Reorganized Debtor's certificate of incorporation and bylaws or other formation and constituent documents, and applicable laws of the Reorganized Debtor's jurisdiction of formation.

### 12.   Directors and Officers Insurance Policies.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor shall be deemed to have assumed all of the Debtor's Directors and Officers ("D&O") Liability Insurance Policies under section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtor's foregoing assumption of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed.

### 13.   Other Insurance Policies.

On the Effective Date, the Debtor's Insurance Policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the Reorganized Debtor under section 365 of the Bankruptcy Code and Section 6.17 of the Plan. Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtor under the Insurance Policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtor shall retain all rights and defenses under such Insurance Policies. The Insurance Policies shall apply to and be enforceable by and against the insureds and the Reorganized Debtor in the same manner and according to the same terms and practices applicable to the Debtor, as existed prior to the Effective Date. Following the Effective Date, the Debtor's Insurance Policies shall comply with all applicable covenants set forth in the 2021 Bond Documents.

### 14.   Preservation of Rights of Action.

In accordance with section 1123(b) of the Bankruptcy Code but subject to the releases set forth in Section 11 of the Plan, including but not limited to the release of all Causes of Action against the Trustee and the Consenting Holders, all Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine, initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court. **Subject to the releases set forth in Section 11 of the Plan, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtor**

or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the confirmation of the Plan or the occurrence of the Effective Date.

## 15. Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including: (1) assumption of Executory Contracts; (2) selection of the directors, managers, and officers for the Reorganized Debtor; (3) the execution of and entry into the 2021 Bond Documents; (4) the issuance and distribution of the Series 2021 Bonds as provided in the Plan; and (5) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the company structure of the Reorganized Debtor and any company action required by the Debtor or Reorganized Debtor, as applicable, in connection therewith shall be deemed to have occurred on and shall be in effect as of the Effective Date without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtor or Reorganized Debtor, as applicable.

On or prior to the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtor or Reorganized Debtor, as applicable (including any Board Chair, Board Vice-Chair, president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof), shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtor or the Reorganized Debtor, as applicable, including (1) the 2021 Bond Documents, (2) the Series 2021 Bonds and (3) any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

## 16. Effectuating Documents; Further Transactions.

Prior to, on, and after the Effective Date, the Debtor and Reorganized Debtor and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the 2021 Bond Documents, and any securities issued under the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, actions, or consents except for those expressly required under the Plan. All counterparties to any documents described in this paragraph are authorized to and may execute

28

any such documents as may be required or provided by such documents without further order of the Court.

### D.    Assumption of Executory Contracts and Unexpired Leases.

#### 1.    Assumption of Executory Contracts.

Except as otherwise provided in the Plan or in a motion filed by the Debtor before the Effective Date, each of the Executory Contracts of the Debtor, shall be deemed assumed as of the Effective Date, without the need for any further notice to or action, order, or approval of the Court, pursuant to section 365 of the Bankruptcy Code. All existing Residency Agreements shall be assumed. The Confirmation Order may constitute an order of the Court approving the assumption of each of the Executory Contracts, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

#### 2.    Inclusiveness.

Except as otherwise provided in the Plan or agreed to by the Debtor and the applicable counterparty, each Executory Contract shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract.

#### 3.    Cure of Defaults.

The Debtor or the Reorganized Debtor, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the Debtor's ordinary course of business.

#### 4.    Full Release and Satisfaction.

Assumption of any Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract at any time before the effective date of the assumption. The foregoing provision shall not apply to and shall not impair the rights of the Holders of the Series 2021 Bonds,

#### 5.    Reservation of Rights.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is in fact an Executory Contract or that the Debtor or the Reorganized Debtor has any liability thereunder.

#### 6.    Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases under section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

**E.     Conditions Precedent to Confirmation and the Effective Date.**

**1.     Conditions Precedent to Confirmation.**

The Debtor shall not submit the Confirmation Order for consideration by the Court until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

**a.**     The proposed Confirmation Order shall be in form and substance reasonably satisfactory in all respects to the Debtor, the Trustee and the Consenting Holders; and

**b.**     The Plan the Plan Supplement (including the 2021 Bond Documents), and any schedules, documents, supplements and exhibits to any of the foregoing documents shall be, in form and substance satisfactory to the Debtor, the Trustee, and the Consenting Holders, and on the terms contemplated by the Plan Support Agreement.

**2.     Conditions Precedent to the Effective Date.**

The Effective Date shall not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

**a.**     The Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor, the Trustee, and the Consenting Holders, and such Confirmation Order shall not be subject to any stay or an unresolved request for revocation under section 1144 of the Bankruptcy Code;

**b.**     The Plan Support Agreement shall not have been terminated, and remains in full force and effect;

**c.**     On the occurrence of the Effective Date, the conditions to effectiveness of the 2021 Bond Documents shall have been satisfied or waived by the Trustee and the Consenting Holders, and the Refinancing Transaction shall have closed pursuant to the terms of the Plan Support Agreement;

**d.**     The Effective Date shall be no later than November 23, 2021.

**e.**     All actions, documents, certificates, and agreements necessary to implement the Plan, including, without limitation, 2021 Bond Documents, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and

**f.**     All requisite governmental authorities and third parties shall have approved or consented, to the extent required, to all actions, documents, certificates, and agreements necessary to implement the Plan.

**3.**     **Waiver of Conditions.**

The conditions to confirmation and consummation of the Plan set forth therein may be waived in writing at any time by the Debtor, with the written consent of the Trustee, without notice to any other parties in interest or the Court and without a hearing.

**4.**     **Effect of Failure of Conditions.**

If consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders of Claims or Interests or any other Person in any respect.

**F.**     **Effect of Confirmation.**

**1.**     **General.**

Under section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved under the Plan. The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Court that any such compromise or settlement is in the best interests of the Debtor, its Estate, and any Holders of Claims and Interests and is fair, equitable and reasonable. Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided, however*, that nothing contained in the Plan shall preclude any Person or Entity from exercising their rights under and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan, including but not limited to the 2021 Bond Documents.

**2.**     **Releases by the Debtor.**

Pursuant to section 1123(b) of the Bankruptcy Code, notwithstanding anything contained in the Plan to the contrary, for good and valuable consideration, the adequacy of which is hereby confirmed, including the consummation of the transactions contemplated by the Plan, on and after the Effective Date, each Released Party shall be deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtor, the Reorganized Debtor, and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor, the Reorganized Debtor, or the Estate, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, tort, contract, or otherwise, that the Debtor, the Reorganized Debtor, or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between the Debtor and any Released Party, the 2016 Bonds, the assertion or enforcement of rights and remedies against the Debtor, the Debtor's in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between the Debtor and any non-Debtor, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan Support Agreement, the Disclosure Statement, the Refinancing Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Cash Collateral Order, or any other restructuring transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan Support Agreement, this Plan (including for the avoidance of doubt the plan supplement), or the 2021 Bond Documents, before or during the filing of the Chapter 11 Case, the filing of the Chapter 11 Case, the pursuit of Confirmation of this Plan, the pursuit of consummation of this Plan, the administration and implementation of this Plan, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order of the Bankruptcy Court. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Refinancing Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the 2021 Bond Documents, or any Claim or obligation arising under the Plan.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will

permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under the foregoing release. Notwithstanding the foregoing, nothing in Section 11.2 of the Plan shall or shall be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtor or the Reorganized Debtor, unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under Bankruptcy Rule 9019, of foregoing Debtor release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor's release; (iii) in the best interest of the Debtor and its Estate; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to the Debtor, the Reorganized Debtor, or the Debtor's Estate asserting any Claim or Cause of Action released pursuant to the Debtor's release.

3.    **Releases by Holders of Claims.**

**ON AND AFTER THE EFFECTIVE DATE, EXCEPT (I) FOR THE RIGHT TO ENFORCE THE PLAN OR ANY RIGHT OR OBLIGATION ARISING UNDER THE PLAN SUPPLEMENT THAT REMAINS IN EFFECT OR BECOMES EFFECTIVE AFTER THE EFFECTIVE DATE OR (II) AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR CONFIRMATION ORDER, INCLUDING THE 2021 BOND DOCUMENTS, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE OBLIGATIONS OF THE DEBTOR UNDER THE PLAN AND THE CONTRIBUTIONS OF THE RELEASED PARTIES TO FACILITATE AND IMPLEMENT THE PLAN, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, EACH RELEASED PARTY WILL BE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY EACH RELEASING PARTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, TORT, CONTRACT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTOR OR THE REORGANIZED DEBTOR, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE**

**DEBTOR AND ANY RELEASED PARTY, THE 2016 BONDS, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTOR, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, INTERCOMPANY TRANSACTIONS BETWEEN THE DEBTOR AND ANY NON-DEBTOR, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR CONSUMMATION OF THE PLAN SUPPORT AGREEMENT, THIS DISCLOSURE STATEMENT, THE REFINANCING TRANSACTION, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), THE CASH COLLATERAL ORDER, OR ANY OTHER RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT, THE PLAN SUPPORT AGREEMENT, THIS PLAN (INCLUDING FOR THE AVOIDANCE OF DOUBT THE PLAN SUPPLEMENT), OR THE 2021 BOND DOCUMENTS, BEFORE OR DURING THE FILING OF THE CHAPTER 11 CASE, THE FILING OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY OTHER THAN THE DEBTOR THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY REFINANCING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE 2021 BOND DOCUMENTS, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASES ARE: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A**

**GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTOR AND ITS ESTATE; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASES.**

4.      **Exculpation.**

Except as otherwise specifically provided in the Plan or the Confirmation Order, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur liability for, and each Exculpated Party will be released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with or arising out of this Chapter 11 Case, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Plan Support Agreement and related prepetition transactions, this Disclosure Statement, the Plan, the Plan Supplement, or any Refinancing Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during this Chapter 11 Case, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Case, the solicitation of votes for or the pursuit of confirmation of the Plan, the administration, funding, consummation, or distribution of property under of this Plan or any related agreement, the occurrence of the Effective Date, the issuance of securities under or in connection with the Plan, or the transactions in furtherance of any of the foregoing, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under this Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.      **Discharge of Claims and Causes of Action.**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and

Causes of Action of any kind or nature whatsoever against the Debtor or any of its Assets or properties, including any interest accrued on such Claims or Interests from and after the Petition Date, and regardless of whether any property shall have been abandoned by order of the Court, distributed or retained under the Plan on account of such Claims, Interests or Causes of Action. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. Such discharge shall void any judgment obtained against the Debtor or the Reorganized Debtor at any time, to the extent that such judgment relates to a discharged Claim.

> **6.** **Injunction.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, INCLUDING BUT NOT LIMITED TO ANY RIGHT ARISING UNDER OR RELATED TO THE 2021 BOND DOCUMENTS, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION WILL BE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION, OR RECOUPMENT OF ANY KIND UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE EFFECTIVE DATE, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH OF (I) – (V) ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED UNDER THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED OR DISCHARGED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASE UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

7.     **Binding Nature of Plan.**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTOR, THE REORGANIZED DEBTOR, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON ACQUIRING PROPERTY UNDER THE PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS WITH THE DEBTOR AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THE PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

8.     **Protection Against Discriminatory Treatment.**

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons and Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtor, or another Person or Entity with whom the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Case.

9.     **Preservation of Privilege and Defenses.**

No action taken by the Debtor or Reorganized Debtor in connection with the Plan shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtor or Reorganized Debtor, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).

10.    **Injunction Against Interference with Plan.**

Upon the Court's entry of the Confirmation Order, all Holders of Claims and Interests, the Debtor, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtor's, the Reorganized Debtor's and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of the Plan.

11.    **Release of Liens.**

Except as otherwise provided in the Plan, the Confirmation Order, the 2021 Bond Documents, including to the extent the 2021 Bond Documents amend or restate the 2016 Bond Documents, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with, and conditioned upon, the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released. Except as otherwise provided in the Plan, the Confirmation Order, the 2021 Bond Documents, including to the extent the 2021 Bond Documents amend or restate the 2016 Bond Documents, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's Estate shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## G.    Modification, Revocation or Withdrawal of the Plan.

### 1.    Modification and Amendments.

The Plan or any exhibits thereto may be amended, modified, or supplemented by the Debtor with the consent of the Trustee in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtor or the Reorganized Debtor may institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

### 2.    Effect of Confirmation on Modifications.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3.    Revocation or Withdrawal of the Plan.

Subject to the terms of the Plan Support Agreement, the Debtor reserves the right to, consistent with its fiduciary duties, revoke or withdraw the Plan before the Effective Date. If the Debtor revokes or withdraws the Plan, or if the Confirmation Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Person.

## H.    Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, other than rights and obligations arising under the 2021 Bond Documents, including any exhibits and schedules thereto, the Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan, including, but not limited to, jurisdiction to:

    **a.**    allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

    **b.**    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

    **c.**    resolve any matters related to: (i) the assumption or rejection of any Executory Contract to which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract; (ii) any potential contractual obligation under any Executory Contract that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

    **d.**    ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

    **e.**    adjudicate, decide or resolve any matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

    **f.**    adjudicate, decide or resolve any matter involving the Reorganized Debtor;

    **g.**    adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

    **h.**    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

    **i.**    resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations,

indemnifications and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

**j.**      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

**k.**      resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture or other agreement or document relating to any of the foregoing;

**l.**      adjudicate any and all disputes arising from or relating to Distributions under the Plan;

**m.**      consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Court order, including the Confirmation Order;

**n.**      hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

**o.**      enforce all orders previously entered by the Court;

**p.**      hear any other matter not inconsistent with the Bankruptcy Code; and

**q.**      enter a final decree closing the Chapter 11 Case.

**I.      Miscellaneous Provisions.**

**1.      Section 1125(e) Good Faith Compliance.**

As of and subject to the occurrence of the Confirmation Date, the Debtor and its Related Persons shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

**2.      Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

**3.      Closing of the Chapter 11 Case.**

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, but by no later than thirty (30) days after the Effective Date, file with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Case.

### 4.      Plan Supplement.

Any exhibits or schedules not filed with the Plan may be contained in the Plan Supplement, if any, and the Debtor hereby reserves the right to file such exhibits or schedules as a Plan Supplement.

### 5.      Further Assurances.

The Debtor or the Reorganized Debtor may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor, the Reorganized Debtor and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 6.      Exhibits Incorporated.

All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if fully set forth therein.

### 7.      Inconsistency.

In the event of any inconsistency among the Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of the Plan shall govern.

### 8.      No Admissions.

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or any other party in interest, or (c) constitute an admission of any sort by the Debtor or other party in interest.

### 9.      Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order and the Effective Date has occurred. None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by the Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests before the Effective Date.

### 10.      Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

### 11.    Entire Agreement.

On the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.    Notices.

All notices, requests, and demands to or upon the Debtor in the Chapter 11 Case shall be in writing and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

<div align="center">

Kansas City United Methodist Retirement Home, Inc.,
d/b/a Kingswood Senior Living Community
Attention: Sergio del Pino, Executive Director
10000 Wornall Road
Kansas City, MO 64114
Telephone: (816) 442-3223
E-mail: delpinos@kingswoodretirementliving.com

with copies to:

McDowell, Rice, Smith & Buchanan, P.C.
Attention: Jonathan A. Margolies
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
Telephone: (816) 960-7320
Email: jmargolies@mcdowellrice.com

</div>

All notices and requests to Persons holding any Claim or Interest in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in the Chapter 11 Case. Any such Holder of a Claim or Interest may designate in writing any other address for purposes of this section, which designation will be effective upon receipt by the Debtor.

### 13.    Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted; provided, however, no such alteration shall materially affect the terms of the 2021 Bond Documents without the consent of the Trustee Notwithstanding any

such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Missouri, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

### 15.    Request for Confirmation.

The Debtor requests entry of the Confirmation Order under section 1129(a) of the Bankruptcy Code and, to the extent necessary, section 1129(b) of the Bankruptcy Code.

## IV.    RISK FACTORS IN CONNECTION WITH THE PLAN

The Holders of Bond Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    Bankruptcy Considerations.

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Court, there can be no assurance that the Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in Section 10 of the Plan, and there can be no assurance that such conditions will be satisfied or waived. In the event the conditions precedent described in Section 10 of the Plan have not been satisfied, or waived (to the extent possible) by the Debtor or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and

Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

**B.      Risks Related to the Debtor's Business and Industry**

**1.      Even if the Plan is confirmed, the extent of the Debtor's remaining indebtedness may impair its financial condition and the Debtor's ability to grow and compete.**

As of the Petition Date, the Debtor's total secured debt was approximately $56,374,112.19. Although the Debtor anticipates that the Plan will significantly decrease the annual debt service requirements of the Debtor and, over time, increase its liquidity, it still will have a significant level of debt upon consummation of the Plan. The Debtor's debt has important consequences for its financial condition, including:

  i.      making the Debtor vulnerable to general adverse economic, competitive and industry conditions;

  ii.     limiting the Debtor's ability to obtain additional financing to support its operations and make capital improvements, if necessary;

  iii.    requiring a substantial portion of the Debtor's cash flow from operations for the payment of principal and interest on its debt and reducing its ability to use its cash flow to fund working capital, capital expenditures, execution of its business strategy, acquisitions, operations and general corporate requirements; and

  iv.     limiting the Debtor's ability to receive trade credit from its vendors or otherwise placing it at a competitive disadvantage to other less leveraged competitors.

**2.      Servicing the Debtor's debt will require a significant amount of cash, and its ability to generate sufficient cash depends upon many factors, some of which are beyond its control.**

The Debtor's ability to make payments on and refinance its debt, fund planned capital expenditures and execute its business strategy depends on its ability to generate cash flow in the future. To some extent, this is subject to general economic, financial, competitive and other factors that are beyond the Debtor's control. Even if the Plan is consummated, there can be no assurance that the Debtor's business will continue to generate cash flows at or above current levels or that it will be able to meet its cash needs. If the Debtor is unable to service its debt or experiences a significant reduction in its liquidity, the Debtor could be forced to reduce or delay planned capital expenditures and other initiatives, sell assets, restructure or refinance its debt or seek additional equity capital, and the Debtor may be unable to take any of these actions on satisfactory terms or in a timely manner, or at all. Further, any of these actions may not be sufficient to allow the Debtor to service its debt obligations or may have a materially adverse effect on its results of operations

and financial condition. The Debtor's failure to generate sufficient operating cash flows to pay its debts or refinance its indebtedness could have a material adverse effect on its results of operations and financial condition. If the Debtor cannot make scheduled payments on its debt, it would be in default, and as a result, holders of such debt could declare all outstanding principal and interest to be due and payable and the Debtor's existing and future lenders could, under certain circumstances, terminate their commitments to lend it money and foreclose against the assets securing its borrowings.

### 3.   The Debtor may fail to maintain turnover or occupancy.

The economic feasibility of the Community, including its refund obligations, depends upon the ability of the Community to attract new residents and to maintain substantial occupancy of its facility.

If the Debtor does not achieve the required levels of occupancy for the Community, the revenues anticipated by the Community from monthly service fees and other charges could be adversely affected. Additionally, if a substantial number of residents live beyond the life expectancies anticipated by the Debtor, new residents will be admitted at a slower rate and the receipt of additional, potentially higher Entrance Fees will be curtailed with a consequent impairment of the Community's cash flow. Even if the anticipated attrition levels are realized and maintained, no assurance can be given that remarketing of vacated units will take place as quickly as assumed by the Debtor.

### 4.   The Debtor may be faced with competition from other similar facilities.

The Debtor faces competition from similar facilities operating in or near its market area, from other residential facilities for older adults and from existing facilities offering custodial, intermediate and skilled nursing care. The Debtor may face additional competition in the future as a result of the construction of new, or the renovation or expansion of existing, housing and nursing care facilities for elderly persons in the area served by the Community as well as in the areas surrounding the area served by the Community.

### 5.   The Plan and the related transactions, which contemplate transactions that will modify the Debtor's capital structure, are based in large part upon assumptions and analyses developed by it. If these assumptions and analyses prove to be incorrect, the Debtor's Plan may be unsuccessful in its execution of the restructuring and it may be unable to continue as a going concern.

The Plan and the transactions related thereto, which contemplate transactions that will affect the Debtor's capital structure, are premised upon assumptions and analyses of the Debtor that are based upon the Debtor's experience and perception of historical trends, current conditions and expected future developments, as well as other factors that it considers appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtor's expectations and assumptions depend on a number of factors.

In addition, the Plan relies upon financial forecasts, including with respect to revenue growth, improved earnings before interest, taxes, depreciation and amortization, improved interest

margins, and growth in cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. The Debtor's actual financial condition and results of operations may differ, perhaps materially, from what it anticipated. Consequently, there can be no assurance that the results or developments contemplated by the Plan will occur or, even if they do occur, that they will have the anticipated effects on the Debtor's business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the transactions contemplated by the Plan.

6.      **Uncertainties related to the Debtor's business may impact its ability to attract new residents.**

The Debtor's success depends on its ability to consistently, accurately and effectively provide affordable living accommodations and related healthcare and support services to seniors. Should seniors perceive that the uncertainties related to the Debtor's business have adversely affected its services, there will be a decrease in new residents attracted to the Community.

7.      **Uncertainties related to the Debtor's business may create a distraction for or cause a loss of personnel and may otherwise adversely affect its ability to attract new personnel.**

The market for qualified personnel is competitive and the Debtor's future success will depend upon, among other factors, its ability to attract and retain key personnel and to pay those personnel market wages. In addition, uncertainties about the future prospects and viability of its business is impacting and is likely to continue to impact the Debtor's ability to attract and retain key personnel, and is a distraction for existing personnel. If the Debtor loses the services of key personnel, if one or more of them decides to join a competitor or otherwise compete with it or if personnel continue to be distracted due to the uncertainties about the future prospects and viability of its business, the Debtor may not be able to effectively implement its business strategy and its business could suffer. The loss of the services of any of the Debtor's other key management personnel or the failure to attract and retain personnel could have a material adverse effect on its results of operations and financial condition due to disruptions in its leadership and the continuity of its business relationships.

8.      **Third-party reimbursement may be reduced or eliminated.**

The health care industry, in general, is subject to regulation by a number of governmental agencies, including those which administer the Medicare reimbursement program, and other federal, state and local governmental agencies. As a result, the Debtor is sensitive to legislative and regulatory changes in such programs and is affected by reductions in governmental spending for such programs. Congress has in the past enacted a number of provisions which affect health care providers, and additional legislative changes can be expected. Previous legislative actions have included limitation of payments to nursing homes under the Medicare program.

Future legislation, regulation or actions by the federal government are expected to continue the trend toward more restrictive limitations on reimbursement for long-term care services. At present, no determination can be made concerning whether, or in what form, such legislation would

be introduced and enacted into law. Similarly, the impact of future cost control programs and future regulations upon the Debtor's financial performance cannot be determined at this time.

The Debtor may receive reimbursement from non-governmental third-party payors, such as commercial insurers, employers under self-insurance programs, health maintenance organizations, and preferred provider organizations. Most of these programs make payments at rates which are less than actual charges. Accordingly, there can be no assurance that payments made under such programs will be adequate to cover actual costs incurred.

### 9.    The income of the elderly may diminish.

A large percentage of the monthly income of the residents of the Community is fixed income derived from pensions and social security or income from investments. If, due to inflation or otherwise, substantial increases in monthly fees are required to cover increases in operating costs, wages, benefits and other expenses, residents may have difficulty paying such monthly fees. Furthermore, investment income of the residents may be adversely affected by declines in the stock market and sustained historically low market interest rates, also resulting in payment difficulties.

### 10.    Continuing Long-Term Uncertainties Regarding COVID-19 Pandemic As Any Resurgence May Undermine the Debtor's Business.

In the last several months, COVID-19 infection rates in the United States have stabilized or continued to drop and most states, including Missouri, have streamlined the vaccination process. While federal guidance is softening regarding masks and other COVID-19 precautions, there is still the risk of a potential resurgence or the emergence and impact of different COVID variants, the effects of which the Debtor cannot thoroughly predict at this time.

From an operational perspective, the Debtor is focused on providing the safest possible environment for its Residents and employees. Although the Debtor is continuing to implement appropriate safety measures, as a provider of healthcare services, it is and continues to be exposed to the health and economic effects of COVID-19, many of which may have and will continue to have a material adverse impact on the Company's employees, as well as its business operations and financial condition. Future COVID-19 issues could 1) diminish the public's trust in healthcare facilities, especially healthcare facilities, such as the Debtor, that cater to vulnerable populations and 2) result in reduced employee morale, labor unrest, work stoppages or other workforce disruptions. Both of these could have an adverse effect on the Debtor's business operations and financial condition.

### 11.    Other Possible Risk Factors.

The occurrence of any of the following events, or other unanticipated events, could adversely affect the financial condition or results of operations of the Debtor:

> i.    reinstatement of or establishment of mandatory governmental wage, rent or price controls;

ii.      adoption of federal, state or local legislation or regulations having an adverse effect on the future operating or financial performance of the Debtor;

iii.     events adversely affecting the operation of the Community, including enactment of legislation imposing ceilings on increases in health care charges, changes in Medicare or comparable regulations or attempts by third-party payors administering health care cost reimbursement plans to control or restrict the operations of certain health care facilities;

iv.     a decline in the population, a change in the age composition of the population or a decline in the economic conditions of the Debtor's market area;

v.      developments or events affecting the federal or state exemption of the Debtor's income from taxation;

vi.     suspension or revocation of or failure to renew any license, certificate or approval to operate the Community, or any portion thereof, or any restriction on new admissions to licensed beds;

vii.    changes in key management personnel;

viii.   reductions in utilization of continuing care retirement and assisted living facilities as a result of preventive medicine, improved occupational health and safety, development and utilization of medical and scientific research and technological advances and other developments;

ix.     changes in reimbursement procedures or in contracts under public or private insurance programs;

x.      increased costs of attracting and retaining, or decreased availability of a sufficient number of, health professionals, including trained nurses vital to the Community;

xi.     increases in costs, including costs associated with, among other things, salaries, wages and fringe benefits, supplies, technology and equipment, insurance, energy and other utilities, the attraction and retention of nurses and other personnel, compliance with or violation of environmental laws and regulations, and other costs that could result in a sizable increase in expenditures without a corresponding increase in revenues;

xii.    inability of the Debtor to obtain future governmental approvals to undertake additional projects necessary to remain competitive as to rates, charges and the quality and scope of care or any limitation on

the availability of tax-exempt or other financing for future projects; and

 xiii. the occurrence of natural disasters, including floods, hurricanes, tornadoes and earthquakes, could damage the Community, interrupt utility service or otherwise impair the operations of the Debtor and the generation of revenues from the Community. The Community is required to be covered by general property insurance in amounts which management of the Debtor considers to be sufficient to provide for the replacement of such facility in the event of a natural disaster.

## C. Additional Factors

### 1. No Duty to Update Disclosures.

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an order of the Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

### 2. Representations Outside this Disclosure Statement.

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are subject to approval by the Court. Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims or Interests that are entitled to vote to accept or reject the Plan.

### 3. No Admission.

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or Holders of Claims and Interests.

### 4. Tax and Other Related Considerations.

A discussion of potential tax consequences of the Plan is provided in Section VII hereof; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice. Holders of Claims and/or Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

## V. PLAN CONFIRMATION AND CONSUMMATION

## A. The Confirmation Hearing.

Bankruptcy Code section 1128(a) requires the Court, after appropriate notice, to hold a Confirmation Hearing. On, or as promptly as practicable after the filing of the Plan and this

Disclosure Statement, the Debtor will request, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing (the "Confirmation Hearing Notice") will be provided to all known Creditors or their representatives. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization or liquidation. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Court, together with proof of service thereof, and served upon: (i) counsel for the Debtor, McDowell, Rice, Smith & Buchanan, P.C., 605 W. 47th Street, Suite 350, Kansas City, Missouri 64112, Attn: Jonathan A. Margolies (jmargolies@mcdowellrice.com); (ii) counsel for UMB Bank, N.A., Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel Bleck (dbleck@mintz.com); (iii) the Office of the United States Trustee for the Western District of Missouri, 400 East 9th Street, Room 3440, Kansas City, MO 64106 and (iv) such other parties as the Court may order, so as to be actually received no later than the date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE COURT, IT MAY NOT BE CONSIDERED BY THE COURT IN DETERMINING CONFIRMATION OF THE PLAN.**

### B.    Plan Confirmation Requirements Under the Bankruptcy Code.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the Chapter 11 Case. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

### 1.    Best Interests of Creditors.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less

than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Debtor, with the assistance of its professionals, has prepared the Liquidation Analysis attached hereto as **Exhibit E**. The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case. In preparing the Liquidation Analysis, the Debtor has taken into account the nature, status and underlying value of its Assets, the ultimate realizable value of its Assets, and the extent to which such Assets are subject to liens and security interests. In addition, the Liquidation Analysis also reflects the required time and resources necessary to effectuate an orderly wind down of the Community, which provides critical care to residents and must comply with numerous federal and state regulations.

Based upon the Liquidation Analysis, the Debtor believes that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of: (a) the likelihood that the Debtor's Assets would have to be sold or otherwise disposed of in an orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. In the opinion of the Debtor, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the Holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Debtor believes that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Plan. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

## 2.     Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.

In order to establish the feasibility of the Plan for purposes of section 1129(a)(11) of the Bankruptcy Code, the Debtor and its management team and advisors, have developed the Financial Projections attached hereto as **Exhibit D**. The Financial Projections set forth the projected financial performance of the Reorganized Debtor over a defined period of time based upon a number of assumptions and factors. The Financial Projections are unaudited. Impaired creditors and other interested parties should review Section IV of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtor.

The Debtor anticipates that the Financial Projections will show that the Reorganized Debtor will have a viable operation following the Chapter 11 Case and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### 3.      Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

### 4.      Additional Requirements for Nonconsensual Confirmation.

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as: (a) the plan otherwise satisfies the requirements for confirmation; (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class; and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### 5.      No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

### 6.      Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class ("Dissenting Class"), i.e., a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

### a.   Class of Secured Claims.

Each holder of an impaired secured claim either: (i) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim; (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (iii) receives the "indubitable equivalent" of its allowed secured claim.

### b.   Class of Unsecured Creditors.

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

### c.   Class of Interests.

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

The Debtor believes the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Interests are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Interests that are of equal priority.

## VI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following alternatives may be available to the Debtor: (i) a liquidation of the Debtor's Assets pursuant to chapter 7 of the Bankruptcy Code; or (ii) an alternative plan of reorganization or liquidation may be proposed and confirmed.

### A.   Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under chapter 7 of the Bankruptcy

Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that such a liquidation would result in smaller distributions being made to the Debtor's Creditors than those provided for in the Plan because: (a) the likelihood that other Assets of the Debtor would have to be sold or otherwise disposed of in an orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. The Debtor has found that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

> **B.      Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.**

If the Plan is not confirmed, the Debtor may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Debtor's Assets. However, the Debtor believes that the terms of the Plan provide for an orderly and efficient restructuring of the Debtor's obligations and will result in the realization of the most value for Holders of Claims against the Debtor's Estate.

## VII.    CERTAIN FEDERAL TAX MATTERS RELATING TO THE PLAN

> **A.      Introduction.**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain U.S. Holders, as defined below, (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims. This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtor has not requested, and does not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtor within the meaning of the IRC, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, pass through entities,

beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, non-U.S. Holders, and holders of Claims who are themselves in bankruptcy). This summary assumes that the various debt and other arrangements to which any the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtor "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a U.S. Holder ("U.S. Holder") is a holder of a Claim or Interest that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

### B.      U.S. Federal Income Tax Consequences to the Debtor.

Generally, when a debtor discharges its debt obligation for an amount less than the adjusted issue price of the debt obligation, the debtor must include such difference in its gross income as cancellation of indebtedness ("COD") income. Due to its status as a not-for-profit corporation generally exempt from U.S. federal income tax pursuant to section 501(a) of the IRC, however, the Debtor does not expect that the Plan will result in any significant federal income tax consequences to it.

Although the Debtor does not expect that the implementation of the Plan would adversely affect its tax-exempt status, and does not believe that any COD income triggered by the Plan would be treated as "unrelated business taxable income" ("UBTI") that is taxable to the Debtor, if the Debtor's tax-exempt status were adversely affected, or if any COD income would be treated as UBTI, the Debtor may become subject to tax on its income. Even if any COD income triggered by the Plan were treated as UBTI, it is expected that the Debtor would qualify for a bankruptcy exclusion rule pursuant to which the Debtor would not recognize such COD income so long as the discharge were granted by the Court or occurred pursuant to a plan of reorganization approved by the Court. In such case, however, the Debtor would generally be required to reduce certain income tax attributes otherwise available and of value to the Debtor by the amount of the COD income. Tax attributes subject to reduction include:  (a) net operating losses ("NOLs") and NOL carryforwards; (b) credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the Debtor's depreciable and nondepreciable assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate of the Debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards.

## C.      U.S. Federal Income Tax Consequences to Holders of Claims.

### 1.      Holders of Bond Claims (Class 3).

Pursuant to the Plan, the Holders of Series 2016 Bonds will exchange such bonds for pro rata shares of the Series 2021B Bonds and the Series 2021D Bonds (the "Bond Exchange"), and Bondholder Deficiency Claim will be waived. The tax consequences of the Bond Exchange to a particular holder will vary depending on each holder's circumstances. Accordingly, each holder should consult with its tax advisors as to any potential tax consequences to such holder, including as to (i) whether the Bond Exchange could result in a taxable disposition to a particular holder, and (ii) the treatment and tax consequences of the Series 2021B Bonds and the Series 2021D Bonds received by a holder in exchange for its allocable share of accrued and unpaid interest on its Series 2016 Bonds.

### 2.      Holders of General Unsecured Claims (Class 4).

As part of the Plan, a U.S. Holder of a General Unsecured Claim will receive a cash payment equal to 100% of the Allowed amount of such General Unsecured Claim, but will not receive any interest thereon, in each case subject to all defenses or disputes the Debtor may assert as to the validity or amount of such Claim.

The precise U.S. federal income tax consequences for a Holder of a General Unsecured Claim will depend, in part, upon the Holder's method of accounting (cash or accrual) and whether its Claim is a capital asset or item of property in the hands of the holder.

To the extent that a U.S. Holder does not have any basis in its General Unsecured Claim for U.S. federal income tax purposes (e.g., such U.S. Holder does not hold its General Unsecured Claim as a capital asset or as an item of property), then such U.S. Holder is generally expected to recognize income equal to the amount received for such Claim. Such income is further expected to be classified as ordinary in nature.

On the other hand, for a U.S. Holder that holds its General Unsecured Claim as a capital asset or as an item of property, such U.S. Holder would generally be expected to realize gain or loss in an amount equal to the difference between (a) the amount received for such Claim and (b) the adjusted tax basis in its General Unsecured Claim, determined immediately prior to the Effective Date. The character of such gain or loss will depend on certain factors that are specific to the U.S. Holder of a General Unsecured Claim.

Holders of General Unsecured Claims should consult their tax advisors with respect to the U.S. federal income tax consequences to them of the Plan.

### 3.       Holders of Resident Refund Claims (Class 5).

As part of the Plan, a U.S. Holder of a Resident Refund Claim will receive 100% of the Allowed amount of such Resident Refund Claims in accordance with the terms of the applicable Residency Agreement. The tax consequences to a U.S. Holder of a Resident Refund Claim depend upon circumstances specific to such holder, including whether the Resident Refund Claim arises out of a "continuing-care contract" as defined in section 7872(h) of the IRC and whether such U.S. Holder deducted any portion of his or her Entrance Fee at the time the Entrance Fee was paid. To the extent any such deductions were taken, a U.S. Holder may be required to recognize income upon receipt of the payment of the Resident Refund Claim.

Holders of Resident Refund Claims should consult their tax advisors with respect to the U.S. federal income tax consequences to them of the Plan.

### D.       U.S. Tax Consequences of Ownership of the Series 2021 Bonds.

The federal income tax consequences of holding the Series 2021 Bonds will depend on the terms, structure and composition of the Series 2021 Bonds.

As a condition precedent to the Effective Date, the Trustee will receive a satisfactory opinion of bond counsel that the interest on the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds will be excludable from gross income for federal income tax purposes and will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals. Notwithstanding this opinion, ownership of the Series 2021 Bonds may result in additional federal and state tax consequences to the U.S. Holders of the Series 2021 Bonds.

The opinion of bond counsel is based on current legal authority, may cover matters not directly addressed by such authorities, and represents bond counsel's judgment as to the proper treatment of the Series 2021 Bonds. It is not binding on the IRS or the courts. Furthermore, bond counsel cannot give, and will not give, any opinion or assurance about the further activities of the Reorganized Debtor, or about the effect of future changes to the IRC, the applicable regulations promulgated thereunder, or the interpretation or enforcement thereof by the IRS. The Reorganized Debtor, however, has agreed to act in a manner so as to maintain the exclusion from gross income of the interest on the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds. Interest on the Series 2021A Bonds is expected to be included in gross income for federal income tax purposes.

E.        **Information Reporting and Backup Withholding.**

The Reorganized Debtor will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**VIII.   RECOMMENDATION AND CONCLUSION**

The Debtor believes the Plan is in the best interests of its Estate, Creditors and other interested parties and urge the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

*[Remainder of Page Intentionally Left Blank]*

Dated: August 18, 2021                    Respectfully submitted,

                                          Kansas City United Methodist Retirement Home,
                                          Inc. d/b/a Kingswood Senior Living Community


                                          By:    /s/ Ross P. Marine_____
                                                 Name: Ross P. Marine_____
                                                 Title: Chair of the Board_____

## Exhibit A

**Plan of Reorganization**

**(Filed concurrently)**

## Exhibit B

## Plan Support Agreement

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "Plan Support Agreement") is made and entered into as of August 17, 2021 (the "Effective Date") by and between Kansas City United Methodist Retirement Home, Inc. d/b/a Kingswood Senior Living Community (the "Borrower") and each of the undersigned holders of Bonds (as defined herein) (the "Consenting Holders," and together with the Borrower, each a "Party" and collectively the "Parties").

## RECITALS

A.    The Industrial Development Authority of the City of Kansas City, Missouri (the "Issuer") issued its Industrial Development Authority of the City of Kansas City, Missouri $51,770,000 Senior Living Facility Revenue Bonds (Kingswood Project) Series 2016 (the "Bonds") pursuant to that certain Bond Trust Indenture, dated as of January 1, 2016 (the "Bond Indenture") between the Issuer and UMB Bank, N.A., as bond trustee (the "Bond Trustee").

B.    Proceeds of the Bonds were loaned by the Issuer to the Borrower pursuant to that certain Loan Agreement dated January 1, 2016 between the Borrower and the Issuer (the "Loan Agreement") primarily to (i) finance, refinance and reimburse the costs of certain facilities of the Borrower described in the Bond Indenture (the "Project"), (ii) refund certain bonds described in the Bond Indenture, (iii) fund required debt service reserves for the Bonds, (iv) fund interest on the Bonds, and (v) pay certain expenses relating to issuance of the Bonds

C.    The rights of the Issuer under the Loan Agreement were assigned to the Bond Trustee.  In addition, as security for its obligations with respect to the Bonds, the Borrower entered into: (i) that certain Master Trust Indenture (Amended and Restated) dated as of January 1, 2016 (the "MTI") with UMB Bank, N.A., in its capacity as master trustee (the "Master Trustee," and together with the Bond Trustee, the "Trustee"), pursuant to which the Borrower granted the Master Trustee a first priority lien on and security interest in substantially all of the Borrower's assets as described in the MTI; and (ii) that certain Deed of Trust and Security Agreement, dated as of January 1, 2016 (as supplemented and modified, the "Mortgage"), pursuant to which the Borrower granted the Master Trustee a first priority lien on and security interest in substantially all of the Borrower's assets as described in the Mortgage, including but not limited to the real estate associated with the Project and the improvements thereon, and all of the Borrower's equipment, furniture, fixtures and other personal property (all such collateral so granted under the Bond Documents (as defined below), the "Collateral").

D.    The MTI, the Bond Indenture, the Loan Agreement, the Mortgage, and any other document or agreement delivered as security for, or in respect to, the Bonds or the Borrower's obligations under any such documents are collectively referred to herein as the "Bond Documents."

C.      Each Consenting Holder holds debt arising out of, or related to, the Bonds, and the Consenting Holders hold debt, in aggregate, arising out of or related to the Bonds equal to at least fifty (50%) of the principal amount of the Bonds outstanding.

D.      Defaults, potential defaults or Events of Default have occurred (or will occur) under the Bond Documents.[1]

E.      The Borrower desires to implement a restructuring (the "Restructuring") of its financial obligations with respect to the Bonds and its other outstanding obligations on the terms and conditions set forth in the restructuring term sheet (including all exhibits therein, the "Term Sheet") attached hereto as **Exhibit 1**.

F.      The Consenting Holders have agreed to the Restructuring, solely on the terms and conditions outlined in the Term Sheet.

G.      The Borrower intends to implement the Restructuring by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing a case (the "Chapter 11 Case") in the United States Bankruptcy Court for the Western District of Missouri (the "Bankruptcy Court") no later than August 19, 2021 (the "Outside Petition Date").

H.      Each Party has reviewed, or has had the opportunity to review, this Plan Support Agreement and the Term Sheet with the assistance of professional legal advisors of its own choosing.

## STATEMENT OF AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Preliminary Statements. The statements set forth in the recitals are incorporated herein and form an integrated part of this Plan Support Agreement, subject to such modifications and amendments as may be permitted pursuant to Section 11 hereof.

2.      Effectiveness of Plan Support Agreement. Upon the execution of this Plan Support Agreement by the Parties, this Plan Support Agreement will constitute the legally binding and enforceable agreement of the Parties, effective as of the Effective Date.

3.      Agreements of the Borrower. Consistent with the Borrower's business judgment and the exercise of its fiduciary duties, the following are material covenants and conditions to the agreements contained herein:

---

[1]      Capitalized terms not otherwise defined herein have the meaning ascribed to such term in the Bond Documents, as applicable.

2

(a)     The Borrower shall provide drafts of the following documents (collectively, the "<u>Bankruptcy Documents</u>") in form and substance reasonably satisfactory to the Consenting Holders and the Trustee no later than five (5) business days prior to the Outside Petition Date:

    i)     Chapter 11 Petition with required documents, including: (i) officer's certificate, (ii) board resolutions, (iii) top 20 creditors list, (iv) Rule 1007(a)(1) corporate ownership statement, (v) declaration of electronic filing, and (vi) declaration regarding attorney compensation;

    ii)     Declaration in Support of First-Day Pleadings;

    iii)     Notice of Designation as Complex Chapter 11 Case;

    iv)     Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Providing Adequate Protection (the "<u>Cash Collateral Motion</u>"), and the proposed interim order (the "<u>Interim Cash Collateral Order</u>," and collectively with the final cash collateral order, the "<u>Cash Collateral Orders</u>"), which orders shall be drafted by the Trustee;

    v)     Plan of Reorganization (the "<u>Plan</u>");

    vi)     Disclosure Statement with respect to the Plan of Reorganization (the "<u>Disclosure Statement</u>");

    vii)     Motion for Order Authorizing Maintenance of Cash Management System and Continued Use of Certain Existing Bank Accounts, and Deposit Practices and Related Business Forms;

    viii)     Application for Approval of Payment of Prepetition Payroll;

    ix)     Application for Determination of Adequate Assurance of Payment to Utility Providers;

    x)     Debtor's Motion for Entry of an Order Authorizing Debtor to (I) Escrow Post-Petition Entrance Fees and (II) Refund Certain Resident Entrance Fees and proposed Order;

    xi)     Debtor's Motion for Entry of an Order Authorizing the Implementation of Procedures to Maintain and Protect Confidential Patient Information and proposed Order;

    xii)     Motion for Entry of an Order Authorizing the Debtor to Enter into the Plan Support Agreement and proposed Order;

xiii)     Request for Consideration of Certain "First Day" Matters.

(b)     The Borrower shall take all commercially reasonable steps to obtain approvals for the Restructuring as expeditiously as is reasonably practicable under applicable law, including the solicitation of requisite acceptances by means of the Disclosure Statement.

(c)     The Borrower shall take all commercially reasonable steps to obtain any and all requisite regulatory or third party approvals necessary to consummate the Restructuring as is reasonably practicable.

(d)     The Borrower will take all commercially reasonable efforts to file the Chapter 11 Case, contemporaneously with the Bankruptcy Documents, no later than the Outside Petition Date (the date on which the Chapter 11 Case and Bankruptcy Documents are actually filed shall be referred to herein as the "Petition Date").

(e)     The Borrower shall take all reasonably necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan reasonably acceptable in form and substance to the Consenting Holders and the Trustee (the "Confirmation Order") on or before the date that is eighty-two (82) days after the Petition Date.

(f)     The Plan effective date occurs on or before the date that is ninety-seven (97) days after the Petition Date (the "Plan Effective Date").

(g)     The Borrower shall take no action inconsistent with the Restructuring, the transactions contemplated thereby, or the expeditious confirmation and consummation of such transactions.

(h)     Subject to the exercise of its fiduciary duties, the Borrower shall not file a petition under the Bankruptcy Code or seek any similar relief without providing the Trustee and the Consenting Holders at least five (5) business days' written notice thereof.

(i)     In the event the Borrower proposes a plan of reorganization that does not comply with this Plan Support Agreement or that constitutes a Support Agreement Termination Event (as defined below), the Borrower will not assert that the Consenting Holders or the Trustee have expressly or impliedly supported, endorsed, or otherwise agreed to any financial information, including any projections or liquidation analysis, included in the Bankruptcy Documents or have otherwise agreed to or acknowledged any facts set forth in the Bankruptcy Documents.

4

(j)     The Borrower will not:

    i)      incur any further indebtedness with priority over the Bonds;

    ii)     transfer any assets other than in the ordinary course of its business other than miscellaneous assets not necessary for the operations of the Borrower; and

    iii)    take any action that would result in entry of an order terminating, whether in whole or in part, the Borrower's exclusive right to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code.

4.      <u>Agreements of Consenting Holders</u>.

(a)     <u>Ownership</u>. Each Consenting Holder represents and warrants that, as of the date hereof, such Consenting Holder either (i) is the sole legal or beneficial owner of a principal amount of the Bonds outstanding as set forth on **Schedule 1** hereto, and all related claims, rights, powers, and causes of action arising out of or in connection with or otherwise relating to such Bonds or the Bond Documents (collectively, the "<u>Claims</u>"), or (ii) has the power and authority to bind the legal and beneficial owner(s) of such Bonds and Claims to the terms of this Plan Support Agreement and, in either case, such Consenting Holder has full power and authority to vote on and consent to such matters concerning such Bonds outstanding and such Claims and to exchange, assign and transfer such Bonds and Claims.

(b)     <u>Restrictions on Transfers</u>. Until this Plan Support Agreement has been terminated in accordance with Section 8, each Consenting Holder shall not voluntarily sell, transfer, or assign any of its Bonds or Claims or any option thereon or any right or interest (voting or otherwise) therein unless the transferee thereof (i) has already executed this Plan Support Agreement or (ii) agrees in writing by executing the form of Joinder attached hereto as **Exhibit 2** to be bound, for the benefit of the Parties, by all of the terms of this Plan Support Agreement. Subject to applicable securities and bankruptcy law, this Plan Support Agreement shall in no way be construed to preclude any Consenting Holder or any of its respective subsidiaries or affiliates from acquiring additional Bonds; *provided*, *however*, that any such additional Bonds acquired by such Consenting Holder or any subsidiary or affiliate thereof shall automatically be deemed to be subject to the terms of this Plan Support Agreement.

(c)     <u>Voting on the Plan</u>. Subject to the terms and conditions of this Plan Support Agreement, and so long as this Plan Support Agreement has not been terminated, and further provided that the Disclosure Statement approved by the Bankruptcy Court contains information substantially similar to that set forth in the Disclosure Statement filed as part of the Bankruptcy Documents, each Consenting Holder will vote all claims that it holds or as to which it has voting authority with

5

respect to the Bonds outstanding, the Claims, and all other claims, rights, or interests that exist against the Borrower to accept the Plan, provide it is in a form substantially similar to that set forth in the Plan filed as part of the Bankruptcy Documents.

(d)     Support.   So long as this Plan Support Agreement has not been terminated, absent the consent of the Borrower, each Consenting Holder will not:

> i)      support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning the Borrower or its assets, other than the Restructuring;

> ii)     take any action inconsistent with the Term Sheet, the transactions contemplated hereby or thereby, or the expeditious confirmation and consummation of such transactions;

> iii)    vote against the Plan or otherwise agree, consent, or provide any support, to any other Chapter 11 plan or other restructuring or sale or liquidation of assets concerning the Borrower or its assets, other than the Restructuring;

> iv)     object to or otherwise commence any proceeding to oppose or alter the Plan or any of the terms of the Restructuring (or any other document filed in furtherance of, and that is consistent with the Restructuring); or

> v)      direct the Trustee to take any action or otherwise act in a manner contrary to the terms of this Plan Support Agreement.

(e)     Adequate Information; Compliance with Section 1125(g) of the Bankruptcy Code.   Each Consenting Holder has obtained "adequate information" (within the meaning of that phrase for purposes of Section 1125(a)(1) of the Bankruptcy Code) regarding the Restructuring and the Borrower has provided all material, relevant information that the Consenting Holder has requested in advance of executing this Plan Support Agreement. Additionally, for purposes of this Plan Support Agreement, the solicitation of its support of the Plan in accordance with the terms and conditions hereof complies with applicable law and that each Consenting Holder was solicited in a manner complying with applicable law.

(f)     Appearing in the Bankruptcy Court.   Notwithstanding any provision in this Plan Support Agreement to the contrary, nothing in this Plan Support Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent

6

with this Plan Support Agreement and the Restructuring and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring.

(g)   Direct the Trustee.  To the extent necessary, each Consenting Holder will direct the Trustee to take actions consistent with this Plan Support Agreement.

(h)   Documents.  The Consenting Holders shall direct the Trustee to take all reasonable efforts to draft or cause to be drafted the following documents in form and substance satisfactory to the Consenting Holders no later than the Outside Petition Date:

> i)     Interim Cash Collateral Order;
>
> ii)    2021 Bond Trust Indenture;
>
> iii)   2021 Master Trust Indenture;
>
> iv)   2021 Supplemental Master Trust Indenture;
>
> v)    2021 Deed of Trust; and
>
> vi)   2021 Loan Agreement (collectively with the documents listed in (i) through (v) above, the "Plan Support Documents").

5.   Representations and Warranties of the Borrower.  The Borrower represents and warrants to the Consenting Holders that the following statements are true, correct, and complete as of the date hereof:

(a)   it has all requisite corporate or similar authority to enter into this Plan Support Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of the Borrower's obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)   the execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by such Borrower of this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)   the execution, delivery, and performance by such Borrower of this Plan Support Agreement does not and shall not require any registration or filing

7

with, consent or approval of, notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body;

(d)     to the best of its knowledge, after reasonable diligence, the information provided in connection with the Restructuring and this Plan Support Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

(e)     this Plan Support Agreement is, and after the Petition Date but subject to the assumption of this Plan Support Agreement pursuant to Section 365 of the Bankruptcy Code shall be, a legally valid and binding obligation of the Borrower, enforceable in accordance with its terms.

6.     Representations and Warranties of the Consenting Holders. Each Consenting Holder represents and warrants to the Borrower that the following statements are true, correct, and complete as of the date hereof:

(a)     it has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Plan Support Agreement and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)     the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)     the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(d)     this Plan Support Agreement is the legally valid and binding obligation of such Consenting Holder, enforceable in accordance with its terms.

7.     Alternative Transactions.  From and after execution of this Plan Support Agreement until it is terminated pursuant to Section 8 hereof, neither the Borrower nor any of its officers, directors, employees, agents, representatives, or affiliates (including any investment banker or financial advisor retained by the Borrower) shall, directly or indirectly, encourage, solicit, or initiate any inquiry or proposal from, or encourage, solicit, or initiate any negotiations with, or solicit or initiate any discussions with any person or entity (other than the Consenting Holders and the Trustee or an affiliate, associate, representative or agent of such parties) concerning any potential sale of the Borrower or restructuring of the Borrower or a transaction that is similar to, in conflict with or in

8

substitution of the Restructuring pursuant to the terms hereof (each, an "Alternative Transaction"), or agree to endorse or take any other action to facilitate any Alternative Transaction, unless the Borrower has obtained the prior written consent of the Consenting Holders holding all rights related to or otherwise having voting authority with respect to 75% of the principal amount of the Bonds held collectively by the Consenting Holders who are signatory hereto (the "Requisite Consenting Holders").

8.     Termination of Support Agreement. Upon the occurrence of any Support Agreement Termination Event, this Plan Support Agreement shall be deemed terminated upon written notice from the non-breaching Party to the breaching Party.  In the event of any such termination, all Parties shall be immediately relieved of any obligations hereunder.  If the Chapter 11 Case has been filed prior to such occurrence, such notice may be provided as part of a motion for relief from the automatic stay; *provided* that nothing herein shall be deemed to require a motion for relief from the automatic stay to effect such termination.  Notwithstanding the above or anything else in this Plan Support Agreement to the contrary, upon termination of this Plan Support Agreement, any Consenting Holder shall be entitled as of right to change or withdraw its vote in favor of the Plan and be relieved from all obligations of a Consenting Holder under this Plan Support Agreement (collectively, a "Withdrawal"), with prior written notice thereof to the Borrower and, if applicable, compliance with Rule 3018 of the Federal Rules of Bankruptcy Procedure.  The occurrence of any one or more the following shall constitute a "Support Agreement Termination Event":

(a)     Failure by the Parties hereto to agree to the form and substance of any of the Plan Support Documents or the Bankruptcy Documents by the earlier of the Petition Date or the Outside Petition Date;

(b)     Any of the Bankruptcy Documents is withdrawn, materially modified or amended (except in the case of a document which is an interim order, by replacement with a final order that would otherwise meet the requirements of a Bankruptcy Document, or with the consent of the Consenting Holders and/or the Trustee);

(c)     The Borrower fails to file the Bankruptcy Documents on the Petition Date;

(d)     The Petition Date does not occur on or before the Outside Petition Date;

(e)     The Borrower:

i)     files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that requests or would result in a withdrawal, material modification, or amendment of the Plan, or that, as to any provision of the Plan, materially adversely affects the Consenting Holders;

9

ii) files a motion, pleading, objection, lawsuit, or administrative or adversary proceeding (or takes any action in support of such a motion or pleading filed by another party) in the Bankruptcy Court or other court, or otherwise assists in any of the foregoing, that requests or would result in a withdrawal, modification, or amendment (including in the case of document which is an interim order, by replacement with a final order) of the Restructuring; or

iii) files a motion, complaint, application, or other request seeking to disallow, subordinate, or limit in any way the Bonds held by the Consenting Holders, the Claims, or the liens of the Consenting Holders and/or the Trustee, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in any way the Bonds, Claims, or liens of the Consenting Holders and/or the Trustee, or asserting a claim against any Consenting Holder and/or the Trustee to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against any Consenting Holder and/or the Trustee.

(f) Following the Petition Date, the Bankruptcy Court has:

i) not entered an order authorizing the assumption of this Plan Support Agreement under Section 365 of the Bankruptcy Code within thirty (30) days of the Petition Date or such later date as is agreed to in writing by the Requisite Consenting Holders;

ii) entered an order materially staying, reversing, vacating, materially amending or modifying the Cash Collateral Orders (other than the replacement of the interim order with the final order) without the prior written approval of the Trustee, or fails to enter the interim Cash Collateral Order on or before the date that is seven (7) days after the Petition Date, or the final Cash Collateral Order on or before the date that is forty-two (42) days after the Petition Date on such terms as set out in the Cash Collateral Orders;

iii) not approved the Disclosure Statement on or before the date that is forty-two (42) days after the Petition Date, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

iv) not entered the Confirmation Order on or before the date that is eighty-two (82) days after the Petition Date, or by such

10

later date as is agreed to in writing by the Requisite Consenting Holders;

v)     entered an order denying confirmation of the Plan;

vi)    entered an order pursuant to Section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage the Borrower's business (unless the motion resulting in such order was filed or supported by the Trustee), or the Borrower files a motion, application or other pleading consenting to or acquiescing in any such appointment;

vii)   entered an order dismissing the Chapter 11 Case or an order pursuant to Section 1112 of the Bankruptcy Code converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

viii)  entered an order suspending the Chapter 11 Case under Section 305 of the Bankruptcy Code;

ix)    entered an order in the Chapter 11 Case, over the objection of the Trustee, approving financing pursuant to Section 364 of the Bankruptcy Code that (i) would grant an additional security interest or a lien that is equal or senior to that of the Trustee on any Collateral, or (ii) would grant to any party other than the Trustee a super priority administrative claim that is senior or equal to that granted to the Trustee under the Cash Collateral Orders; or

x)     granted relief that is inconsistent with this Plan Support Agreement or the Plan or that would result in a withdrawal, modification, or amendment of the Restructuring that is contrary to the Term Sheet and that has a material adverse effect on the Consenting Holders; *provided* that such relief has not resulted from any action or inaction by the Consenting Holders or the Trustee.

(g)   The Plan Effective Date shall not have occurred by the date that is ninety-seven (97) days after the Petition Date or by such later date as is agreed to by the Requisite Consenting Holders;

11

(h)    An injunction, judgment, order, decree, ruling, or charge shall have been entered that prevents consummation of the Restructuring and that remains in effect for longer than thirty (30) days;

(i)    There is a mutual written agreement to terminate this Plan Support Agreement by the Parties;

(j)    Failure by the Borrower to comply with any obligations under this Plan Support Agreement, other than those set forth in this Section 8 (which shall be an automatic termination), and such failure is not cured within five (5) business days after written notice thereof has been given to the Borrower;

(k)    Failure by the Borrower to comply with any obligations under this Section 8; and

(l)    Failure by any of the Consenting Holders to comply with any of its obligations under this Plan Support Agreement, and such failure is not cured within five (5) business days after written notice thereof has been given by the Borrower to such Consenting Holder and the Trustee.

9.    <u>Effect of Termination</u>.  Upon termination of this Plan Support Agreement, all obligations hereunder, shall terminate and shall be of no force and effect.

10.    <u>Cooperation; Further Assurances; Acknowledgment; Definitive Documents</u>.  Each Party shall cooperate with each other and shall coordinate its activities (to the extent practicable) in respect of all commercially reasonable actions necessary to consummate the Restructuring.  The Parties further agree to execute and deliver such other instruments and to perform such commercially reasonable acts, in addition to the matters herein specified, as may be appropriate or necessary, from time to time, to effectuate the Restructuring.

11.    <u>Amendments.</u> This Plan Support Agreement may not be modified, amended or supplemented except in a writing signed by the Parties.

12.    <u>GOVERNING LAW; JURISDICTION.</u> THIS PLAN SUPPORT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MISSOURI, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS PLAN SUPPORT AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL

12

BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE STATE OF MISSOURI HAVING JURISDICTION, AND BY EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING; <u>PROVIDED</u>, THAT AFTER THE PETITION DATE THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ISSUES RELATING TO THIS PLAN SUPPORT AGREEMENT.

13.     <u>Specific Performance</u>. It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Plan Support Agreement are uncertain at the time of entering into this Plan Support Agreement and that breach of this Plan Support Agreement would result in damages that would be difficult to determine with certainty.  It is understood that money damages would not be a sufficient remedy for any breach of this Plan Support Agreement, and the Parties shall each be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach.  Such remedies shall be deemed the exclusive remedies for breach of this Plan Support Agreement by any Party or its representatives.

14.     <u>Survival</u>. Notwithstanding any sale of the Bonds outstanding or Claims in accordance with Section 4(b) of this Plan Support Agreement, the agreements and obligations herein shall survive such sale and shall continue in full force and effect for the benefit of the Borrower and the Consenting Holders in accordance with the terms hereof, and any purchaser of such Bonds and/or Claims shall be bound by and subject to the terms of this Plan Support Agreement.

15.     <u>Headings</u>. The headings of the Sections, paragraphs, and subsections of this Plan Support Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

16.     <u>Successors and Assigns; Severability; Several Obligations.</u> This Plan Support Agreement is intended to bind and inure to the benefit of each of the Parties and its respective successors, assigns, heirs, executors, administrators, and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof.  The agreements, representations, and obligations of the Consenting Holders under this Plan Support Agreement are, in all respects, several and not joint.

17.     <u>No Third-Party Beneficiaries</u>. Unless expressly stated herein, this Plan Support Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

18.     <u>Consideration</u>. No consideration shall be due or paid to the Consenting Holders and the Trustee for agreement of the Consenting Holders to support the

Restructuring and to vote in favor of the Plan in accordance with the terms and conditions of this Plan Support Agreement, other than the Borrower's agreement to pursue the Restructuring and to file, pursue confirmation of, and implement the Plan in accordance with the terms and conditions of this Plan Support Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

19. _Prior Negotiations; Entire Agreement_. This Plan Support Agreement constitutes the entire agreement of the Parties related to the Restructuring, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties acknowledge that all Bond Documents shall continue in full force and effect.

20. _Counterparts_. This Plan Support Agreement and any amendments, joinders (including the joinder in the form of **Exhibit 2** hereto), consents, or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Facsimile or scanned signatures on this Plan Support Agreement shall be treated as originals for all purposes.

21. _Construction_. This Plan Support Agreement shall be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, and at arm's length and shall be interpreted without favor to any Party.

22. _Time of the Essence_. Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Plan Support Agreement.

23. _Notices_. All notices, demands, requests, consents, approvals, and other communications ("_Notice_" or "_Notices_") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) overnight mail by a reputable national overnight air courier service, or (iii) electronic mail, , addressed to the respective parties as follows:

If to Borrower:

Kansas City United Methodist Retirement Home, Inc. d/b/a
Kingswood Senior Living Community
10000 Wornall Road
Kansas City, MO 64114
Attn: Connie Cargin, Director of Finance
Telephone: 816.442.3223
Email: carginc@kingswoodretirementliving.com

Copy to:

14

McDowell, Rice, Smith & Buchanan, P.C.
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
Attn: Scott A. Long
      Jonathan Margolies
Telephone: (816) 753-5400
Email: slong@mcdowellrice.com
      jmargolies@mcdowellrice.com

and

Greystone
225 E. John Carpenter Freeway, Suite 700
Irving, TX 75062
Attn: Justin Spooner, First Vice President
Telephone: 972.402.3728
Email: juspooner@greystonecommunities.com

If to Trustee:

UMB BANK, N.A.
120 Sixth Street South, Suite 1400
Minneapolis, MN 55402
Attn: Gordon Gendler
Telephone: 612-337-7002
Email: gordon_gendler@umb.com

Copy to:

Mintz Levin Cohn Ferris Glovsky and Popeo, PC
One Financial Center
Boston, MA 02111
Attn: Daniel Bleck
Telephone: 617.348.4498
Email: dsbleck@mintz.com

Copy to: Consenting Bondholders

[See Schedule 1 Attached Hereto]

or to such other addresses as any Party may hereafter designate. Notice by courier or messenger service or by overnight mail shall be effective upon receipt. Notice by electronic mail shall be effective upon receipt.

15

24.     <u>Reservation of Rights</u>. Except as expressly provided in this Plan Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including its Claims.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Plan Support Agreement is terminated for any reason, each Party hereto fully reserves any and all of its rights.  Except as required by the Bankruptcy Code to assume, perform, or disclose this Plan Support Agreement, pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Plan Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

25.     <u>Nature of Consenting Holder Obligations</u>.   The obligations of each Consenting Holder hereunder shall be several, and not joint with the obligations of any other Consenting Holder herein, and no Consenting Holder shall be responsible in any way for the performance of the obligations of any other Consenting Holder hereunder.  Nothing herein or in any other agreement or document, and no action taken by any Consenting Holder pursuant hereto or thereto, shall be deemed to constitute the Consenting Holders as a group, a partnership, an association, a joint venture or any other kind of entity, or to create a presumption that the Consenting Holders are in any way acting in concert or as a group with respect to such obligations or the transaction contemplated by this Plan Support Agreement.  Each Consenting Holder shall be entitled to protect and enforce its rights, including without limitation, the rights arising out of this Plan Support Agreement, and it shall not be necessary for any other Consenting Holder to be joined as an additional party in the proceeding for such purpose.

26.     <u>Automatic Stay</u>.  The Borrower acknowledges that after the commencement of the Chapter 11 Case, the giving of notice of termination by any Party pursuant to this Plan Support Agreement or a Withdrawal shall not be a violation of the automatic stay provisions of Section 362 of the Bankruptcy Code.

27.     <u>Support Agreement Not a Plan</u>. This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms.  This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

*[Signature pages to follow]*

16

BORROWER:

**KANSAS CITY UNITED METHODIST
RETIREMENT HOME, INC. D/B/A
KINGSWOOD SENIOR LIVING
COMMUNITY**

By_____
Printed Name: Ross P. Marine
Title: Chair of the Board

[Consenting Holders signature pages on file with the Debtor]

## **SCHEDULE 1**
"CONSENTING HOLDERS"

[On file with Debtor]

## **EXHIBIT 1**

TERM SHEET

## RESTRUCTURING TERM SHEET (BONDHOLDER PROPOSED)

This Restructuring Term Sheet (this "***Term Sheet***"), dated as of August 17, 2021, sets forth certain of the principal terms and conditions of a financial restructuring (the "***Restructuring Transaction***") of the outstanding indebtedness of Kansas City United Methodist Retirement Home, Inc. d/b/a Kingswood Senior Living Community ("***Kingswood***" or the "***Borrower***"), including, without limitation, $51,770,000 Senior Living Facilities Revenue Bonds (Kingswood Project) Series 2016 (the "***Series 2016 Bonds***") issued by The Industrial Development Authority of the City of Kansas City, Missouri (the "***Issuer***") pursuant to that certain Bond Trust Indenture (the "***Indenture***") dated as of January 1, 2016, between the Issuer and UMB Bank, N.A., as trustee (the "***Trustee***"). This Term Sheet sets out the various terms and conditions of the Restructuring Transaction set forth by Kingswood, the members of an informal steering committee comprised of a majority of holders (the "***Majority Holders***") of Series 2016 Bonds (each referred to herein as a "***Steering Committee Member***" and, collectively, as the "***Steering Committee***"; and together with the Trustee, the "***Restructuring Proponents***") and the Trustee (collectively, the "***Parties***").

The Restructuring Transaction contemplates, among other things, an exchange (the "***Proposed Exchange***") of the outstanding Series 2016 Bonds, plus any accrued and unpaid interest thereon, as provided for herein, for new Series 2021 Bonds (as hereinafter defined). This Term Sheet contemplates the consummation of the Restructuring Transaction through a Plan of Reorganization (the "***Plan***") in a chapter 11 proceeding of the Borrower (the "***Anticipated Bankruptcy Proceeding***") pending before a court of a competent jurisdiction (the "***Bankruptcy Court***") as more fully described below.

This Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation between the Borrower, the Issuer and the Trustee acting at the direction of the Steering Committee, the final terms of which may differ from and will control over this Term Sheet. This Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of any plan of reorganization, including without limitation, the Plan, or the Proposed Exchange.

**THIS TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE SERIES 2016 BONDS. THIS TERM SHEET IS SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND COMPARABLE STATE STATUTES. NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF THE BORROWERS, THE TRUSTEE, THE MAJORITY HOLDERS, AND ALL OTHER PARTIES.**

### I.    Overview

This Term Sheet sets forth the principal terms of a proposed Restructuring Transaction to (i) address the restructuring of the debts and other obligations of Kingswood, including the Series 2016 Bonds; and (ii) provide for additional investment for necessary capital expenses and working capital, which investment shall be provided by Steering Committee Members, which Restructuring Transaction shall be consummated through the Anticipated Bankruptcy Proceeding.

1

## II. **Bond Restructuring**

| Series 2021 Bonds | |
|---|---|
| **Restructuring Overview** | The Restructuring Transaction contemplates, among other things, an exchange of the outstanding Series 2016 Bonds in the aggregate outstanding principal amount of approximately $51,770,000, plus any accrued and unpaid interest thereon, for $27,000,000 principal amount of new Series 2021B Bonds and $12,050,000 principal amount of new Series 2021D Bonds.<br><br>In conjunction with the bond exchange, (i) the Issuer will issue $5,500,000 principal amount of new Series 2021A Bonds to refinance certain project costs and fund working capital and other expenses for the community[1], and (ii) the Issuer also will issue $4,400,000 principal amount of new Series 2021C Bonds to fund designated capital expense improvements for the community[2] (the Series 2021A Bonds, Series 2021B Bonds, Series 2021C Bonds, and Series 2021D Bonds are referred to collectively as the "***Series 2021 Bonds***"). While the Series 2021A Bonds will be taxable for federal income tax purposes, the Series 2021B Bonds, Series 2021C Bonds and Series 2021D Bonds will be tax exempt.<br><br>The Restructuring Transaction will be implemented through the Plan. The Series 2021 Bonds will be issued on the effective date of the Plan (the "***Effective Date***"). The issuance, and terms and conditions of the Series 2021 Bonds will be set forth in definitive documents, including a Master Trust Indenture, Loan Agreement and Bond Indenture (collectively, the "***Series 2021 Bond Documents***").<br><br>The Borrower will commence the Anticipated Bankruptcy Proceedings and will file the Plan and draft forms of Series 2021 Bond Documents and a disclosure statement to the Plan (the "***Disclosure Statement***"), that is acceptable to the Trustee and the Majority Holders, which contains the terms and conditions outlined in this Term Sheet, on the timeline set forth below.<br><br>Prior to the commencement of the Anticipated Bankruptcy Proceeding, the Borrower shall provide copies of drafts of the Plan, Disclosure Statement and other pleadings, and documents, including the Series 2021 Bond Documents (collectively, the "***Solicitation Documents***") to the Trustee and the Majority Holders for their review and consent. Any substantive amendments, modifications or supplements to the Solicitation Documents shall be reviewed by, and acceptable to, the Trustee and the Steering Committee; provided, however, that no amendment, modification, or supplement shall be materially different from this Term Sheet, unless otherwise agreed by the Trustee, Steering Committee and Borrower. |
| **Steering Committee Support** | Prior to the commencement of the Anticipated Bankruptcy Proceeding, and subject to the timeline set forth herein, the Steering Committee agrees to take all |

---

[1] Of the $5,500,000, $500,000 shall be used to fund up the Series 2021A DSRF (defined below).
[2] Of the $4,400,000, $400,000 shall be used to fund up the Series 2021C DSRF (defined below).

|  | necessary steps to enter into a binding support agreement (the "***Support Agreement***") concerning the Steering Committee's commitment to and support of the Plan and the Restructuring Transaction. |
|---|---|
|  | The Steering Committee agrees to not take any actions inconsistent with this Term Sheet, and to direct the Trustee not to take any actions inconsistent with this Term Sheet. The Steering Committee agrees to consent to the Restructuring Transaction as set forth in the Plan and this Term Sheet by delivering duly executed and completed consents on a timely basis pursuant to the ongoing solicitation of votes for the Restructuring Transaction and shall not change such consents; provided, however, such consents shall only be binding to the extent set out in the Support Agreement. The Steering Committee agrees not to otherwise commence any proceeding to oppose the Plan and the Restructuring Transaction. All such actions by the Steering Committee are subject to the terms of the Support Agreement. |
| **Majority Holders Retention of Bonds and Claims** | The Steering Committee agrees that they shall not sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Series 2016 Bonds, or any right, claim, or interest (voting or otherwise) related to or arising from the Series 2016 Bonds, subject to the terms and conditions of the Support Agreement. |
| **Restructuring of Series 2016 Bonds** | **Exchange of Series 2016 Bonds**: Holders shall receive in exchange for such bonds (a) ratable shares of Series 2021B Tax-Exempt Bonds in the principal amount of $27 million, and (b) ratable shares of Series 2021D Capital Appreciation Bonds in the principal amount of $12.05 million, on the following terms: <br><br> Series 2021B Tax-Exempt Bonds: <br> • Principal of $27,000,000; <br> • Term of 25 years; <br> • Interest to accrue at a rate of 5.0% per annum payable semi-annually; <br> • Interest will be tax exempt for federal income tax purposes; <br> • Payments on the Series 2021B Bonds will be interest only for the first 13 years, with annual principal payments commencing thereafter (commencing on the second interest payment date after the interest-only period) with such annual principal payments being based on a 12 year amortization schedule as set forth on "**Schedule 1**"; and <br> • Secured lien on all assets of Kingswood, junior only to the Series 2021A Bonds and Series C Bonds and senior to the Series 2021D Bonds. <br><br> Series 2021D Capital Appreciation Bonds: <br> • Principal Amount: $12,050,000; <br> • Term of 25 years; <br> • Interest to accrue at 2.0% per annum, payable from Excess Cash (defined below) pursuant to the Distribution Waterfall (defined below); <br> • Interest will be tax exempt for federal income tax purposes; |

3

|  | • Principal payable semi-annually from Excess Cash with such available Excess Cash applied first to accrued interest then to principal;<br>• Series 2021D Bonds shall be subordinate to the payment of the Series 2021A Bonds, Series 2021B Bonds, and Series 2021C Bonds; and<br>• Subordinate lien on all assets of Kingswood, junior only to the Series 2021A Bonds, Series 2021B Bonds, and Series 2021C Bonds. |
|---|---|
| **New Money Bonds for Working Capital** | On the Effective Date, Kingswood will issue for purchase by the Steering Committee Members new Series 2021A Taxable Bonds under the following terms:<br><br>• Principal of $5,500,000;<br>• Term of 16 years;<br>• Interest to accrue at a rate of 10% per annum payable semi-annually;<br>• Interest will be taxable for federal income tax purposes;<br>• Payments on the Series 2021A Bonds will be interest only for the initial 3 years, with annual principal payments commencing thereafter (commencing on the second interest payment date after the interest only period), with such annual principal payments being based on a 13 year amortization schedule as set forth on "**Schedule 2**";<br>• Make-whole provision applicable if Series 2021A Bonds are refinanced prior to 10-years; par call on and after 10 year. Make-whole premium until 10-year par call calculated based on U.S. Treasuries plus 25 basis points; and<br>• First priority lien on all assets of Kingswood (i.e., senior to the Series 2021B Bonds and Series 2021D Bonds; pari passu with Series 2021C Bonds). |
| **New Money Bonds for Capital Improvements** | On the Effective Date, the Issuer will issue for purchase by the Steering Committee Members new Series 2021C Tax-Exempt Bonds under the following terms:<br><br>• Principal of $4,400,000;<br>• Term of 25 years;<br>• Interest to accrue at a rate of 7.5% per annum payable semi-annually;<br>• Interest will be tax exempt for federal income tax purposes;<br>• Payments on the Series 2021C Bonds will be interest only for the first 13 years, with annual principal payments commencing thereafter (commencing on the second interest payment date after the interest only period) with such annual principal payments being based on a 12 year amortization schedule as set forth on "**Schedule 3**"; and |

4

|  | • Secured lien on all assets of Kingswood, pari passu with Series 2021A Bonds, and senior to the Series 2021B Bonds and Series 2021D Bonds. |
|---|---|
| **Essential Terms and Conditions under Bond Indenture** | |
| **Operating Account** | Upon the Effective Date, Kingswood shall establish an Operating Account, which shall be subject to the Trustee's lien under the Series 2021 Bond Documents and pursuant to a deposit account control agreement reasonably acceptable to the Trustee. The Operating Account shall be funded in accordance with the provisions contained herein. |
| **Revenue Fund** | Upon the Effective Date, Kingswood shall establish a Revenue Fund, which shall be subject to the Trustee's lien under the Series 2021 Bond Documents, pursuant to which all revenues and other income of Kingswood (the "**Revenues**") shall, on and after the Effective Date, be deposited on a weekly basis.[3] Funds from the Revenue Fund shall be withdrawn pursuant to the Distribution Waterfall below. |
| **Repair and Replacement Fund** | Upon the Effective Date, Kingswood shall establish a Repair and Replacement Fund,  which shall be subject to the Trustee's lien under the Series 2021 Bond Documents, and fund such Repair and Replacement Fund from proceeds of the Series 2021C Bonds (less amounts necessary to fund the Series 2021C DSRF (defined below)). Funds from the Repair and Replacement Fund shall only be withdrawn to pay the costs associated with the items designated on a schedule to be agreed upon by Kingswood and the Steering Committee and appended as "**Schedule 4**" to this Term Sheet. |
| **Bond Fund** | Upon the Effective Date, Kingswood shall establish a Bond Fund with the Trustee, subject to the Trustee's lien under the Series 2021 Bond Documents, with subaccounts for each series of Series 2021 Bonds.<br><br>In accordance with the Distribution Waterfall below, the Bond Fund will receive (i) the monthly payments of principal and interest due and payable under the Series 2021A Bonds, Series 2021B Bonds, and Series 2021C Bonds, and (ii) Excess Cash (as defined herein and to the extent provided for in the Distribution Waterfall) with such amounts then being distributed to holders of Series 2021D Bonds. |
| **Debt Service Reserve Fund** | Upon the Effective Date, Kingswood shall establish a Debt Service Reserve Fund with the Trustee, subject to the Trustee's lien under the Series 2021 Bond Documents, to secure payment of the Series 2021A Bonds, Series 2021B Bonds, and Series 2021C Bonds. |

---

[3] Monies received from new entrance fees shall be first used to pay any obligated entrance fee refund with the balance being deposited into the Revenue Fund.

| | |
|---|---|
| | • A subaccount for the Debt Service Reserve Fund associated with the Series 2021A Bonds will be established in the amount of $500,000 and funded from proceeds of the Series 2021A Bonds ("Series 2021A DSRF").<br><br>• A subaccount for the Debt Service Reserve Fund associated with the Series 2021B Bonds will be established and partially funded from existing amounts remaining in the debt service reserve accounts for the Series 2016 Bonds to secure payment of the Series 2021B Bonds and the balance funded as described below ("Series 2021B DSRF").<br><br>• A subaccount for the Debt Service Reserve Fund associated with the Series 2021C Bonds will be established and funded in the amount of $400,000 from proceeds of the Series 2021C Bonds. ("Series 2021C DSRF")<br><br>On the Effective Date, the Series 2021B DSRF requirement shall equal the least of the three-part tax test[4], since the Series 2021B Bonds are tax exempt. The balance in the existing Series 2016 reserve account shall be deposited into the 2021B DSRF on the issue date and since there are insufficient funds available in the existing Series 2016 reserve account to fund the Series 2021B DSRF requirement, after issuance the Series 2021B DSRF shall build up to the Series 2021B DSRF requirement pursuant to the Distribution Waterfall.<br><br>The Series 2021A DSRF, Series 2021B DSRF, and Series 2021C DSRF shall not become an asset of Kingswood, but shall remain funds held by the Trustee for the benefit of the holders of the Series 2021A Bonds, Series 2021B Bonds, and Series 2021C Bonds, respectively. Any draw on any of the debt service reserve funds shall be an event of default under the Series 2021 Bond Documents. |
| **Distribution Waterfall** | On the first Business Day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority, to the extent there exists no event of default under the Series 2021 Bond Documents (the "***Distribution Waterfall***"):<br><br>• First, to Kingswood for deposit to the Operating Fund the amounts necessary for Kingswood to pay in the upcoming month: (i) budgeted operating expenses for the upcoming month, including without limitation for costs of operating, managing, maintaining and improving the Facilities, budgeted capital expenses (after funds in the Series 2021C Repair and Replacement Project Fund have been fully disbursed for the items listed on **Schedule 4**), including costs for the refurbishment of Independent Living Units as is necessary for occupancy or reoccupancy of the Independent Living Units; (ii) the refunding of Entrance Fees; and, (iii) payments on Non-Recourse Indebtedness (the amount to be |

---

[4] The least of 10% of par, 125% of average annual debt service and 100% of maximum annual debt service. Based on the proposed amortization for the Series 2021B Bonds in Schedule 1, the debt service reserve fund requirement shall be 10% of the par amount, $2,700,000.

deposited from the Revenue Fund to the Operating Fund in any given month shall take into account any unapplied amount withdrawn for such purpose in a prior month or any amount of the Series 2021A Funds remaining on deposit in the Operating Fund, but excluding from the calculation of the amount to be deposited in the Operating Fund from the Revenue Fund the amount of any Excess Cash (defined below) released to Kingswood that remains in the Operating Fund) , as such amount is set forth in a certificate from the Borrower delivered to the Trustee no later than seven (7) Business Days prior to the first Business Day of a month;

- Second, to the Series 2021A Debt Service Fund and the Series 2021C Debt Service Fund in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date of the respective bonds;

- Third, to the Series 2021B Debt Service Fund in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date for the Series 2021B Bonds;

- Fourth, commencing on the month following the expiration of the interest only period for the Series 2021A Bonds and monthly thereafter until the Series 2021A Bonds are satisfied in full, to the Debt Service Fund subaccount for the Series 2021A Bonds in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date for such bonds;

- Fifth, commencing on the month following the expiration of the interest only period for the Series 2021C Bonds and monthly thereafter until the Series 2021C Bonds are satisfied in full, to the Debt Service Fund subaccount for the Series 2021C Bonds in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date for such bonds;

- Sixth, commencing on the month following the expiration of the interest only period for the Series 2021B Bonds and monthly thereafter until the Series 2021B Bonds are satisfied in full, to the Debt Service Fund subaccount for the Series 2021B Bonds in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date for such bonds;

- Seventh, commencing on the next month after the Series 2021C Bonds are satisfied, to replenish any deficiency as of the Effective Date in the Series 2021B DSRF necessary to make the amount therein equal the Debt Service Reserve Fund Requirement with respect to the Series 2021B Bonds; and

- Eighth, all amounts remaining above one-hundred (100) days Cash on Hand in the Revenue Fund after application of paragraphs *First* through and including *Seven* above (such remaining amounts referred to as "***Excess Cash***") shall be distributed as follows: (1) seventy percent (70%) to the amounts outstanding under the Series 2021D Bonds; and (2) thirty percent (30%) to Borrower as unrestricted funds to be deposited in a separate account to be established and maintained by Kingswood subject to the lien of the Trustee.

| Operating/Financial Covenants | |
|---|---|
| **Days Cash on Hand Covenant** | Kingswood shall report Days Cash on Hand semiannually, commencing June 30, 2022, and continuing semi-annually thereafter (each such date being a "***Semi-Annual Testing Date***"). Kingswood covenants to maintain Days Cash on Hand on each such Semi-Annual Testing Date at or above the levels set forth on <u>**Schedule 5**</u> (the "***Days Cash on Hand Covenant***") |
| **IL Occupancy Covenants** | Kingswood shall maintain the occupancy levels, as of the dates and no less than those, set forth on <u>**Schedule 6**</u> for the independent living (apartment and Villa) units (the "***IL Occupancy Covenant***").  Occupancy shall be based on the actual occupancy independent living as of the last day of each such fiscal quarter. |
| **AL/SNF Occupancy Covenants** | Kingswood shall maintain as of the testing dates set forth in <u>**Schedule 7**</u> and <u>**Schedule 8,**</u> as applicable, (i) the occupancy levels of no less than those set forth in <u>**Schedule 7**</u> for Assisted Living/Memory Care ("***AL***") units, and (ii) the occupancy levels  of no less than those set forth on <u>**Schedule 8**</u> for Nursing Center ("***SNF***") units (the "***AL/SNF Occupancy Covenant***"). |
| **Debt Service Coverage Ratio Covenant** | Kingswood shall achieve a DSCR (the "***DSCR Covenant***") in the amount, and tested on a rolling four quarter basis as of the date (each such date being a "***DSCR Testing Date***"), set forth on <u>**Schedule 9**</u>.<br><br>The numerator of the DSCR will include net Entrance Fees (*i.e.*, Entrance Fees received during such period minus Entrance Fees refunded during such period) as well as all other revenue received during such period that is available for debt service, minus Operating Expenses. The denominator of the DSCR will be Maximum Annual Debt Service on the Series 2021A Bonds, Series 2021B Bonds, and Series 2021C Bonds; provided that the denominator for the Fiscal Year ending December 31, 2046, the last year of amortization of the Series 2021 Bonds, shall be deemed not to exceed $3,700,000. |
| **Failure to meet covenants** | (i)      If Kingswood fails to meet the Days Cash on Hand Covenant, the AL/SNF Occupancy Covenant, or the DSCR Covenant as of any testing date, then upon the first occurrence of such non-compliance, if so directed by the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2021 Bonds, Kingswood shall be required to retain a management consultant within <u>30</u> days of receipt of such direction that is acceptable to the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2021 Bonds, to provide a report and improvement plan to the Trustee.  The proposed management consultant will be deemed <u>**not**</u> acceptable unless a majority has consented to the proposed management consultant within 14 days.<br><br>(ii)      In the event that a management consultant is required under the provisions of (i) above, and if Kingswood fails to meet the Days Cash on Hand Covenant, the AL/SNF Occupancy Covenant or the DSCR Covenant by the end of the second quarter after the report and improvement plan described in (i) above are provided, Kingswood shall, *if so directed by the holders of not less than a* |

| | |
|---|---|
| | *majority of the outstanding aggregate principal amount of the Series 2021 Bonds*, appoint an independent third party manager within <u>30</u> days of receipt of such direction that is acceptable to such holders or if a third party manager is then managing the facility, replace the then current manager with a manager acceptable to such holders; <u>provided</u> <u>however</u> that if at the end of such second quarter, a Consultant certifies that Kingswood has reasonably complied with all of the recommendations contained in the report and improvement plan described in (i) above, then the period for compliance with such covenants shall be extended by two additional quarters; <u>provided</u> that if the manager fails to reasonably comply with such recommendations at any time during such extended two quarter period then at any such time, a majority of bondholders may cause a replacement of manager. For avoidance of doubt, failure to comply with such covenants after the extended period (if applicable) may result in a change of management if directed by the majority of bondholders.<br><br>(iii)    If on any testing date, the DSCR is 1.0x or below **or** the Days Cash on Hand is less than 90% of the applicable covenant amount as of a Testing Date, it shall constitute an Event of Default under the Series 2021 Bond Documents.<br><br>(iv)    Same remedies in (i) above will apply for failure to meet the IL Occupancy Covenant, provided that the Borrower shall be required to hire a marketing consultant in lieu of a management consultant.  In the event that a marketing consultant is required and the Borrower fails to meet the IL Occupancy Covenant by the end of the second quarter after the report and improvement plan are provided, the Borrower shall, at the direction of the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2021 Bonds, replace the marketing agent, or if there is no acting marketing agent, the Borrower shall be required to hire a marketing agent acceptable to the Trustee. |
| **Additional Debt** | No additional indebtedness while the Series 2021D Bonds remain outstanding without the consent of the majority of bondowners, except for non-recourse debt which may be incurred for a term not in excess of 5 years and in an amount up to but not in excess of an aggregate of $250,000 for the first four years and $350,000 thereafter, for the most recent Fiscal Year for which Financial Statements are available. |
| **Operations/Reporting Requirements** | |
| **Reporting** | The Borrower shall deliver monthly financial statements (including a balance sheet, an income statement, an escrow statement and a cash flow statement) and a monthly report on marketing, occupancy and sales within 45 days following the prior month end comparing actual results to budget and shall include an explanation of variances of more than 10% from budgeted amounts. Such financial statements shall also include an Entrance Fee analysis.  Monthly reporting will be replaced by quarterly reporting after payment in full of Series 2021A Bonds, and for so long as the Borrower is in compliance with all of its covenants under Series 2021 Bond Documents; *provided* that quarterly reporting shall revert to monthly reporting in the event that the Borrower is out |

9

|  | of compliance with any of its covenants under the Series 2021 Bond Documents. |
|---|---|
|  | The Borrower shall enter into a new Continuing Disclosure Agreement providing for the same reporting as required by the existing Continuing Disclosure Agreement (in addition to the information required above), except for any amendments thereto required to reflect changes to Rules 15c2-12. |
| **Update Calls** | For the first year from the Effective Date, the Borrower shall hold monthly calls for holders of the Series 2021 Bonds. After such time, the Borrower shall hold quarterly calls, unless a majority of bondholders requests monthly calls. |
| **Management** | The Borrower's Management and Marketing Services Agreement with GMSC Missouri, LLC ("***Greystone***") will be amended to extend the termination date through December 31, 2026 (i.e., an approximately 5 year term after the Effective Date), in accordance with existing financial terms and conditions as set forth in current agreement. |
| **Entrance Fees** | So long as the Series 2021 Bonds are Outstanding, the Institution shall not reduce the amount of any Entrance Fees or offer any new discounts to Entrance Fee pricing which reduces the effective amounts of current gross Entrance Fees received by greater than 5% in the aggregate from the pricing schedule attached hereto as **Schedule 10**, to be tested quarterly on a rolling 12-month basis beginning with fiscal quarter ended December 31, 2022, without consent of a majority of the bondholders. Information about Entrance Fees and discounts will be provided as part of the reporting described in "Reporting" above. Discounting by more than 5%, as described above, will be an Event of Default upon the direction of a majority of bondholders. |
| **General Provisions** | |
| **Release/Exculpation** | The Restructuring Transaction contemplated by this Term Sheet shall contain customary release, injunction and exculpation provisions for all Parties to the Restructuring Transaction to the extent available under applicable law. The Parties hereby agree that they will use respective best efforts to obtain approval of such release, injunction and exculpatory provisions, which by way of example only shall include opposing any effort by any person or entity that is not a Party to this Term Sheet to eliminate or reduce the scope of such release, injunction and exculpation provisions. |
| **Sponsor Loan** | Amounts owing to (1) the Borrower's Wesley Fund which has an outstanding principal amount due of $1 million plus accrued interest and (2) the Kingswood Foundation which has an outstanding principal amount due of $80,000 plus accrued interest shall be waived on the Effective Date. |
| **Binding Effect** | The obligation of each of the undersigned parties to pursue the Restructuring Transaction in accordance with the terms hereof is subject to (i) the negotiation, execution and delivery of mutually acceptable final documentation, (ii) receipt of all necessary consents, including any consent of any party's credit or other committee or board of directors and any regulatory approvals, and (iii) receipt |

| | |
|---|---|
| | of a satisfactory tax opinion confirming that the interest on the Series 2021B Bonds, Series 2021C Bonds, and Series 2021D Bonds will be excluded from gross income for federal income tax purposes under the Internal Revenue Code. |
| **Timeline** | The following timeline will be applicable: <br><br> (1) Term Sheet approved by the Parties – August 17, 2021; <br><br> (2) First draft of Master Trustee Indenture, Bond Indenture and other key Series 2021 Bonds Documents, and Support Agreement to be delivered by the Trustee – June 10, 2021; <br><br> (3) First draft of "First Day" pleadings for Anticipated Bankruptcy Proceeding, Plan, disclosure statement in support of Plan (the "***Disclosure Statement***"), motion to establish solicitation procedures, and proposed cash collateral budget to be delivered by the Borrower – August 5, 2021; <br><br> (4) Final drafts of items identified in (2) and (3) above agreed to by the Parties – August 18, 2021; <br><br> (5) Petition Date – The date on which the Borrowers file the Anticipated Bankruptcy Proceeding with the Bankruptcy Court – August 18, 2021; <br><br> (6) Entry of Interim Cash Collateral Order – August 25, 2021; <br><br> (7) Entry of Final Cash Collateral Order, approval of Disclosure Statement, and motion to establish solicitation procedures – September 29, 2021; <br><br> (8) Confirmation of Plan – November 8, 2021; and <br><br> (9) Effective Date of Plan, including issuance of Series 2021 Bonds – November 15, 2021. <br><br> *For dates after August 18, 2021, parties agree to use their good faith efforts to achieve these dates, but these dates are subject to bankruptcy court scheduling and orders. |
| **Miscellaneous** | This Term Sheet shall be governed by the laws of the State of Missouri. <br><br> This Term Sheet may be executed in one or more counterparts, and when all counterparts have been executed, each executed counterpart will have the force and effect of the original. |

## **SCHEDULE 1**

Aug 4, 2021  12:43 pm  Prepared by DBC Finance                                              (Finance 8.500 Kingswood DBC (08.02.2021):2021_V2)   Page 6

### BOND DEBT SERVICE

**Kingswood - DF Modified, REVISED
Series 2021 B (Tax-Exempt - Restructured)**

| | Dated Date | 11/15/2021 |
| | Delivery Date | 11/15/2021 |

| Period Ending | Principal | Coupon | Interest | Debt Service |
|---|---|---|---|---|
| 11/15/2022 | | | 1,350,000 | 1,350,000 |
| 11/15/2023 | | | 1,350,000 | 1,350,000 |
| 11/15/2024 | | | 1,350,000 | 1,350,000 |
| 11/15/2025 | | | 1,350,000 | 1,350,000 |
| 11/15/2026 | | | 1,350,000 | 1,350,000 |
| 11/15/2027 | | | 1,350,000 | 1,350,000 |
| 11/15/2028 | | | 1,350,000 | 1,350,000 |
| 11/15/2029 | | | 1,350,000 | 1,350,000 |
| 11/15/2030 | | | 1,350,000 | 1,350,000 |
| 11/15/2031 | | | 1,350,000 | 1,350,000 |
| 11/15/2032 | | | 1,350,000 | 1,350,000 |
| 11/15/2033 | | | 1,350,000 | 1,350,000 |
| 11/15/2034 | | | 1,350,000 | 1,350,000 |
| 11/15/2035 | 960,000 | 5.000% | 1,350,000 | 2,310,000 |
| 11/15/2036 | 1,010,000 | 5.000% | 1,302,000 | 2,312,000 |
| 11/15/2037 | 1,060,000 | 5.000% | 1,251,500 | 2,311,500 |
| 11/15/2038 | 1,905,000 | 5.000% | 1,198,500 | 3,103,500 |
| 11/15/2039 | 2,000,000 | 5.000% | 1,103,250 | 3,103,250 |
| 11/15/2040 | 2,100,000 | 5.000% | 1,003,250 | 3,103,250 |
| 11/15/2041 | 2,205,000 | 5.000% | 898,250 | 3,103,250 |
| 11/15/2042 | 2,315,000 | 5.000% | 788,000 | 3,103,000 |
| 11/15/2043 | 2,435,000 | 5.000% | 672,250 | 3,107,250 |
| 11/15/2044 | 2,555,000 | 5.000% | 550,500 | 3,105,500 |
| 11/15/2045 | 2,685,000 | 5.000% | 422,750 | 3,107,750 |
| 11/15/2046 | 5,770,000 | 5.000% | 288,500 | 6,058,500 |
| | 27,000,000 | | 28,378,750 | 55,378,750 |

## SCHEDULE 2

### BOND DEBT SERVICE

**Kingswood - DF Modified, REVISED**
**Series 2021 A (Taxable - New Money)**

Dated Date              11/15/2021
Delivery Date           11/15/2021

| Period Ending | Principal | Coupon | Interest | Debt Service |
|---|---|---|---|---|
| 11/15/2022 |  |  | 550,000 | 550,000 |
| 11/15/2023 |  |  | 550,000 | 550,000 |
| 11/15/2024 |  |  | 550,000 | 550,000 |
| 11/15/2025 | 225,000 | 10.000% | 550,000 | 775,000 |
| 11/15/2026 | 245,000 | 10.000% | 527,500 | 772,500 |
| 11/15/2027 | 270,000 | 10.000% | 503,000 | 773,000 |
| 11/15/2028 | 300,000 | 10.000% | 476,000 | 776,000 |
| 11/15/2029 | 330,000 | 10.000% | 446,000 | 776,000 |
| 11/15/2030 | 360,000 | 10.000% | 413,000 | 773,000 |
| 11/15/2031 | 400,000 | 10.000% | 377,000 | 777,000 |
| 11/15/2032 | 435,000 | 10.000% | 337,000 | 772,000 |
| 11/15/2033 | 480,000 | 10.000% | 293,500 | 773,500 |
| 11/15/2034 | 530,000 | 10.000% | 245,500 | 775,500 |
| 11/15/2035 | 580,000 | 10.000% | 192,500 | 772,500 |
| 11/15/2036 | 640,000 | 10.000% | 134,500 | 774,500 |
| 11/15/2037 | 705,000 | 10.000% | 70,500 | 775,500 |
|  | 5,500,000 |  | 6,216,000 | 11,716,000 |

# SCHEDULE 3

## BOND DEBT SERVICE

**Kingswood - DF Modified, REVISED
Series 2021 C (Tax-Exempt - Capital Improvement)**

| | |
|---|---|
| Dated Date | 11/15/2021 |
| Delivery Date | 11/15/2021 |

| Period Ending | Principal | Coupon | Interest | Debt Service |
|---|---|---|---|---|
| 11/15/2022 | | | 330,000 | 330,000 |
| 11/15/2023 | | | 330,000 | 330,000 |
| 11/15/2024 | | | 330,000 | 330,000 |
| 11/15/2025 | | | 330,000 | 330,000 |
| 11/15/2026 | | | 330,000 | 330,000 |
| 11/15/2027 | | | 330,000 | 330,000 |
| 11/15/2028 | | | 330,000 | 330,000 |
| 11/15/2029 | | | 330,000 | 330,000 |
| 11/15/2030 | | | 330,000 | 330,000 |
| 11/15/2031 | | | 330,000 | 330,000 |
| 11/15/2032 | | | 330,000 | 330,000 |
| 11/15/2033 | | | 330,000 | 330,000 |
| 11/15/2034 | | | 330,000 | 330,000 |
| 11/15/2035 | 125,000 | 7.500% | 330,000 | 455,000 |
| 11/15/2036 | 135,000 | 7.500% | 320,625 | 455,625 |
| 11/15/2037 | 140,000 | 7.500% | 310,500 | 450,500 |
| 11/15/2038 | 295,000 | 7.500% | 300,000 | 595,000 |
| 11/15/2039 | 315,000 | 7.500% | 277,875 | 592,875 |
| 11/15/2040 | 340,000 | 7.500% | 254,250 | 594,250 |
| 11/15/2041 | 365,000 | 7.500% | 228,750 | 593,750 |
| 11/15/2042 | 390,000 | 7.500% | 201,375 | 591,375 |
| 11/15/2043 | 420,000 | 7.500% | 172,125 | 592,125 |
| 11/15/2044 | 450,000 | 7.500% | 140,625 | 590,625 |
| 11/15/2045 | 485,000 | 7.500% | 106,875 | 591,875 |
| 11/15/2046 | 940,000 | 7.500% | 70,500 | 1,010,500 |
| | 4,400,000 | | 7,003,500 | 11,403,500 |

<u>**SCHEDULE 4**</u>

**SERIES 2021C PROJECT – REPAIR AND REPLACEMENT PROJECT FUND**

The Series 2021C Project includes the following facilities of the Institution, the costs of which will be paid in whole or in part, or for which the Institution will be reimbursed or which will be refinanced, in whole or in part, from the proceeds of the sale of the Series 2021C Bonds, and which constitute a "project" as defined in the Act, as further described in the Tax Compliance Agreement.

A detailed list of the Series 2021C Project components will be set forth in the Bond Indenture with the total costs thereof and timing of expenditure therefor consistent with the following general categories and periods with any balance expended on the Series C Project in 2025:

|  | **2022** | **2023** | **2024** |
|---|---|---|---|
| Apartment Refurbishment | $265,000 | $265,000 | $215,000 |
| Villa Refurbishment | $300,000 | $300,000 | $300,000 |
| **Subtotal** | $565,000 | $565,000 | $515,000 |
| Other Capital | $1,264,370 | $421,600 | $459,100 |
| **Total** | **$1,829,370** | **$986,600** | **$974,100** |

## SCHEDULE 5

### Liquidity Covenant

| Semi-Annual Testing Date | Covenant Days Cash on Hand |
|---|---|
| June 30, 2022 | 45 |
| December 31, 2022 | 45 |
| June 30, 2023 | 45 |
| December 31, 2023 | 50 |
| June 30, 2024 | 60 |
| December 31, 2024 | 65 |
| June 30, 2025 | 65 |
| December 31, 2025 and each June 30 and December 31 thereafter | 75 |

**Schedule 6**

**IL Occupancy Covenants**

| Quarterly Testing Date | % |
|---|---|
| June 30, 2022 | 71.9 |
| September 30, 2022 | 73.8 |
| December 31, 2022 | 73.8 |
| March 31, 2023 | 75.2 |
| June 30, 2023 | 76.2 |
| September 30, 2023 | 76.2 |
| December 31, 2023 and the last day of each fiscal quarter thereafter | 77.1 |

**Schedule 7**

**AL Occupancy Covenants**

| **Quarterly Testing Date** | **%** |
|---|---|
| March 31, 2022 | 76.5% |
| June 30, 2022 and the last date of each fiscal quarter thereafter | 76.9% |

**Schedule 8**

**SNF Occupancy Covenants**

| Quarterly Testing Date | SNF |
|---|---|
| March 31, 2022 | 73.9% |
| June 30, 2022 | 77.5% |
| September 30, 2022 and last date of each fiscal quarter thereafter | 78.5% |

Schedule 8

**Schedule 9**

**Debt Service Coverage Covenant**

| Testing Date | DSCR |
|---|---|
| 6/30/2023 | 1.05 |
| 9/30/2023 | 1.10 |
| 12/31/2023 | 1.15 |
| 3/31/2024 | 1.15 |
| 6/30/2024 | 1.15 |
| 9/30/2024 | 1.15 |
| 12/31/2024 | 1.15 |
| 3/31/2025 | 1.15 |
| 6/30/2025 | 1.15 |
| 9/30/2025 | 1.15 |
| 12/31/2025 | 1.15 |
| Each 12/31 thereafter | 1.15 |

**Schedule 10**

2021 Entrance Fees

| | 90% Refundable 50% Refundable | Amortizing 0% Refundable |
|---|---|---|
| Embury Traditional* | 57,413 | 34,448 |
| Embury Classic* | 67,725 | 40,635 |
| Embury Deluxe* | 82,031 | 49,219 |
| Cartwright Classic* | 110,694 | 66,416 |
| Cartwright Deluxe* | 122,413 | 73,448 |
| Cartwright Custom Traditional* | 140,225 | 84,135 |
| Cartwright Custom Classic | 151,944 | 91,166 |
| Cartwright Custom Deluxe | 158,038 | 94,823 |
| Cartwright Contemporary | 165,000 | 99,000 |
| Cartwright Classic Royale | 165,069 | 99,041 |
| Cartwright Royale | 167,188 | 100,313 |
| Cartwright Expanded Royale | 171,875 | 103,125 |
| Cartwright Classic Imperial | 180,069 | 108,041 |
| Kirkham Traditional | 166,788 | 100,073 |
| Kirkham Expanded Traditional | 177,569 | 106,541 |
| Kirkham Classic Traditional | 192,569 | 115,541 |
| Kirkham Classic | 205,225 | 123,135 |
| Kirkham Classic Deluxe | 212,898 | 127,739 |
| Kirkham Royale | 237,100 | 142,260 |
| Kirkham Classic Royale | 320,763 | 192,458 |
| Strawbridge Suite | 376,563 | 225,938 |
| Cokesbury Suite | 380,000 | 228,000 |
| MacKendree Suite | 380,000 | 228,000 |
| Abingdon Villa | 345,000 | 207,000 |
| Baltimore Villa | 355,000 | 213,000 |
| Chatham Villa | 350,000 | 210,000 |
| Darlington Villa | 370,000 | 222,000 |
| Edenbridge Villa | 395,000 | 237,000 |

Note : Entrance Fees are projected to increase 3% annually
*Unit types marked with an * are eligible for a Rental Contract with no Entrance Fee.

# **EXHIBIT 2**

JOINDER

## FORM OF JOINDER

This Joinder to the Plan Support Agreement, dated as of August 17, 2021, by and among the Borrower and the Consenting Holders (the "Support Agreement"), is executed and delivered by _____ (the "Joining Party") as of _____, 2021.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1.  Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Plan Support Agreement (and all exhibits and annexes thereto), attached to this Joinder as **Annex I** (as such Plan Support Agreement, exhibits and annexes may be hereafter amended, restated, or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Consenting Holder" and a "Party" for all purposes under the Plan Support Agreement.

2.  Representations and Warranties.  With respect to the Bonds set forth below its name on the signature page hereof and all related claims, rights, and causes of action arising out of or in connection with or otherwise relating to such Bonds, the Joining Party hereby makes to the Borrower the representations and warranties of the Consenting Holders set forth in the Plan Support Agreement.

3.  Notices.  For purposes of notices and other communications to be delivered to the Joining Party the relevant addresses and facsimile numbers are set forth below.

4.  Governing Law.  This Joinder shall be governed by and construed in accordance with the laws of the state of Missouri, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

## **Exhibit C**

**2021 Bond Documents**

**Draft August 17, 2021**

---

**BOND TRUST INDENTURE**

**Dated as of November 15, 2021**

---

Between

**THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE
CITY OF KANSAS CITY, MISSOURI**

**And**

**UMB BANK, N.A.
Kansas City, Missouri,
as Bond Trustee**

---

**$5,500,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021A
(Federally Taxable)**

**$27,000,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021B**

**$4,400,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021C**

**$12,050,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021D**

---

**BOND TRUST INDENTURE**

**TABLE OF CONTENTS**

Page

**ARTICLE I**

**DEFINITIONS, RULES OF CONSTRUCTION**

Section 101.   Definitions of Words and Terms ................................................................4
Section 102.   Rules of Construction ............................................................................13

**ARTICLE II**

**THE BONDS**

Section 201.   Authorization and Terms of Bonds .........................................................14
Section 202.   Method and Place of Payment .............................................................18
Section 203.   Form, Denomination and Numbering ....................................................19
Section 204.   Execution and Authentication ...............................................................19
Section 205.   Registration, Transfer and Exchange ....................................................20
Section 206.   Mutilated, Destroyed, Lost and Stolen Bonds.......................................21
Section 207.   Cancellation of Bonds ..........................................................................21
Section 208.   Book-Entry Bonds; Securities Depository .............................................21
Section 209.   Limited Public Offering; Restrictions on Transfer ................................23

**ARTICLE III**

**REDEMPTION OF BONDS**

Section 301.   Redemption of Bonds Prior to Maturity .................................................23
Section 302.   Election to Redeem ..............................................................................25
Section 303.   Selection of Bonds to be Redeemed ......................................................25
Section 304.   Notice of Redemption ..........................................................................26
Section 305.   Payment of Redemption Price ...............................................................27

**ARTICLE IV**

**FUNDS AND ACCOUNTS, APPLICATION OF BOND PROCEEDS AND OTHER MONEYS**

Section 401.   Creation of Funds and Accounts ...........................................................28
Section 402.   Deposit of Bond Proceeds and Other Moneys .......................................29
Section 403.   Series 2021C Repair and Replacement Project Fund ............................29
Section 404.   Bond Fund .............................................................................................30
Section 405.   Debt Service Reserve Fund ..................................................................31
Section 406.   Rebate Fund ..........................................................................................31
Section 407.   Series 2021A Project Fund and Operating Fund ...................................32
Section 408.   Revenue Fund ......................................................................................32
Section 409.   Payments Due on Non-Business Days ...................................................34
Section 410.   Nonpresentment of Bonds ....................................................................34

(i)

## ARTICLE V

### SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

Section 501.    Moneys to be Held in Trust ................................................................34
Section 502.    Investment of Moneys ......................................................................34
Section 503.    Records and Reports of Bond Trustee ...............................................35

## ARTICLE VI

### GENERAL COVENANTS AND PROVISIONS

Section 601.    Authority to Issue Bonds and Execute Bond Indenture .....................36
Section 602.    Limited Obligations ..........................................................................36
Section 603.    Payment of Bonds .............................................................................36
Section 604.    Performance of Covenants ................................................................36
Section 605.    Enforcement of Rights ......................................................................36
Section 606.    Inspection of Books and Documents ..................................................37
Section 607.    Tax Covenants ..................................................................................37
Section 608.    Information and Opinions to be Provided to the Authority..................38
Section 609.    Continuing Disclosure ......................................................................38

## ARTICLE VII

### DEFAULT AND REMEDIES

Section 701.    Events of Default ..............................................................................38
Section 702.    Acceleration of Maturity; Rescission and Annulment .......................39
Section 703.    Exercise of Remedies by the Bond Trustee ........................................40
Section 704.    Limitation on Suits by Bondowners ...................................................41
Section 705.    Control of Proceedings by Bondowners .............................................42
Section 706.    Application of Moneys Collected .......................................................42
Section 707.    Rights and Remedies Cumulative ......................................................44
Section 708.    Advances by Bond Trustee ................................................................44
Section 709.    Waiver of Past Defaults ....................................................................44

## ARTICLE VIII

### BOND TRUSTEE AND PAYING AGENTS

Section 801.    Acceptance of Trusts; Certain Duties and Responsibilities..................45
Section 802.    Certain Rights of Bond Trustee .........................................................46
Section 803.    Notice of Defaults .............................................................................48
Section 804.    Compensation and Reimbursement .....................................................48
Section 805.    Corporate Trustee Required; Eligibility ...........................................49
Section 806.    Resignation and Removal of Bond Trustee .........................................50
Section 807.    Appointment of Successor Bond Trustee .............................................51
Section 808.    Acceptance of Appointment by Successor Bond Trustee.......................51
Section 809.    Merger, Consolidation and Succession to Business ............................52
Section 810.    Co-Bond Trustees and Separate Bond Trustees ..................................52
Section 811.    Paying Agents ...................................................................................53

# ARTICLE IX

## SUPPLEMENTAL BOND INDENTURES

Section 901.   Supplemental Bond Indentures without Consent of Bondowners.................................53
Section 902.   Supplemental Bond Indentures with Consent of Bondowners.......................................54
Section 903.   Execution of Supplemental Bond Indentures...................................................................55
Section 904.   Effect of Supplemental Bond Indentures .......................................................................55
Section 905.   Reference in Bonds to Supplemental Bond Indentures....................................................55
Section 906.   Institution's Consent to Supplemental Bond Indentures.................................................56

# ARTICLE X

## SATISFACTION AND DISCHARGE

Section 1001.   Payment, Discharge and Defeasance of Bonds ............................................................56
Section 1002.   Satisfaction and Discharge of Bond Indenture.............................................................57
Section 1003.   Rights Retained After Discharge...................................................................................57

# ARTICLE XI

## NOTICES, ACTS OF BONDOWNERS

Section 1101.   Notices............................................................................................................................58
Section 1102.   Acts of Bondowners .......................................................................................................59

# ARTICLE XII

## MISCELLANEOUS PROVISIONS

Section 1201.   Further Assurances ..........................................................................................................60
Section 1202.   Immunity of Officers, Employees and Members of Authority.......................................60
Section 1203.   Limitation on Authority Obligations..............................................................................60
Section 1204.   Benefit of Bond Indenture..............................................................................................61
Section 1205.   Severability ....................................................................................................................61
Section 1206.   Electronic Transactions ..................................................................................................61
Section 1207.   Execution in Counterparts..............................................................................................62
Section 1208.   Governing Law...............................................................................................................62

Exhibit A – Series 2021A Project and Series 2021C Project
Exhibit B – Form of Bond

\*   \*   \*

**BOND TRUST INDENTURE**

**BOND TRUST INDENTURE** dated as of **November 15, 2021** (the *"Bond Indenture"*), between **THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI**, a public corporation duly organized and existing under the laws of the State of Missouri (the *"Authority"*), and **UMB BANK, N.A.**, a national banking association duly organized and existing and authorized to accept and execute trusts of the character herein set out under the laws of the United States of America, and having a corporate trust office located in Kansas City, Missouri, as trustee (the *"Bond Trustee"*);

**RECITALS**

1.      The Authority is authorized by the Industrial Development Corporations Act, Chapter 349 of the Revised Statutes of Missouri, as amended (the *"Act"*), to issue revenue bonds for the purpose of providing funds to pay the costs of purchasing, constructing, improving and extending "projects," as defined in the Act, and to issue refunding bonds, said revenue bonds to be payable solely out of the revenues of the Authority pledged in favor of the owners of said bonds.

2.      Pursuant to the Act the Authority issued **$51,770,000** aggregate principal amount of **Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2016** (the *"Series 2016 Bonds"*), under a Bond Trust Indenture dated as of January 1, 2016 (the *"Original Bond Indenture"*) between the Authority and the Bond Trustee for the purpose of making a loan (the *"2016 Loan"*) to **Kansas City United Methodist Retirement Home, Inc. d/b/a Kingswood Senior Living Community**, a Missouri nonprofit corporation (the *"Institution"*), under a Loan Agreement dated as of January 1, 2016 (the *"Original Loan Agreement"*) between the Authority and the Institution, to provide funds to (a) finance, refinance and reimburse the costs of certain facilities of the Institution, (b) refund certain outstanding bonds, (c) fund required debt service reserves, (d) fund interest on the Series 2016 Bonds, and (e) pay certain costs of issuance relating to the Series 2016 Bonds.

3.      Subsequent to the issuance of the Series 2016 Bonds, the Institution defaulted on certain of its obligations in connection with the Series 2016 Bonds, including without limitation its obligations under the Original Bond Indenture and the Original Loan Agreement, and entered into negotiations with certain owners of a majority of principal amount of the Series 2016 Bonds to address the issues.  On _____, 2021, the Institution filed its voluntary petition under Chapter 11 of the Bankruptcy Code in the bankruptcy case styled In re: Kansas City United Methodist Retirement Home Inc. Case No.  21-_____ (___) (the "*Bankruptcy Proceedings*") in the United States Bankruptcy Court for the Western District of Missouri (the "*Bankruptcy Court*").  On _____, 2021, the Institution filed its reorganization plan which included the restructuring of the Series 2016 Bonds (the "*Bankruptcy Plan*").  On _____, 2021, the Bankruptcy Court issued its order (the "*Order*") confirming the Bankruptcy Plan.  The Order and the Bankruptcy Plan provide that all of the payment obligations of the Authority under the outstanding Series 2016 Bonds are to be restructured by having the owners of all of the Series 2016 Bonds exchange such outstanding Series 2016 Bonds for Series 2021B Bonds and Series 2021D Bonds (as defined below) (the "*Bond Exchange*").

4.      In order to effectuate the Bond Exchange and the Bankruptcy Plan, including funding additional costs of the Project and facilities of the Institution, the Institution has requested that the Authority issue: (a) **$5,500,000** in aggregate principal amount of its **Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021A (Federally Taxable)** (the *"Series 2021A Bonds"*), (b) **$27,000,000** in aggregate principal amount of its **Senior Living Facilities Revenue Bonds (Kingswood**

**Project), Series 2021B** (the "*Series 2021B Bonds*"), (c) **$4,400,000** in aggregate principal amount of its **Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021C** (the "*Series 2021C Bonds*"), and (d) **$12,050,000** in aggregate principal amount of its **Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021D** (the "*Series 2021D Bonds*" and, together with the Series 2021A Bonds, the Series 2021B Bonds and the Series 2021C Bonds, the "*Series 2021 Bonds*" or the "*Bonds*"), and exchange the Series 2021B Bonds and the Series 2021D Bonds for the outstanding Series 2016 Bonds, with each owner of Series 2016 Bonds to receive their ratable share of Series 2021B Bonds and Series 2021D as set forth in this Bond Indenture.

       **5.**      The Authority is authorized pursuant to the Act and a resolution adopted by the Authority (the "*Resolution*") to issue the Bonds under this Bond Indenture for the purpose of making a loan (the "*Loan*") to the Institution under a Loan Agreement of even date herewith (the "*Loan Agreement*") between the Authority and the Institution, to provide funds to (a) exchange the Series 2016 Bonds, (b) fund improvements to the Facilities of the Institution, and (c) fund interest and required debt service reserves.

       **6.**      The Bonds constitute Related Bonds (as defined in the hereinafter referred to Master Indenture) and the obligations of the Institution to make loan payments under the Loan Agreement will constitute Indebtedness under the Master Trust Indenture dated as of November 15, 2021 (as amended and supplemented, including by Supplemental Master Trust Indenture No. 1 dated as of November 15, 2021, the "*Master Indenture*"), among the Institution, and such other persons as from time to time are Obligated Group Members (collectively, the "*Obligated Group*") and UMB Bank, N.A., as trustee (the "*Master Trustee*"). The obligations of the Institution under the Loan Agreement will be secured by (i) a **Master Indenture Obligation No. 1 (Series 2021A Bonds)** (the "*Series 2021A Master Obligation*"), (ii) a **Master Indenture Obligation No. 2 (Series 2021B Bonds)** (the "*Series 2021B Master Obligation*"), (iii) a **Master Indenture Obligation No. 3 (Series 2021C Bonds)** (the "*Series 2021C Master Obligation*"), and (iv) a **Master Indenture Obligation No. 4 (Series 2021D Bonds)** (the "*Series 2021D Master Obligation*" and together with the Series 2021A Master Obligation, the Series 2021B Master Obligation and the Series 2021C Master Obligation, the "*Series 2021 Master Obligations*"), each to be issued under the Master Indenture concurrently with the original issuance of the Bonds. The Order and Bankruptcy Plan provide for the termination of the Master Trust Indenture dated as of January 1, 2016 (the "*Original Master Indenture*") and the cancelation of the Master Obligations issued under the Original Master Indenture to evidence and secure the obligations of the Institution under the Original Loan Agreement for the Series 2016 Bonds.

       **7.**      All things necessary to make the Bonds, when authenticated by the Bond Trustee and issued as provided in this Bond Indenture, the valid, legal and binding obligations of the Authority, and to constitute this Bond Indenture a valid, legal and binding pledge and assignment of the property, rights, interests and revenues made herein for the security of the payment of the Bonds, have been done and performed, and the execution and delivery of this Bond Indenture and the execution and issuance of the Bonds, subject to the terms of this Bond Indenture, have in all respects been duly authorized.

## GRANTING CLAUSES

       To declare the terms and conditions upon which Bonds are to be authenticated, issued and delivered, to secure the payment of all of the Bonds issued and Outstanding under this Bond Indenture, to secure the performance and observance by the Authority of all the covenants, agreements and conditions contained in this Bond Indenture and in the Bonds, and in consideration of the premises, the acceptance by the Bond Trustee of the trusts created by this Bond Indenture, and the purchase and acceptance of the

Bonds by the owners thereof, the Authority transfers in trust, pledges and assigns to the Bond Trustee, and grants a security interest to the Bond Trustee in, the following described property (said property referred to herein as the *"Trust Estate"*):

(a)    all right, title and interest of the Authority (including, but not limited to, the right to enforce any of the terms thereof) in, to and under (1) the Loan Agreement, including, without limitation, all Loan Payments and other payments to be received by the Authority and paid by the Institution under and pursuant to and subject to the provisions of the Loan Agreement (except the Authority's rights to payment of its fees and expenses and to indemnification as set forth in the Loan Agreement and as otherwise expressly set forth therein), (2) the Series 2021 Master Obligations, and (3) all financing statements or other instruments or documents evidencing, securing or otherwise relating to the loan of the proceeds of the Bonds;

(b)    all moneys and securities (except moneys and securities held in the Rebate Fund) from time to time held by the Bond Trustee in the funds and accounts under the terms of this Bond Indenture; *provided, however,* (i) that amounts held in the Series 2021A Account of the Bond Fund shall be pledged only to the Owners of the Series 2021A Bonds, (ii) that amounts held in the Series 2021B Account of the Bond Fund shall be pledged only to the Owners of the Series 2021B Bonds, (iii) that amounts held in the Series 2021C Account of the Bond Fund shall be pledged only to the Owners of the Series 2021C Bonds, (iv) that amounts held in the Series 2021D Account of the Bond Fund shall be pledged only to the Owners of the Series 2021D Bonds, (v) that amounts held in the Series 2021A Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2021A Bonds, (vi) that amounts held in the Series 2021B Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2021B Bonds, and (vii) that amounts held in the Series 2021C Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2021C Bonds; and

(c)    any and all other property (real, personal or mixed) of every kind and nature hereafter from time to time, by delivery or by writing of any kind, pledged, assigned or transferred as and for additional security under this Bond Indenture by the Authority or by anyone on its behalf or with its written consent, to the Bond Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof.

The Bond Trustee shall hold in trust and administer the Trust Estate, upon the terms and conditions set forth in this Bond Indenture for the equal and pro rata benefit and security of each and every owner of Bonds, without preference, priority or distinction as to participation in the lien, benefit and protection of this Bond Indenture of one Bond over or from the others, except that the Series 2021D Bonds shall be subordinated to the Series 2021A Bonds, the Series 2021B Bonds and the Series 2021C Bonds as herein provided; except that the Series 2021B Bonds shall be subordinated to the Series 2021A Bonds and the Series 2021C Bonds but senior the Series 2021D Bonds; and except that the Series 2021A Bonds will be pari passu with Series 2021C Bonds, and both the Series 2021A Bonds and the Series 2021C Bonds will be senior to the Series 2021B Bonds and Series 2021D Bonds, all as provided herein.

**NOW, THEREFORE,** the Authority covenants and agrees with the Bond Trustee, for the equal and proportionate benefit of the respective owners of the Bonds, that all Bonds are to be issued,

authenticated and delivered and the Trust Estate is to be held and applied by the Bond Trustee, subject to the further covenants, conditions and trusts herein set forth, as follows:

## ARTICLE I

### DEFINITIONS, RULES OF CONSTRUCTION

**Section 101.     *Definitions of Words and Terms.***

For all purposes of this Bond Indenture, except as otherwise provided or unless the context otherwise requires, the following words and terms used in this Bond Indenture shall have the following meanings:

*"Act"* means the **Industrial Development Corporations Act**, **Chapter 349 of the Revised Statutes of Missouri**, as from time to time amended.

*"Assisted Living/Memory Care Beds"* means, collectively, the thirty-four (34) assisted living beds and the twenty-three (23) memory care beds in the Facilities.

*"Authority"* means **The Industrial Development Authority of the City of Kansas City, Missouri**, and its successors and assigns or any body, agency or instrumentality of the State of Missouri or any political subdivision thereof succeeding to or charged with the powers, duties and functions of the Authority.

*"Authority Representative"* means (a) the President, Chairman or any Vice President or Vice Chairman of the Authority, (b) such other person or persons at the time designated to act on behalf of the Authority in matters relating to this Bond Indenture and the Loan Agreement as evidenced by a written certificate furnished to the Institution and the Bond Trustee containing the specimen signature of such person or persons and signed on behalf of the Authority by its resident, Chairman or any Vice President or Vice Chairman, and (c) any other duly authorized officer of the Authority whose authority to execute any particular instrument or take a particular action under this Bond Indenture or the Loan Agreement is evidenced to the satisfaction of the Bond Trustee.

*"Average Occupied Assisted Living/Memory Care Beds"* means the average number of Occupied Assistant Living/Memory Care Beds during the applicable Fiscal Quarter.

*"Average Occupied Skilled Nursing Care Beds"* means the average number of Occupied Skilled Nursing Care Beds during the applicable Fiscal Quarter.

*"Bankruptcy Court"* means the United States Bankruptcy Court for the Western District of Missouri.

*"Bankruptcy Plan"* means the reorganization plan filed by the Institution and approved by the Bankruptcy Court via the Order.

*"Bankruptcy Proceedings"* means In re: Kansas City United Methodist Retirement Home Inc. Case No. 21-_____ (___).

-4-

*"Bond Exchange"* means the restructuring of the Series 2016 Bonds by exchange thereof for ratable portions of the Series 2021B Bonds and Series 2021D Bonds.

*"Bonds"* means the Series 2021 Bonds.

*"Bond Indenture"* means this Bond Trust Indenture as originally executed by the Authority and the Bond Trustee, as from time to time amended and supplemented by Supplemental Bond Indentures in accordance with the provisions of this Bond Indenture.

*"Bond Trustee"* means **UMB Bank, N.A.**, in its capacity as trustee under this Bond Indenture, and its successor or successors and any other corporation or association which at any time may be substituted in its place pursuant to and at the time serving as trustee under this Bond Indenture.

*"Bondowner"*, *"Owner"* or *"Registered Owner"* means the Person or Persons in whose name a Bond is registered as shown on the bond register maintained by the Bond Trustee.

*"Book-Entry System"* means the book-entry system maintained by the Securities Depository described in **Section 208** hereof.

*"Business Day"* means a day other than (a) a Saturday, Sunday or legal holiday, (b) a day on which banks located in any city in which the principal corporate trust office or designated payment office of the Bond Trustee is located are required or authorized by law to remain closed, or (c) a day on which the Securities Depository or the New York Stock Exchange is closed.

*"Continuing Disclosure Agreement"* means the Continuing Disclosure Agreement of even date herewith, between the Institution, on its own behalf and as Obligated Group Representative on behalf of the Members from time to time of the Obligated Group, and UMB Bank, N.A., as Dissemination Agent, as from time to time amended in accordance with the provisions thereof.

*"Bond Fund"* means the fund by that name created by **Section 401** hereof.

*"Debt Service Reserve Fund"* means the fund by that name created by **Section 401** hereof, consisting of three accounts: the Series 2021A Account, the Series 2021B Account, and the Series 2021C Account.

*"Debt Service Reserve Requirement"* means, (a) for the Series 2021A Bonds initially $500,000, (b) for the Series 2021B Bonds initially $[2,700,000][*least of three-part tax test*], and (c) for the Series 2021C Bonds initially $400,000; provided, that if a series of Bonds bears interest that is excludable from gross income under the Internal Revenue Code and the Debt Service Reserve Requirement is greater than the amount permitted by the federal income tax laws to be invested without regard to yield restrictions, the Debt Service Reserve Requirement shall be reduced to an amount equal to the maximum amount permitted by the federal income tax laws to be invested without regard to yield restrictions.

*"Deed of Trust"* has the meaning set forth in the Master Indenture.

*"Defeasance Obligations"* means Government Obligations that are not subject to redemption prior to maturity.

-5-

*"Determination of Taxability"* means and shall be deemed to have occurred on the first to occur of the following:

(i)      the date when the Institution files any statement, supplemental statement or other tax schedule, return or document which discloses that an Event of Taxability shall have in fact occurred; or

(ii)     the date when the Authority or the Institution shall be advised in writing by the Commissioner or any District Director of the Internal Revenue Service (or any other government official or agent exercising the same or a substantially similar function from time to time) that, based upon filings of the Institution, or upon any review or audit of the Institution or upon any other ground whatsoever, an Event of Taxability shall have occurred;

*provided, however,* no Determination of Taxability shall occur under subparagraph (ii) hereunder unless the Institution has been afforded the opportunity, at its expense, to contest any such assessment, and, further, no Determination of Taxability shall occur until such contest, if made, has been finally determined.

*"Electronic Notice"* means notice transmitted through the internet, e-mail or facsimile machine or other electronic means, if operative as between any two parties, or if not operative, in writing or by telephone (promptly confirmed in writing).

*"EMMA"* means the Electronic Municipal Market Access system for municipal securities disclosures operated by the MSRB, which can be accessed at www.emma.msrb.org.

*"Entrance Fees"* has the meaning set forth in the Master Indenture.

*"Event of Taxability"* means a (i) change in law or fact or the interpretation thereof, or the occurrence or existence of any fact, event or circumstance which has the effect of causing interest paid or payable on the Series 2021B Bonds, the Series 2021C Bonds or the Series 2021D Bonds to become included, in whole or in part, in the gross income of the owners of such Bonds or any former owner of such Bonds for federal income tax purposes or (ii) the entry of any decree or judgment by a court of competent jurisdiction, or the taking of any official action by the Internal Revenue Service or the Department of the Treasury, which decree, judgment or action shall be final under applicable procedural law, in either case, which has the effect of causing interest paid or payable on the Series 2021B Bonds, the Series 2021C Bonds or the Series 2021D Bonds to become included, in whole or in part, in the gross income of the owner of such Bonds or any former owner of such Bonds for federal income tax purposes with respect to such Bonds.

*"Facilities"* shall have the meaning given to such term in the Master Indenture.

*"Financing Documents"* means this Bond Indenture, the Bonds, the Loan Agreement, the Master Indenture, Supplemental Master Indenture No. 1, the Series 2021 Master Obligations, the Deed of Trust, the Continuing Disclosure Agreement, the Tax Compliance Agreement, and any and all future renewals and extensions or restatements of, or amendments or supplements to, any of the foregoing; provided, however, that when the words "Financing Documents" are used in the context of the authorization, execution, delivery, approval or performance of Financing Documents by a particular party, the same shall mean only those Financing Documents that provide for or contemplate authorization, execution, delivery, approval or performance by such party.

*"Fiscal Quarter"* means a period of three full calendar months ending on March 31, June 30, September 30 or December 31, respectively.

*"Fiscal Year"* shall have the meaning given to such term in the Master Indenture.

*"Governing Body"* means, when used with respect to the Institution, its board of directors, board of trustees or other board or group of individuals in which the powers of the Institution are vested.

*"Government Obligations"* means the following:

> (a)   bonds, notes, certificates of indebtedness, treasury bills or other securities constituting direct obligations of, or obligations the principal of and interest on which are fully and unconditionally guaranteed by, the United States of America;

> (b)   evidences of direct ownership of a proportionate or individual interest in future interest or principal payments on specified direct obligations of, or obligations for which the full and timely payment of the principal and interest is unconditionally guaranteed by, the United States of America, issued by or through the Federal Reserve Bank, which obligations are held by a bank or trust company organized and existing under the laws of the United States of America or any state thereof in the capacity of custodian in form and substance satisfactory to the Bond Trustee; and

> (c)   obligations issued by the Resolution Funding Corporation pursuant to the Financial Corporations Reform, Recovery and Enforcement Act of 1989 (the *"FIRREA"*), if (1) the principal of such obligations is payable when due from payments of maturing principal and non-interest bearing direct obligations of the United States of America that are issued by the Secretary of the Treasury and deposited in the Funding Corporation Principal Fund established pursuant to the FIRREA, and (2) the interest on such obligations, to the extent not paid from other specified sources, is payable when due by the Secretary of the Treasury pursuant to the FIRREA.

*"Independent Living Unit"* means any independent living apartment or villa of the Institution.

*"Institution"* means **Kansas City United Methodist Retirement Home, Inc. d/b/a Kingswood Senior Living Community**, a Missouri nonprofit corporation, and its successors and assigns.

*"Institution Representative"* means the Chairman, Executive Director or Chief Financial Officer of the Institution and any other person or persons at the time designated to act on behalf of the Institution in matters relating to this Bond Indenture and the Loan Agreement as evidenced by a written certificate furnished to the Authority and the Bond Trustee containing the specimen signature of such person or persons and signed on behalf of the Institution by its Chairman, Executive Director or Chief Financial Officer.  Such certificate may designate an alternate or alternates each of whom shall be entitled to perform all duties of the Institution Representative.

*"Interest Payment Date"* means May 15 and November 15 of each year, commencing May 15, 2022.

*"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended, and, when appropriate, any statutory predecessor or successor thereto, and all applicable regulations (whether

proposed, temporary or final) thereunder and any applicable official rulings, announcements, notices, procedures and judicial determinations relating to the foregoing.

*"Loan"* means the loan of the proceeds of the Bonds made by the Authority to the Institution under the Loan Agreement.

*"Loan Agreement"* means Loan Agreement of even date herewith, between the Authority and the Institution, as from time to time amended by Supplemental Loan Agreements in accordance with the provisions of the Loan Agreement.

*"Loan Payments"* means the payments of principal and interest on the Loan referred to in **Section 4.1** of the Loan Agreement.

*"Management Company"* means any management company engaged by the Institution to manage the facilities and business owned and/or operated by the Institution, which Management Company is currently GMSC Missouri, LLC, a Missouri limited liability company.

*"Management Consultant"* means an independent management consulting firm of favorable repute for skill and experience in performing the duties imposed upon it by the Loan Agreement and the Master Indenture and which is acceptable to a majority of Holders of the Bonds.

*"Marketing Consultant"* means an independent marketing consulting firm of favorable repute for skill and experience in performing the duties imposed upon it by the Loan Agreement and which is acceptable to a majority of Holders of the Bonds.

*"Master Indenture"* means the Master Trust Indenture dated as of November 15, 2021, as originally executed by the Institution, the other Members of the Obligated Group and the Master Trustee, as from time to time amended or supplemented in accordance with the terms thereof.

*"Master Trustee"* means **UMB Bank, N.A.,** Kansas City, Missouri, in its capacity as trustee under the Master Indenture, or any successor trustee under the Master Indenture.

*"Obligated Group"* means the Institution, and any other Person that has fulfilled the requirements for entry into the Obligated Group set forth in **Section 3.11** of the Master Indenture and that has not ceased such status pursuant to **Section 3.12** of the Master Indenture.

*"Obligated Group Member"* or *"Member of the Obligated Group"* means each Person that is a Member of the Obligated Group on the date of original execution and delivery of the Master Indenture (which includes the Institution), each Person that subsequent to the date of the Master Indenture becomes an Obligated Group Member pursuant to the terms of the Master Indenture, and their successors and assigns, unless any such Person has withdrawn from the Obligated Group pursuant to the terms of the Master Indenture.

*"Obligated Group Representative"* means the Institution, acting through its Governing Body, its Governing Body Chair, its chief executive officer, its chief financial officer or its other duly authorized officers acting pursuant to duly delegated authority, or such other Obligated Group Member from time to time designated as the Obligated Group Representative in an Officer's Certificate delivered to the Master Trustee and the Bond Trustee.

*"Occupancy Target"* means (i) with respect to Independent Living Units, the target percentage for Occupied Independent Living Units listed in **Section 5.11(a)** of the Loan Agreement., (ii) with respect to Assisted Living/Memory Care Beds, the target percentage for Average Assisted Living/Memory Care Beds listed in **Section 5.11(b)** of the Loan Agreement, and (iii) with respect to Skilled Nursing Care Beds, the target percentage for Average Occupied Skilled Nursing Care Beds listed in **Section 5.11(c)** of the Loan Agreement.

*"Occupied"* means (i) with respect to Assisted Living/Memory Care Beds, a bed for which: (a) a Residency Agreement or admission agreement has been entered into, (b) the Institution has received the necessary occupancy permits and licenses and (c) monthly service fees are accruing, (ii) with respect to any Independent Living Unit, a unit for which: (x) a Residency Agreement has been entered into, (y) the total Entrance Fees for such Independent Living Unit have been paid, if applicable, and (z) monthly service fees and/or rental fees, if applicable, are accruing, and (iii) with respect to Skilled Nursing Facility Beds, a bed for which: the Institution has received the necessary occupancy permits and licenses and service fees are accruing.

*"Officer's Certificate"* means a written certificate of the Institution signed by the Institution Representative, which certificate shall be deemed to constitute a representation of, and shall be binding upon, the Institution with respect to matters set forth therein, and which certificate in each instance, including the scope, form, substance and other aspects thereof, is acceptable to the Bond Trustee.

*"Operating Fund"* means the fund by that name created by **Section 401** hereof and held in a bank account established and controlled by the Institution.

*"Opinion of Bond Counsel"* means a written opinion of Gilmore & Bell, P.C., or other legal counsel acceptable to the Authority and the Bond Trustee who is nationally recognized as expert in matters pertaining to the validity of obligations of governmental issuers and the exemption from federal income taxation of interest on such obligations.

*"Opinion of Counsel"* means a written opinion of any legal counsel having expertise in the matters covered in such opinion and acceptable to the Institution and the Bond Trustee and, to the extent the Authority is asked to take action in reliance thereon, the Authority, who may be an employee of or counsel to the Institution, the Authority or the Bond Trustee.

*"Order"* means the order of the Bankruptcy Court approving the Bankruptcy Plan.

*"Original Bond Indenture"* means the Bond Trust Indenture dated as of January 1, 2016 between the Authority and the Bond Trustee.

*"Original Loan Agreement"* means the Loan Agreement dated as of January 1, 2016 between the Authority and the Institution.

*"Outstanding"* means the following:

(a)     with respect to Bonds, as of the date of determination, all Bonds theretofore authenticated and delivered under this Bond Indenture, except the following:

(1)     Bonds theretofore cancelled by the Bond Trustee or delivered to the Bond Trustee for cancellation as provided in **Section 207** hereof;

(2)     Bonds for whose payment or redemption moneys or Defeasance Obligations in the necessary amount has been deposited with the Bond Trustee in trust for the owners of such Bonds as provided in **Section 1001** hereof, provided that, if such Bonds are to be redeemed, notice of such redemption has been duly given pursuant to this Bond Indenture or provision therefor satisfactory to the Bond Trustee has been made;

(3)     Bonds in exchange for or in lieu of which other Bonds have been authenticated and delivered under this Bond Indenture; and

(4)     Bonds alleged to have been mutilated, destroyed, lost or stolen that have been replaced as provided in **Section 206** hereof.

"*Permitted Investments*" means, if and to the extent the same are at the time legal for investment of funds held under this Bond Indenture, the following:

(a)     Government Obligations;

(b)     bonds, notes or other obligations of any state of the United States or any political subdivision of any state, which at the time of their purchase are rated in one of the two highest rating categories by a nationally recognized rating service;

(c)     certificates of deposit or time or demand deposits constituting direct obligations of any bank, bank holding company, savings and loan association, trust company or other financial institution organized under the laws of the United States or any state thereof (including the Bond Trustee or any of its affiliates), except that investments may be made only in certificates of deposit or time or demand deposits that are:

(1)     insured by the Bank Insurance Fund or the Savings Association Insurance Fund of the Federal Deposit Insurance Corporation, or any other similar United States Government deposit insurance program then in existence; or

(2)     continuously and fully secured by Government Obligations, which have a market value, exclusive of accrued interest, at all times at least equal to the principal amount of such certificates of deposit or time or demand deposits; or

(3)     issued by a bank, bank holding company, savings and loan association, trust company or other financial institution organized under the laws of the United States or any state thereof (including the Bond Trustee or any of its affiliates) whose outstanding unsecured long-term debt is rated, at the time of purchase, in one of the two highest rating categories by a nationally recognized rating service;

(d)     repurchase agreements with any bank, bank holding company, savings and loan association, trust company or other financial institution organized under the laws of the United States or any state thereof (including the Bond Trustee or any of its affiliates), that are continuously and fully secured by Government Obligations and that have a market value, exclusive of accrued interest, at all times at least equal to the principal amount of such repurchase agreements, provided that each such repurchase agreement conforms to current industry standards as to form and time, is in commercially reasonable form, is for a commercially reasonable period, results in transfer of legal title to identified

-10-

Government Obligations that are segregated in a custodial or trust account for the benefit of the Bond Trustee, and further provided that Government Obligations acquired pursuant to such repurchase agreements shall be valued at the lower of the then current market value thereof or the repurchase price thereof set forth in the applicable repurchase agreement;

(e)       investment agreements constituting an obligation of a bank, bank holding company, savings and loan association, trust company, insurance company or other financial institution whose outstanding unsecured long-term debt is rated, at the time of execution of such agreement, in one of the two highest rating categories by a nationally recognized rating service;

(f)        short term discount obligations of the Federal National Mortgage Association and the Government National Mortgage Association; and

(g)       money market mutual funds (1) that invest in Government Obligations or that are registered with the federal Securities and Exchange Commission (SEC), meeting the requirements of Rule 2a-7 under the Investment Company Act of 1940, and (2) that at the time of investment are rated in one of the two highest categories by a nationally recognized rating service, including those for which the Bond Trustee or an affiliate performs services for a fee, whether as a custodian, transfer agent, investment advisor or otherwise.

The Bond Trustee and the Master Trustee shall be entitled to assume that any investment that at the time of purchase is a Permitted Investment remains a Permitted Investment thereafter, absent receipt of written notice or information to the contrary.

For the purposes of this definition, obligations issued or held in the name of the Bond Trustee or the Master Trustee (or in the name of the Authority and payable to the Bond Trustee or the Master Trustee) in book-entry form on the books of the Department of Treasury of the United States shall be deemed to be deposited with the Bond Trustee or the Master Trustee, as applicable.

*"Person"* shall have the meaning given to such term in the Master Indenture.

*"Principal Payment Date"* means each date on which a principal installment is due and payable on the Bonds, whether at maturity, or upon redemption or acceleration or otherwise.

*"Qualified Transferee"* means (i) a "qualified institutional buyer" as defined in Rule 144A promulgated under the Securities Act of 1933, as amended (the *"Securities Act"*), that purchases for its own account or for the account of a qualified institutional buyer, or (ii) an "accredited investor" as defined in Regulation D promulgated under the Securities Act.

*"Rating Agency"* means, if the Bonds are rated, **Moody's Investors Service, Inc.**, if such agency's ratings are in effect with respect to the Bonds, **S&P Global Ratings**, if such agency's ratings are in effect with respect to the Bonds, and **Fitch Ratings, Inc.**, if such agency's ratings are in effect with respect to the Bonds, and their respective successor and assigns.  If any such corporation ceases to act as a securities rating agency, the Institution may appoint any other nationally recognized securities rating agency acceptable to the Bond Trustee as a replacement Rating Agency.

*"Rebate Fund"* means the fund by that name created by **Section 401** hereof.

*"Record Date"* means the first day of the calendar month (whether or not a Business Day) immediately prior to each Interest Payment Date.

*"Residency Agreement"* means an agreement entered into by the Institution with respect to the granting of rights to the exclusive use of any unit (or any bedroom in a shared or semi-private unit) in the facilities of the Institution, as the same may be amended from time to time.

*"Securities Depository"* means **The Depository Trust Company**, New York, New York, or its nominee, and its successors and assigns, acting as securities depository under a Book-Entry System.

*"Series 2016 Bonds"* means the Senior Living Facility Revenue Bonds (Kingswood Project), Series 2016, aggregating the principal amount of **$51,770,000** issued under the Original Bond Indenture.

*"Series 2021 Bonds"* or the "*Bonds*" means, collectively, the Series 2021A Bonds, the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds.

*"Series 2021 Master Obligations"* means, collectively, Master Indenture Obligation Nos. 1 through 4, each issued, authenticated and delivered under the Master Indenture, which evidence and secures the obligations of the Institution under the Loan Agreement.

*"Series 2021A Bonds"* means the Senior Living Facility Revenue Bonds (Kingswood Project), Series 2021A (Federally Taxable), aggregating the principal amount of **$5,500,000** issued under this Bond Indenture.

*"Series 2021A Project"* means the facilities of the Institution described on **Exhibit A** hereto, the costs of which will be refinanced, in whole or in part, from the proceeds of the sale of the Series 2021A Bonds, and which constitute a "project" as defined in the Act.

*"Series 2021A Project Fund"* means the fund by that name created by **Section 401** hereof.

*"Series 2021B Bonds"* means the Senior Living Facility Revenue Bonds (Kingswood Project), Series 2021B, aggregating the principal amount of **$27,000,000** issued under this Bond Indenture.

*"Series 2021C Bonds"* means the Senior Living Facility Revenue Bonds (Kingswood Project), Series 2021C, aggregating the principal amount of **$4,400,000** issued under this Bond Indenture.

*"Series 2021C Project"* means the facilities of the Institution described on **Exhibit A** hereto, the costs of which will be paid in whole or in part, or for which the Institution will be reimbursed or which will be refinanced, in whole or in part, from the proceeds of the sale of the Series 2021C Bonds, and which constitute a "project" as defined in the Act, as further described in the Tax Compliance Agreement.

*"Series 2021C Repair and Replacement Project Fund"* means the fund by that name created by **Section 401** hereof.

*"Series 2021D Bonds"* means the Senior Living Facility Revenue Bonds (Kingswood Project), Series 2021D, aggregating the principal amount of **$12,050,000** issued under this Bond Indenture.

*"Skilled Nursing Care Beds"* means the skilled nursing care beds in the Facilities that are staffed, from time to time, which are currently sixty-five (65) staffed beds.

-12-

*"Supplemental Bond Indenture"* means any indenture supplemental or amendatory to this Bond Indenture entered into by the Authority and the Bond Trustee pursuant to **Article IX** hereof.

*"Supplemental Loan Agreement"* means any agreement supplemental or amendatory to a Loan Agreement entered into by the Authority and the applicable Institution pursuant to **Article VIII** of the applicable Loan Agreement.

*"Supplemental Master Indenture No. 1"* means Supplemental Master Trust Indenture No. 1 dated as of November 15, 2021, among the Institution, and such other persons as from time to time are Obligated Group Members and the Master Trustee, amending or supplementing the Master Indenture, entered into pursuant to **Article IX** of the Master Indenture.

*"Tax Compliance Agreement"* means the Tax Compliance Agreement of even date herewith with respect to the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds, among the Authority, the Institution and the Bond Trustee, as from time to time amended in accordance with the provisions thereof.

*"Tax-Exempt Organization"* means a nonprofit organization, organized under the laws of the United States of America or any state thereof, that is an organization described in Section 501(c)(3) of the Internal Revenue Code, is exempt from federal income taxes under Section 501(a) of the Internal Revenue Code, and is not a "private foundation" within the meaning of Section 509(a) of the Internal Revenue Code, or corresponding provisions of federal income tax laws from time to time in effect.

*"Trust Estate"* means the Trust Estate described in the Granting Clauses of this Bond Indenture.

*"Value"*, as of any particular time of determination, means, (a) with respect to cash the face value thereof, (b) with respect to any investments, other than those in the Debt Service Reserve Fund, the lower of the cost of the investment or the market price of the investment on the date of valuation, (c) with respect to any investments in the Debt Service Reserve Fund, the market price of the investment on the date of valuation, and (d) with respect to an insurance policy, letter of credit, or surety bond guaranteeing payments into the Debt Service Reserve Fund, the face value thereof.

*"Written Request"* means, with reference to the Authority, a request in writing signed by an Authority Representative and, with reference to the Institution, a request in writing signed by the Institution Representative, or any other officers designated by the Authority or the Institution, as the case may be, to sign such Written Requests.

### Section 102.    *Rules of Construction.*

For all purposes of this Bond Indenture, except as otherwise expressly provided or unless the context otherwise requires, the following rules of construction apply in construing the provisions of this Bond Indenture:

(a)     The terms defined in this Article include the plural as well as the singular.

(b)     All accounting terms not otherwise defined herein shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles.

(c)     All references herein to "generally accepted accounting principles" refer to such principles in effect on the date of the determination, certification, computation or other action to be taken hereunder using or involving such terms.

(d)     The words "herein", "hereof" and "hereunder" and other words of similar import refer to this Bond Indenture as a whole and not to any particular Article, Section or other subdivision.

(e)     The Article and Section headings herein and in the Table of Contents are for convenience only and shall not affect the construction hereof.

(f)     Whenever an item or items are listed after the word "including", such listing is not intended to be a listing that excludes items not listed.

## ARTICLE II

## THE BONDS

**Section 201.    *Authorization and Terms of Bonds.*** The Bonds shall be issued in accordance with this Article and shall have the terms set forth herein. The total principal amount of Bonds to be issued or exchanged as provided in this **Section 201** is expressly limited to **$48,950,000** (exclusive of any accreted interest on the Series 2021D Bonds added to the principal thereof pursuant to **Section 201(d)(ii)** hereof) to be comprised of the following series of Bonds, which are authorized to be issued as follows:

(a)     *Series 2021A Bonds.*

(i)     *Designation and Date.* The Series 2021A Bonds shall be designated "The Industrial Development Authority of the City of Kansas City, Missouri Senior Living Facility Revenue Bonds (Kingswood Project), Series 2021A (Federally Taxable)." The Series 2021A Bonds shall be dated the date of their initial issuance and delivery.

(ii)     *Maturities, Principal Amounts and Interest Rates.* The Series 2021A Bonds shall be issued in the aggregate principal amount of **$5,500,000** and shall bear interest from their date or from the most recent Interest Payment Date to which interest has been paid, payable on May 15, 2022, and thereafter semiannually on each Interest Payment Date of each year. The Series 2021A Bonds shall bear interest (computed on the basis of a 360-day year of twelve 30-day months) at the rate of **10.00%** per annum and shall have principal payable and mature on the following dates in the following principal amounts (subject to prior redemption as provided in **Article III** hereof):

-14-

| November 15 of the Year | Principal Amount ($) |
|---|---|
| 2025 | 225,000 |
| 2026 | 245,000 |
| 2027 | 270,000 |
| 2028 | 300,000 |
| 2029 | 330,000 |
| 2030 | 360,000 |
| 2031 | 400,000 |
| 2032 | 435,000 |
| 2033 | 480,000 |
| 2034 | 530,000 |
| 2035 | 580,000 |
| 2036 | 640,000 |
| 2037 | 705,000 |

(b)     *Series 2021B Bonds*.

      (i)     *Designation and Date*. The Series 2021B Bonds shall be designated "The Industrial Development Authority of the City of Kansas City, Missouri Senior Living Facility Revenue Bonds (Kingswood Project), Series 2021B." The Series 2021B Bonds shall be dated the date of their initial issuance and delivery. The Series 2021B Bonds will be exchanged for Series 2016 Bonds as provided in **Section 201(f)** hereof.

      (ii)     *Maturity, Principal Amount and Interest Rates*. The Series 2021B Bonds shall be issued in the aggregate principal amount of **$27,000,000** and shall bear interest from their date or from the most recent Interest Payment Date to which interest has been paid, payable on May 15, 2022, and thereafter semiannually on each Interest Payment Date of each year. The Series 2021B Bonds shall bear interest (computed on the basis of a 360-day year of twelve 30-day months) at the rate of **5.00%** per annum and shall have principal payable and mature on the following dates in the following principal amounts (subject to prior redemption as provided in **Article III** hereof):

| November 15 of the Year | Principal Amounts($) |
|---|---|
| 2035 | 960,000 |
| 2036 | 1,010,000 |
| 2037 | 1,060,000 |
| 2038 | 1,905,000 |
| 2039 | 2,000,000 |
| 2040 | 2,100,000 |
| 2041 | 2,205,000 |
| 2042 | 2,315,000 |
| 2043 | 2,435,000 |
| 2044 | 2,555,000 |
| 2045 | 2,685,000 |
| 2046 | 5,770,000 |

(c)     *Series 2021C Bonds*.

    (i)     *Designation and Date*.  The Series 2021C Bonds shall be designated "The Industrial Development Authority of the City of Kansas City, Missouri Senior Living Facility Revenue Bonds (Kingswood Project), Series 2021C."  The Series 2021C Bonds shall be dated the date of their initial issuance and delivery.

    (ii)     *Maturity, Principal Amount and Interest Rates*.  The Series 2021C Bonds shall be issued in the aggregate principal amount of **$4,400,000** and shall bear interest from their date or from the most recent Interest Payment Date to which interest has been paid, payable on May 15, 2022, and thereafter semiannually on each Interest Payment Date of each year.  The Series 2021C Bonds shall bear interest (computed on the basis of a 360-day year of twelve 30-day months) at the rate of **7.50%** per annum and shall have principal payable and mature on the following dates in the following principal amounts (subject to prior redemption as provided in **Article III** hereof):

| November 15 of the Year | Principal Amounts($) |
|---|---|
| 2035 | 125,000 |
| 2036 | 135,000 |
| 2037 | 140,000 |
| 2038 | 295,000 |
| 2039 | 315,000 |
| 2040 | 340,000 |
| 2041 | 365,000 |
| 2042 | 390,000 |
| 2043 | 420,000 |
| 2044 | 450,000 |
| 2045 | 485,000 |
| 2046 | 940,000 |

(d)     *Series 2021D Bonds*.

    (i)     *Designation and Date*.  The Series 2021D Bonds shall be designated "The Industrial Development Authority of the City of Kansas City, Missouri Senior Living Facility Revenue Bonds (Kingswood Project), Series 2021D."  The Series 2021D Bonds shall be dated the date of their initial issuance and delivery.

    (ii)     *Maturity, Principal Amount and Interest Rates*.  The Series 2021D Bonds shall be issued in the aggregate principal amount of **$12,050,000** and shall bear interest from their date or from the most recent Interest Payment Date to which interest has been paid, payable on May 15, 2022, and thereafter semiannually on each Interest Payment Date of each year, but solely from Excess Cash as set forth in **Section 408(b)(viii)** hereof.  The Series 2021D Bonds shall bear interest (computed on the basis of a 360-day year of twelve 30-day months) at the rate of **2.00%** per annum.  The Series 2021D Bonds shall mature on November 15, 2046 and all principal of the Series 2021D Bonds shall be payable on such maturity date (subject to prior redemption as provided in **Article III** hereof, including any mandatory redemption from Excess Cash available for payment of principal pursuant to **Section 301(e) and Section 408(b)(viii)(a)**).  To the extent available

Excess Cash pursuant to **Section 408(b)(viii)** hereof is insufficient to pay interest on the Series 2021D Bonds on any scheduled Interest Payment Date, the amount of such unpaid interest shall accrete and be added to the principal amount of the Series 2021D Bonds on the applicable Interest Payment Date and thereafter shall bear interest at the interest rate due on the Series 2021D Bonds.  Notwithstanding any provision of this Bond Indenture to the contrary, any reference to the principal of the Series 2021D Bonds shall include any unpaid interest on such Series 2021D Bond which has accreted and been added to the principal amount thereof.  The Bond Trustee shall reflect any increase in the principal amount of the Series 2021D Bonds held in the DTC System by making an entry on **Schedule A** of the global Series 2021D Bond certificate, provided that the principal amount thereof shall increase in accordance with the provisions hereof irrespective of whether the Bond Trustee has reflected such increase on such **Schedule A**.

(e)     *Delivery*.  The Bonds shall be executed in the manner set forth herein and delivered to the Bond Trustee for authentication, but prior to or simultaneously with the authentication and delivery of the Bonds by the Bond Trustee the following documents shall be filed with the Bond Trustee:

(1)     A copy, certified by the Secretary, Assistant Secretary or other authorized officer of the Authority, of the resolution adopted by the Authority authorizing the issuance of the Bonds and the execution of this Bond Indenture, the Loan Agreement, the Tax Compliance Agreement and the other Financing Documents to which it is a party.

(2)     A copy, certified by the Secretary, Assistant Secretary or other authorized officer of the Institution, of the resolutions adopted by the Institution authorizing the execution and delivery of the Master Indenture, the Supplemental Master Indenture No. 1, the Loan Agreement, the Tax Compliance Agreement, the Series 2021 Master Obligations, the Deed of Trust and the other Financing Documents to which it is a party, and approving this Bond Indenture, the issuance and sale of the Bonds and the transactions contemplated herein.

(3)     Copies of executed counterparts of this Bond Indenture, the Master Indenture, the Supplemental Master Indenture No. 1, the Loan Agreement, the Tax Compliance Agreement and the Continuing Disclosure Agreement.

(4)     The original executed and endorsed Series 2021 Master Obligations.

(5)     A request and authorization to the Bond Trustee on behalf of the Authority, executed by an Authority Representative, to authenticate the Bonds and deliver said Bonds to or upon the order of Holders upon payment to the Bond Trustee, for the account of the Authority, of the purchase price thereof.  The Bond Trustee shall be entitled to rely conclusively upon such request and authorization as to the names of the purchasers and the amounts of such purchase price.

(6)     The Opinion of Bond Counsel, dated the date of original issuance of the Bonds, in substantially the form required by the Bond Trustee, including without limitation, that the interest on the Series 2021B Bonds, the Series 2021C Bonds

-17-

and the Series 2021D Bonds is excludable from the gross income of the Owners thereof for federal tax purposes.

(7)        Such other opinions, certificates, statements, receipts and documents required by the Financing Documents or as the Bond Trustee shall reasonably require for the delivery of the Bonds.

When the documents specified above have been filed with the Bond Trustee, and when the Bonds shall have been executed and authenticated as required by this Bond Indenture, the Bond Trustee shall (A) deliver the Series 2021A Bonds and the Series 2021C Bonds, but only upon payment to the Bond Trustee of the purchase price of the Series 2021A Bonds and the Series 2021C Bonds, and (B) exchange for the Series 2016 Bonds the Series 2021B Bonds and the Series 2021D Bonds.  The net proceeds of the sale of the Series 2021A Bonds and the Series 2021C Bonds shall be paid to the Bond Trustee and deposited and applied as provided in **Article IV** hereof.

(f)        *Exchange for Series 2016 Bonds*.  Owners tendering Series 2016 Bonds shall receive Series 2021B Bonds and Series 2021D Bonds as follows: (1) Series 2021B Bonds in a principal amount equal to 52% of the principal amount of the Series 2016 Bonds Outstanding held by such Owner, and (2) Series 2021D Bonds, in a principal amount equal to 23% of the principal amount of the Series 2016 Bonds Outstanding held by such Owner.  All Series 2016 Bonds exchanged on the date of issuance of the Bonds will no longer be Outstanding under the Original Bond Indenture or this Bond Indenture. Owners of Series 2016 Bonds who tender such Series 2016 Bonds for exchange in accordance with this Bond Indenture as provided for in the Bankruptcy Plan will be deemed to have (i) waived any and all rights with respect to the Series 2016 Bonds so tendered (including without limitation, any existing or past defaults by the Authority, the Institution, the Bond Trustee or any party acting on the Authority's behalf or at its instruction and their consequences in respect of such Series 2016 Bonds), and (ii) released and discharged the Authority, the Institution, the Bond Trustee and their respective affiliates, current and former officers, directors, managers, members, employees, attorneys and advisors, each in their respective capacities as such, any party acting on the Institution's behalf or at the Institution's instruction from any and all claims such Owner may have, now or in the future, arising out of or related to the Series 2016 Bonds so tendered, including, without limitation, any and all claims that such Owner may be entitled to receive additional principal or interest payments with respect to the Series 2016 Bonds so tendered, including any accrued and unpaid interest (other than as provided in this Indenture) or to participate in any redemption of the Series 2016 Bonds so tendered.

**Section 202.**    **Method and Place of Payment.**

The Bond Trustee shall act as paying agent for the purpose of effecting payment of the principal of, redemption premium, if any, and interest on the Bonds.  The principal of, redemption premium, if any, and interest on the Bonds shall be payable in any coin or currency of the United States of America which on the respective dates of payment thereof is legal tender for the payment of public and private debts.

The principal of and the redemption premium, if any, on all Bonds shall be payable by check or draft at maturity or upon earlier redemption to the Persons in whose names such Bonds are registered on the bond register maintained by the Bond Trustee at the maturity or redemption date thereof, upon the

presentation and surrender of such Bonds at the principal corporate trust office or at such other office designated by the Bond Trustee for such purpose.

The interest payable on each Bond on any interest payment date shall be paid by the Bond Trustee to the registered owner of such Bond as shown on the bond register at the close of business on the Record Date, (a) by check or draft mailed to such registered owner at the address as it appears on the bond register or at such other address as is furnished to the Bond Trustee in writing by such owner, or (b) at the written request addressed to the Bond Trustee by any owner of Bonds in the aggregate principal amount of at least **$1,000,000**, by electronic transfer to such owner upon written notice to the Bond Trustee from such owner containing the electronic transfer instructions for the financial institution (which shall be located in the continental United States) to which such owner wishes to have such transfer directed, provided such written notice is given by such owner to the Bond Trustee not less than **5** Business Days before the applicable Record Date.  Any such written notice for electronic transfer shall be signed by such owner and shall include the name of the bank, its address, its ABA routing number and the name, number and contact name related to such owner's account at such bank to which the payment is to be credited.

## Section 203.    *Form, Denomination and Numbering.*

The Bonds issued under this Bond Indenture shall be issuable as fully registered bonds without coupons in substantially the form set forth in **Exhibit B** hereto, with such necessary or appropriate variations, omissions and insertions as are permitted or required by this Bond Indenture.  The Bonds may have endorsed thereon such legends or text as may be necessary or appropriate to conform to any applicable rules and regulations of any governmental authority or any custom, usage or requirement of law with respect thereto.

The Bonds shall be issuable in the denomination of **$100,000** or any integral multiple of **$5,000** in excess thereof.

The Bonds of each series shall be numbered from **R-1** consecutively upward in order of issuance or in such other manner as the Bond Trustee shall designate, and shall bear appropriate "CUSIP" identification numbers (if then generally in use).

## Section 204.    *Execution and Authentication.*

The Bonds shall be executed on behalf of the Authority by the manual or facsimile signature of its President, Chairman or any Vice President or Vice Chairman and attested by the manual or facsimile signature of its Secretary or an Assistant Secretary, and shall have the corporate seal of the Authority affixed thereto or imprinted thereon.  If any officer whose manual or facsimile signature appears on any Bonds shall cease to hold such office before the authentication and delivery of such Bonds, such signature shall nevertheless be valid and sufficient for all purposes, the same as if such person had remained in office until delivery.  Any Bond may be signed by such persons as at the actual time of the execution of such Bond shall be the proper officers to sign such Bond although at the date of such Bond such persons may not have been such officers.

No Bond shall be secured by, or be entitled to any lien, right or benefit under, this Bond Indenture or be valid or obligatory for any purpose, unless the certificate of authentication thereon is executed by the Bond Trustee by manual signature of an authorized officer or signatory of the Bond Trustee, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.  At any time and from time to time after the execution and

delivery of this Bond Indenture, the Authority may deliver Bonds executed by the Authority to the Bond Trustee for authentication and the Bond Trustee shall authenticate and deliver such Bonds as in this Bond Indenture provided and not otherwise.

### Section 205.     Registration, Transfer and Exchange.

The Bond Trustee is hereby appointed *"bond registrar"* for the purpose of registering Bonds and transfers of Bonds as herein provided.  The Bond Trustee shall cause to be kept at its corporate trust office a register (referred to herein as the *"bond register"*) in which, subject to such reasonable regulations as it may prescribe, the Bond Trustee shall provide for the registration, transfer and exchange of Bonds as herein provided.

Bonds may be transferred or exchanged only upon the bond register maintained by the Bond Trustee as provided in this Section.  Upon surrender for transfer or exchange of any Bond at the corporate trust office of the Bond Trustee, the Authority shall execute, and the Bond Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Bonds of any authorized denominations and of a like aggregate principal amount and same series and maturity and bearing interest at the same rate.

Every Bond presented or surrendered for transfer or exchange shall (if so required by the Bond Trustee, as bond registrar) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Bond Trustee, as bond registrar, duly executed by the owner thereof or his attorney or legal representative duly authorized in writing.

All Bonds issued upon any transfer or exchange of Bonds shall be the valid obligations of the Authority, evidencing the same debt, and entitled to the same security and benefits under this Bond Indenture, as the Bonds surrendered upon such transfer or exchange.

No service charge shall be made for any registration, transfer or exchange of Bonds, but the Bond Trustee may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Bonds, and such charge shall be paid before any such new Bond shall be delivered.  The fees and charges of the Bond Trustee for making any transfer or exchange and the expense of any bond printing necessary to effect any such transfer or exchange shall be paid by the Institution.  In the event any registered owner fails to provide a certified taxpayer identification number to the Bond Trustee, the Bond Trustee may impose a charge against such registered owner sufficient to pay any governmental charge required to be paid as a result of such failure.  In compliance with Section 3406 of the Internal Revenue Code, such amount may be deducted by the Bond Trustee from amounts otherwise payable to such registered owner hereunder or under the Bonds.

The Bond Trustee shall not be required (a) to transfer or exchange any Bond during a period beginning **15** days before the day of the mailing of a notice of redemption of such Bond and ending at the close of business on the day of such mailing, or (b) to transfer or exchange any Bond so selected for redemption in whole or in part, during a period beginning at the opening of business on any Record Date for such Bonds and ending at the close of business on the relevant Interest Payment Date therefor.

The Person in whose name any Bond is registered on the bond register shall be deemed and regarded as the absolute owner thereof for all purposes, except as otherwise provided in this Bond Indenture when a Book-Entry System is in effect for the Bonds, and payment of or on account of the principal of and premium, if any, and interest on any such Bond shall be made only to or upon the order

of the registered owner thereof or his legal representative, but such registration may be changed as herein provided.  All such payments shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

The Bond Trustee will keep the bond register on file at its corporate trust office, which shall include a list of the names and addresses of the last known owners of all Bonds and the serial numbers of such Bonds held by each of such owners.  At reasonable times and under reasonable regulations established by the Bond Trustee, the bond register may be inspected and copied by the Authority, the Institution, or the owners of **10%** in principal amount of Bonds Outstanding or the authorized representative thereof, provided that the ownership of such owner and the authority of any such designated representative shall be evidenced to the satisfaction of the Bond Trustee.

### Section 206.    *Mutilated, Destroyed, Lost and Stolen Bonds.*

If (a) any mutilated Bond is surrendered to the Bond Trustee, or the Bond Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Bond, and (b) there is delivered to the Authority and the Bond Trustee such security or indemnity as may be required by the Bond Trustee to save each of them harmless, then, in the absence of notice to the Bond Trustee that such Bond has been acquired by a bona fide purchaser, the Authority shall execute and the Bond Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of the same principal amount, bearing a number not contemporaneously outstanding.

Upon the issuance of any new Bond under this Section, the Authority and the Bond Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.

Every new Bond issued pursuant to this Section in lieu of any mutilated, destroyed, lost or stolen Bond, shall constitute an original contractual obligation of the Authority, and shall be entitled to all the security and benefits of this Bond Indenture equally and ratably with all other Outstanding Bonds.

### Section 207.    *Cancellation of Bonds.*

All Bonds surrendered to the Bond Trustee for payment, redemption, transfer, exchange or replacement shall be promptly cancelled by the Bond Trustee.  The Authority or the Institution may at any time deliver to the Bond Trustee for cancellation any Bonds previously authenticated and delivered hereunder, which the Authority or the Institution may have acquired in any manner whatsoever, and all Bonds so delivered shall be promptly cancelled by the Bond Trustee.  No Bond shall be authenticated in lieu of or in exchange for any Bond cancelled as provided in this Section, except as expressly provided by this Bond Indenture.  All cancelled Bonds held by the Bond Trustee shall be destroyed and disposed of by the Bond Trustee in accordance with applicable record retention requirements.  The Bond Trustee shall execute and deliver upon written request to the Authority and the Institution a certificate describing the Bonds so cancelled.

### Section 208.    *Book-Entry Bonds; Securities Depository.*

The Bonds shall initially be registered to Cede & Co., the nominee for The Depository Trust Company, New York, New York (the *"Securities Depository"*), and no beneficial owner will receive certificates representing its respective interest in the Bonds, except in the event the Bond Trustee issues replacement bonds as provided in this Section.  It is anticipated that during the term of the Bonds, the

Securities Depository will make book-entry transfers among those financial institutions for whom the Securities Depository effects book-entry transfers and pledges of securities deposited with the Securities Depository in the Book-Entry System, as such listing of Participants exists at such time (the *"Participants"*) and receive and transmit payment of principal of, premium, if any, and interest on, the Bonds to the Participants until and unless the Bond Trustee authenticates and delivers replacement bonds to the beneficial owners as described in the following paragraph.

If (a) the Institution determines (1) that the Securities Depository is unable to properly discharge its responsibilities, or (2) that the Securities Depository is no longer qualified to act as a securities depository and registered clearing agency under the Securities Exchange Act of 1934, as amended, or (3) that the continuation of a book-entry system to the exclusion of any Bonds being issued to any Bondowner other than Cede & Co. is no longer in the best interests of the beneficial owners of the Bonds, or (b) the Bond Trustee receives written notice from Participants representing interests in not less than **50%** of the Bonds Outstanding, as shown on the records of the Securities Depository (and certified to such effect by the Securities Depository), that the continuation of a book-entry system to the exclusion of any Bonds being issued to any Bondowner other than Cede & Co. is no longer in the best interests of the beneficial owners of the Bonds, then the Bond Trustee shall notify the Bondowners of such determination or such notice and of the availability of certificates to owners requesting the same, and the Bond Trustee shall register in the name of and authenticate and deliver replacement bonds to the beneficial owners or their nominees in principal amounts representing the interest of each; provided, that in the case of a determination under (a)(1) or (a)(2) of this paragraph, the Institution, with the consent of the Bond Trustee, may select a successor securities depository in accordance with the following paragraph to effect book-entry transfers.  In such event, all references to the Securities Depository herein shall relate to the period of time when at least one Bond is registered in the name of the Securities Depository or its nominee.  Upon the issuance of replacement bonds, all references herein to obligations imposed upon or to be performed by the Securities Depository shall be deemed to be imposed upon and performed by the Bond Trustee, to the extent applicable with respect to such replacement bonds.  If the Securities Depository resigns and the Institution, the Bond Trustee or Bondowners are unable to locate a qualified successor of the Securities Depository in accordance with the following paragraph, then the Bond Trustee shall authenticate and cause delivery of replacement bonds to Bondowners, as provided herein.  The Bond Trustee may rely on information from the Securities Depository and its Participants as to the names and addresses of and principal amounts owned by each of the beneficial owners of the Bonds.  The cost of printing, registration, authentication, and delivery of replacement bonds shall be paid for by the Institution.

In the event the Securities Depository resigns, is unable to properly discharge its responsibilities, or is no longer qualified to act as a securities depository and registered clearing agency under the Securities Exchange Act of 1934, as amended, the Institution may, subject to the operational arrangements of the Securities Depository, appoint a successor Securities Depository provided the Bond Trustee receives written evidence satisfactory to the Bond Trustee with respect to the ability of the successor Securities Depository to discharge its responsibilities.  Any such successor Securities Depository shall be a securities depository that is a registered clearing agency under the Securities Exchange Act of 1934, as amended, or other applicable statute or regulation that operates a securities depository upon reasonable and customary terms.  The Bond Trustee upon its receipt of a Bond or Bonds for cancellation shall cause the delivery of Bonds to the successor Securities Depository in appropriate denominations and form as provided herein.

**Section 209.**  **Restrictions on Transfer.**

The Bonds are being sold only to Qualified Transferees and may be transferred only to Qualified Transferees.

No beneficial ownership interest in a Bond may be transferred unless the proposed transferee is a Qualified Transferee.  Each Person who is or who becomes a beneficial owner of a Bond shall be deemed by the acceptance or acquisition of such beneficial ownership interest to have agreed to be bound by the provisions of this Section.

<div align="center">

**ARTICLE III**

**REDEMPTION OF BONDS**

</div>

**Section 301.**  **Redemption of Bonds Prior to Maturity.**

The Bonds are subject to optional, extraordinary and mandatory redemption prior to maturity as follows:

(a)  *Optional Redemption of the Bonds*.  The Bonds are subject to optional redemption by the Authority, upon written direction from the Institution, on any date on or after November 15, 2031 (the "Par Call Date") in whole or in part at any time, at a redemption price equal to 100% of the principal amount of the Bonds being redeemed, plus accrued interest thereon to the redemption date, without premium.

(b)  *Optional Redemption of Series 2021A Bonds Prior to the Par Call Date with Make-Whole.* Prior to the Par Call Date, the Series 2021A Bonds are subject to optional redemption by the Authority, upon written directions from the Institution, in whole or in part at any time, at a redemption price equal to the greater of (i) 100% of the principal amount of the Series 2021A Bonds to be redeemed; or (ii) the sum of the present values of the remaining scheduled payments of principal of and interest on the Series 2021A Bonds to be redeemed to the maturity date of the Series 2021A Bonds to be redeemed (exclusive of interest accrued to the redemption date) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 25 basis points, plus accrued and unpaid interest on the Series 2021A Bonds being redeemed to the redemption date.  "Treasury Rate" means, with respect to any redemption date the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity excluding inflation indexed securities (as compiled and published in the most recent Federal Reserve Statistical Release H.15 that has become publicly available on a day at least two Business Days, but no more than 45 calendar days, prior to the redemption date, (or, if such Statistical Release is no longer published, any publicly available source of similar market data), most nearly equal to the period from the redemption date to the maturity date of the Series 2021A Bonds to be redeemed; provided, however, that if the period from the redemption date to such maturity date is less than one year, the yield to maturity of the United States Treasury securities with a constant maturity of one year will be used.

(c)  *Extraordinary Optional Redemption of Bonds.*  The Bonds are subject to redemption and payment prior to the stated maturity thereof, upon direction from the Institution provided in writing by the Institution Representative, in whole or in part on any date, at a

<div align="center">

-23-

</div>

redemption price equal to **100%** of the principal amount thereof, plus accrued interest thereon to the redemption date, without premium, upon the occurrence of any of the following events:

(1)    all or a substantial portion of the Facilities are damaged or destroyed by fire or other casualty, or title to, or the temporary use of, all or a substantial portion of the Facilities are condemned or taken for any public or quasi-public use by any authority exercising the power of eminent domain or title thereto is found to be deficient, to such extent that in the determination of the Institution (A) such Facilities cannot be reasonably restored or replaced to the condition thereof preceding such event, or (B) such Institution or any affiliate is thereby prevented from carrying on its normal operations of such Facilities, or (C) the cost of restoration or replacement thereof would exceed the Net Proceeds of any casualty insurance, title insurance or condemnation awards with respect thereto; or

(2)    as a result of any changes in the Constitution of the State of Missouri or the Constitution of the United States of America or of legislative or administrative action (whether state or federal) or by final direction, judgment or order of any court or administrative body (whether state or federal) entered after the contest thereof by the Institution in good faith, this Bond Indenture or the Loan Agreement becomes void or unenforceable or impossible of performance in accordance with the intent and purpose of the parties as expressed therein, or unreasonable burdens or excessive liabilities are imposed upon the Institution with respect to such facilities or the operation thereof; or

(3)    the Institution is required or ordered, by legislative, judicial or administrative action of the United States or of the State of Missouri, or any agency, department or subdivision thereof, to operate the facilities financed or refinanced with the proceeds of the Bonds in a manner inconsistent with the stated goals, purposes and policies of the Institution established in the Institution's articles of incorporation, bylaws or other governing documents, including without limitation its goals, purposes and policies with respect to its primary operations, and such legislative, judicial or administrative action is applicable to the Institution because the Institution is a party to the Loan Agreement.

(d)    *Mandatory Redemption of Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds upon Determination of Taxability.*  Upon the occurrence of a Determination of Taxability, the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021C Bonds are subject to mandatory redemption, in whole, on a date established by the Institution no later than **90** days after such occurrence, at a redemption price equal to the principal amount thereof plus accrued interest to the redemption date; provided, however, that if the Event of Taxability giving rise to such Determination of Taxability is the result of the occurrence or existence of any fact, event or circumstance caused by the Institution (including, without limitation, the taking of any action by the Institution, or the failure to take any action by the Institution, or the making by the Institution of any misrepresentation in any certificate required to be given in connection with the issuance, sale or delivery of the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds), then the redemption price shall be equal to 105% of the principal amount of the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds, plus accrued interest to the redemption date.

-24-

(e)    *Mandatory Redemption of Series 2021D Bonds from Excess Cash*.  The Series 2021D Bonds are subject to mandatory redemption from Excess Cash (as defined in **Section 408(b)(viii)**), to the extent of such Excess Cash available for the payment of principal of the Series 2021D Bonds pursuant to **Section 408(b)(viii)(a)**, on the first Interest Payment Date that is at least 30 days after the date on which such Excess Cash is deposited into the Series 2021D Account of the Bond Fund for payment of principal, at a redemption price equal to 100% of the principal amount of the Bonds being redeemed, plus accrued interest thereon to the redemption date, without premium.

**Section 302.    Election to Redeem.**

In case of any optional redemption or extraordinary optional redemption, the Institution shall, at least **35** days prior to the redemption date (unless a shorter notice shall be satisfactory to the Bond Trustee), give written notice to the Bond Trustee, with a copy to the Authority, directing the Bond Trustee to call Bonds of a series for redemption and give notice of redemption and specifying the redemption date, the principal amount and maturities of the series of Bonds to be called for redemption, the applicable redemption price or prices and the provision or provisions of this Bond Indenture pursuant to which such Bonds are to be called for redemption.  The Bond Trustee may in its discretion waive such notice period so long as the notice requirements set forth in **Section 304** hereof are met.

The foregoing provisions of this Section shall not apply in the case of any mandatory redemption of Bonds under this Bond Indenture or under any Supplemental Bond Indenture, and the Bond Trustee shall call Bonds for redemption and shall give notice of redemption pursuant to such mandatory redemption requirements without the necessity of any action by the Authority or the Institution and whether or not the Bond Trustee shall hold in the Bond Fund moneys available and sufficient to effect the required redemption.

**Section 303.    Selection of Bonds to be Redeemed.**

Bonds may be redeemed only in the principal amount of **$100,000** or any integral multiple of **$5,000** in excess thereof.

If less than all Bonds are to be redeemed and paid prior to maturity pursuant to **Section 301(a), 301(c)** or **301(d)** hereof, such Bonds shall be redeemed from the series and maturity or maturities selected by the Institution.  If less than all such Bonds of any maturity of a series are to be redeemed, the particular Bonds to be redeemed shall be selected by the Bond Trustee from the Bonds of such series and maturity which have not previously been called for redemption, by lot or such other equitable manner as the Bond Trustee may determine and which may provide for the selection for redemption of portions of the principal of Bonds of a denomination larger than **$5,000**.

If less than all Series 2021A Bonds are to be redeemed and paid prior to maturity pursuant to **Section 301(b)** hereof and if such Series 2021A Bonds are registered in book-entry form and so long as DTC or a successor securities depository is the sole registered owner of the Series 2021A Bonds, the particular Series 2021A Bonds or portions thereof to be redeemed shall be allocated on a pro rata pass-through distribution of principal basis in accordance with DTC procedures, provided that, so long as the Series 2021A Bonds are held in book-entry form, the selection for redemption of such Bonds shall be made in accordance with the operational arrangements of DTC then in effect. If the DTC operational arrangements do not allow for the redemption of the Series 2021A Bonds on a pro rata pass-through distribution of principal basis as described above, then the Series 2021A Bonds will be selected for

redemption, in accordance with DTC procedures, by lot or in such other manner as is in accordance with the applicable DTC operational arrangements.

Any Bond that is to be redeemed only in part shall be surrendered at the place of payment therefor (with, if the Bond Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Bond Trustee duly executed by, the owner thereof or his attorney or legal representative duly authorized in writing), and the Bond Trustee shall authenticate and deliver to the owner of such Bond, without service charge, a new Bond or Bonds of the applicable series and of any authorized denomination or denominations as requested by such owner in the aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Bond so surrendered.  If the owner of any such Bond shall fail to present such Bond to the Bond Trustee for payment and exchange as aforesaid, said Bond shall, nevertheless, become due and payable on the redemption date to the extent of the unit or units of principal amount called for redemption (and to that extent only).

In lieu of surrender under the preceding paragraph, payment of the redemption price of a portion of any Bond may be made directly to the registered owner thereof without surrender thereof, if there shall have been filed with the Bond Trustee a written agreement of such owner satisfactory in form and substance to the Bond Trustee, and, if such owner is a nominee, the Person for whom such owner is a nominee, that payment shall be so made and that such owner will not sell, transfer or otherwise dispose of such Bond unless prior to delivery thereof such owner shall present such Bond to the Bond Trustee for notation thereon of the portion of the principal thereof redeemed or shall surrender such Bond in exchange for a new Bond or Bonds for the unredeemed balance of the principal of the surrendered Bond.

Notwithstanding the foregoing, in the event that the Securities Depository for the Bonds is DTC, the Bond Trustee shall follow the procedure for redemption and notice as set forth in DTC's operational arrangements, as in effect at the time.

**Section 304.    *Notice of Redemption.***

Unless waived by any owner of Bonds to be redeemed, official notice of any such redemption shall be given by the Bond Trustee by electronic notice, telecopy, first class mail or prepaid overnight delivery service, at least **20** days prior to the redemption date to each registered owner of the Bonds to be redeemed at the address shown on the bond register.

All official notices of redemption shall be dated and shall state the following:

(a)    the redemption date;

(b)    the redemption price;

(c)    the series and principal amount (and, in the case of partial redemption, the respective principal amounts, CUSIP or other identification numbers and maturity dates) of the Bonds to be redeemed;

(d)    that on the redemption date the redemption price will become due and payable upon each such Bond or portion thereof called for redemption, and that interest thereon shall cease to accrue from and after said date; and

(e)     the place where the Bonds to be redeemed are to be surrendered for payment of the redemption price, which place of payment shall be a corporate trust office of the Bond Trustee.

With respect to optional redemptions, such notice may be conditioned upon moneys being on deposit with the Bond Trustee on or prior to the redemption date in an amount sufficient to pay the redemption price on the redemption date.  If such notice is conditional and either the Bond Trustee receives written notice from the Institution that moneys sufficient to pay the redemption price will not be on deposit on the redemption date, or such moneys are not received on the redemption date, then such notice shall be of no force and effect, the Bond Trustee shall not redeem such Bonds and the Bond Trustee shall give notice, in the same manner in which the notice of redemption was given, that such moneys were not or will not be so received and that such Bonds will not be redeemed.

The failure of any owner of Bonds to receive notice given as provided in this Section, or any defect therein, shall not affect the validity of any proceedings for the redemption of any Bonds.  Any notice mailed as provided in this Section shall be conclusively presumed to have been duly given and shall become effective upon mailing, whether or not any owner receives such notice.

So long as the Securities Depository is effecting book-entry transfers of the Bonds, the Bond Trustee shall provide the notices specified in this Section only to the Securities Depository.  It is expected that the Securities Depository shall, in turn, notify its Participants and that the Participants, in turn, will notify or cause to be notified the beneficial owners.  Any failure on the part of the Securities Depository or a Participant, or failure on the part of a nominee of a beneficial owner of a Bond to notify the beneficial owner of the Bond so affected, shall not affect the validity of the redemption of such Bond.

## Section 305.     *Payment of Redemption Price.*

On or prior to any redemption date, there shall be deposited with the Bond Trustee an amount of money sufficient to pay the redemption price of all the Bonds that are to be redeemed on that date.  Such money shall be held in trust for the benefit of the Persons entitled to such redemption price and shall not be deemed to be part of the Trust Estate.

Notice of redemption having been given as aforesaid, the Bonds to be redeemed shall, on the redemption date, become due and payable at the redemption price therein specified, and from and after such date (unless payment of the redemption price has not been made) such Bonds shall cease to bear interest.  Upon surrender of any such Bond for redemption in accordance with said notice, the redemption price of such Bond shall be paid by the Bond Trustee to the registered owner in immediately available funds by close of business on the redemption date.  Installments of interest with a due date on or prior to the redemption date shall be payable to the owners of the Bonds registered as such on the bond register on the relevant Record Dates according to the terms of such Bonds and the provisions of **Section 204** hereof.

Upon the payment of the redemption price of Bonds being redeemed, each check or other transfer of funds issued for such purpose shall bear or have enclosed the CUSIP number identifying, by issue, series and maturity, the Bonds being redeemed with the proceeds of such check or other transfer.

If any Bond called for redemption is not paid upon surrender thereof for redemption, or as otherwise provided under **Section 303** hereof in lieu of surrender, the principal (and premium, if any) shall, until paid, bear interest from the redemption date at the rate prescribed therefor in the Bond.

## ARTICLE IV

### FUNDS AND ACCOUNTS, APPLICATION OF BOND PROCEEDS
### AND OTHER MONEYS

***Section 401.     Creation of Funds and Accounts.***

There are hereby created and ordered to be established in the custody of the Bond Trustee the following special trust funds and accounts with respect to the Bonds, to be designated as follows:

(a)     **"The Industrial Development Authority of the City of Kansas City, Missouri-- Kingswood Bond Fund"** (the *"Bond Fund"*), including the following accounts:

> i.   **"Series 2021A Interest Account"**
> ii.  **"Series 2021A Principal Account"**
> iii. **"Series 2021B Interest Account"**
> iv.  **"Series 2021B Principal Account"**
> v.   **"Series 2021C Interest Account"**
> vi.  **"Series 2021C Principal Account"**
> vii. **"Series 2021D Account"**

(b)     **"The Industrial Development Authority of the City of Kansas City, Missouri-- Kingswood Debt Service Reserve Fund"** (the *"Debt Service Reserve Fund"*), including the following accounts:

> i.   **"Series 2021A Account"**
> ii.  **"Series 2021B Account"**
> iii. **"Series 2021C Account"**

(c)     **"The Industrial Development Authority of the City of Kansas City, Missouri-- Kingswood Rebate Fund"** (the *"Rebate Fund"*).

(d)     **"The Industrial Development Authority of the City of Kansas City, Missouri-- Kingswood Revenue Fund"** (the *"Revenue Fund"*).

(e)     **"The Industrial Development Authority of the City of Kansas City, Missouri-- Kingswood Series 2021A Project Fund"** (the *"Series 2021A Project Fund"*).

(f)     **"The Industrial Development Authority of the City of Kansas City, Missouri-- Kingswood Series 2021C Repair and Replacement Project Fund"** (the *"Series 2021C Repair and Replacement Project Fund"*).

The Bond Trustee is authorized to establish separate accounts or subaccounts within such funds or otherwise segregate moneys within such funds, on a book-entry basis or in such other manner as the Bond Trustee may deem necessary or convenient, or as the Bond Trustee shall be instructed by the Authority.

All moneys deposited with or paid to the Bond Trustee for the funds and accounts held under this Bond Indenture shall be held by the Bond Trustee in trust and shall be applied only in accordance with the provisions of this Bond Indenture and the Loan Agreement, and, until used or applied as herein provided

(except for moneys in the Rebate Fund), shall constitute part of the Trust Estate and be subject to the lien, terms and provisions hereof and shall not be commingled with any other funds of the Authority or the Institution except as provided under **Section 502** hereof for investment purposes.

In addition to the accounts described above that are established and in the custody of the Bond Trustee, the Institution, pursuant to **Section 5.13** of the Loan Agreement, shall establish the **"Kingswood Operating Fund"** (the *"Operating Fund"*).

### Section 402. *Deposit of Bond Proceeds and Other Moneys.*

(a)     The proceeds of the Series 2021A Bonds in the amount of **$5,500,000.00** shall be paid to the Bond Trustee, and the Bond Trustee shall deposit and apply such proceeds as follows:

(i)     Deposit to the credit of the Series 2021A Account of the Debt Service Reserve Fund the sum of **$500,000** from the proceeds of the Series 2021A Bonds, equal to the Debt Service Reserve Requirement for the Series 2021A Bonds.

(ii)     Deposit to the credit of the Series 2021A Project Fund the sum of **$5,000,000** from the proceeds of the Series 2021A Bonds in accordance with **Section 407** hereof.

(b)     The proceeds of the Series 2021C Bonds in the amount of $4,400,000.00 shall be paid to the Bond Trustee, and the Bond Trustee shall deposit and apply such proceeds as follows:

(i)     Deposit to the credit of the Series 2021C Account of the Debt Service Reserve Fund the sum of **$400,000** from the proceeds of the Series 2021C Bonds, equal to the Debt Service Reserve Requirement for the Series 2021C Bonds.

(ii)     Deposit to the credit of the Series 2021C Repair and Replacement Project Fund the sum of **$4,000,000** from the proceeds of the Series 2021C Bonds to fund costs of the Series 2021C Project in accordance with **Section 403** hereof.

(c)     The amount of **$[1,484,000]|*less amounts used prior to closing*]** shall be transferred from the Debt Service Reserve Fund under the Original Bond Indenture to the Series 2021B Account of the Debt Service Reserve Fund, equal to a portion of the Debt Service Reserve Requirement for the Series 2021B Bonds.

### Section 403. *Series 2021C Repair and Replacement Project Fund.*

Moneys in the Series 2021C Repair and Replacement Project Fund shall be disbursed solely to pay costs of the Series 2021C Project set forth in **Exhibit A** to this Bond Indenture.

If an event of default specified in **Section 701** hereof has occurred and is continuing and the Bonds have been declared due and payable pursuant to **Section 702** hereof, any balance remaining in the Series 2021C Repair and Replacement Project Fund, other than amounts required to be transferred to the Rebate Fund pursuant to **Section 406** hereof, shall without further authorization be deposited in the Series 2021C Principal Account of the Bond Fund by the Bond Trustee as provided in **Section 404** hereof with advice to the Institution and to the Authority of such action.

*Section 404.*     *Bond Fund.*

(a)     The Bond Trustee shall deposit and credit to the Bond Fund, as and when received, as set forth below.

(i)     The amount required to be deposited therein under **Section 408** hereof, and all Loan Payments made by the Institution pursuant to **Section 4.1** of the Loan Agreement.

(ii)     Any amount required to be transferred to an account of the Bond Fund from an account of the Debt Service Reserve Fund pursuant to **Section 403** or **Section 405** hereof.

(iii)     Interest earnings and other income on Permitted Investments required to be deposited in the Bond Fund pursuant to **Section 502** hereof.

(iv)     All other moneys received by the Bond Trustee under and pursuant to any of the provisions of this Bond Indenture or the Loan Agreement for deposit into the Bond Fund.

(b)     The Bond Trustee shall on each Interest Payment Date pay or cause to be paid out of (i) the Series 2021A Interest Account in the Bond Fund, the interest due on the Series 2021A Bonds, (ii) the Series 2021B Interest Account of the Bond Fund, the interest due on the Series 2021B Bonds, (iii) the Series 2021C Interest Service Account of the Bond Fund, the interest due on the Series 2021C Bonds, and (iii) the Series 2021D Account of the Bond Fund, the interest due on the Series 2021D Bonds, subject to **Section 201(d)(ii)**.

(c)     The Bond Trustee shall on each principal payment or mandatory sinking fund payment date pay or cause to be paid to the Paying Agent upon presentation and surrender of the requisite Bonds (such presentation and surrender not being required if Cede & Co. is the holder of the applicable Bond) the following:

(i)     Out of the Series 2021A Principal Account of the Bond Fund, the principal amount, if any, due on the Series 2021A Bonds;

(ii)     Out of the Series 2021B Principal Account of the Bond Fund, the principal amount, if any, due on the Series 2021B Bonds;

(iii)     Out of the Series 2021C Principal Account of the Bond Fund, the principal amount, if any, due on the Series 2021C Bonds; and

(iv)     Out of the Series 2021D Account of the Bond Fund, the principal amount, if any, due on the Series 2021D Bonds.

After payment in full of the principal of, redemption premium, if any, and interest on the Bonds (or after provision has been made for the payment thereof as provided in this Bond Indenture), all rebatable arbitrage to the United States and the fees, charges and expenses of the Bond Trustee and the Authority, and any other amounts required to be paid under this Bond Indenture and the Loan Agreement, all amounts remaining in the Bond Fund shall be paid to the Institution upon the expiration or sooner termination of the Loan Agreement and the Master Indenture.

**Section 405.     *Debt Service Reserve Fund.***

The Bond Trustee shall deposit and credit to the Debt Service Reserve Fund, as and when received, as follows:

(a)      The initial deposits and transfer required by **Section 402** hereof.

(b)      Payments required to be made by the Institution under **Section 408(b)(vii)** hereof or under the Loan Agreement to make up a deficiency in the Debt Service Reserve Fund.

(c)      Interest earnings and other income on Permitted Investments required to be deposited in the Debt Service Reserve Fund.

(e)      All other moneys received by the Bond Trustee under and pursuant to any of the provisions of the Loan Agreement or any other Financing Document, when accompanied by written directions from the person depositing such moneys that such moneys are to be paid into the Debt Service Reserve Fund.

Except as otherwise herein provided, moneys in the Series 2021A Account, the Series 2021B Account, and the Series 2021C Account of the Debt Service Reserve Fund shall be disbursed and expended by the Bond Trustee solely for the payment of the principal of and redemption premium, if any, and interest on the Series 2021A Bonds, the Series 2021B Bonds, and the Series 2021C Bonds, respectively, if sufficient moneys therefor are not available in the Bond Fund.  In the event the balance of moneys in the Bond Fund for the applicable series of Bonds is insufficient to pay principal of or interest on such series of Bonds when due and payable, moneys in the applicable account of the Debt Service Reserve Fund shall be transferred into the applicable account of the Bond Fund in an amount sufficient to make up such deficiency.  The Bond Trustee may use moneys in the Debt Service Reserve Fund for such purpose whether or not the amount in the Debt Service Reserve Fund at that time equals the Debt Service Reserve Requirement.  Such moneys shall be used first to make up any deficiency in the payment of interest and then principal on the respective series of the Bonds.  Moneys in the respective accounts of the Debt Service Reserve Fund shall also be used to pay the last Series 2021A Bonds, the Series 2021B Bonds, and the Series 2021C Bonds, as applicable, becoming due unless such Bonds and all interest thereon be otherwise paid, and thereafter any remaining balance in the Debt Service Reserve Fund shall be paid to the Institution.

**Section 406.     *Rebate Fund.***

There shall be deposited in the Rebate Fund such amounts as are required to be deposited therein pursuant to the Tax Compliance Agreement.  All amounts on deposit at any time in the Rebate Fund shall be held by the Bond Trustee in trust to the extent required to pay rebatable arbitrage to the United States of America, and neither the Institution, the Authority nor the owner of any Bonds shall have any rights in or claim to such money.

The Bond Trustee shall remit from moneys in the Rebate Fund all rebate installments and a final rebate payment to the United States required by the Tax Compliance Agreement.  Neither the Bond Trustee nor the Authority shall have any obligation to pay any amounts required to be rebated pursuant to this Section and the Tax Compliance Agreement, other than from moneys held in the Rebate Fund as provided in this Bond Indenture or from other moneys provided to it by the Institution.  Any moneys

remaining in the Rebate Fund after redemption and payment of all of the Bonds and payment and satisfaction of any rebatable arbitrage shall be withdrawn and paid to the Institution.

The obligation to pay arbitrage rebate to the United States and to comply with all other requirements of this Section and the Tax Compliance Agreement shall survive the defeasance or payment in full of the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds until all rebatable arbitrage shall have been paid.

**Section 407.** **Series 2021A Project Fund and Operating Fund.**

(a)     Amounts on deposit in the Series 2021A Project Fund shall be applied and allocated on the date of issuance of the Series 2021A Bonds to refinance the costs of the Series 2021A Project shown on **Exhibit A** hereto for the benefit of the Institution, and thereafter the Series 2021A Project shall remain designated as facilities refinanced with proceeds of the Series 2021A Bonds until the Series 2021A Bonds are no longer Outstanding.

(b)     The Institution by its execution of the Loan Agreement directs that amounts applied and allocated to refinance costs of the Series 2021A Project pursuant to **Subsection 407(a)**, shall, following such application and allocation, be immediately transferred by the Bond Trustee from the Series 2021A Project Fund to the Operating Fund, and thereafter shall be applied by the Institution to pay certain costs associated with the issuance of the Series 2021 Bonds, to pay certain Entrance Fee refund obligations of the Institution, to pay certain accounts payable of the Institution and, thereafter, any amounts thereof remaining after the payment of the foregoing costs and expenses (the "***Remaining Series 2021A Funds***"), shall be applied as set forth in **Section 408(b)(i)** of this Bond Indenture.

**Section 408.** **Revenue Fund.**

(a)     The Institution shall deposit, or cause to be deposited to the Revenue Fund, upon receipt thereof, all Gross Receipts (as defined in the Master Indenture) in the form of cash, checks, or negotiable instruments.

(b)     On the **first (1st)** Business Day of each calendar month, amounts in the Revenue Fund shall be transferred or deposited, as applicable, by the Bond Trustee in the following order of priority (the "***Distribution Waterfall***"):

(i)     First, to the Institution for deposit to the Operating Fund the amounts necessary for the Institution to pay in the upcoming month: (i) budgeted operating expenses for the upcoming month, including without limitation for costs of operating, managing, maintaining and improving the Facilities, budgeted capital expenses (after funds in the Series 2021C Repair and Replacement Project Fund have been fully disbursed), including costs for the refurbishment of Independent Living Units as is necessary for occupancy or reoccupancy of the Independent Living Units; (ii) the refunding of Entry Fees; and, (iii) payments on Non-Recourse Indebtedness (the amount to be deposited from the Revenue Fund to the Operating Fund in any given month shall take into account any unapplied amount deposited in the Operating Fund from the Revenue Fund for such purpose in a prior month or any amount of the remaining Series 2021A Funds remaining on deposit in the Operating Fund, but excluding from the calculation of the amount to be deposited in the Operating Fund from the Revenue Fund the amount of any Excess Cash released to the Institution pursuant to **Section 408(b)(viii)(b)** hereof that remains in the Operating

Fund), as certified by Institution (in a certificate setting forth in reasonable detail the projected application of the amount so certified) delivered to the Bond Trustee no later than **seven (7)** Business Days prior to the **first (1st)** Business Day of such month;

(ii)  Second, to the Series 2021A Interest Account and the Series 2021C Interest Account of the Bond Fund, an amount equal to **one-sixth (1/6th)** of the interest due on the next Interest Payment Date for the Series 2021A Bonds and the Series 2021C Bonds, respectively;

(iii)  Third, to the Series 2021B Interest Account of the Bond Fund, an amount equal to **one-sixth (1/6th)** of the interest due on the next Interest Payment Date for the Series 2021B Bonds;

(iv)  Fourth, commencing December, 2024, to the Series 2021A Principal Account of the Bond Fund, an amount equal to **one-twelfth (1/12th)** of the principal due on the next principal payment date for the Series 2021A Bonds;

(v)  Fifth, commencing December, 2034, to the Series 2021C Principal Account of the Bond Fund, an amount equal to **one-twelfth (1/12th)** of the principal due on the next principal payment date for the Series 2021C Bonds;

(vi)  Sixth, commencing December, 2034, to the Series 2021B Principal Account of the Bond Fund, an amount equal to **one-twelfth (1/12th)** of the principal due on the next principal payment date for the Series 2021B  Bonds;

(vii)  Seventh, after no Series 2021C Bonds are Outstanding under this Bond Indenture, to the Series 2021B Account of Debt Service Reserve Fund the amount necessary to make the amount therein equal the Debt Service Reserve Requirement for the Series 2021B Bonds; and

(viii)  Eighth, any remaining amounts (such remaining amounts referred to as "Excess Cash") after (x) application of paragraphs First to Seventh above (disregarding any such paragraph pursuant to the provisions of which application has not yet commenced) and (y) in excess of an amount equal to 100 Days Cash on Hand (as defined in the Master Indenture), which shall continue to be held in in the Revenue Fund,  shall be transferred as follows:

a.  70% of the Excess Cash to the Series 2021D Account of the Bond Fund to pay interest due on the next Interest Payment Date and then to pay principal of the Series 2021D Bonds pursuant to **Section 301(e)**; and

b.  30% of the Excess Cash to the Institution to be spent solely on expenses related to the Facilities in accordance with **Section 5.14** of the Loan Agreement.

(c)  Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, the provisions of **Section 706** hereof shall apply with respect to the Revenue Fund.

*Section 409.*     *Payments Due on Non-Business Days.*

In any case where the date of maturity of principal of, redemption premium, if any, or interest on the Bonds or the date fixed for redemption of any Bonds (each a *"Scheduled Payment Date"*) shall be a day other than a Business Day, then payment of principal, redemption premium, if any, or interest need not be made on such Scheduled Payment Date but may be made on the next succeeding Business Day with the same force and effect as if made on the Scheduled Payment Date, and no interest shall accrue for the period after the Scheduled Payment Date.

*Section 410.*     *Nonpresentment of Bonds.*

In the event any Bond shall not be presented for payment when the principal thereof becomes due, either at maturity or otherwise, or at the date fixed for redemption thereof, if funds sufficient to pay such Bond shall have been made available to the Bond Trustee, all liability of the Authority to the owner thereof for the payment of such Bond, shall forthwith terminate and be completely discharged, and thereupon it shall be the duty of the Bond Trustee to hold such funds in trust, without liability for interest thereon, for the benefit of the owner of such Bond, who shall thereafter be restricted exclusively to such funds for any claim of whatever nature on his part under this Bond Indenture or on or with respect to said Bond.  If any Bond is not presented for payment within **one (1)** year following the date when such Bond becomes due, whether by maturity or otherwise, the Bond Trustee shall pay to the Institution the funds theretofore held by it for payment of such Bond, and such Bond shall, subject to the defense of any applicable statute of limitation, thereafter be an unsecured obligation of the Institution, and the owner thereof shall be entitled to look only to the Institution for payment, and then only to the extent of the amount so repaid, and the Institution shall not be liable for any interest thereon and shall not be regarded as a trustee of such money.

# ARTICLE V

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

*Section 501.*     *Moneys to be Held in Trust.*

All moneys deposited with or paid to the Bond Trustee for the funds and accounts held by the Bond Trustee under this Bond Indenture, and all moneys deposited with or paid to any paying agent under any provision of this Bond Indenture shall be held by the Bond Trustee in trust and shall be applied only in accordance with the provisions of this Bond Indenture and the Loan Agreement, and, until used or applied as herein provided, and except as provided in **Sections 305** and **1001** hereof, shall (except for moneys in the Rebate Fund which shall be held in trust but are not subject to the lien of this Bond Indenture) constitute part of the Trust Estate and be subject to the lien, terms and provisions hereof and shall not be commingled with any other funds of the Authority or the Institution except as provided under **Section 502** hereof for investment purposes.

*Section 502.*     *Investment of Moneys.*

Moneys held in each of the funds and accounts under this Bond Indenture shall be invested and reinvested by the Bond Trustee, pursuant to written directions of the Institution Representative, in accordance with the provisions of this Bond Indenture and the Tax Compliance Agreement in Permitted

-34-

Investments that mature or are subject to redemption by the owner thereof prior to the date such funds are expected to be needed.  The Bond Trustee may conclusively rely upon such instructions as to both the suitability and legality of the directed investments.  If the Institution Representative fails to provide written directions concerning investment of moneys, the Bond Trustee may invest in such Permitted Investments specified in **paragraph (g)** of the definition of Permitted Investments, provided they mature or are subject to redemption prior to the date such funds will be needed.  The Bond Trustee is authorized, in making or disposing of any investment permitted by this Section, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or such affiliate is acting as an agent of the Bond Trustee or for any third person or dealing as principal for its own account.  The Bond Trustee may pool moneys for investment purposes, except moneys held in any fund or account that are required to be yield restricted in accordance with the Tax Compliance Agreement, which shall be invested separately.  Any such Permitted Investments shall be held by or under the control of the Bond Trustee and shall be deemed at all times a part of the fund or account in which such moneys are originally held.  The interest accruing on each fund or account and any profit realized from such Permitted Investments (other than any amounts required to be deposited in the Rebate Fund pursuant to **Section 406** hereof) shall be credited to such fund or account, and any loss resulting from such Permitted Investments shall be charged to such fund or account.  The Bond Trustee shall sell or present for redemption and reduce to cash a sufficient amount of such Permitted Investments whenever it shall be necessary to provide moneys in any fund or account for the purposes of such fund or account and the Bond Trustee shall not be liable for any loss resulting from such investments.

Although the Authority and the Institution each recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Authority and the Institution hereby agree that confirmations of Permitted Investments are not required to be issued by the Bond Trustee for each month in which a monthly statement is rendered.

### Section 503.        *Records and Reports of Bond Trustee.*

The Bond Trustee shall maintain records with respect to any and all moneys or investments held by the Bond Trustee under this Bond Indenture.  The Bond Trustee shall furnish to the Institution, monthly by the 10th day of each month, a statement showing the status of each of the funds and accounts established under this Bond Indenture which are held by the Bond Trustee, showing the balance in each such fund or account as of the first day of the preceding month, the total of deposits to and the total of disbursements from each such fund or account, the dates of such deposits and disbursements, and the balance in each such fund or account on the last day of the preceding month.  The Bond Trustee shall render an annual accounting for each calendar year ending December 31 to the Authority, the Institution and any Bondowner requesting the same (at the expense of such Bondowner), showing in reasonable detail all financial transactions relating to the Trust Estate during the accounting period, including investment earnings and the balance in any funds or accounts created by this Bond Indenture as of the beginning and close of such accounting period.

**ARTICLE VI**

**GENERAL COVENANTS AND PROVISIONS**

*Section 601.      Authority to Issue Bonds and Execute Bond Indenture.*

The Authority covenants that it is duly authorized under the constitution and laws of the State of Missouri to execute this Bond Indenture, to issue the Bonds and to pledge and assign the Trust Estate in the manner and to the extent herein set forth; that all action on its part for the execution and delivery of this Bond Indenture and the issuance of the Bonds has been duly and effectively taken; and that the Bonds in the hands of the owners thereof are and will be valid and enforceable obligations of the Authority according to the import thereof, subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights to the extent applicable and their enforcement may be subject to the exercise of judicial discretion in appropriate cases.

*Section 602.      Limited Obligations.*

The Bonds and the interest thereon shall be special, limited obligations of the Authority payable (except to the extent paid out of Bond proceeds or the income from the temporary investment thereof and under certain circumstances from insurance proceeds and condemnation awards) solely out of the Loan Payments derived by the Authority under the Loan Agreement and the Series 2021 Master Obligations (except for fees and expenses payable to the Authority and the Authority's right to indemnification as set forth in the Loan Agreement), and are secured by a transfer, pledge and assignment of and a grant of a security interest in the Trust Estate to the Bond Trustee and in favor of the owners of the Bonds, as provided in this Bond Indenture.  The Bonds and interest thereon shall not be deemed to constitute a debt or liability of the State of Missouri or of any political subdivision thereof within the meaning of any state constitutional provision or statutory limitation and shall not constitute a pledge of the full faith and credit of the State of Missouri or of any political subdivision thereof, but shall be payable solely from the funds provided for in the Loan Agreement and in this Bond Indenture.  The issuance of the Bonds shall not, directly, indirectly or contingently, obligate the State of Missouri or any political subdivision thereof to levy any form of taxation therefor or to make any appropriation for their payment.  The Authority has no power to tax.

*Section 603.      Payment of Bonds.*

The Authority shall duly and punctually pay or cause to be paid, but solely from the sources specified in this Bond Indenture, the principal of, redemption premium, if any, and interest on the Bonds in accordance with the terms of the Bonds and this Bond Indenture.

*Section 604.      Performance of Covenants.*

The Authority shall (to the extent within its control) faithfully perform or cause to be performed at all times any and all covenants, undertakings, stipulations and provisions which are to be performed by the Authority contained in this Bond Indenture, in the Bonds and in all proceedings pertaining thereto.

*Section 605.      Enforcement of Rights.*

The Bond Trustee, as assignee, transferee, pledgee, and owner of a security interest under this Bond Indenture in its name or in the name of the Authority may enforce all assigned rights of the

-36-

Authority and the Bond Trustee and all obligations of the Institution under and pursuant to the Loan Agreement and any other Financing Documents for and on behalf of the Bondowners, whether or not the Authority is in default hereunder.

### Section 606.     *Inspection of Books and Documents.*

The Authority covenants and agrees that all documents and proceedings in its possession relating to the Bonds, this Bond Indenture and the Loan Agreement, and the transactions relating thereto shall at all reasonable times be open to inspection by such accountants or other agencies as the Bond Trustee may from time to time designate.  The Bond Trustee covenants and agrees that all books and documents in its possession relating to the Bonds, this Bond Indenture and the Loan Agreement, and the transactions relating thereto, including financial statements of the Institution, shall be open to inspection by the Authority during business hours upon reasonable notice.

### Section 607.     *Tax Covenants.*

The Authority (to the extent within its power or direction) shall not use or permit the use of any proceeds of the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds or any other funds of the Authority, directly or indirectly, in any manner, and shall not take or permit to be taken any other action or actions, which would adversely affect the exclusion of the interest on any Series 2021B Bonds, Series 2021C Bonds or Series 2021D Bonds from gross income for federal income tax purposes. The Authority agrees that so long as any of the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds remain Outstanding, it will comply with the provisions of the Tax Compliance Agreement applicable to the Authority.

The Bond Trustee agrees to comply with the provisions of the Tax Compliance Agreement.  The Bond Trustee from time to time may cause a firm of attorneys, consultants or independent accountants or an investment banking firm to supply the Bond Trustee, on behalf of the Authority, with such information as the Bond Trustee, on behalf of the Authority, may request in order to determine in a manner reasonably satisfactory to the Bond Trustee, on behalf of the Authority, all matters relating to (a) the actuarial yields on the Bonds as the same may relate to any data or conclusions necessary to verify that the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds are not "arbitrage bonds" within the meaning of Section 148 of the Internal Revenue Code, and (b) compliance with the rebate requirements of Section 148(f) of the Internal Revenue Code.  Payment for costs and expenses incurred in connection with supplying the foregoing information shall be paid by the Institution.

Notwithstanding any provision of this Section, if the Institution provide to the Bond Trustee and the Authority an Opinion of Bond Counsel to the effect that any action required under this Section is no longer required, or to the effect that some further action is required, to maintain the exclusion of interest on the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds from federal gross income, the Bond Trustee and the Authority may conclusively rely on such opinion in complying with the provisions of this Bond Indenture, and the covenants under this Bond Indenture shall be deemed to be modified to that extent.

The foregoing covenants of this Section shall remain in full force and effect notwithstanding the defeasance of the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds pursuant to **Article X** hereof or any other provision of this Bond Indenture, until the final maturity date of all Series 2021B Bonds, Series 2021C Bonds and Series 2021D Bonds Outstanding and payment thereof.

### Section 608.    *Information and Opinions to be Provided to the Authority.*

The Bond Trustee shall deliver to the Authority, upon Written Request by the Authority, copies of the financial statements and certificates required to be delivered to the Bond Trustee under the Loan Agreement or the Master Indenture.  Each Opinion of Bond Counsel required to be addressed and delivered to the Bond Trustee under any provision of this Bond Indenture shall also be addressed and delivered to the Authority.

### Section 609.    *Continuing Disclosure.*

Under the Continuing Disclosure Agreement, the Institution, on its own behalf and as Obligated Group Representative on behalf of the Members from time to time of the Obligated Group, has undertaken all responsibility for compliance with continuing disclosure requirements, and the Authority shall have no liability to the owners of the Bonds or any other person with respect to S.E.C. Rule 15c2-12. Notwithstanding any other provision of this Bond Indenture, failure of the Institution or the Dissemination Agent to comply with the Continuing Disclosure Agreement shall not be considered an event of default under this Bond Indenture, the Loan Agreement or any other Financing Document, and the sole remedy in the event of such failure shall be such actions as may be necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the Institution to comply with its obligations under the Loan Agreement or the Continuing Disclosure Agreement.

## ARTICLE VII

## DEFAULT AND REMEDIES

### Section 701.    *Events of Default.*

The term *"event of default"*, wherever used in this Bond Indenture, means any one of the following events (whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    default in the payment of any interest on any Bond when such interest becomes due and payable; provided that the payment of interest on the Series 2021D Bonds shall be due only upon the availability of Excess Cash, as set forth in **Section 408(b)(viii)(a)** above and to the extent not available, principal of the Series 2021D Bonds shall be adjusted and interest accrue as set forth in **Section 201(d)(ii)** above;

(b)    default in the payment of the principal of (or premium, if any, on) any Bond when the same becomes due and payable (whether at maturity, upon proceedings for redemption, by acceleration or otherwise); provided that the payment of accreted principal on the Series 2021D Bonds shall be due only upon the availability of Excess Cash, as set forth in **Section 408(b)(viii)(a)** above and to the extent not available, principal of the Series 2021D Bonds shall be adjusted as set forth in **Section 201(d)(ii)** above;

(c)    default in the performance, or breach, of any covenant or agreement of the Authority in this Bond Indenture (other than a covenant or agreement a default in the performance or breach of which is specifically dealt with elsewhere in this Section), and continuance of such default or breach for a period of **60** days after there has been given to the Authority

and the Institution by the Bond Trustee or to the Authority, the Institution and the Bond Trustee by the owners of at least **50%** in principal amount of the Bonds Outstanding, a written notice specifying such default or breach and requiring it to be remedied; provided, that if such default cannot be fully remedied within such **60**-day period, but can reasonably be expected to be fully remedied, such default shall not constitute an event of default if the Authority shall promptly upon receipt of such notice commence the curing of such default and shall thereafter prosecute and complete the same with due diligence and dispatch;

(d)     any event of default under the Loan Agreement or the Master Indenture shall have occurred and is continuing and has not been waived in accordance with the provisions of the Loan Agreement or the Master Indenture; or

(e)     a draw on any account of the Debt Service Reserve Fund is made to pay principal of or interest on the Bonds other than to pay the last Series 2021A Bonds, Series 2021B Bonds, or Series 2021C Bonds, as applicable, becoming due.

With regard to any alleged default concerning which notice is given to the Institution under the provisions of this Section, the Authority hereby grants the Institution full authority for the account of the Authority to perform any covenant or obligation, the nonperformance of which is alleged in said notice to constitute a default, in the name and stead of the Authority, with full power to do any and all things and acts to the same extent that the Authority could do and perform any such things and acts in order to remedy such default.

### Section 702.     *Acceleration of Maturity; Rescission and Annulment.*

If the Series 2021 Master Obligations have been declared by the Master Trustee to be immediately due and payable, then, without further action, all Bonds Outstanding shall become and be immediately due and payable, anything in the Bonds or herein to the contrary notwithstanding.

If an event of default under **Section 701(a)** through **(d)** hereof occurs and is continuing, the Bond Trustee may, or, upon the written request of the owners of not less than **50%** in principal amount of the Bonds Outstanding, shall, by written notice to the Authority and the Institution, declare the principal of all Bonds Outstanding and the interest accrued thereon to the date of acceleration to be due and payable, and upon any such declaration such principal and interest shall become immediately due and payable.

At any time after such a declaration of acceleration has been made, but before any judgment or decree for payment of money due on any Bonds has been obtained by the Bond Trustee as provided in this Article, the owners of a majority in principal amount of the Bonds Outstanding may, by written notice to the Authority, the Institution and the Bond Trustee, instruct the Bond Trustee to rescind and annul such declaration and its consequences if:

(a)     there is deposited with the Bond Trustee a sum sufficient to pay the following:

(1)     all overdue installments of interest on all Bonds;

(2)     the principal of (and premium, if any, on) any Bonds which have become due otherwise than by such declaration of acceleration and interest thereon at the rate or rates prescribed therefor in such Bonds; and

(3)    all sums paid or advanced by the Bond Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Bond Trustee, its agents and counsel; and

(b)    all events of default, other than the non-payment of the principal of Bonds which have become due solely by such declaration of acceleration, have been cured or have been waived as provided in **Section 709** hereof.

No such rescission and annulment shall affect any subsequent default or impair any right consequent thereon.

### Section 703.    *Exercise of Remedies by the Bond Trustee.*

Upon the occurrence and continuance of any event of default under this Bond Indenture, unless the same is waived as provided in this Bond Indenture, the Bond Trustee shall have the following rights and remedies, in addition to any other rights and remedies provided under this Bond Indenture or by law:

(a)    *Right to Bring Suit, Etc.*  The Bond Trustee may pursue any available remedy at law or in equity by suit, action, mandamus or other proceeding to enforce the payment of the principal of, premium, if any, and interest on the Bonds Outstanding, including interest on overdue principal (and premium, if any) and on overdue installments of interest, and any other sums due under this Bond Indenture, to realize on or to foreclose any of its interests or liens under this Bond Indenture or any other Financing Document, to enforce and compel the performance of the duties and obligations of the Authority as set forth in this Bond Indenture and to enforce or preserve any other rights or interests of the Bond Trustee under this Bond Indenture with respect to any of the Trust Estate or otherwise existing at law or in equity.

(b)    *Exercise of Remedies at Direction of Bondowners.*  If requested in writing to do so by the owners of not less than **50%** in principal amount of Bonds Outstanding and if indemnified as provided in **Section 802(e)** hereof, the Bond Trustee shall be obligated to exercise such one or more of the rights and remedies conferred by this Article as the Bond Trustee shall deem most expedient in the interests of the Bondowners.

(c)    *Appointment of Receiver.*  Upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Bond Trustee and of the Bondowners under this Bond Indenture, the Bond Trustee shall be entitled, as a matter of right, to the appointment of a receiver or receivers of the Trust Estate, pending such proceedings, with such powers as the court making such appointment shall confer.

(d)    *Suits to Protect the Trust Estate*.  The Bond Trustee shall have power to institute and to maintain such proceedings as it may deem expedient to prevent any impairment of the Trust Estate by any acts which may be unlawful or in violation of this Bond Indenture and to protect its interests and the interests of the Bondowners in the Trust Estate, including power to institute and maintain proceedings to restrain the enforcement of or compliance with any governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order would impair the security under this Bond Indenture or be prejudicial to the

-40-

interests of the Bondowners or the Bond Trustee, or to intervene (subject to the approval of a court of competent jurisdiction) on behalf of the Bondowners in any judicial proceeding to which the Authority or the Institution is a party and which in the judgment of the Bond Trustee has a substantial bearing on the interests of the Bondowners.

(e)     *Enforcement without Possession of Bonds.*  All rights of action under this Bond Indenture or any of the Bonds may be enforced and prosecuted by the Bond Trustee without the possession of any of the Bonds or the production thereof in any suit or other proceeding relating thereto, and any such suit or proceeding instituted by the Bond Trustee shall be brought in its own name as trustee of an express trust.  Any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Bond Trustee, its agents and counsel, and subject to the provisions of **Section 707** hereof, be for the equal and ratable benefit of the owners of the Bonds in respect of which such judgment has been recovered.

(f)     *Restoration of Positions.*  If the Bond Trustee or any Bondowner has instituted any proceeding to enforce any right or remedy under this Bond Indenture by suit, foreclosure, the appointment of a receiver, or otherwise, and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Bond Trustee or to such Bondowner, then and in every case the Authority, the Institution, the Bond Trustee and the Bondowners shall, subject to any determination in such proceeding, be restored to their former positions and rights under this Bond Indenture, and thereafter all rights and remedies of the Bond Trustee and the Bondowners shall continue as though no such proceeding had been instituted.

### Section 704.     *Limitation on Suits by Bondowners.*

No owner of any Bond shall have any right to institute any proceeding, judicial or otherwise, under this Bond Indenture, or for the appointment of a receiver or trustee or for any other remedy under this Bond Indenture, unless:

(a)     such owner has previously given written notice to the Bond Trustee of a continuing event of default;

(b)     the owners of not less than **50%** in principal amount of the Bonds Outstanding shall have made written request to the Bond Trustee to institute proceedings in respect of such event of default in its own name as Bond Trustee under this Bond Indenture;

(c)     such owner or owners have offered to the Bond Trustee indemnity as provided in this Bond Indenture against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)     the Bond Trustee for **60** days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e)     no direction inconsistent with such written request has been given to the Bond Trustee during such **60**-day period by the owners of a majority in principal amount of the Outstanding Bonds;

it being understood and intended that no one or more owners of Bonds shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Bond Indenture to affect, disturb or prejudice the lien of this Bond Indenture or the rights of any other owners of Bonds, or to obtain or to seek to obtain priority or preference over any other owners or to enforce any right under this Bond Indenture, except in the manner herein provided and for the equal and ratable benefit of all Outstanding Bonds.

Notwithstanding the foregoing or any other provision in this Bond Indenture, however, the owner of any Bond shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and interest on such Bond on the respective stated maturity expressed in such Bond (or, in the case of redemption, on the redemption date) and nothing contained in this Bond Indenture shall affect or impair the right of any owner to institute suit for the enforcement of any such payment.

### Section 705.    *Control of Proceedings by Bondowners.*

The owners of a majority in principal amount of the Bonds Outstanding shall have the right, during the continuance of an event of default,

(a)    to require the Bond Trustee to proceed to enforce this Bond Indenture, either by judicial proceedings for the enforcement of the payment of the Bonds and the foreclosure of this Bond Indenture, or otherwise; and

(b)    to direct the time, method and place of conducting any proceeding for any remedy available to the Bond Trustee, or exercising any trust or power conferred upon the Bond Trustee under this Bond Indenture, provided that:

(1)    such direction shall not be in conflict with any rule of law or this Bond Indenture;

(2)    the Bond Trustee may take any other action deemed proper by the Bond Trustee which is not inconsistent with such direction; and

(3)    the Bond Trustee shall not determine that the action so directed would be unjustly prejudicial to the owners not taking part in such direction.

Notwithstanding any provision of this Section, if the Institution provides to the Bond Trustee and the Authority an Opinion of Bond Counsel to the effect that any action required under this Section is no longer required, or to the effect that some further action is required, to maintain the exclusion of interest on the Bonds from federal gross income, the Bond Trustee and the Authority may conclusively rely on such opinion in complying with the provisions of this Bond Indenture, and the covenants under this Bond Indenture shall be deemed to be modified to that extent.

### Section 706.    *Application of Moneys Collected.*

Any moneys collected by the Bond Trustee pursuant to this Article (after the deductions for payment of costs and expenses of proceedings resulting in the collection of such moneys), together with any other sums then held by the Bond Trustee as part of the Trust Estate, shall be applied, after the payment of all amounts due the Bond Trustee under **Section 804** hereof, then in the following order, at the date or dates fixed by the Bond Trustee and, in case of the distribution of such money on account of

principal (or premium, if any) or interest, upon presentation of the Bonds and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

**First:** To the payment of all installments of interest then due on the Series 2021A Bonds and the Series 2021C Bonds, in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, without any discrimination or privilege;

**Second:** To the payment of the unpaid principal or redemption price, if any, of any of the Series 2021A Bonds and the Series 2021C Bonds or principal installments which shall have become due (other than Series 2021A Bonds and the Series 2021C Bonds or principal installments called for redemption for the payment of which moneys are held pursuant to the provisions of this Bond Indenture), in the order of their due dates and, if the amount available shall not be sufficient to pay in full Series 2021A Bonds and the Series 2021C Bonds or principal installments due on any particular date, then to the payment ratably, according to the amount of principal due on such date, to the Persons entitled thereto without any discrimination or privilege;

**Third:** To the payment of all installments of interest then due on the Series 2021B Bonds, in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, without any discrimination or privilege;

**Fourth:** To the payment of the unpaid principal or redemption price, if any, of any of the Series 2021B Bonds or principal installments which shall have become due (other than Series 2021B Bonds or principal installments called for redemption for the payment of which moneys are held pursuant to the provisions of this Bond Indenture), in the order of their due dates and, if the amount available shall not be sufficient to pay in full Series 2021B Bonds or principal installments due on any particular date, then to the payment ratably, according to the amount of principal due on such date, to the Persons entitled thereto without any discrimination or privilege;

**Fifth:** To the payment of all installments of interest then due on the Series 2021D Bonds, in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, without any discrimination or privilege;

**Sixth:** To the payment ratably of the unpaid principal of the Series 2021D Bonds without priority or preference of one maturity over another or one Series 2021D Bond over another Series 2021D Bond to the Persons entitled thereto, without any discrimination or privilege; and

**Seventh:** To the payment of the remainder, if any, to the Institution or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

Notwithstanding anything above to the contrary, moneys in each of the Series 2021A Account, the Series 2021B Account and the Series 2021C Account of the Debt Service Reserve Fund shall be applied in the above manner solely for payments due on the Series 2021A Bonds, the Series 2021B Bonds and the Series 2021C Bonds, respectively, after all other moneys collected by the Bond Trustee pursuant to this Article have been applied pursuant to the provisions of this section.

-43-

Whenever moneys are to be applied by the Bond Trustee pursuant to the provisions of this Section, such moneys shall be applied by it at such times, and from time to time, as the Bond Trustee shall determine, having due regard for the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future.  Whenever the Bond Trustee shall apply such moneys, it shall fix the date (which shall be an interest payment date unless it shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Bond Trustee shall give such notice as it may deem appropriate of the deposit with it of any such moneys and of the fixing of any such date, and shall not be required to make payment to the owner of any unpaid Bond until such Bond shall be presented to the Bond Trustee for appropriate endorsement or for cancellation if fully paid.

**Section 707.    *Rights and Remedies Cumulative.***

No right or remedy herein conferred upon or reserved to the Bond Trustee or to the Bondowners is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.  No delay or omission of the Bond Trustee or of any owner of any Bond to exercise any right or remedy accruing upon an event of default shall impair any such right or remedy or constitute a waiver of any such event of default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Bond Trustee or to the Bondowners may be exercised from time to time, and as often as may be deemed expedient, by the Bond Trustee or by the Bondowners, as the case may be.

**Section 708.    *Advances by Bond Trustee.***

If the Institution shall fail to make any payment or perform any of its covenants in the Loan Agreement, the Bond Trustee may, at any time and from time to time, use and apply any moneys held by it under this Bond Indenture, or make advances, to effect payment or performance of any such covenant on behalf of the Institution.  All moneys so used or advanced by the Bond Trustee, together with interest at the Bond Trustee's announced prime rate per annum, shall be repaid by the Institution upon demand and such advances shall be secured under this Bond Indenture prior to the Bonds.  For the repayment of all such advances the Bond Trustee shall have the right to use and apply any moneys at any time held by it under this Bond Indenture but no such use of moneys or advance shall relieve the Institution from any default hereunder.

**Section 709.    *Waiver of Past Defaults.***

Before any judgment or decree for payment of money due has been obtained by the Bond Trustee as provided in this Article, the owners of a majority in principal amount of the Bonds Outstanding may, by written notice delivered to the Bond Trustee and the Authority, on behalf of the owners of all the Bonds waive any past default hereunder and its consequences, except a default (a) in the payment of the principal of (or premium, if any) or interest on any Bond, or (b) in respect of a covenant or provision hereof which under **Article IX** hereof cannot be modified or amended without the consent of the owner of each Outstanding Bond affected.

Upon any such waiver, such default shall cease to exist, and any event of default arising therefrom shall be deemed to have been cured, for every purpose of this Bond Indenture; but no such

waiver shall extend to or affect any subsequent or other default or impair any right or remedy consequent thereon.

## ARTICLE VIII

## BOND TRUSTEE AND PAYING AGENTS

*Section 801.*      *Acceptance of Trusts; Certain Duties and Responsibilities.*

The Bond Trustee accepts and agrees to execute the trusts imposed upon it by this Bond Indenture, but only upon the following terms and conditions:

(a)      The Bond Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Bond Indenture, and no implied covenants or obligations shall be read into this Bond Indenture against the Bond Trustee; and in the absence of bad faith, negligence or willful misconduct on its part, the Bond Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Bond Trustee and conforming to the requirements of this Bond Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Bond Trustee, the Bond Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Bond Indenture.

(b)      If an event of default has occurred and is continuing, the Bond Trustee shall exercise such of the rights and powers vested in it by this Bond Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

(c)      No provision of this Bond Indenture shall be construed to relieve the Bond Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, **except** as follows:

(1)      that this subsection shall not be construed to limit the effect of subsection (a) of this Section;

(2)      that the Bond Trustee shall not be liable for any error of judgment made in good faith by an authorized officer of the Bond Trustee, unless it shall be proved that the Bond Trustee was negligent in ascertaining the pertinent facts;

(3)      that the Bond Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Bond Trustee, or exercising any trust or power conferred upon the Bond Trustee, under this Bond Indenture; and

(4)      that no provision of this Bond Indenture shall require the Bond Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance

-45-

of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)    Whether or not therein expressly so provided, every provision of this Bond Indenture relating to the conduct or affecting the liability of or affording protection to the Bond Trustee shall be subject to the provisions of this Section.

### Section 802.    *Certain Rights of Bond Trustee.*

Except as otherwise provided in **Section 801** hereof:

(a)    The Bond Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)    The Bond Trustee shall be entitled to rely upon an Officer's Certificate as to the sufficiency of any request or direction of the Institution mentioned herein, the existence or non-existence of any fact or the sufficiency or validity of any instrument, paper or proceeding, or that a resolution in the form therein set forth has been duly adopted by the governing board of the Institution and is in full force and effect.

(c)    Whenever in the administration of this Bond Indenture the Bond Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Bond Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate.

(d)    The Bond Trustee may consult with counsel, and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by the Bond Trustee hereunder in good faith and in reliance thereon.

(e)    The Bond Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Bond Indenture at the request or direction of any of the Bondowners pursuant to this Bond Indenture, unless such Bondowners shall have offered to the Bond Trustee reasonable security or indemnity against the fees, costs, expenses and liabilities (except as may result from the Bond Trustee's own negligence or willful misconduct) which might be incurred by it in compliance with such request or direction; provided that the Bond Trustee may not require indemnity as a condition to declaring the principal of and interest on the Bonds to be due and payable under **Section 702**, or to making any payment of principal, purchase price, premium or interest on the Bonds.

(f)    The Bond Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document, but the Bond Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Bond Trustee shall determine to make such further

inquiry or investigation, it shall be entitled to examine the records of the Authority, personally or by agent or attorney.

(g)    The Bond Trustee assumes no responsibility for the correctness of the recitals contained in this Bond Indenture and in the Bonds, except the certificate of authentication on the Bonds.  The Bond Trustee makes no representations as to the value or condition of the Trust Estate or any part thereof, or as to the title thereto or as to the security afforded thereby or hereby, or as to the validity or sufficiency of this Bond Indenture or of the Bonds.  The Bond Trustee shall not be accountable for the use or application by the Authority or the Institution of any of the Bonds or the proceeds thereof or of any money paid to or upon the order of the Authority or the Institution under any provision of this Bond Indenture.

(h)    The Bond Trustee, in its individual or any other capacity, may become the owner or pledgee of Bonds and may otherwise deal with the Authority or the Institution with the same rights it would have if it were not Bond Trustee.

(i)    All money received by the Bond Trustee shall, until used or applied or invested as herein provided, be held in trust for the purposes for which they were received. Money held by the Bond Trustee in trust hereunder need not be segregated from other funds except to the extent required by law or by this Bond Indenture.  The Bond Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise provided in this Bond Indenture.

(j)    The Bond Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Bond Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(k)    The Bond Trustee shall have no responsibility with respect to any information, statement or recital in any official statement offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds, except for any information provided by the Bond Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Bonds.

(l)    The Bond Trustee agrees to accept and act upon instructions or directions pursuant to this Bond Indenture sent by unsecured e-mail, facsimile transmission or other similar unsecured electronic methods, provided, however, that (1) the Institution, subsequent to such transmission of written instructions, shall provide the originally executed instructions or directions to the Bond Trustee in a timely manner, (2) such originally executed instructions or directions shall be signed by a person as may be designated and authorized to sign for the Institution or in the name of the Institution, by an authorized representative of the Institution, and (3) the Institution shall provide to the Bond Trustee an incumbency certificate listing such designated persons, which incumbency certificate shall be amended whenever a person is to be added or deleted from the listing.  If the Institution elects to give the Bond Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Bond Trustee in its discretion elects to act upon such instructions, the Bond Trustee's understanding of such instructions shall be deemed controlling.  The Bond Trustee shall not be liable for any losses, costs or expenses arising

-47-

directly or indirectly from the Bond Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction.  The Institution agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Bond Trustee, including without limitation the risk of the Bond Trustee acting on unauthorized instructions, and the risk of interception and misuse by third parties.

(m)    Notwithstanding any other provision of this Bond Indenture to the contrary, any provision relating to the conduct of, intended to provide authority to act, right to payment of fees and expenses, protection, immunity and indemnification to the Bond Trustee, shall be interpreted to include any action of the Bond Trustee, whether it is deemed to be in its capacity as Bond Trustee, bond registrar or paying agent.

(n)    The Bond Trustee may inform the Bondowners (with notice thereof to the Institution) of environmental hazards that the Bond Trustee has reason to believe exist, and the Bond Trustee has the right to take no further action and, in such event no fiduciary duty exists which imposes any obligation for further action with respect to the Trust Estate or any portion thereof if the Bond Trustee in its individual capacity, determines that any such action would materially and adversely subject the Bond Trustee to environmental or other liability for which the Bond Trustee has not been adequately indemnified.

(o)    Permissive rights of the Bond Trustee, if any, enumerated in this Bond Indenture shall not be construed as duties, and with respect to such permissive rights the Bond Trustee shall not be answerable for other than its negligence or willful misconduct.

**Section 803.    *Notice of Defaults.***

The Bond Trustee shall not be required to take notice or be deemed to have notice of any default hereunder except a default in any of the payments to the Bond Trustee required to be made by **Article IV** hereof or **Article IV** of the Loan Agreement, unless the Bond Trustee shall be specifically notified in writing of such default by the Authority, the Institution, or the owners of at least **50%** in principal amount of all Bonds Outstanding, and in the absence of such notice so delivered, the Bond Trustee may conclusively assume there is no default except as aforesaid.  Within **30** days after the occurrence of any default hereunder of which the Bond Trustee is required to take notice or has received notice as provided in this Section, the Bond Trustee shall give written notice of such default to the Authority, the Institution and all owners of Bonds as shown on the bond register maintained by the Bond Trustee, unless such default shall have been cured or waived.  For the purpose of this Section, the term *"default"* means any event which is, or after notice or lapse of time or both would become, an event of default.

**Section 804.    *Compensation and Reimbursement.***

The Bond Trustee shall be entitled to payment or reimbursement, as follows:

(a)    from time to time for reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(b)    except as otherwise expressly provided herein, upon its request, for all reasonable expenses, disbursements and advances incurred or made by the Bond Trustee in

accordance with any provision of this Bond Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to the Bond Trustee's negligence, willful misconduct or bad faith; and

(c)     to indemnify the Bond Trustee for, and to hold it harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on its part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

All such payments and reimbursements shall be made by the Institution with interest at the rate of interest per annum equal to the prime rate announced from time to time by the Bond Trustee.  The indemnifications set forth herein shall survive the termination of this Bond Indenture and/or the resignation or removal of the Bond Trustee.

The Bond Trustee shall promptly notify the Institution in writing of any claim or action brought against the Bond Trustee in respect of which indemnity may be sought against the Institution, setting forth the particulars of such claim or action, and the Institution will assume the defense thereof, including the employment of counsel satisfactory to the Bond Trustee and the payment of all expenses.  The Bond Trustee may employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall not be payable by the Institution unless (i) such employment has been specifically authorized by the Institution, (ii) in the opinion of the Bond Trustee the Institution has failed to actively and competently pursue the defense of such claim or action, or (iii) the Institution's counsel is precluded, by the rules governing conflicts of interest, from representing the Bond Trustee.

Pursuant to the provisions of the Loan Agreement, the Institution has agreed to pay to the Bond Trustee all reasonable fees, charges, advances and expenses of the Bond Trustee.  As security for the performance of the obligations of the Institution under this Section, the Bond Trustee shall be secured under this Bond Indenture by a lien on the Trust Estate prior to the Bonds, and for the payment of such compensation, expenses, reimbursements and indemnity the Bond Trustee shall have the right to use and apply any trust moneys held by it under this Bond Indenture, other than amounts in the Rebate Fund.  The Bond Trustee agrees that the Authority shall have no liability for any fees, charges and expenses of the Bond Trustee.

### Section 805.    *Corporate Trustee Required; Eligibility.*

There shall at all times be a Bond Trustee hereunder which shall be a bank or trust company organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, subject to supervision or examination by federal or state authority, having a corporate trust office located in the State of Missouri.  The Bond Trustee must have a combined capital and surplus or consolidated net worth of at least **$100,000,000**, or must provide a guaranty of the full and prompt performance by the Bond Trustee of its obligations under this Bond Indenture and any other agreements made in connection with the Bonds by a guarantor with such combined capital and surplus or consolidated net worth.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so

published.  If at any time the Bond Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect specified in this Article.

### Section 806.    *Resignation and Removal of Bond Trustee.*

(a)    The Bond Trustee may resign at any time by giving written notice thereof to the Authority, the Institution and each owner of Bonds Outstanding as shown by the bond register required by this Bond Indenture to be kept by the Bond Trustee.  If an instrument of acceptance by a successor Bond Trustee shall not have been delivered to the Bond Trustee within **30** days after the giving of such notice of resignation, the resigning Bond Trustee may petition any court of competent jurisdiction for the appointment of a successor Bond Trustee.

(b)    If the Bond Trustee has or shall acquire any conflicting interest (within the meaning of the Trust Indenture Act of 1939, as amended), it shall, within **90** days after ascertaining that it has a conflicting interest, or within **30** days after receiving written notice from the Authority or the Institution (so long as the Institution is not in default under this Bond Indenture) that it has a conflicting interest, either eliminate such conflicting interest or resign in the manner and with the effect specified in subsection (a).

(c)    The Bond Trustee may be removed at any time by an instrument or concurrent instruments in writing delivered to the Authority and the Bond Trustee signed by the owners of a majority in principal amount of the Outstanding Bonds, or, so long as the Institution is not in default under the Loan Agreement, by the Institution Representative. The Authority, the Institution or any Bondowner may at any time petition any court of competent jurisdiction for the removal for cause of the Bond Trustee.

(d)    If at any time:

(1)    the Bond Trustee shall fail to comply with subsection (b) after written request therefor by the Institution, or any Bondowner, or

(2)    the Bond Trustee shall cease to be eligible under **Section 805** hereof and shall fail to resign after written request therefor by the Institution or by any such Bondowner, or

(3)    the Bond Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Bond Trustee or of its property shall be appointed or any public officer shall take charge or control of the Bond Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, the Institution may remove the Bond Trustee, or the Institution, so long as the Institution is not in default under the Loan Agreement, or any Bondowner may petition any court of competent jurisdiction for the removal of the Bond Trustee and the appointment of a successor Bond Trustee.

The Bond Trustee shall give notice of each resignation and each removal of the Bond Trustee and each appointment of a successor Bond Trustee to the registered owners of Bonds as their names and


addresses appear in the bond register maintained by the Bond Trustee.  Each notice shall include the name of the successor Bond Trustee and the address of its corporate trust office.

No resignation or removal of the Bond Trustee and no appointment of a successor Bond Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Bond Trustee under **Section 808** hereof.

### Section 807.     Appointment of Successor Bond Trustee.

If the Bond Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Bond Trustee for any cause, the Authority, at the written direction of the Institution (so long as no event of default hereunder or under the Loan Agreement has occurred and is continuing), or the owners of a majority in principal amount of Bonds Outstanding (if an event of default hereunder or under the Loan Agreement has occurred and is continuing), by an instrument or concurrent instruments in writing delivered to the Institution and the retiring Bond Trustee, shall promptly appoint a successor Bond Trustee.  In case all or substantially all of the Trust Estate shall be in the possession of a receiver or trustee lawfully appointed, such receiver or trustee, by written instrument, may similarly appoint a temporary successor to fill such vacancy until a new Bond Trustee shall be so appointed by the Institution or the Bondowners.  If, within **30** days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Bond Trustee shall be appointed in the manner herein provided, the successor Bond Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Bond Trustee and supersede the retiring Bond Trustee and any temporary successor Bond Trustee appointed by such receiver or trustee.  If no successor Bond Trustee shall have been so appointed and accepted appointment in the manner herein provided, the Bond Trustee or any Bondowner may petition any court of competent jurisdiction for the appointment of a successor Bond Trustee, until a successor shall have been appointed as above provided.  The successor so appointed by such court shall immediately and without further act be superseded by any successor appointed as above provided.  Every such successor Bond Trustee appointed pursuant to the provisions of this Section shall be a bank with trust powers or trust company in good standing under the law of the jurisdiction in which it was created and by which it exists, meeting the eligibility requirements of this Article.

### Section 808.     Acceptance of Appointment by Successor Bond Trustee.

Every successor Bond Trustee appointed hereunder shall execute, acknowledge and deliver to the Authority and to the retiring Bond Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Bond Trustee shall become effective and such successor Bond Trustee, without any further act, deed or conveyance, shall become vested with all the estates, properties, rights, powers, trusts and duties of the retiring Bond Trustee; but, on request of the successor Bond Trustee, such retiring Bond Trustee shall, upon payment of its fees, expenses and charges, execute and deliver an instrument conveying and transferring to such successor Bond Trustee upon the trusts herein expressed all the estates, properties, rights, powers and trusts of the retiring Bond Trustee, and shall duly assign, transfer and deliver to such successor Bond Trustee all property and money held by such retiring Bond Trustee hereunder.  Upon request of any such successor Bond Trustee, the Authority shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Bond Trustee all such estates, properties, rights, powers and trusts.

No successor Bond Trustee shall accept its appointment unless at the time of such acceptance such successor Bond Trustee shall be qualified and eligible under this Article.

### Section 809.        *Merger, Consolidation and Succession to Business.*

Any corporation or association into which the Bond Trustee may be merged or with which it may be consolidated, or any corporation or association resulting from any merger or consolidation to which the Bond Trustee shall be a party, or any corporation or association succeeding to all or substantially all of the corporate trust business of the Bond Trustee, shall be the successor of the Bond Trustee hereunder, provided such corporation or association shall be otherwise qualified and eligible under this Article, and shall be vested with all of the title to the whole property or Trust Estate and all the trusts, powers, discretions, immunities, privileges and all other matters as was its predecessor, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any Bonds shall have been authenticated, but not delivered, by the Bond Trustee then in office, any successor by merger or consolidation to such authenticating Bond Trustee may adopt such authentication and deliver the Bonds so authenticated with the same effect as if such successor Bond Trustee had itself authenticated such Bonds.

### Section 810.        *Co-Bond Trustees and Separate Bond Trustees.*

At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any of the Trust Estate may at the time be located, or in the enforcement of any default or the exercise any of the powers, rights or remedies herein granted to the Bond Trustee, or any other action which may be desirable or necessary in connection therewith, the Bond Trustee shall have power to appoint, and, upon the written request of the Bond Trustee or of the owners of at least **25%** in principal amount of the Bonds Outstanding, the Authority shall for such purpose join with the Bond Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint, one or more Persons approved by the Bond Trustee either to act as co-trustee, jointly with the Bond Trustee, of all or any part of the Trust Estate, or to act as separate trustee of any such property, in either case with such powers as may be provided in the instrument of appointment, and to vest in such person or persons in the capacity aforesaid, any property, title, right or power deemed necessary or desirable, subject to the other provisions of this Section.  If the Authority does not join in such appointment within **15** days after the receipt by it of a request so to do, or in case an event of default has occurred and is continuing, the Bond Trustee alone shall have power to make such appointment.

Should any written instrument from the Authority be required by any co-trustee or separate trustee so appointed for any more fully confirming to such co-trustee or separate trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Authority.

Every co-trustee or separate trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms, namely:

(a)     The Bonds shall be authenticated and delivered, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Bond Trustee hereunder, shall be exercised solely, by the Bond Trustee.

(b)     The rights, powers, duties and obligations hereby conferred or imposed upon the Bond Trustee in respect of any property covered by such appointment shall be conferred or imposed upon and exercised or performed by the Bond Trustee or by the Bond Trustee and such co-trustee or separate trustee jointly, as shall be provided in the instrument

appointing such co-trustee or separate trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Bond Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by such co-trustee or separate trustee.

(c)     The Bond Trustee at any time, by an instrument in writing executed by it, may accept the resignation of or remove any co-trustee or separate trustee appointed under this Section, and, in case an event of default has occurred and is continuing, the Bond Trustee shall have power to accept the resignation of, or remove, any such co-trustee or separate trustee without the concurrence of the Authority.  Upon the written request of the Bond Trustee, the Authority shall join with the Bond Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to effectuate such resignation or removal.  A successor to any co-trustee or separate trustee so resigned or removed may be appointed in the manner provided in this Section.

(d)     No co-trustee or separate trustee hereunder shall be personally liable by reason of any act or omission of the Bond Trustee, or any other such trustee hereunder.

(e)     Any request, demand, authorization, direction, notice, consent, waiver or other act of Bondowners delivered to the Bond Trustee shall be deemed to have been delivered to each such co-trustee and separate trustee.

**Section 811.     *Paying Agents.***

The Bond Trustee is hereby designated and agrees to act as principal paying agent for and in respect to the Bonds.  The Bond Trustee may, in its discretion, cause the necessary arrangements to be made through the Bond Trustee for the designation of alternate paying agents, if any, and for the making available of funds hereunder for the payment of the principal of, premium, if any, and interest on the Bonds at the principal corporate trust office or other designated payment office of said alternate paying agents.  In the event of a change in the office of Bond Trustee, the predecessor Bond Trustee which has resigned or been removed shall cease to be trustee of any funds provided hereunder and paying agent for principal of, premium, if any, and interest on the Bonds, and the successor Bond Trustee shall become such Bond Trustee and paying agent unless a separate paying agent or agents are appointed by the Authority in connection with the appointment of any successor Bond Trustee.

# ARTICLE IX

# SUPPLEMENTAL BOND INDENTURES

**Section 901.     *Supplemental Bond Indentures without Consent of Bondowners.***

Without the consent of the owners of any Bonds, the Authority and the Bond Trustee may from time to time enter into one or more Supplemental Bond Indentures for any of the following purposes:

(a)     to more precisely identify the facilities financed or refinanced with proceeds of the Bonds, or to substitute or add additional property thereto as permitted by the Loan Agreement, or to correct or amplify the description of any property at any time subject to

the lien of this Bond Indenture, or better to assure, convey and confirm unto the Bond Trustee any property subject or required to be subjected to the lien of this Bond Indenture, or to subject to the lien of this Bond Indenture additional property;

(b)     to add to the conditions, limitations and restrictions on the authorized amount, terms or purposes of issue, authentication and delivery of Bonds, as herein set forth, additional conditions, limitations and restrictions thereafter to be observed;

(c)     to evidence the appointment of a separate trustee or the succession of a new trustee under this Bond Indenture;

(d)     to add to the covenants of the Authority or to the rights, powers and remedies of the Bond Trustee for the benefit of the owners of all of the Bonds or to surrender any right or power herein conferred upon the Authority;

(e)     to cure any ambiguity, to correct or supplement any provision in this Bond Indenture which may be inconsistent with any other provision herein or to make any other change, with respect to matters or questions arising under this Bond Indenture, which shall not be inconsistent with the provisions of this Bond Indenture, provided such action shall not materially adversely affect the interests of the owners of the Bonds; or

(f)     to modify, eliminate or add to the provisions of this Bond Indenture to such extent as shall be necessary to effect the qualification of this Bond Indenture under the Trust Indenture Act of 1939, as amended, or under any similar federal statute hereafter enacted, or to permit the qualification of the Bonds for sale under the securities laws of the United States or any state of the United States.

**Section 902.     Supplemental Bond Indentures with Consent of Bondowners.**

With the consent of the owners of not less than a majority in principal amount of the Bonds then Outstanding affected by such Supplemental Bond Indenture, the Authority and the Bond Trustee may enter into one or more Supplemental Bond Indentures for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Bond Indenture or of modifying in any manner the rights of the owners of the Bonds under this Bond Indenture; provided, however, that no such Supplemental Bond Indenture shall, without the consent of the owner of each Outstanding Bond affected thereby, carry out any of the following:

(a)     change the stated maturity or mandatory redemption date of the principal of, or any installment of interest on, any Bond, or reduce the principal amount thereof or the interest thereon or any premium payable upon the redemption thereof, or change any place of payment where, or the coin or currency in which, any Bond, or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the redemption date);

(b)     reduce the percentage in principal amount of the Outstanding Bonds, the consent of whose owners is required for any such Supplemental Bond Indenture, or the consent of whose owners is required for any waiver provided for in this Bond Indenture of

compliance with certain provisions of this Bond Indenture or certain defaults hereunder and their consequences;

(c)     modify the obligation of the Authority to make payment on or provide funds for the payment of any Bond;

(d)     modify or alter the provisions of the proviso to the definition of the term *"Outstanding"*;

(e)     modify any of the provisions of this Section or **Section 709** hereof, except to increase any percentage provided thereby or to provide that certain other provisions of this Bond Indenture cannot be modified or waived without the consent of the owner of each Bond affected thereby; or

(f)     except as provided in the Master Indenture or the Loan Agreement, permit the creation of any lien ranking prior to or on a parity with the lien of this Bond Indenture with respect to any of the Trust Estate or terminate the lien of this Bond Indenture on any property at any time subject hereto or deprive the owner of any Bond of the security afforded by the lien of this Bond Indenture.

The Bond Trustee may in its discretion determine whether or not any Bonds would be affected by any Supplemental Bond Indenture and any such determination shall be conclusive upon the owners of all Bonds, whether theretofore or thereafter authenticated and delivered hereunder.  The Bond Trustee shall not be liable for any such determination made in good faith.

### Section 903.     *Execution of Supplemental Bond Indentures.*

In executing, or accepting the additional trusts created by, any Supplemental Bond Indenture permitted by this Article or the modification thereby of the trusts created by this Bond Indenture, the Bond Trustee and the Authority shall receive and, subject to **Section 801** hereof, shall be fully protected in relying upon, an Opinion of Bond Counsel addressed and delivered to the Bond Trustee and the Authority stating that the execution of such Supplemental Bond Indenture is permitted by and in compliance with this Bond Indenture, and that the execution and delivery thereof will not adversely affect the exclusion from federal gross income of interest on any tax-exempt Bonds.  The Bond Trustee may, but shall not, except to the extent required in the case of any Supplemental Bond Indenture entered into under **Section 901(f)** hereof, be obligated to, enter into any Supplemental Bond Indenture which affects the Bond Trustee's own rights, duties or immunities under this Bond Indenture or otherwise.

### Section 904.     *Effect of Supplemental Bond Indentures.*

Upon the execution of any Supplemental Bond Indenture under this Article, this Bond Indenture shall be modified in accordance therewith and such Supplemental Bond Indenture shall form a part of this Bond Indenture for all purposes; and every owner of Bonds theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

### Section 905.     *Reference in Bonds to Supplemental Bond Indentures.*

Bonds authenticated and delivered after the execution of any Supplemental Bond Indenture pursuant to this Article may, and if required by the Bond Trustee shall, bear a notation in form approved by the Bond Trustee as to any matter provided for in such Supplemental Bond Indenture.  New Bonds so

-55-

modified as to conform, in the opinion of the Bond Trustee, to any such Supplemental Bond Indenture may be prepared and executed by the Authority and authenticated and delivered by the Bond Trustee in exchange for Outstanding Bonds.

### Section 906.      Institution's Consent to Supplemental Bond Indentures.

So long as no event of default has occurred and is continuing under the Loan Agreement, a Supplemental Bond Indenture under this Article will not become effective unless and until the Institution consents in writing to the execution and delivery of such Supplemental Bond Indenture.

## ARTICLE X

## SATISFACTION AND DISCHARGE

### Section 1001.    Payment, Discharge and Defeasance of Bonds.

Bonds will be deemed to be paid and discharged and no longer Outstanding under this Bond Indenture and will cease to be entitled to any lien, benefit or security of this Bond Indenture if the Authority shall pay or provide for the payment of such Bonds in any one or more of the following ways:

(a)      by paying or causing to be paid the principal of (including redemption premium, if any) and interest on such Bonds, as and when the same become due and payable;

(b)      by delivering such Bonds to the Bond Trustee for cancellation; or

(c)      by depositing in trust with the Bond Trustee, or other paying agent or escrow agent meeting the same eligibility requirements of the Bond Trustee under **Section 805** hereof, moneys and Defeasance Obligations in an amount, together with the income or increment to accrue thereon, without consideration of any reinvestment thereof, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on such Bonds at or before their respective maturity or redemption dates (including the payment of the principal of, premium, if any, and interest payable on such Bonds to the maturity or redemption date thereof); provided that, if any such Bonds are to be redeemed prior to the maturity thereof, notice of such redemption is given in accordance with the requirements of this Bond Indenture or provision satisfactory to the Bond Trustee is made for the giving of such notice.

Bonds may be defeased in advance of their maturity or redemption dates pursuant to subsection (c) above, subject to receipt by the Bond Trustee and the Authority of (a) if the defeasance will occur more than **180 days** prior to their payment in full (whether by maturity or redemption), a verification report prepared by independent certified public accountants, or other verification agent, satisfactory to the Bond Trustee and the Authority, and (b) an Opinion of Bond Counsel addressed and delivered to the Bond Trustee and the Authority to the effect that the payment of the principal of and redemption premium, if any, and interest on all of the Bonds then Outstanding and any and all other amounts required to be paid under the provisions of this Bond Indenture has been provided for in the manner set forth in this Bond Indenture and to the effect that so providing for the payment of any Bonds will not cause the interest on any tax-exempt Bonds to be included in gross income for federal income tax purposes, notwithstanding the satisfaction and discharge of this Bond Indenture.

The foregoing notwithstanding, the liability of the Authority in respect of such Bonds shall continue, but the owners thereof shall thereafter be entitled to payment only out of the moneys and Defeasance Obligations deposited with the Bond Trustee as aforesaid.

Moneys and Defeasance Obligations so deposited with the Bond Trustee pursuant to this Section shall not be a part of the Trust Estate but shall constitute a separate trust fund for the benefit of the Persons entitled thereto. Such moneys and Defeasance Obligations shall be applied by the Bond Trustee to the payment to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such moneys and Defeasance Obligations have been deposited with the Bond Trustee.

### Section 1002.    Satisfaction and Discharge of Bond Indenture.

This Bond Indenture and the lien, rights and interests created by this Bond Indenture shall cease, determine and become null and void (except as to any surviving rights under **Section 1003** hereof) if the following conditions are met:

(a)    the principal of, premium, if any, and interest on all Bonds has been paid or is deemed to be paid and discharged by meeting the conditions of **Section 1001** hereof;

(b)    all other sums payable under this Bond Indenture with respect to the Bonds are paid or provision satisfactory to the Bond Trustee is made for such payment;

(c)    the Bond Trustee receives an Opinion of Bond Counsel (which may be based upon a ruling or rulings of the Internal Revenue Service) addressed to the Bond Trustee and the Authority to the effect that so providing for the payment of any Bonds will not adversely affect the exclusion of the interest on the Bonds from gross income for federal income tax purposes, notwithstanding the satisfaction and discharge of this Bond Indenture; and

(d)    the Bond Trustee receives an Opinion of Bond Counsel addressed and delivered to the Bond Trustee and the Authority to the effect that all conditions precedent in this Section to the satisfaction and discharge of this Bond Indenture have been complied with.

Thereupon, the Bond Trustee shall execute and deliver to the Authority a termination statement and such instruments of satisfaction and discharge of this Bond Indenture as may be necessary and shall pay, assign, transfer and deliver to the Authority, or other Persons entitled thereto, all moneys, securities and other property then held by it under this Bond Indenture as a part of the Trust Estate, other than moneys or Defeasance Obligations held in trust by the Bond Trustee as herein provided for the payment of the principal of, premium, if any, and interest on the Bonds.

### Section 1003.    Rights Retained After Discharge.

Notwithstanding the satisfaction and discharge of this Bond Indenture, the Bond Trustee shall retain such rights, powers and duties under this Bond Indenture as may be necessary and convenient for the payment of amounts due or to become due on the Bonds and the registration, transfer and exchange of Bonds as provided herein. Nevertheless, any moneys held by the Bond Trustee for the payment of the principal of, redemption premium, if any, or interest on any Bond remaining unclaimed for **1** year after the principal of all Bonds has become due and payable, whether at maturity or upon proceedings for redemption or by declaration as provided herein, shall then be paid to the Institution, and the Owners of

any Bonds not theretofore presented for payment shall thereafter be entitled to look only to the Institution for payment thereof and all liability of the Bond Trustee or the Authority with respect to such moneys shall thereupon cease.

## ARTICLE XI

## NOTICES, ACTS OF BONDOWNERS

### Section 1101.   Notices.

Except as otherwise provided herein, it shall be sufficient service of any notice, request, demand, authorization, direction, consent, waiver or other paper required or permitted by this Bond Indenture to be made, given or furnished to or filed with the following Persons, if the same shall be delivered by prepaid overnight delivery service, or mailed by first class mail, postage prepaid, or transmitted by confirmed telecopy, at the following addresses or telecopy numbers (provided, however, that notice to the Bond Trustee shall be deemed given only upon receipt):

    (a)    To the Authority:

        The Industrial Development Authority of the City of Kansas City, Missouri
        1100 Walnut St. Suite 1700
        Kansas City, Missouri 64106
        Attention:  Executive Director
        Telecopy:  (816) 221-0189

    (b)    To the Master Trustee and Bond Trustee:

        UMB Bank, N.A.
        928 Grand Boulevard, 12th Floor,
        Kansas City, Missouri 64106
        Attention:  Corporate Trust Department
        Telecopy:  (816) 860-3029

    (c)    To the Institution and Obligated Group Representative:

        Kansas City United Methodist Retirement Home, Inc. d/b/a Kingswood Senior
        Living Community
        10000 Wornall Road
        Kansas City, Missouri 64114
        Attention:  Executive Director
        Telecopy:  (816) 942-8131

    (d)    To the Bondowners:

        To the addresses of the Bondowners as shown on the bond register maintained by
        the Bond Trustee under this Bond Indenture.

    (e)    To the Securities Depository:

The Depository Trust Company
55 Water Street, 50th Floor
New York, New York  10041-0099
Attention:  Supervisor, Put Bonds Section/Reorganization Department
Telecopy:  (212) 855-5235

If, because of the temporary or permanent suspension of mail service or for any other reason, it is impossible or impractical to mail any notice in the manner herein provided, then such delivery of notice in lieu thereof as shall be made with the approval of the Bond Trustee shall constitute a sufficient notice.

If notice to Bondowners is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Bondowner shall affect the sufficiency of such notice with respect to other Bondowners.  Where this Bond Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Bondowners shall be filed with the Bond Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

### Section 1102.    Acts of Bondowners.

Any notice, request, demand, authorization, direction, consent, waiver or other action provided by this Bond Indenture to be given or taken by Bondowners may be embodied in and evidenced by one or more substantially concurrent instruments of similar tenor signed by such Bondowners in person or by an agent duly appointed in writing.  Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Bond Trustee, and, where it is hereby expressly required, to the Authority or the Institution.  Proof of execution of any such instrument or of a writing appointing any such agent, or of the ownership of Bonds, shall be sufficient for any purpose of this Bond Indenture and conclusive in favor of the Authority and the Bond Trustee, if made in the following manner:

(a)     The fact and date of the execution by any Person of any such instrument or writing may be proved by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof, or by the affidavit of a witness of such execution.  Whenever such execution is by an officer of a corporation or a member of a partnership on behalf of such corporation or partnership, such certificate or affidavit shall also constitute sufficient proof of his authority.

(b)     The fact and date of execution of any such instrument or writing and the authority of any Person executing the same may also be proved in any other manner which the Bond Trustee deems sufficient; and the Bond Trustee may in any instance require further proof with respect to any of the matters referred to in this Section.

(c)     The ownership of Bonds and the amount or amounts, numbers and other identification of such Bonds, and the date of holding the same, shall be proved by the bond register maintained by the Bond Trustee.

-59-

In determining whether the owners of the requisite principal amount of Bonds Outstanding have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Bonds registered in the name of the Authority or the Institution shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Bond Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which the Bond Trustee knows to be so owned shall be so disregarded.

Any notice, request, demand, authorization, direction, consent, waiver or other action by the owner of any Bond shall bind every future owner of the same Bond and the owner of every Bond issued upon the transfer thereof or in exchange therefor or in lieu thereof, in respect of anything done or suffered to be done by the Bond Trustee or the Authority in reliance thereon, whether or not notation of such action is made upon such Bond.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### Section 1201.   Further Assurances.

The Authority shall do, execute, acknowledge and deliver such Supplemental Bond Indentures and such further acts, instruments, financing statements and assurances as the Bond Trustee may reasonably require for accomplishing the purposes of this Bond Indenture.

### Section 1202.   Immunity of Officers, Employees and Members of Authority.

No recourse shall be had for the payment of the principal of or redemption premium, if any, or interest on any of the Bonds or for any claim based thereon or upon any obligation, covenant or agreement contained in this Bond Indenture against any past, present or future officer, director, member, employee or agent of the Authority, or of any successor public corporation, either directly or through the Authority or any successor public corporation, under any rule of law or equity, statute or constitution, or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officers, directors, members, employees or agents as such is hereby expressly waived and released as a condition of and consideration for the execution of this Bond Indenture and the issuance of Bonds.

### Section 1203.   Limitation on Authority Obligations.

Any other term or provision in this Bond Indenture or in any other Financing Documents or elsewhere to the contrary notwithstanding:

(a)     Any and all obligations (including without limitation, fees, claims, demands, payments, damages, liabilities, penalties, assessments and the like) of or imposed upon the Authority or its members, officers, agents, employees, representatives, advisors or assigns, whether under this Bond Indenture or any of the other Financing Documents or elsewhere and whether arising out of or based upon a claim or claims of tort, contract, misrepresentation, or any other or additional legal theory or theories whatsoever (collectively, the *"Obligations"*), shall in all events be absolutely limited obligations and liabilities, payable solely out of the following, if any, available at the time the Obligation in question is asserted (1) Bond proceeds and investments therefrom, and (2) payments derived from the Bonds, this Bond Indenture (including the Trust Estate to the extent

provided in this Bond Indenture) and the Loan Agreement (except for the fees and expenses of the Authority and the Authority's right to indemnification under the Loan Agreement under certain circumstances and as otherwise expressly set forth therein); (the above provisions (1) and (2) being collectively referred to as the *"exclusive sources of the Obligations"*).

(b)      The Obligations shall not be deemed to constitute a debt or liability of the State of Missouri or of any political subdivision thereof within the meaning of any state constitutional provision or statutory limitation and shall not constitute a pledge of the full faith and credit of the State of Missouri or of any political subdivision thereof, but shall be payable solely from and out of the exclusive sources of the Obligations and shall otherwise impose no liability whatsoever, primary or otherwise, upon the State of Missouri or any political subdivision thereof or any charge upon their general credit or taxing power.

(c)      In no event shall any member, officer, agent, employee, representative or advisor of the Authority, or any successor or assign of any such person or entity, be liable, personally or otherwise, for any Obligation.

(d)      In no event shall this Bond Indenture be construed as (1) depriving the Authority of any right or privilege, or (2) requiring the Authority or any member, officer, agent, employee, representative or advisor of the Authority to take or omit to take, or to permit or suffer the taking of, any action by itself or by anyone else; which deprivation or requirement would violate or result in the Authority's being in violation of the Act or any other applicable state or federal law.

### Section 1204.    Benefit of Bond Indenture.

This Bond Indenture shall inure to the benefit of and shall be binding upon the Authority and the Bond Trustee and their respective successors and assigns, subject, however, to the limitations contained herein.  With the exception of rights expressly conferred in this Bond Indenture, nothing in this Bond Indenture or in the Bonds, express or implied, shall give to any Person, other than the parties hereto and their successors and assigns hereunder, any separate trustee or co-trustee appointed under **Section 810** hereof, the owners of Outstanding Bonds, any benefit or any legal or equitable right, remedy or claim under this Bond Indenture.

### Section 1205.    Severability.

If any provision in this Bond Indenture or in the Bonds shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

### Section 1206.    Electronic Transactions.

The transaction described herein may be conducted and related documents may be sent, received or stored by electronic means.  Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

### *Section 1207.    Execution in Counterparts.*

This Bond Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

### *Section 1208.    Governing Law.*

This Bond Indenture shall be governed by and construed in accordance with the laws of the State of Missouri.

**IN WITNESS WHEREOF,** the Authority and the Bond Trustee have caused this Bond Trust Indenture to be duly executed by their duly authorized officers, as of the day and year first above written.

<div style="text-align: right;">

**THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI**

</div>

By: _____
Title:  Chairman

ATTEST:

By: _____
Title:  Assistant Secretary

Bond Trust Indenture

**UMB BANK, N.A.**, as Bond Trustee


By: _____
Title:


ATTEST:


By: _____
Title:

Bond Trust Indenture

**EXHIBIT A**
**TO BOND TRUST INDENTURE**

**SERIES 2021A PROJECT – SERIES 2021A PROJECT FUND**

The Series 2021A Project includes a portion of the facilities of the Institution the costs of which will be refinanced, in whole or in part, from the proceeds of the sale of the Series 2021A Bonds, and which constitute a "project" as defined in the Act. The Series 2021A Project costs were originally financed with proceeds of the Series 2016 Bonds and comprised a portion of the Project under the Original Bond Indenture. The portion of the facilities comprising the Series 2021A Project are allocable to the $12,720,000 principal amount of the Series 2016 Bonds that will be discharged in the Bond Exchange and that will not be financed with proceeds of the Series 2021B Bonds, the Series 2021C Bonds or the Series 2021D Bonds.

**SERIES 2021C PROJECT – REPAIR AND REPLACEMENT PROJECT FUND**

The Series 2021C Project includes the following facilities of the Institution, the costs of which will be paid in whole or in part, or for which the Institution will be reimbursed or which will be refinanced, in whole or in part, from the proceeds of the sale of the Series 2021C Bonds, and which constitute a "project" as defined in the Act, as further described in the Tax Compliance Agreement.

A detailed list of the Series 2021C Project components will be set forth in the Bond Indenture with the total costs thereof and timing of expenditure therefor consistent with the following general categories and periods with any balance expended on the Series C Project in 2025:

|  | __2022__ | __2023__ | __2024__ |
|---|---|---|---|
| Apartment Refurbishment | $265,000 | $265,000 | $215,000 |
| Villa Refurbishment | $300,000 | $300,000 | $300,000 |
| **Subtotal** | $565,000 | $565,000 | $515,000 |
| Other Capital | $1,264,370 | $421,600 | $459,100 |
| **Total** | **$1,829,370** | **$986,600** | **$974,100** |

**EXHIBIT B**
**TO BOND TRUST INDENTURE**

**(FORM OF BONDS)**

Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to the Issuer or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.

THIS BOND OR ANY PORTION HEREOF MAY BE SOLD ONLY AND TRANSFERRED ONLY (1) IN DENOMINATIONS OF $100,000 OR INTEGRAL MULTIPLES OF $5,000 IN EXCESS THEREOF, (2) TO A QUALIFIED TRANSFEREE, (3) IN ACCORDANCE WITH THE TRANSFER RESTRICTIONS SET FORTH IN THE BOND INDENTURE AND (4) BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER REPRESENTS THAT (A) IT IS A "QUALIFIED TRANSFEREE" AND (B) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS BOND OR ANY BENEFICIAL INTEREST HEREIN EXCEPT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED TRANSFEREE" AND IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY APPLICABLE JURISDICTION.

**UNITED STATES OF AMERICA**
**STATE OF MISSOURI**

Registered                                                                                                 Registered
No. R-___                                                            $[5,500][27,000][4,400][12,050],000

**THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE**
**CITY OF KANSAS CITY, MISSOURI**

**SENIOR LIVING FACILITIES REVENUE BOND**
**(KINGSWOOD PROJECT)**
**SERIES 2021[A (FEDERALLY TAXABLE)][B][C][D]**

| Interest Rate | Maturity Date | Date of Bonds | CUSIP |
|---|---|---|---|
| [10.00][5.00][7.50][2.00]% | November 15, 20[37][46][46][46] | November 15, 2021 | _____ |

**Registered Owner:** _____** CEDE & CO. **_____

**Principal Amount:** _____ **DOLLARS**

*Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Bond Indenture and the Master Indenture described herein.*

**THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI**, a public corporation duly organized and existing under the laws of the State of Missouri (the *"Authority"*), for value received, promises to pay, but solely from the sources herein specified to the registered owner named above, or registered assigns, the principal amount stated above on the maturity date stated above, except as the provisions herein set forth with respect to redemption prior to maturity may become applicable hereto, and in like manner to pay interest on said principal amount at the interest rate per annum stated above (computed on the basis of a **360**-day year of twelve **30**-day months) from the Date of Bonds stated above or from the most recent interest payment date to which interest has been paid or duly provided for, payable semiannually on each Interest Payment Date (May 15 and November 15) in each year beginning on May 15, 2022, until said principal amount is paid.

**Method and Place of Payment.**  The principal of, redemption premium, if any, and interest on this Bond shall be payable in any coin or currency of the United States of America which on the respective dates of payment thereof is legal tender for the payment of public and private debts.  The principal of and redemption premium, if any, on this Bond shall be payable by check or draft to the registered owner at the maturity or redemption date upon presentation and surrender of this Bond at the corporate trust office or other designated payment office of **UMB BANK, N.A.**, Kansas City, Missouri (the *"Bond Trustee"*).  The interest payable on this Bond on any interest payment date shall be paid by the Bond Trustee to the registered owner of this Bond appearing on the bond register maintained by the Bond Trustee at the close of business on the Record Date for such interest, which shall be the first day of the calendar month (whether or not a Business Day) next preceding such interest payment date and shall be paid by (1) check or draft mailed to such registered owner at his address as it appears on such bond register or at such other address furnished in writing by such registered owner to the Bond Trustee, or (2) at the written request addressed to the Bond Trustee by any owner of Bonds in the aggregate principal amount of at least **$1,000,000**, by electronic transfer to such owner upon written notice to the Bond Trustee from such owner containing the electronic transfer instructions for the financial institution (which shall be in the continental United States) to which such owner wishes to have such transfer directed and such written notice is given by such owner to the Bond Trustee not less than **5** Business Days prior to the applicable Record Date.  Any such written notice for electronic transfer shall be signed by such owner and shall include the name of the bank, its address, its ABA routing number and the name, number and contact name related to such owner's account at such bank to which the payment is to be credited.

**Authorization of Bonds.**  This Bond is one of a duly authorized series of bonds of the Authority designated **"Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021[A (Federally Taxable)][B][C][D]"** in the aggregate principal amount of **$[5,500,000][27,000,000][4,400,000][12,050,000]** (the *"Bonds"*), issued pursuant to the authority of and in full compliance with the constitution and statutes of the State of Missouri, including particularly Chapter 349 of the Revised Statutes of Missouri, as amended, and pursuant to proceedings duly had by the Authority.  The Bonds are issued under and are equally and ratably secured and entitled to the protection given by a Bond Trust Indenture dated as of November 15, 2021 (said Bond Trust Indenture, as

amended and supplemented from time to time in accordance with the provisions thereof, herein called the *"Bond Indenture"*), between the Authority and the Bond Trustee, for the purpose of making a loan (the *"Loan"*) to Kansas City United Methodist Retirement Home, Inc. d/b/a Kingswood Senior Living Community, a Missouri nonprofit corporation (the *"Institution"*), under a Loan Agreement dated as of November 15, 2021 (the *"Loan Agreement"*) between the Authority and the Institution, to provide funds for the purposes set forth in the Bond Indenture.  The obligations of the Institution under the Loan Agreement will be secured by a **Master Indenture Obligation No. [1][2][3][4] (Series 2021A][B][C][D] Bonds)** (the "Series 2021A][B][C][D] Master Obligation") in the aggregate principal amount of **$[5,500,000][27,000,000][4,400,000][12,050,000]**to be issued, delivered to the Authority and endorsed by the Authority to the Bond Trustee, pursuant to the terms of the Master Trust Indenture dated as of November 15, 2021 (as amended and supplemented, including by Supplemental Master Trust Indenture No. 1 dated as of November 15, 2021), among the Institution, and such other persons as from time to time are Obligated Group Members and UMB Bank, N.A., as master trustee.  Under the Bond Indenture, the Authority has pledged and assigned certain of its rights under the Loan Agreement, including the right to receive Loan Payments thereunder, and under the Series 2021A Master Obligation, to the Bond Trustee as security for the Bonds.  Reference is hereby made to the Bond Indenture, which may be inspected at the principal corporate trust office of the Bond Trustee, for a description of the property pledged and assigned thereunder, and the provisions, among others, with respect to the nature and extent of the security for the Bonds, and the rights, duties and obligations of the Authority, the Bond Trustee and the registered owners of the Bonds, and a description of the terms upon which the Bonds are issued and secured, upon which provision for payment of the Bonds or portions thereof and defeasance of the lien of the Bond Indenture with respect thereto may be made and upon which the Bond Indenture may be deemed satisfied and discharged prior to payment of the Bonds.

     **Redemption of Bonds Prior to Maturity.**  The Bonds are subject to optional, extraordinary and mandatory redemption prior to maturity as set forth in the Bond Indenture.

     **Book-Entry System.**  The Bonds are being issued by means of a book-entry system with no physical distribution of bond certificates to be made except as provided in the Bond Indenture.  One Bond certificate with respect to each date on which the Bonds are stated to mature or with respect to each form of Bonds, registered in the nominee name of the Securities Depository, is being issued and required to be deposited with the Securities Depository or its agent and immobilized in its custody.  The book-entry system will evidence positions held in the Bonds by the Securities Depository's participants, beneficial ownership of the Bonds in authorized denominations being evidenced in the records of such participants. Transfers of ownership shall be effected on the records of the Securities Depository and its participants pursuant to rules and procedures established by the Securities Depository and its participants.  The Authority and the Bond Trustee will recognize the Securities Depository nominee, while the registered owner of this Bond, as the owner of this Bond for all purposes, including (a) payments of principal of, and redemption premium, if any, and interest on, this Bond, (b) notices, and (c) voting.  Transfer of principal, interest and any redemption premium payments to participants of the Securities Depository, and transfer of principal, interest and any redemption premium payments to beneficial owners of the Bonds by participants of the Securities Depository will be the responsibility of such participants and other nominees of such beneficial owners.  The Authority and the Bond Trustee will not be responsible or liable for such transfers of payments or for maintaining, supervising or reviewing the records maintained by the Securities Depository, the Securities Depository nominee, its participants or persons acting through such participants.  While the Securities Depository nominee is the owner of this Bond, notwithstanding the provisions hereinabove contained, payments of principal of, redemption premium, if any, and interest on this Bond shall be made in accordance with existing arrangements among the Authority, the Bond Trustee and the Securities Depository.

**Transfer and Exchange.   EXCEPT AS OTHERWISE PROVIDED IN THE BOND INDENTURE, THIS GLOBAL BOND MAY BE TRANSFERRED, IN WHOLE BUT NOT IN PART, ONLY TO ANOTHER NOMINEE OF THE SECURITIES DEPOSITORY OR TO A SUCCESSOR SECURITIES DEPOSITORY OR TO A NOMINEE OF A SUCCESSOR SECURITIES DEPOSITORY.**  This Bond may be transferred or exchanged, as provided in the Bond Indenture, only upon the bond register maintained by the Bond Trustee at the above-mentioned office of the Bond Trustee by the registered owner hereof in person or by his duly authorized attorney or legal representative, upon surrender of this Bond together with a written instrument of transfer satisfactory to the Bond Trustee duly executed by the registered owner or his duly authorized attorney, and thereupon a new Bond or Bonds of the same series and maturity and in the same aggregate principal amount, and bearing interest at the same rate shall be issued to the transferee in exchange therefor as provided in the Bond Indenture, and upon payment of the charges therein prescribed.  Except as otherwise specifically provided herein and in the Bond Indenture with respect to rights of Participants and beneficial owners when a Book-Entry System is in effect, the Authority and the Bond Trustee may deem and treat the person in whose name this Bond is registered on the bond register as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price hereof and interest due hereon and for all other purposes.  The Bonds are issuable in the form of fully registered Bonds without coupons in the denominations of **$100,000** or any integral multiple of **$5,000** in excess thereof.

**Restrictions on Transfer.**  The Bonds, subject to the provisions of the Bond Indenture, may be sold and transferred only to Qualified Transferees.  No beneficial ownership interest in a Bond may be transferred unless the proposed transferee is a Qualified Transferee.  Each Person who is or who becomes a beneficial owner of a Bond shall be deemed by the acceptance or acquisition of such beneficial ownership interest to have agreed to be bound by these provisions.  *"Qualified Transferee"* means (i) a "qualified institutional buyer" as defined in Rule 144A promulgated under the Securities Act of 1933, as amended (the *"Securities Act"*), that purchases for its own account or for the account of a qualified institutional buyer, or (ii) an "accredited investor" as defined in Regulation D promulgated under the Securities Act.

**Limitation on Rights.**  The registered owner of this Bond shall have no right to enforce the provisions of the Bond Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Bond Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Bond Indenture.  In certain events, on the conditions, in the manner and with the effect set forth in the Bond Indenture, the principal of all the Bonds issued under the Bond Indenture and then outstanding may become or may be declared due and payable before the stated maturity thereof, together with interest accrued thereon.  The Bonds or the Bond Indenture may be modified, amended or supplemented only to the extent and in the circumstances permitted by the Bond Indenture.

**Other Bonds Issued under Bond Indenture.**  Concurrently with the issuance of the Bonds, the Authority is issuing its Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021[A (Federally Taxable)][B][C][D], Series 2021[A (Federally Taxable)][B][C][D] and Series 2021[A (Federally Taxable)][B][C][D] (collectively, the *"Other Series 2021 Bonds"*) pursuant to the Bond Indenture and subject to the Loan Agreement, each of which will be secured by a master obligation issued under the Master Indenture.  The relative rights of the beneficial owners of the Bonds and the Other Series 2021 Bonds, including senior, subordinate and parity payment priorities, are set forth in the Bond Indenture.

**Limited Obligations.**  The Bonds and the interest thereon are special, limited obligations of the Authority payable solely out of Loan Payments derived by the Authority under the Loan Agreement and are secured by a pledge and assignment of such Loan Payments and other funds as provided in the Bond Indenture.  The Bonds shall not be deemed to constitute a debt or liability of the State of Missouri or of any political subdivision thereof within the meaning of any state constitutional provision or statutory limitation and shall not constitute a pledge of the full faith and credit of the State of Missouri or of any political subdivision thereof, but shall be payable solely from the funds provided for in the Loan Agreement and in the Bond Indenture.  The issuance of the Bonds shall not, directly, indirectly or contingently, obligate the State of Missouri or any political subdivision thereof to levy any form of taxation therefor or to make any appropriation for their payment.  The State of Missouri shall not in any event be liable for the payment of the principal of, premium, if any, or interest on the Bonds or for the performance of any pledge, mortgage, obligation or agreement of any kind whatsoever which may be undertaken by the Authority.  No breach by the Authority of any such pledge, mortgage, obligation or agreement may impose any liability, pecuniary or otherwise, upon the State of Missouri or any charge upon its general credit or its taxing power.  The Authority has no power to tax.

**Authentication.**  This Bond shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Bond Indenture until the Certificate of Authentication hereon shall have been executed by the Bond Trustee.

**IT IS HEREBY CERTIFIED AND DECLARED** that all acts, conditions and things required to exist, happen and be performed precedent to and in the execution and delivery of the Bond Indenture and the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by law.

B-5

**IN WITNESS WHEREOF**, **THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI** has caused this Bond to be executed in its name by the manual or facsimile signature of its chairman or vice chairman and attested by the manual or facsimile signature of its secretary or an assistant secretary and its corporate seal to be affixed or imprinted hereon, all as of the Date of Bonds specified above.

**THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI**

By: _____

Title:  Chairman

[SEAL]

ATTEST:

By: _____

Title:  Assistant Secretary

## CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds described in the within mentioned Bond Indenture.

Date of Authentication:  _____

**UMB BANK, N.A.**, Bond Trustee

By: _____

Title:  Authorized Signature

B-6

**ASSIGNMENT**

**FOR VALUE RECEIVED** the undersigned hereby sells, assigns and transfers unto

_____

(Please Print or Typewrite Name, Address and Social Security Number or Taxpayer Identification Number of Transferee)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints

_____

Attorney

to transfer the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:  _____ _____, _____

_____

**NOTICE:** The signature to this assignment must correspond with the name as it appears upon the face of the within Bond in every particular, without alteration or enlargement or any change whatever.

[Medallion]{or}[Signature Guaranteed By:

_____

(Name of Eligible Guarantor Institution as defined by SEC Rule 17 Ad-15 (17 CFR 240.17 Ad-15))

By:  _____

Title:  _____]

B-7

Draft August 17, 2021

_____

**LOAN AGREEMENT**

**Dated as of November 15, 2021**

_____

**Between**

**THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE
CITY OF KANSAS CITY, MISSOURI**

**And**

**KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC.
D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**

_____

**$5,500,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021A
(Federally Taxable)**

**$27,000,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)**

**Series 2021B**

**$4,400,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021C**

**$12,050,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021D**

_____

**The rights, title and interest of The Industrial Development Authority of the City of Kansas City, Missouri in this Loan Agreement (with certain exceptions) have been pledged and assigned to UMB Bank, N.A., as Bond Trustee, under the Bond Trust Indenture dated as of November 15, 2021, between the Authority and the Bond Trustee.**

# LOAN AGREEMENT

## TABLE OF CONTENTS

Page

### ARTICLE I
### DEFINITIONS AND RULES OF CONSTRUCTION
Section 1.1.    Definitions of Words and Terms ................................................................ 2
Section 1.2.    Rules of Construction ................................................................................ 2

### ARTICLE II
### REPRESENTATIONS
Section 2.1.    Representations by the Authority ............................................................... 3
Section 2.2.    Representations by the Institution .............................................................. 4
Section 2.3.    Survival of Representations ....................................................................... 6

### ARTICLE III
### THE LOAN
Section 3.1.    Loan of Funds to the Institution ................................................................ 6
Section 3.2.    Use of Proceeds ......................................................................................... 6

### ARTICLE IV
### PAYMENT AND SECURITY PROVISIONS
Section 4.1.    Loan Payments ........................................................................................... 7
Section 4.2.    Credits on Loan Payments ......................................................................... 7
Section 4.3.    Additional Payments .................................................................................. 8
Section 4.4.    Prepayment of the Loan ............................................................................. 9
Section 4.5.    Obligations Absolute and Unconditional ................................................. 10
Section 4.6.    Assignment of Authority's Rights ............................................................ 10

### ARTICLE V
### GENERAL COVENANTS AND PROVISIONS
Section 5.1.    Corporate Existence and Tax-Exempt Status .......................................... 11
Section 5.2.    Maintenance and Use of Property ............................................................ 11
Section 5.3.    Compliance With Laws and Regulations .................................................. 11
Section 5.4.    Payment of Taxes and Other Charges ...................................................... 12
Section 5.5.    Indemnity .................................................................................................. 12
Section 5.6.    Tax Covenants .......................................................................................... 13
Section 5.7.    Continuing Disclosure .............................................................................. 13
Section 5.8.    Assignment by the Institution ................................................................... 13
Section 5.9.    Covenants under Master Indenture and Other Financing Documents ...... 14
Section 5.10.   Recording and Filing of Security Interest ............................................... 14
Section 5.11.   Covenants Concerning Marketing, Occupancy and Repositioning .......... 14
Section 5.12.   Covenants Concerning Entrance Fees ...................................................... 16
Section 5.13.   Operating Fund ......................................................................................... 17
Section 5.14.   Application of Excess Cash ...................................................................... 17

### ARTICLE VI
### PERMITTED INDEBTEDNESS
Section 6.1.    Permitted Indebtedness ............................................................................. 17

### ARTICLE VII
### DEFAULT AND REMEDIES
Section 7.1.    Events of Default ...................................................................................... 17
Section 7.2.    Acceleration of Maturity; Rescission and Annulment .............................. 19

(i)

Section 7.3.    Exercise of Remedies by the Bond Trustee .................................................. 20
Section 7.4.    Application of Moneys Collected ................................................................. 20
Section 7.5.    Rights and Remedies Cumulative ................................................................ 20
Section 7.6.    Delay or Omission Not Waiver .................................................................... 21
Section 7.7.    Waiver of Past Defaults ............................................................................... 21
Section 7.8.    Advances by Bond Trustee .......................................................................... 21

**ARTICLE VIII**
**SUPPLEMENTAL LOAN AGREEMENTS**

Section 8.1.    Supplemental Loan Agreements without Consent of Bondowners ................ 21
Section 8.2.    Supplemental Loan Agreements with Consent of Bondowners ..................... 22
Section 8.3.    Execution of Supplemental Loan Agreements .............................................. 23
Section 8.4.    Effect of Supplemental Loan Agreements .................................................... 23
Section 8.5.    Reference in Bonds to Supplemental Loan Agreements ............................... 23

**ARTICLE IX**
**TERM AND TERMINATION OF LOAN AGREEMENT**

Section 9.1.    Term of Loan Agreement .............................................................................. 23
Section 9.2.    Termination and Discharge of Loan Agreement ........................................... 24

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

Section 10.1.    Further Assurances ...................................................................................... 24
Section 10.2.    Payments Due on Saturdays, Sundays and Holidays .................................. 24
Section 10.3.    Notices ........................................................................................................ 24
Section 10.4.    Limitation of Authority's Liability .............................................................. 24
Section 10.5.    Immunity of Officers, Employees and Directors of the Authority and the Institution ..... 25
Section 10.6.    No Violations of Law ................................................................................... 25
Section 10.7.    Bond Indenture Provisions .......................................................................... 25
Section 10.8.    Benefit of Loan Agreement ......................................................................... 26
Section 10.9.    Severability ................................................................................................. 26
Section 10.10.    Counterparts ............................................................................................... 26
Section 10.11.    Electronic Transactions ............................................................................... 26
Section 10.12.    Governing Law ........................................................................................... 26

Schedule 5.12    Schedule of Entrance Fees

\*    \*    \*

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (the *"Loan Agreement"*), dated as of **November 15, 2021**, between **THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI**, a public corporation duly organized and existing under the laws of the State of Missouri (the *"Authority"*), and **KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**, a nonprofit corporation organized and existing under the laws of the State of Missouri (the *"Institution"*);

## RECITALS

1.      Pursuant to the Industrial Development Corporations Act, Chapter 349 of the Revised Statutes of Missouri, as amended (the *"Act"*), and at the request of the Institution, the Authority issued $51,770,000 aggregate principal amount of **Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2016** (the *"Series 2016 Bonds"*), under a Bond Trust Indenture dated as of January 1, 2016 (the *"Original Bond Indenture"*) between the Authority and UMB Bank, N.A., as Bond Trustee (the *"Bond Trustee"*), for the purpose of making a loan (the *"2016 Loan"*) of the proceeds of the Series 2016 Bonds to the Institution under a Loan Agreement dated as of January 1, 2016 (the "*Original Loan Agreement*") to provide funds to (a) finance, refinance and reimburse the costs of certain facilities of the Institution described in the Original Bond Indenture (the *"Project"*), (b) refund the Refunded Bonds described in the Original Bond Indenture (the *"Refunded Bonds"*), (c) fund required debt service reserves, (d) fund interest on the Series 2016 Bonds, and (e) pay certain costs of issuance related to the Series 2016 Bonds, in consideration of payments by the Institution.

2.      Subsequent to the issuance of the Series 2016 Bonds, the Institution defaulted on certain of its obligations in connection with the Series 2016 Bonds, including without limitation its obligations under the Original Bond Indenture and the Original Loan Agreement, and entered into negotiations with certain owners of a majority of principal amount of the Series 2016 Bonds to address the issues.  On _____, 2021, the Institution filed its voluntary petition under Chapter 11 of the Bankruptcy Code in the bankruptcy case styled In re: Kansas City United Methodist Retirement Home Inc. Case No.  21-_____ (___) (the *"Bankruptcy Proceedings"*) in the United States Bankruptcy Court for the Western District of Missouri (the "*Bankruptcy Court*").  On _____, 2021, the Institution filed its reorganization plan which included the restructuring of the Series 2016 Bonds (the "*Bankruptcy Plan*").  On _____, 2021, the Bankruptcy Court issued its order (the "*Order*") confirming the Bankruptcy Plan.  The Order and the Bankruptcy Plan provide that all of the payment obligations of the Authority under the outstanding Series 2016 Bonds are to be restructured by having the owners of all of the Series 2016 Bonds exchange such outstanding Series 2016 Bonds for Series 2021B Bonds and Series 2021D Bonds (as defined below) (the "*Bond Exchange*").

3.      In order to effectuate the Bond Exchange and the Bankruptcy Plan, including funding additional costs of the Project and facilities of the Institution, the Institution has requested that the Authority issue: (a) **$5,500,000** in aggregate principal amount of its **Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021A (Federally Taxable)** (the "*Series 2021A Bonds*"), (b) **$27,000,000** in aggregate principal amount of its **Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021B** (the "*Series 2021B Bonds*"), (c) **$4,400,000** in aggregate principal amount of its **Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021C** (the "*Series 2021C Bonds*"), and (d) **$12,050,000** in aggregate principal amount of its **Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021D** (the "*Series 2021D Bonds*" and, together with the Series 2021A Bonds, the Series 2021B Bonds and the Series 2021C Bonds, the "*Series 2021 Bonds*")), and exchange the Series 2021B

Bonds and the Series 2021D Bonds for the outstanding Series 2016 Bonds, with each owner of Series 2016 Bonds to receive their ratable share of Series 2021B Bonds and Series 2021D as set forth in the Bond Indenture.  The Series 2021 Bonds will be issued for the Authority to make a loan (the *"2021 Loan"* or the "*Loan*") of the proceeds of the Series 2021 Bonds to the Institution under this Loan Agreement for the purposes described herein.

**4.**       The Order and Bankruptcy Plan also provide for the termination of the Master Trust Indenture dated as of January 1, 2016 (the "*Original Master Indenture*") and the cancellation of the Master Obligations issued under the Original Master Indenture to evidence and secure the obligations of the Institution under the Original Loan Agreement for the Series 2016 Bonds, each in exchange for execution of a new Master Trust Indenture dated as of November 15, 2021 and Supplemental Master Trust Indenture No. 1 dated as of November 15, 2021 (collectively referred to herein as the "*Master Indenture*"), among the Institution, and such other persons as from time to time are Obligated Group Members (collectively, the "*Obligated Group*") and UMB Bank, N.A., as trustee (the *"Master Trustee"*), and the issuance and delivery under the Master Indenture, to evidence and secure the 2021 Loan,  of (i) the **Master Indenture Obligation No. 1 (Series 2021A Bonds)** (the *"Series 2021A Master Obligation"*), in the principal amount of **$5,500,000**,  (ii) the **Master Indenture Obligation No. 2 (Series 2021B Bonds)** (the *"Series 2021B Master Obligation"*), in the principal amount of **$27,000,000**, (iii) the **Master Indenture Obligation No. 3 (Series 2021C Bonds)** (the *"Series 2021C Master Obligation"*), in the principal amount of **$4,400,000**, to be issued under the Master Trust Indenture dated as of November 15, 2021, and Supplemental Master Trust Indenture No. 1 dated as of November, 2021, among the Institution, the Obligated Group and the Master Trustee, and (iv) the **Master Indenture Obligation No. 4 (Series 2021D Bonds)** (the *"Series 2021D Master Obligation"* and with the Series 2021A Master Obligation, the Series 2021B Master Obligation and the Series 2021C Master Obligation, the *"Series 2021 Master Obligations"*), in the principal amount of **$12,050,000**.

**5.**       The Authority and the Institution are entering into this Loan Agreement to provide for the loan of the proceeds of the Bonds by the Authority to the Institution, and the repayment of the Loan by the Institution.

**NOW, THEREFORE,** in consideration of the premises and the mutual representations, covenants and agreements set forth in this Loan Agreement, the Authority and the Institution covenant and agree as follows:

## ARTICLE I

## DEFINITIONS AND RULES OF CONSTRUCTION

***Section 1.1.       Definitions of Words and Terms.***

For all purposes of this Loan Agreement, except as otherwise provided or unless the context otherwise requires, words and terms used in this Loan Agreement have the same meanings as set forth in **Section 101** of the Bond Indenture and in **Section 1.01** of the Master Indenture.

***Section 1.2.       Rules of Construction.***

For all purposes of this Loan Agreement, except as otherwise provided or unless the context otherwise requires, the following rules of construction apply in construing the provisions of this Loan Agreement:

(a)     The defined terms referred to in this Article include the plural as well as the singular.

(b)     All accounting terms not otherwise defined herein or in the Bond Indenture shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles.

(c)     All references herein to "generally accepted accounting principles" refer to such principles in effect on the date of the determination, certification, computation or other action to be taken hereunder using or involving such terms.

(d)     All references in this instrument to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of this instrument.

(e)     The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Loan Agreement as a whole and not to any particular Article, Section or other subdivision.

(f)     The Article and Section headings herein and in the Table of Contents are for convenience only and shall not affect the construction hereof.

(g)     Whenever an item or items after the word "including," such listing is not intended to be a listing that excludes items not listed.

## ARTICLE II

## REPRESENTATIONS

### Section 2.1.     *Representations by the Authority.*

The Authority represents and warrants to the Institution and the Bond Trustee as follows:

(a)     *Organization and Authority.* The Authority (1) is a public corporation duly organized and existing under the laws of the State of Missouri, (2) has lawful power and authority to issue the Bonds for the purposes set forth in the Bond Indenture, to enter into, execute and deliver the Bond Indenture and this Loan Agreement and to perform its obligations thereunder and hereunder, and (3) by all necessary corporate action has been duly authorized to execute and deliver the Bond Indenture and this Loan Agreement and the other Financing Documents required to be executed and delivered by it in connection with the issuance of the Bonds, acting by and through its duly authorized officers.

(b)     *No Defaults or Violations of Law.* The execution and delivery of this Loan Agreement and any other Financing Documents by the Authority will not result in a breach of any of the terms of, or constitute a default under, any indenture, mortgage, deed of trust, lease or other

agreement or instrument to which the Authority is a party or by which it or any of its property is bound or its articles of incorporation, bylaws or any of the constitutional or statutory rules or regulations applicable to the Authority or its property.

(c)     *Absence of Litigation.*  No litigation, proceedings or investigations are pending or, to the knowledge of the Authority, threatened against the Authority at law or in equity before any court, tribunal, governmental authority or arbitration board seeking to restrain, enjoin or in any way limit the approval or issuance and delivery of the Bonds, the Bond Indenture, this Loan Agreement or any other Financing Documents to which the Authority is a party, or which challenges the existence or powers of the Authority to enter into and carry out the transactions contemplated by this Loan Agreement or any other Financing Documents to which it is a party, or wherein an unfavorable determination could materially and adversely affect the validity or enforceability of the Bonds, this Loan Agreement, or any other Financing Document to which the Authority is a party or its ability to perform its obligations thereunder.

### Section 2.2.      *Representations by the Institution.*

The Institution represents and warrants to the Authority and the Bond Trustee as follows:

(a)     *Organization, Tax-Exempt Status and Authority.*  The Institution (1) is a private nonprofit corporation duly organized and validly existing under the laws of the State of Missouri not operated for private or corporate profit, (2) is authorized by law to provide or operate a "project" (as defined in the Act) in the State of Missouri, (3) is an Obligated Group Member and the Obligated Group Representative under the Master Indenture, (4) is a Tax-Exempt Organization, (5) has not declared and has not been determined to have any "unrelated business taxable income" as defined in Section 512 of the Internal Revenue Code which could have a material adverse effect on its status as a Tax-Exempt Organization or which, if such income were subject to federal income taxation, could have a material adverse effect on the condition, financial or otherwise, of the Institution, (6) has lawful power and authority to enter into, execute and deliver this Loan Agreement, and to execute and deliver the Series 2021 Master Obligations and the other Financing Documents required to be executed and delivered by it in connection with the issuance of the Bonds and to perform its obligations hereunder and thereunder, and (7) by all necessary corporate action has been duly authorized to execute and deliver this Loan Agreement, the Series 2021 Master Obligations and the other required Financing Documents, acting by and through its duly authorized officers.

(b)     *No Defaults or Violations of Law.*  Except as addressed by the Order and Bankruptcy Plan, the execution and delivery of this Loan Agreement and any other Financing Documents by the Institution will not conflict with or result in a breach of any of the terms of, or constitute a default under, any indenture, mortgage, deed of trust, lease or other agreement or instrument to which the Institution is a party or by which it or any of its property is bound or its articles of incorporation, bylaws, or any of the rules or regulations of any court or other governmental body applicable to the Institution or its property.

(c)     *Licenses, Permits and Approvals.*  The Institution is duly authorized and has all necessary licenses and permits to occupy and operate its senior living facilities under the laws and regulations of the State of Missouri and the departments, agencies and political

subdivisions thereof, and the Institution has obtained or will obtain all requisite approvals of federal, state and local governmental bodies necessary for the operation of the Facilities. The Institution has no knowledge of any material violation of applicable federal, state and local zoning, subdivision, environmental, pollution control and other laws and regulations relating to its facilities.

(d)     *Pending Litigation.*  Other than the Order and Bankruptcy Plan, no litigation, proceedings or investigations are pending or, to the knowledge of the Institution, threatened against the Institution, except litigation involving claims, the probable recoveries in which and the estimated costs and expenses of defense of which, based upon the advice of litigation counsel to the Institution, (1) will be entirely within the Institution's applicable insurance policy limits (subject to applicable deductibles) or are not in excess of the total of the available reserves held under the Institution's applicable self-insurance program, or (2) if adversely determined, will not materially and adversely affect the financial condition or operations of the Institution.  In addition, no litigation, proceedings or investigations are pending or, to the knowledge of the Institution, threatened against the Institution seeking to restrain, enjoin or in any way limit the approval or issuance and delivery of the Bond Indenture, the Bonds, this Loan Agreement or any other required Financing Documents by the Authority, or this Loan Agreement or any other required Financing Documents by the Institution, or which would in any manner challenge or adversely affect the corporate existence or powers of the Institution to enter into and carry out the transactions described in or contemplated by or the execution, delivery, validity or performance by the Institution of the terms and provisions of this Loan Agreement or any other Financing Documents to which it is a party.

(e)     *Financial Statements and Other Information.*  The unaudited financial statements of the Institution for the fiscal year ended December 31, 2020 correctly and fairly present the financial condition of the Institution as of the dates and for the periods stated therein, and the results of the operations of the Institution for each of such periods, respectively, all in accordance with generally accepted accounting principles except as stated in the notes thereto, and, except as addressed by the Order and Bankruptcy Plan, there has been no material adverse change in the financial condition of the Institution from that set forth in said financial statements, except as may be disclosed in the Disclosure Statement.  The financial statements and other information of the Institution included in the Disclosure Statement relating to the Bonds do not, nor do the representations and warranties of the Institution in this Loan Agreement or in any other Financing Documents to which the Institution is a party or any written statement (including the Disclosure Statement relating to the Bonds) furnished by the Institution to the Authority and the Bond Trustee, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein or therein not misleading.  There is no fact of which the Institution has actual knowledge which the Institution has not disclosed to the Authority and Bondowners in writing which materially affects adversely or, so far as the Institution can now foresee, will materially affect adversely the financial condition or operations of the Institution, its status as a Tax-Exempt Organization, its ability to own and operate its properties or its ability to make the payments under this Loan Agreement when and as the same become due and payable.

(f)     *The Master Indenture.*  Each of the Series 2021 Master Obligations, upon its issuance, will constitute a Master Obligation (as defined in the Master Indenture) secured by and entitled

to the benefits and protection of the Master Indenture on a parity with all other Master Obligations issued and secured under the Master Indenture.

(g)    *Related Bonds.*  The Bonds, upon their issuance, will constitute Related Bonds (as defined in the Master Indenture).

(h)    *Projects.*  The Series 2021A Project and the Series 2021C Project each constitute a "project" as defined in the Act.

### Section 2.3.    *Survival of Representations.*

All representations of the Authority and the Institution contained in this Loan Agreement or in any certificate or other instrument delivered by the Authority and the Institution pursuant to this Loan Agreement, the Bond Indenture, or any other Financing Document, or in connection with the transactions contemplated thereby, shall survive the execution and delivery thereof and the issuance, sale and delivery of the Bonds, as representations of facts existing as of the date of execution and delivery of the instruments containing such representations.

# ARTICLE III

# THE LOAN

### Section 3.1.    *Loan of Funds to the Institution.*

The Authority shall make the Loan to the Institution, using the proceeds of the sale of the Bonds, and the Institution shall cause the proceeds of the Loan to be used for the purposes and upon the terms and conditions provided in the Bond Indenture and this Loan Agreement.

As an inducement for the Authority to issue the Bonds and make the Loan, and as security for the Loan, and to further provide for the Loan Payments hereunder and the payment of the principal of, redemption premium, if any, and interest on the Bonds, the Institution shall cause the Series 2021 Master Obligations to be issued under the Master Indenture, payable to the order of the Authority and endorsed by the Authority to the Bond Trustee, with interest rates, payment dates and prepayment provisions corresponding to the analogous provisions of the Bonds and otherwise being in substantially the form specified by Supplemental Master Trust Indenture No. 1.  The Bond Trustee as holder of the Series 2021 Master Obligations shall be entitled to the benefit, security and protection of the Master Indenture.

### Section 3.2.    *Use of Proceeds.*

The proceeds of the Bonds shall be paid to the Bond Trustee for deposit as provided under the Bond Indenture and shall be administered, disbursed and applied in the manner provided in the Bond Indenture.

If the proceeds derived from the sale of the Bonds issued for such purpose are not sufficient to pay in full the costs of the Series 2021A Project and the Series 2021C Project, the Institution shall pay so much of the cost thereof as may be in excess of the proceeds of the Bonds and any investment income thereon available therefor.  The Institution agrees that if, after exhaustion of the proceeds of the Bonds and investment income thereon, the Institution should pay any portion of the costs of the Series 2021A Project and the Series 2021C Project pursuant to the provisions of this Section, it shall not be entitled to any

reimbursement therefor from the Authority or the Bond Trustee nor shall it be entitled to any abatement, diminution or postponement of its payments hereunder.

In addition, the Institution agrees to pay the costs of issuing the Bonds which are not being paid with the proceeds of the sale of the Bonds either by paying any or all of such costs directly or by depositing the same with the Bond Trustee. Any monies so deposited with the Bond Trustee shall be disbursed by the Bond Trustee in accordance with written instructions from the Institution.

## ARTICLE IV

## PAYMENT AND SECURITY PROVISIONS

### Section 4.1.    Loan Payments.

The Institution shall make the following payments (*"Loan Payments"*) in repayment of the Loan and to provide for payment of the principal of, redemption premium, if any, and interest on the Bonds, directly to the Bond Trustee, in immediately available funds, for deposit in the applicable accounts in the Bond Fund, on the following dates, and otherwise as set out below:

(a)     *Bond Fund-Interest:*  On or before the dates required by the Bond Indenture the amount of interest coming due on each Series of the Bonds.

(b)     *Bond Fund-Principal:*  On or before the dates required by the Bond Indenture the amount of principal on each Series of the Bonds coming due (whether at maturity or upon mandatory sinking fund redemption or acceleration).

(c)     *Bond Fund-Redemption:*  On or before the date required by this Loan Agreement or the Bond Indenture, the amount required to redeem Bonds then Outstanding if the Institution exercises its right to redeem Bonds under any provision of the Bond Indenture or if any Bonds are required to be redeemed (other than pursuant to mandatory sinking fund redemption provisions) under any provision of the Bond Indenture.

The Institution shall receive a credit against its obligations to make the Loan Payments under this Section and the obligation of the Institution to make any such payment hereunder shall be deemed satisfied and discharged to the extent provided in **Section 4.2** of this Loan Agreement.

If the Institution fails to make any of the payments required in this Section, the item or installment so in default shall continue as an obligation of the Institution until the amount in default shall have been fully paid, and the Institution agrees to pay the same with interest thereon from the date when such payment was due until paid in full, at the rate of interest borne by the Bonds.

### Section 4.2.    Credits on Loan Payments.

Notwithstanding any provision contained in this Loan Agreement or in the Bond Indenture to the contrary, in addition to any credits on the Loan resulting from the payment or prepayment of Loan Payments from other sources:

(a)     any moneys deposited by the Bond Trustee or the Institution in any account in the Bond Fund as interest (including moneys received as accrued interest from the sale of Bonds and

any initial deposit made from the proceeds of the sale of any Bonds) shall be credited against the obligation of the Institution to pay interest on the Loan as the same becomes due;

(b)     any moneys deposited by the Bond Trustee or the Institution in any account in the Bond Fund as principal shall be credited against the obligation of the Institution to pay the principal of the Loan as the same becomes due in the order of maturity thereof, except that prepayments for purposes of making an optional deposit into the Bond Fund for the redemption of Bonds shall be applied to the principal corresponding to the maturities of the Bonds to be redeemed or purchased, delivered and cancelled from the proceeds of such optional deposit;

(c)     the principal amount of any Bonds of any maturity purchased by the Institution and delivered to the Bond Trustee, or purchased by the Bond Trustee and cancelled, in accordance with the Bond Indenture shall be credited against the obligation of the Institution to pay principal on the Loan so purchased; provided, however, that deposit of a Bond of one maturity may not be credited against a payment that would be used, in the normal course, to retire a Bond of another maturity; and

(d)     the investment income accruing to any account in the Bond Fund and the amount of any moneys transferred by the Bond Trustee from any other fund held under the Bond Indenture and deposited in the Bond Fund as interest or principal shall be credited against the obligation of the Institution to pay interest or principal, as the case may be, as the same become due.

**Section 4.3.     Additional Payments.**

The Institution shall make the following additional payments to the following Persons:

(a)     *Authority Fees.*  The Institution shall cause to be paid to the Authority, upon demand, its regular fees and charges, and all reasonable expenses, including attorneys fees, incurred by the Authority in relation to the Bonds and the transactions contemplated by this Loan Agreement, the Bond Indenture and any of the Financing Documents.

(b)     *Bond Trustee Fees and Professional Fees.*  The Institution shall cause to be paid to the Bond Trustee, Dissemination Agent, authenticating agents, paying agents, registrars, counsel, accountants, rebate analysts and other Persons when due, all reasonable fees, charges and expenses of such Persons for services rendered under the Bond Indenture and under any of the Financing Documents and expenses incurred in the performance of such services under the Bond Indenture and any of the Financing Documents for which such Persons are entitled to payment or reimbursement, including expenses of compliance with the Tax Compliance Agreement and the Continuing Disclosure Agreement.

(c)     *Advances by Bond Trustee.*  The Institution shall cause to be paid to the Bond Trustee the amount of all advances of funds made by the Bond Trustee under the provisions of this Loan Agreement or the Bond Indenture, with interest thereon at the prime rate announced from time to time by the Bond Trustee.

(d)     *Arbitrage Rebate Payments.*  The Institution shall cause to be paid to the United States Government or the Bond Trustee for deposit in the Rebate Fund all rebate payments required under the Tax Compliance Agreement and Section 148(f) of the Internal Revenue Code, to the extent such amounts are not available to the Bond Trustee in the Rebate Fund held under the Bond Indenture.

(e)     *Debt Service Reserve Fund.*  The Institution shall cause to be paid to the Bond Trustee for deposit in the Debt Service Reserve Fund the amounts at the times as required by the Bond Indenture.

(f)     *Costs of Enforcement.*  In the event the Institution defaults under any of the provisions of this Loan Agreement and Bond Trustee employs attorneys or incurs other fees, charges and expenses for the collection of required payments or the enforcement of performance or observance of any obligation or agreement on the part of the Institution contained in this Loan Agreement or the Bond Indenture, the Institution on demand therefor shall cause to be paid to the Bond Trustee the reasonable fees and expenses of such attorneys and such other expenses so incurred by the Bond Trustee.  The Institution also shall cause to be paid, and shall indemnify the Authority and the Bond Trustee and their respective members, directors, officers, employees and agents from and against, all costs, expenses and charges, including reasonable counsel fees and expenses, incurred for the collection of payments due or for the enforcement or performance or observance of any covenant or agreement of the Institution under this Loan Agreement or under the Bond Indenture or any other Financing Document.

(g)     *Taxes and Assessments.*  The Institution shall cause to be paid all taxes and assessments of any type or character charged to the Authority or to the Bond Trustee affecting the amount available to the Authority or the Bond Trustee from payments to be received hereunder or in any way arising due to the transactions contemplated hereby (including property and other taxes and assessments assessed or levied by any public agency or governmental authority of whatsoever character having power to levy taxes or assessments) but excluding any taxes based upon the capital and/or income of the Bond Trustee or any other Person other than the Institution; provided, however, that the Institution shall have the right to protest any such taxes or assessments and to require the Authority or the Bond Trustee, as the case may be, at the Institution's expense, to protest and contest any such taxes or assessments assessed or levied upon them and that the Institution shall have the right to withhold payment of any such taxes or assessments pending disposition of any such protest or contest unless such withholding, protest, or contest would materially adversely affect the rights or interests of the Authority or the Bond Trustee.

(h)     *Other Amounts Payable.*  The Institution shall cause to be paid to the Person or Persons entitled thereto, any other amounts which the Institution has agreed to pay under this Loan Agreement or which the Institution is required to pay under the Bond Indenture.

### Section 4.4.     Prepayment of the Loan.

The Institution may prepay from time to time the amounts payable under this Loan Agreement in sums sufficient to redeem or to pay or cause to be paid all or part of the Bonds in accordance with the provisions of the Bond Indenture.  Upon written notice and direction by the Institution to the Bond Trustee to redeem Bonds subject to optional redemption under the Bond Indenture, the Bond Trustee shall forthwith

take all steps (other than the payment of the money required for such redemption) necessary under the applicable redemption provisions of the Bond Indenture to effect redemption of all or part of the then Outstanding Bonds, as may be specified by the Institution, on the date established for such redemption. Whenever any Bonds shall have been called for optional redemption under any provision of the Bond Indenture, the Institution shall cause to be deposited with the Bond Trustee moneys in such amounts and at such times required to redeem such Bonds, including the principal, redemption premium, if any, and accrued interest thereon to the redemption date. The Institution further agrees that in the event the payment of principal of and interest on the Loan is accelerated upon the occurrence of an event of default under this Loan Agreement, all Loan Payments payable for the remainder of the term of this Loan Agreement shall be accelerated and prepayment shall be made on the Loan in such amounts. Any such prepayments shall be deposited in the Bond Fund, and applied by the Bond Trustee in accordance with the provisions of the Bond Indenture.

### Section 4.5.    *Obligations Absolute and Unconditional.*

The obligations of the Institution under this Loan Agreement are general obligations of the Institution, and the full faith and credit of the Institution is pledged to the payment of all amounts due and payable by the Institution under this Loan Agreement. The Institution shall pay all such amounts due and payable under this Loan Agreement using any and all available resources of the Institution, as necessary. The Institution shall pay all Loan Payments and other payments due under this Loan Agreement and perform its obligations, covenants and agreements under this Loan Agreement, without notice or demand, and without abatement, deduction, set-off, counterclaim, recoupment, discrimination or defense or any right of termination or cancellation arising from any circumstances whatsoever, and regardless of the invalidity of any portion of this Loan Agreement, and, to the extent permitted by law, the Institution waives the provisions of any statute or other law now or hereafter in effect contrary to any of its obligations, covenants or agreements under this Loan Agreement or which releases or purports to release the Institution therefrom. Nothing in this Loan Agreement shall be construed as a waiver by the Institution of any rights or claims the Institution may have against the Authority under this Loan Agreement or otherwise, but any recovery upon such rights or claims shall be had from the Authority separately, it being the intent of this Loan Agreement that the Institution shall be unconditionally and absolutely obligated to perform fully all of its obligations, agreements and covenants under this Loan Agreement for the benefit of the owners of the Bonds.

### Section 4.6.    *Assignment of Authority's Rights.*

Under the Bond Indenture, the Authority has pledged, assigned, transferred in trust and granted a security interest to the Bond Trustee in all of the Authority's rights, title and interest under this Loan Agreement (except for the Authority's rights to payment of its fees and expenses and the Authority's right to indemnification in certain circumstances and as otherwise expressly set forth in this Loan Agreement) as security for the Bonds, and such rights, title and interest may be exercised, protected and enforced for or on behalf of the owners of the Bonds in conformity with this Loan Agreement and the Bond Indenture. The Bond Trustee is hereby given the right to enforce, as assignee of the Authority, the performance of the obligations of the Institution under this Loan Agreement, and the Institution hereby consents to the same and agrees that the Bond Trustee may enforce such rights as provided in this Loan Agreement and in the Bond Indenture. The Authority and the Institution recognize that the Bond Trustee is a third party creditor-beneficiary of this Loan Agreement.

## ARTICLE V

## GENERAL COVENANTS AND PROVISIONS

**Section 5.1.     *Corporate Existence and Tax-Exempt Status.***

Except as otherwise expressly provided in this Loan Agreement or the Master Indenture, the Institution shall (a) preserve and keep in full force and effect its corporate or other separate legal existence, (b) remain qualified to do business and conduct its affairs in each jurisdiction where ownership of its property or the conduct of its business or affairs requires such qualification, and (c) maintain its status as a Tax-Exempt Organization.

**Section 5.2.     *Maintenance and Use of Property.***

The Institution shall cause all of its property used or useful in the conduct of its business and operations to be maintained, preserved and kept in good repair and working order and condition and in as safe condition as its operations will permit and shall make all repairs, renewals, replacements and improvements thereof necessary for the efficient conduct of its business and operations, and shall, during the term of the Bonds, operate the facilities financed and refinanced by the Bonds, as a "project" within the meaning of the Act. Nothing in this Section shall obligate the Institution to preserve, repair, renew or replace any property no longer used or no longer useful in the conduct of its business, or prevent the Institution from discontinuing the operation of any of its property or from removing or demolishing any building or buildings, if in its judgment (evidenced, in the case of such a cessation other than in the ordinary course of business, by a determination by its governing board) such discontinuance is desirable in the conduct of its business. The Institution may make additions, alterations and changes to its property so long as such additions, alterations and changes are made in compliance with the provisions of this Loan Agreement and will not result in a violation of the provisions of this Loan Agreement, and the Institution may dispose of any property as permitted by this Loan Agreement.

Subject to the provisions of this Article, the Institution shall have the right to use its property for any purpose allowed by law and contemplated by the Act. Except as provided in this Loan Agreement, the Authority reserves no power or authority with respect to the operation of the property by the Institution and activities incident thereto, it being the intention of the parties to this Loan Agreement that so long as the Institution shall duly and faithfully observe and perform all of the terms, covenants, provisions and agreements of this Loan Agreement, the Institution shall manage, administer and govern the property of the Institution in its activities and affairs on a continuing day-to-day basis.

The Institution agrees that it will not use or permit the use of any of the properties financed or refinanced, or for which it is reimbursed, in whole or in part, out of the proceeds of the Bonds in a manner which is prohibited by the Establishment of Religion Clause of the First Amendment to the Constitution of the United States of America and the decisions of the United States Supreme Court interpreting the same or by any comparable provisions of the Constitution of the State of Missouri and the decisions of the Missouri Supreme Court interpreting the same.

**Section 5.3.     *Compliance with Laws and Regulations.***

The Institution shall conduct its affairs and carry on its business and operations in such manner as to comply with any and all applicable laws of the United States of America and the several states thereof and observe and conform to all valid orders, regulations or requirements of any governmental authority

applicable to the conduct of its business and operations and the ownership of its property, including without limitation environmental laws, orders or regulations; provided, however, that nothing contained in this Loan Agreement shall require the Institution to comply with, observe and conform to any such law, order, regulation or requirement of any governmental authority so long as the validity thereof shall be contested by the Institution in good faith by appropriate proceedings, provided that the Institution shall have set aside on its books adequate reserves with respect to such contest and such contest shall not materially impair the ability of the Institution to meet its obligations under this Loan Agreement.

Section 5.4.    *Payment of Taxes and Other Charges.*

The Institution shall pay or cause to be paid as they become due and payable all taxes, assessments and other governmental charges lawfully levied or assessed or imposed upon the Institution or its property or any part thereof or upon any income therefrom; provided, however, that the Institution shall not be required to pay and discharge or cause to be paid and discharged any such tax, assessment or governmental charge to the extent that the amount, applicability or validity thereof shall currently be contested in good faith by appropriate proceedings and the Institution shall have established and shall maintain adequate reserves on its books for the payment of the same.

Section 5.5.    *Indemnity.*

The Institution shall pay and indemnify and save the Authority and the Bond Trustee and their respective members, directors, officers, employees and agents harmless from and against all loss, liability, damage or expense (including, without limitation, reasonable attorneys fees and expenses) arising out of the issuance of the Bonds and the execution of this Loan Agreement and the other Financing Documents, including, but not limited to, claims for loss or damage to any property or injury to or death of any person, asserted by or on behalf of any person, firm, corporation or governmental authority arising out of or in any way connected with any property of the Institution, or the conditions, occupancy, use, possession, conduct or management of, or any work done in or about such property.  The Institution shall also pay and indemnify and save the Authority and the Bond Trustee and their respective members, directors, officers, employees and agents harmless of, from and against, all costs, reasonable counsel fees, expenses and liabilities incurred by them in any action or proceeding brought by reason of any such claim, demand, expense, penalty, fine or tax.  If any action or proceeding is brought against the Authority or the Bond Trustee or their respective members, directors, officers, employees or agents by reason of any such claim or demand, the Institution, upon notice from the Authority or the Bond Trustee, covenants to resist and defend such action or proceeding on demand of the Authority or the Bond Trustee or their respective members, directors, officers, employees or agents.  If the Institution fails to employ counsel or such counsel shall fail to actively defend such actions, or to protect the Authority or the Bond Trustee, or both, or if there exists a conflict of interest, the Authority and the Bond Trustee may employ counsel at the expense of the Institution to defend such action.  Notwithstanding the foregoing, neither the Authority nor the Bond Trustee nor their respective members, directors, officers, employees and agents shall be indemnified against liability for damage arising out of bodily injury to persons or damage to property caused by their own negligent, willful and malicious acts or omissions or negligent, willful and malicious acts or omissions of their own members, directors, officers, employees or agents.  The Institution shall also pay and indemnify the Authority and the Bond Trustee from and against all fees, costs, expenses and charges, including reasonable counsel fees and expenses, incurred after default of the Institution in enforcing any covenant or agreement of the Institution contained in this Loan Agreement, the Bond Indenture or the other Financing Documents.  The foregoing indemnification shall survive the termination of the Bond Indenture or the resignation or removal of the Bond Trustee.

**Section 5.6.     Tax Covenants.**

The Institution covenants and agrees that it will not take any action or permit any action to be taken that would adversely affect the exclusion from gross income for federal income tax purposes of the interest on the Series 2021B Bonds, the Series 2021C Bonds and the Series 2021D Bonds and will take whatever action, or refrain from whatever action, necessary to comply with the requirements of the Internal Revenue Code to maintain the exclusion from gross income for federal income tax purposes of the interest on such series of the Bonds, and the Institution shall comply with the Tax Compliance Agreement (defined in the Bond Indenture) and will pay or provide for payment to the United States Government or the Bond Trustee, all rebate payments required under Section 148(f) of the Internal Revenue Code and the Tax Compliance Agreement, to the extent such amounts are not available to the Bond Trustee in the Rebate Fund held under the Bond Indenture.  This covenant shall survive payment in full or defeasance of the Bonds.

**Section 5.7.     Continuing Disclosure.**

The Institution acknowledges that the Institution and the other Obligated Group Members are the only "obligated persons" with responsibility for continuing disclosure under the Continuing Disclosure Agreement, and the Authority has undertaken no responsibility with respect to any reports, notices or disclosures provided or required under this Section, and has no liability to any person, including any Beneficial Owner of the Bonds, with respect to SEC Rule 15c2-12.  Notwithstanding any other provision of this Loan Agreement, failure of the Institution to comply with the Continuing Disclosure Agreement shall not be considered an event of default under this Loan Agreement or any other Financing Document; however, the Dissemination Agent may (and, at the request of any Participating Underwriter or the owners of at least **25%** aggregate principal amount in Outstanding Bonds, shall) or any bondowner or Beneficial Owner may take such actions as may be necessary and appropriate, including seeking specific performance by court order, to cause the Institution to comply with its obligations under this Section.  For purposes of this Section, *"Beneficial Owner"* means any person which (a) has the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Bonds (including persons holding Bonds through nominees, depositories or other intermediaries), or (b) is treated as the owner of any Bonds for federal income tax purposes, and *"Dissemination Agent"* and *"Participating Underwriter"* shall have the meaning ascribed thereto in the Continuing Disclosure Agreement.

**Section 5.8.     Assignment by the Institution.**

The Institution shall not assign this Loan Agreement, as a whole or in part, without the prior written consent of the Authority and the Bond Trustee unless such assignment is pursuant to a merger, consolidation or transfer of the Institution's property substantially as an entirety permitted under the Master Indenture, or unless the following conditions are met:

(a)     No assignment shall relieve the Institution from primary liability for any of its obligations under this Loan Agreement, and in the event of any such assignment, the Institution shall continue to remain primarily liable for payment of the amounts specified in this Loan Agreement and the performance and observance of the other agreements to be performed and observed by the Institution under this Loan Agreement to the same extent as though no assignment had been made.

(b)     The assignee shall assume the obligations of the Institution under this Loan Agreement to the extent of the interest assigned.

(c)     The Bond Trustee and the Authority shall have received an Opinion of Bond Counsel, in form and substance satisfactory to the Bond Trustee and the Authority, to the effect that under then existing law the consummation of such assignment would not adversely affect the exclusion of the interest payable on the Bonds from gross income under the Internal Revenue Code.

(d)     The Institution shall give prior written notice of such assignment to the Authority and the Bond Trustee, and, within **30** days after the delivery thereof, shall furnish or cause to be furnished to the Authority and the Bond Trustee a true and complete copy of each assignment and assumption of obligations and an Opinion of Counsel that such assignment is permitted by and in compliance with the provisions of this Loan Agreement.

### Section 5.9.     Covenants under Master Indenture and Other Financing Documents.

The Institution shall perform or cause to be performed all covenants and agreements required on the part of the Institution under the Bond Indenture, the Master Indenture, and the other Financing Documents, and shall deliver to the Bond Trustee all reports, opinions and other documents required by the Bond Indenture, the Master Indenture and all other Financing Documents to be submitted to the Bond Trustee at the times required by the Bond Indenture, the Master Indenture and all other Financing Documents.

### Section 5.10.     Recording and Filing of Security Interest.

The Institution will, forthwith after the execution and delivery of the Loan Agreement and the Bond Indenture and thereafter from time to time, cause the Loan Agreement and the Bond Indenture, including any amendments thereof and supplements thereto, and any financing statements in respect thereof to be filed, registered or recorded in such manner and in such places as may be required by law in order to publish notice of and fully to perfect and protect the lien and security interest therein granted to the Bond Trustee and from time to time will perform or cause to be performed any other act as provided by law and will execute or cause to be executed any and all continuation statements and further instruments necessary for such publication, perfection and protection.

### Section 5.11.     Covenants Concerning Occupancy and Repositioning.

(a)     *Independent Living Occupancy*. The Institution covenants and agrees that it will execute and maintain Residency Agreements so that Occupied Independent Living Units are is at least equal to the following percentages of total Independent Living Units as of the last day of each of the following Fiscal Quarters:

| Fiscal Quarter ending | % |
| --- | --- |
| June 30, 2022 | 71.9 |
| September 30, 2022 | 73.8 |
| December 31, 2022 | 73.8 |
| March 31, 2023 | 75.2 |
| June 30, 2023 | 76.2 |
| September 30, 2023 | 76.2 |
| December 31, 2023 and each Fiscal Quarter thereafter | 77.1 |

(b)     *Assisted Living/Memory Care Occupancy*. The Institution covenants and agrees that it will execute and maintain Residency Agreements so that the Average Occupied Assisted Living/Memory

Care Beds are at least equal to the following percentages of total Assisted Living/Memory Care Beds for the following Fiscal Quarters:

| Fiscal Quarter ending | % |
|---|---|
| March 31, 2022 | 76.5 |
| June 30, 2022 and each Fiscal Quarter thereafter | 76.9 |

(c)    *Skilled Nursing Care Occupancy*. The Institution covenants and agrees that it will execute and maintain Residency Agreements so that the Average Occupied Skilled Nursing Care Beds are at least equal to the following percentages of total Skilled Nursing Care Beds for the following Fiscal Quarters:

| Fiscal Quarter ending | % |
|---|---|
| March 31, 2022 | 73.9 |
| June 30, 2022 | 77.5 |
| September 30, 2022 and each Fiscal Quarter thereafter | 78.5 |

(d)    The Institution shall deliver to the Bond Trustee quarterly reports on each of occupancy amounts set forth in 5.11(a), (b) and (c) above, within 45 days after the end of each Fiscal Quarter, commencing with the quarter ending March 31, 2022.

(e)    If at the end of any Fiscal Quarter (commencing with the Fiscal Quarter ending June 30, 2022), the Institution fails to comply with the covenant set forth in **Section 5.11(a)**, as reflected in the quarterly report delivered pursuant to **Section 5.11(d)** above, if so directed in writing by the Owners of not less than a majority of the Outstanding Series 2021 Bonds (the "**Owners' IL Occupancy Direction**"), the Institution shall retain a Marketing Consultant (who is not the Management Company) acceptable to the Owners of not less than a majority of the Outstanding Series 2021 Bonds (which approval shall not be unreasonably withheld and which approval shall be deemed not given unless provided within 14 days), within 30 days of the Institution's receipt of such Owners' IL Occupancy Direction, to make recommendations to achieve the occupancy target set forth in **Section 5.11(a)**. A copy of the report of such Marketing Consultant's recommendations (the "**Marketing Consultant's IL Report**"), if any, shall be filed with the Bond Trustee within 60 days after the date the Marketing Consultant is retained by the Institution. In the event that the Marketing Consultant is retained but the occupancy target provided in **Section 5.11(a)** remains unmet as of the end of the second Fiscal Quarter after the Marketing Consultant's IL Report is filed with the Bond Trustee, at the written direction of the Owners of not less than a majority of the Outstanding Series 2021 Bonds, the Institution shall appoint an independent third party manager (or replace an existing independent third party manager, if any) within 60 days of receipt of such direction, which third party manager shall be acceptable to the majority of the Owners of the Series 2021 Bonds. If at the end of such second Fiscal Quarter after the Marketing Consultant's IL Report is filed with the Bond Trustee, the Marketing Consultant certifies that the Institution has reasonably complied with all of the recommendations contained in the Marketing Consultant's IL Report, then the period for compliance with such covenants shall be extended by two additional Fiscal Quarters; provided that if the Management Company fails to reasonably comply with such recommendations at any time during such extended two quarter period then, at any such time, a majority of Owners of the Series 2021 Bonds may cause a replacement of the manager. For avoidance of doubt, failure to comply with such covenants after the extended period (if applicable) may result in a change of management if directed by a majority of the Owners of the Series 2021 Bonds.

So long as the Series 2021A or the Series 2021C Bonds are outstanding, the Institution shall follow the recommendations of the Marketing Consultant applicable to it to the extent deemed feasible by its Governing Board and permitted by law. So long as the Institution retains a Marketing Consultant

and the Institution follows such Marketing Consultant's recommendations to the extent feasible and permitted by law, this **Section 5.11** shall be deemed to be complied with even if the Institution's occupancy levels for any subsequent quarter is below the requirements of **Section 5.11(a)**.

(f)     If at the end of any Fiscal Quarter (commencing with March 31, 2022), the Institution fails to comply with the covenants set forth in **Section 5.11(b) or 5.11(c)**, as reflected in the quarterly report delivered pursuant to **Section 5.11(d)** above, if so directed in writing by the Owners of not less than a majority of the Outstanding Series 2021 Bonds, (the "**Owners' AL/HC Occupancy Direction**"), the Institution shall retain a Management Consultant (who is not the Management Company) acceptable to the Owners of not less than a majority of the Outstanding Series 2021 Bonds (which approval shall not be unreasonably withheld and which approval shall be deemed not given unless provided within 14 days), within 30 days of the Institution's receipt of such Owners' AL/HC Occupancy Direction, to make recommendations to achieve the occupancy target set forth in **Section 5.11(b) and/or 5.11(c)**, as applicable. A copy of the report of such Management Consultant's recommendations (the "**Management Consultant's AL/HC Report**"), if any, shall be filed with the Bond Trustee within 60 days after the date the Marketing Consultant is retained by the Institution. In the event that the Marketing Consultant is retained but the occupancy target provided in **Section 5.11(b) and/or 5.11(c)**, as applicable, remains unmet as of the end of the second Fiscal Quarter after the Management Consultant's AL/HC Report is filed with the Bond Trustee, at the written direction of the Owners of not less than a majority of the Outstanding Series 2021 Bonds, the Institution shall appoint an independent third party manager (or replace an existing independent third party manager, if any) within 60 days of receipt of such direction, which third party manager shall be acceptable to the majority of the Owners of the Series 2021 Bonds. If at the end of such Fiscal Quarter after the Management Consultant's AL/HC Report is filed with the Bond Trustee, the Management Consultant certifies that the Institution has reasonably complied with all of the recommendations contained in the Management Consultant's AL/HC Report, then the period for compliance with such covenants shall be extended by two additional Fiscal Quarters; provided that if the Management Company fails to reasonably comply with such recommendations at any time during such extended two quarter period then, at any such time, a majority of Owners of the Series 2021 Bonds may cause a replacement of the manager. For avoidance of doubt, failure to comply with such covenants after the extended period (if applicable) may result in a change of management if directed by a majority of the Owners of the Series 2021 Bonds.

So long as the Series 2021A or the Series 2021C Bonds are outstanding, the Institution shall follow the recommendations of the Marketing Consultant applicable to it to the extent deemed feasible by its Governing Board and permitted by law. So long as the Institution retains a Marketing Consultant and the Institution follows such Marketing Consultant's recommendations to the extent feasible and permitted by law, this **Section 5.11** shall be deemed to be complied with even if the Institution's occupancy levels for any subsequent quarter is below the requirements of **Section 5.11(b)** and/or 5.11(c).

### Section 5.12.   *Covenant Concerning Entrance Fees*

Notwithstanding anything to the contrary contained herein or in any of the Financing Documents, so long as the Series 2021 Bonds are Outstanding, the Institution shall not, without consent of a majority of the Owners of the Series 2021 Bonds, reduce the amount of any Entrance Fees or offer any new discounts to Entrance Fee pricing which reduces the effective amounts of current gross Entrance Fees received by greater than 5% in the aggregate from the pricing schedule attached hereto as **Schedule 5.12**, to be tested quarterly on a rolling 12-month basis beginning with the Fiscal Quarter ending December 31, 2022; provided, however, that any breach of the covenant set forth in this **Section 5.12** shall not be an event of default unless declared by the owners of at least **50%** in principal amount of the Bonds Outstanding.

### Section 5.13.    *Operating Fund*

The Institution will establish or designate a bank account under the control of the Institution or the Manager, on behalf of the Institution, to fund operating expenses of the Facilities and designated as the "Operating Fund" under the Bond Indenture. The Institution shall provide to the Bond Trustee instructions on transferring amounts to the Operating Fund in accordance with **Sections 407(b) and 408(b)(i)** of the Bond Indenture.

### Section 5.14.    *Application of Excess Cash*

The Institution will apply, at the Institution's discretion, any Excess Cash received pursuant to **Section 408(b)(viii)(b)** of the Bond Indenture solely on: (i) expenses directly related to the operation, management, maintenance or improvement of the Facilities; (ii) expenses for repair, improvement and/or replacement of the Facilities; (iii) the refund of Entrance Fees; (iii) other operating expenses, including budgeted capital expenses after funds in the Series 2021C Repair and Replacement Project Fund have been fully disbursed or capital expenses that are not reflected on the schedule associated with the Series 2021C Repair and Replacement Project Fund and costs and expenses for the refurbishment of Independent Living Units as is necessary for occupancy or reoccupancy of the Independent Living Units; (iv) payments of Indebtedness permitted under this Loan Agreement, the Master Indenture, the Supplemental Master Indenture No. 1, the Bond Indenture or any Supplemental Loan Agreement or Supplemental Bond Indenture, including scheduled debt service on or redemption of the Series 2021 Bonds; (v) costs and expenses related to the fulfilment of the Institution's charitable purposes, including the cost and expense of providing charitable care and community benefits to residents who are no long able to pay these costs; and/or (vi) costs and expenses related to the maintenance of the Institution's non-profit status.

## ARTICLE VI

## PERMITTED INDEBTEDNESS

### Section 6.1.    *Permitted Indebtedness.*

The Institution may issue or incur additional Indebtedness for any proper corporate purpose if the conditions set forth in the Master Indenture are met.  Notwithstanding anything to the contrary, no additional Indebtedness shall be issued or incurred if an event of default under this Loan Agreement, or any event which upon notice or the expiration of any applicable grace period, has occurred and is continuing, unless such default shall be cured upon the issuance or incurrence of such additional Indebtedness.

## ARTICLE VII

## DEFAULT AND REMEDIES

### Section 7.1.    *Events of Default.*

The term *"event of default"*, wherever used in this Loan Agreement, means any one of the following events (whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     default in the payment of any interest on the Loan when such interest becomes due and payable;

(b)     default in the payment of the principal of (or premium, if any, on) the Loan when the same becomes due and payable (whether at maturity, upon proceedings for redemption, by acceleration or otherwise);

(c)     default in the performance, or breach, of any covenant or agreement of the Institution in this Loan Agreement (other than a covenant or agreement a default in the performance or breach of which is specifically dealt with elsewhere in this Section), and continuance of such default or breach for a period of **60** days after there has been given to the Institution by the Authority or the Bond Trustee or to the Institution and the Bond Trustee by the owners of at least **50%** in principal amount of the Bonds Outstanding, a written notice specifying such default or breach and requiring it to be remedied; provided, that if such default cannot be fully remedied within such **60**-day period, but can reasonably be expected to be fully remedied, such default shall not constitute an event of default if the Institution shall promptly upon receipt of such notice commence the curing of such default and shall thereafter prosecute and complete the same with due diligence and dispatch;

(d)     any representation or warranty made by the Institution in this Loan Agreement or in any written statement or certificate furnished to the Authority or the Bond Trustee or the purchaser of any Bond in connection with the sale of any Bond or furnished by the Institution pursuant to this Loan Agreement proves untrue in any material respect as of the date of the issuance or making thereof and shall not be corrected or brought into compliance within **60** days after there has been given to the Institution by the Authority or the Bond Trustee or to the Institution and the Bond Trustee by the owners of at least **50%** in principal amount of the Bonds Outstanding, a written notice specifying such default or breach and requiring it to be remedied; provided, that if such default cannot be fully remedied within such **60**-day period, but can reasonably be expected to be fully remedied, such default shall not constitute an event of default if the Institution shall promptly upon receipt of such notice commence the curing of such default and shall thereafter prosecute and complete the same with due diligence and dispatch;

(e)     the entry of a decree or order by a court having jurisdiction in the premises for relief in respect of the Institution, or adjudging the Institution or a Member of the Obligated Group a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, adjustment or composition of or in respect of the Institution or a Member of the Obligated Group under the United States Bankruptcy Code or any other applicable federal or state law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of or for the Institution or a Member of the Obligated Group or any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order remains unstayed and in effect for a period of **90** consecutive days;

(f)     the commencement by the Institution or a Member of the Obligated Group of a voluntary case, or the institution by the Institution or a Member of the Obligated Group of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer

or consent seeking reorganization, arrangement or relief under the United States Bankruptcy Code or any other applicable federal or state law, or the consent or acquiescence by it to the filing of any such petition or the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Institution or a Member of the Obligated Group or any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability or its failure to pay its debts generally as they become due, or the taking of corporate action by the Institution or a Member of the Obligated Group in furtherance of any such action;

(g)     upon declaration of an "event of default" of the owners of at least **50%** in principal amount of the Bonds Outstanding upon failure of the Institution to comply with **Section 5.12** of this Loan Agreement; or

(h)     the occurrence and continuance of any "event of default" specified in the Bond Indenture, or in the Master Indenture that has not been waived or cured.

Promptly after the Institution has knowledge of a default hereunder, the Institution will deliver to the Bond Trustee a written notice specifying the nature and period of existence thereof and the action the Institution is taking and proposes to take with respect thereto.

### Section 7.2.     *Acceleration of Maturity; Rescission and Annulment.*

If an event of default under this Loan Agreement occurs and is continuing, the Bond Trustee, as assignee of the Authority, may, and if requested by the owners of not less than **50%** in principal amount of the Bonds Outstanding shall (a) by written notice to the Institution and the Authority, declare the principal of the Loan and the interest accrued thereon to be due and payable, and upon any such declaration such principal and interest shall become immediately due and payable, or (b) by written notice to the Master Trustee, request that the Master Trustee declare the principal of the Series 2021 Master Obligations (if not then due and payable) to be due and payable immediately subject to the provisions of **Section 4.02** of the Master Indenture regarding waiver of events of default, anything in the Master Indenture or in this Loan Agreement contained to the contrary notwithstanding.

At any time after such a declaration of acceleration has been made, but before any judgment or decree for payment of money due on the Loan has been obtained by the Bond Trustee as hereinafter in this Article provided, the Bond Trustee may, by written notice to the Institution, rescind and annul such declaration and its consequences if:

(a)     the Institution has deposited with the Bond Trustee a sum sufficient to pay (1) all overdue installments of interest on the Loan, (2) the principal of (and premium, if any, on) the Loan which have become due otherwise than by such declaration of acceleration and interest thereon at the rate or rates prescribed therefor, and (3) all sums paid or advanced by the Bond Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Bond Trustee, its agents and counsel; and

(b)     all events of default, other than the non-payment of the principal installments of the Loan which have become due solely by such declaration of acceleration, have been cured or have been waived as provided in **Section 7.7** of this Loan Agreement.

No such rescission and annulment shall affect any subsequent default or impair any right consequent thereon.

### Section 7.3. Exercise of Remedies by the Bond Trustee.

Upon the occurrence and continuance of any event of default under this Loan Agreement and the Bond Indenture, unless the same is waived as provided in this Loan Agreement, the Bond Trustee, as assignee of the Authority, shall have the following rights and remedies, in addition to any other rights and remedies provided under this Loan Agreement or by law:

(a)     *Right to Bring Suit, Etc.* The Bond Trustee may pursue any available remedy at law or in equity by suit, action, mandamus or other proceeding to enforce the payment of the principal of, premium, if any, and interest on the Loan, including interest on overdue principal (and premium, if any) and on overdue installments of interest, and any other sums due under this Loan Agreement, to realize on or to foreclose any of its interests or liens under this Loan Agreement, to enforce and compel the performance of the duties and obligations of the Institution as set forth in this Loan Agreement and to enforce or preserve any other rights or interests of the Bond Trustee under this Loan Agreement existing at law or in equity.

(b)     *Exercise of Remedies at Direction of Bondowners.* If requested in writing to do so by the owners of not less than **50%** in principal amount of Bonds Outstanding and if indemnified as provided in the Bond Indenture, the Bond Trustee shall be obligated to exercise such one or more of the rights and remedies conferred by this Article as the Bond Trustee shall deem most expedient in the interests of the bondowners.

(c)     *Restoration of Positions.* If the Bond Trustee has instituted any proceeding to enforce any right or remedy under this Loan Agreement by suit, foreclosure, the appointment of a receiver, or otherwise, and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Bond Trustee, then and in every case the Authority, the Institution, the Bond Trustee and the bondowners shall, subject to any determination in such proceeding, be restored to their former positions and rights hereunder, and thereafter all rights and remedies of the Bond Trustee shall continue as though no such proceeding had been instituted.

### Section 7.4. Application of Moneys Collected.

Any moneys collected by the Bond Trustee pursuant to this Article (after the deductions for payment of costs and expenses of proceedings resulting in the collection of such moneys) together with any other sums then held by the Bond Trustee as part of the Trust Estate, shall be applied as provided in the Bond Indenture and, in case of the distribution of such money on account of principal (or premium, if any) or interest on the Bonds, shall be credited against amounts due on the Loan.

### Section 7.5. Rights and Remedies Cumulative.

No right or remedy herein conferred upon or reserved to the Bond Trustee is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at

law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

### Section 7.6.      *Delay or Omission Not Waiver.*

No delay or omission of the Bond Trustee to exercise any right or remedy accruing upon an event of default shall impair any such right or remedy or constitute a waiver of any such event of default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Bond Trustee or to the bondowners may be exercised from time to time and as often as may be deemed expedient by the Bond Trustee.

### Section 7.7.      *Waiver of Past Defaults.*

Before any judgment or decree for payment of money due has been obtained by the Bond Trustee as provided in this Article, the owners of a majority in principal amount of the Bonds Outstanding may, by written notice delivered to the Bond Trustee and the Institution, on behalf of the owners of all the Bonds waive any past default hereunder and its consequences, except a default (a) in the payment of the principal of (or premium, if any) or interest on any Bond, or (b) in respect of a covenant or provision hereof which under **Article VIII** of this Loan Agreement cannot be modified or amended without the consent of the owner of each Outstanding Bond affected.

Upon any such waiver, such default shall cease to exist, and any event of default arising therefrom shall be deemed to have been cured, for every purpose of this Loan Agreement; but no such waiver shall extend to or affect any subsequent or other default or impair any right or remedy consequent thereon.

### Section 7.8.      *Advances by Bond Trustee.*

If the Institution fails to make any payment or perform any of its covenants in this Loan Agreement, the Bond Trustee may, at any time and from time to time, use and apply any moneys held by it under the Bond Indenture, or make advances, to effect payment or performance of any such covenant on behalf of the Institution.  All moneys so used or advanced by the Bond Trustee, together with interest at the Bond Trustee's announced prime rate per annum, shall be repaid by the Institution upon demand and such advances shall be secured under the Bond Indenture prior to the Bonds.  For the repayment of all such advances the Bond Trustee shall have the right to use and apply any moneys at any time held by it under the Bond Indenture but no such use of moneys or advance shall relieve the Institution from any default hereunder.

## ARTICLE VIII

## SUPPLEMENTAL LOAN AGREEMENTS

### Section 8.1.      *Supplemental Loan Agreements without Consent of Bondowners.*

Without the consent of the owners of any Bonds, the Authority and the Institution may from time to time enter into one or more Supplemental Loan Agreements, for any of the following purposes:

(a)      to correct or amplify the description of any property of the Institution at any time subject to this Loan Agreement, or to subject to this Loan Agreement additional property or to

more precisely identify any project financed or refinanced out of the proceeds of any Bonds, or to substitute or add additional property thereto;

(b)    to add to the conditions, limitations and restrictions on the authorized amount, terms or purposes of the Loan, as herein set forth, additional conditions, limitations and restrictions thereafter to be observed;

(c)    to evidence the succession of another corporation to the Institution and the assumption by any such successor of the covenants of the Institution herein contained;

(d)    to add to the covenants of the Institution or to the rights, powers and remedies of the Bond Trustee for the benefit of the owners of all Bonds or to surrender any right or power herein conferred upon the Institution; or

(e)    to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein or to make any other changes with respect to matters or questions arising under this Loan Agreement, provided such action shall not materially adversely affect the interests of the owners of the Bonds.

### Section 8.2.    *Supplemental Loan Agreements with Consent of Bondowners.*

With the written consent of the owners of not less than a majority in principal amount of the Bonds then Outstanding affected by such Supplemental Loan Agreement, the Authority and the Institution may enter into Supplemental Loan Agreements, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Loan Agreement or of modifying in any manner the rights of the Bond Trustee and the owners of the Bonds under this Loan Agreement; provided, however, that no such Supplemental Loan Agreement shall, without the written consent of the owner of each Outstanding Bond affected thereby, carry out any of the following:

(a)    change the stated maturity of, or any installment of interest on, the Loan, or reduce the principal amount thereof or the interest thereon or any premium payable upon the redemption thereof, or change any place of payment where, or the coin or currency in which, the Loan, or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the redemption date);

(b)    reduce the percentage in principal amount of the Outstanding Bonds, the consent of whose owners is required for any such Supplemental Loan Agreement, or the consent of whose owners is required for any waiver provided for in this Loan Agreement of compliance with certain provisions of this Loan Agreement or certain defaults hereunder and their consequences; or

(c)    modify any of the provisions of this Section or **Section 7.7** of this Loan Agreement, except to increase any percentage provided thereby or to provide that certain other provisions of this Loan Agreement cannot be modified or waived without the consent of the owner of each Bond affected thereby.

It shall not be necessary for the required percentage of owners of Bonds under this Section to approve the particular form of any proposed Supplemental Loan Agreement, but it shall be sufficient if such act shall approve the substance thereof.

### Section 8.3.    Execution of Supplemental Loan Agreements.

In executing or consenting to any Supplemental Loan Agreement permitted by this Article, the Authority and the Bond Trustee shall receive, and shall be fully protected in relying upon, an Opinion of Bond Counsel addressed to the Bond Trustee and the Authority stating that the execution of such Supplemental Loan Agreement is authorized or permitted by this Loan Agreement, and that the execution and delivery thereof will not adversely affect the exclusion from federal gross income of interest on the Bonds.  The Bond Trustee may, but shall not be obligated to, consent to any such Supplemental Loan Agreement which affects the Bond Trustee's own rights, duties or immunities under this Loan Agreement or otherwise.

### Section 8.4.    Effect of Supplemental Loan Agreements.

Upon the execution of any Supplemental Loan Agreement under this Article, this Loan Agreement shall be modified in accordance therewith and such Supplemental Loan Agreement shall form a part of this Loan Agreement for all purposes; and the Institution, the Authority, the Bond Trustee and every owner of Bonds theretofore or thereafter authenticated and delivered under the Bond Indenture shall be bound thereby.

### Section 8.5.    Reference in Bonds to Supplemental Loan Agreements.

Bonds authenticated and delivered after the execution of any Supplemental Loan Agreement pursuant to this Article may bear a notation in form approved by the Bond Trustee as to any matter provided for in such Supplemental Loan Agreement.  New Bonds so modified as to conform to any such Supplemental Loan Agreement may be prepared and executed by the Authority and authenticated and delivered by the Bond Trustee in exchange for Outstanding Bonds.

## ARTICLE IX

## TERM AND TERMINATION OF LOAN AGREEMENT

### Section 9.1.    Term of Loan Agreement.

This Loan Agreement shall be effective concurrently with the initial issuance and delivery of the Bonds and shall continue in force and effect until the principal of, redemption premium, if any, and interest on all of the Bonds have been fully paid (or provision for their payment shall have been made in accordance with the Bond Indenture) together with all sums to which the Authority and the Bond Trustee are entitled from the Institution under this Loan Agreement; provided, however, the provisions of **Sections 4.3(f)** and **5.5** of this Loan Agreement related to indemnification of the Authority and the Bond Trustee shall remain in full force and effect.

**Section 9.2.      Termination and Discharge of Loan Agreement.**

If the Institution shall pay and discharge or provide for the payment or redemption and discharge of the whole amount of the principal of, redemption premium, if any and interest on the Bonds at the time Outstanding as provided in the Bond Indenture, and shall pay or cause to be paid all other sums payable under this Loan Agreement, then all right, title and interest of the Authority and the Bond Trustee under this Loan Agreement shall thereupon cease, terminate and become void (except as provided in **Section 9.1** of this Loan Agreement), then this Loan Agreement, and the covenants of the Institution contained in this Loan Agreement, shall be discharged and the Loan and the Bonds shall cease to be entitled to any benefit under this Loan Agreement, and all covenants, agreements and obligations of the Institution to the Bond Trustee and the owners of the Bonds shall thereupon cease, terminate and become void; provided that the owners of the related series of Bonds shall be entitled to payment thereof at the times and in the manner stipulated therein and in the Bond Indenture from the sources provided for such payment.

# ARTICLE X

## MISCELLANEOUS PROVISIONS

**Section 10.1.      Further Assurances.**

The Institution will do, execute, acknowledge and deliver such further acts, instruments, financing statements and assurances as the Bond Trustee may reasonably require for accomplishing the purposes of the Bond Indenture and this Loan Agreement.

**Section 10.2.      Payments Due on Saturdays, Sundays and Holidays.**

If the day for any payment due under this Loan Agreement is not a Business Day, then such payment may be made on the next succeeding Business Day without additional interest and with the same force and effect as if made on the specified date for payment.

**Section 10.3.      Notices.**

It shall be sufficient service of any notice, request, complaint, demand or other paper required by this Loan Agreement to be given to or filed with the Authority, the Bond Trustee, the Institution or the owners of the Bonds if the same is given or filed in the manner and at the addresses specified in the Bond Indenture.

**Section 10.4.      Limitation of Authority's Liability.**

No agreements or provisions contained herein nor any agreement, covenant or undertaking of the Authority contained in any Financing Document executed by the Authority in connection with the issuance, sale and delivery of the Bonds shall give rise to any pecuniary liability of the Authority or a general obligation of or a charge against its general credit or shall obligate the Authority financially in any way, except with respect to the funds available hereunder or under the Bond Indenture and pledged to the payment of the Bonds, and their application as provided under the Bond Indenture.  The Authority has no taxing power.  No failure of the Authority to comply with any term, covenant or agreement herein or in any Financing Document executed by the Authority in connection with the Bonds shall subject the Authority to any pecuniary charge or liability except to the extent that the same can be paid or recovered from the funds

-24-

available hereunder or under the Bond Indenture and pledged to the payment of the Bonds.  Nothing herein shall preclude a proper party in interest from seeking and obtaining, to the extent permitted by law, specific performance against the Authority for any failure to comply with any term, condition, covenant or agreement herein or in the Bond Indenture; provided, that no costs, expenses or other monetary relief shall be recoverable from the Authority except as may be payable from the funds available hereunder or under the Bond Indenture and pledged to the payment of the Bonds.

Notwithstanding any other provision of this Loan Agreement or any other Financing Document, (a) the Authority shall not be required to take action under this Loan Agreement unless the Authority (i) is requested in writing by an appropriate Person to take such action and (ii) is assured of payment of or reimbursement for any expense incurred in taking such action, and (b) except with respect to any action for specific performance or any action in the nature of a prohibitory or mandatory injunction, neither the Authority nor any official, officer, member, director, agent, employee or servant of the Authority shall be liable to the Institution, the Bond Trustee or any other Person for any action taken by the Authority or by its officials, officers, members, directors, agents, employees or servants, or for any failure to take action under this Loan Agreement or the Bond Indenture.  In acting under this Loan Agreement, or in refraining from acting under this Loan Agreement, the Authority may conclusively rely on the advice of its counsel.

**Section 10.5.    *Immunity of Officers, Employees and Directors of the Authority and the Institution.***

No recourse shall be had for the payment of the principal of or premium or interest on any of the Loan or for any claim based thereon or upon any representation, obligation, covenant or agreement in this Loan Agreement contained against any past, present or future officer, member, trustee, director, employee or agent of the Authority or the Institution, or, respectively, of any successor public or private corporation thereto, as such, either directly or through the Authority, the Institution, or respectively, any successor public or private corporation thereto, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officers, members, trustees, directors, employees or agents as such is hereby expressly waived and released as a condition of and consideration for the execution of this Loan Agreement.

**Section 10.6.    *No Violations of Law.***

Any other term or provision in this Loan Agreement to the contrary notwithstanding (a) in no event shall this Loan Agreement be construed as (1) depriving the Authority of any right or privilege, or (2) requiring the Authority or any member, agent, employee, representative or advisor of the Authority to take or omit to take, or to permit or suffer the taking of, any action by itself or by anyone else, which deprivation or requirement would violate, or result in the Authority's being in violation of the Act or any other applicable state or federal law, and (b) at no time and in no event will the Institution permit, suffer or allow any of the proceeds of the Loan to be transferred to any Person in violation of, or to be used in any manner which is prohibited by, the Act or any other state or federal law.

**Section 10.7.    *Bond Indenture Provisions.***

The Bond Indenture provisions concerning the Bonds and other matters therein are an integral part of the terms and conditions of the loan made by the Authority to the Institution pursuant to this Loan Agreement and the execution of this Loan Agreement shall constitute conclusive evidence of approval of the Bond Indenture by the Institution to the extent it relates to the Institution.  Additionally, the Institution agrees that, whenever the Bond Indenture by its terms imposes a duty or obligation upon the Institution,

such duty or obligation shall be binding upon the Institution to the same extent as if the Institution were an express party to the Bond Indenture, and the Institution hereby agrees to carry out and perform all of its obligations under the Bond Indenture as fully as if the Institution were a party to the Bond Indenture.

### Section 10.8.    Benefit of Loan Agreement.

This Loan Agreement shall inure to the benefit of and shall be binding upon the Authority, the Institution, the Bond Trustee and the owners of the Bonds and their respective successors and assigns. Nothing in this Loan Agreement or in the Bond Indenture or the Bonds, express or implied, shall give to any Person, other than such parties, any benefit or any legal or equitable right, remedy or claim under this Loan Agreement.

### Section 10.9.    Severability.

If any provision in this Loan Agreement, the Bond Indenture or the Bonds shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

### Section 10.10.   Counterparts.

This Loan Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

### Section 10.11.   Electronic Transactions.

The transaction described herein may be conducted and related documents may be sent, received or stored by electronic means.  Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

### Section 10.12.   Governing Law.

This Loan Agreement shall be governed by and construed in accordance with the laws of the State of Missouri.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF,** the Authority and the Institution have caused this Loan Agreement to be executed by their duly authorized officers, as of the day and year first above written.

**THE INDUSTRIAL DEVELOPMENT
AUTHORITY OF THE CITY OF
KANSAS CITY, MISSOURI**

By: _____
   Chairman

**KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**

By: _____

      Ross P. Marine
      Chair of the Board

## Schedule 5.12

## Schedule of Entrance Fees

2021 Entrance Fees

| | 90% Refundable<br>50% Refundable | Amortizing<br>0% Refundable |
|---|---|---|
| Embury Traditional* | 57,413 | 34,448 |
| Embury Classic* | 67,725 | 40,635 |
| Embury Deluxe* | 82,031 | 49,219 |
| Cartwright Classic* | 110,694 | 66,416 |
| Cartwright Deluxe* | 122,413 | 73,448 |
| Cartwright Custom Traditional* | 140,225 | 84,135 |
| Cartwright Custom Classic | 151,944 | 91,166 |
| Cartwright Custom Deluxe | 158,038 | 94,823 |
| Cartwright Contemporary | 165,000 | 99,000 |
| Cartwright Classic Royale | 165,069 | 99,041 |
| Cartwright Royale | 167,188 | 100,313 |
| Cartwright Expanded Royale | 171,875 | 103,125 |
| Cartwright Classic Imperial | 180,069 | 108,041 |
| Kirkham Traditional | 166,788 | 100,073 |
| Kirkham Expanded Traditional | 177,569 | 106,541 |
| Kirkham Classic Traditional | 192,569 | 115,541 |
| Kirkham Classic | 205,225 | 123,135 |
| Kirkham Classic Deluxe | 212,898 | 127,739 |
| Kirkham Royale | 237,100 | 142,260 |
| Kirkham Classic Royale | 320,763 | 192,458 |
| Strawbridge Suite | 376,563 | 225,938 |
| Cokesbury Suite | 380,000 | 228,000 |
| MacKendree Suite | 380,000 | 228,000 |
| Abingdon Villa | 345,000 | 207,000 |
| Baltimore Villa | 355,000 | 213,000 |
| Chatham Villa | 350,000 | 210,000 |
| Darlington Villa | 370,000 | 222,000 |
| Edenbridge Villa | 395,000 | 237,000 |

Note : Entrance Fees are projected to increase 3% annually
*Unit types marked with an * are eligible for a Rental Contract with no Entrance Fee.

**Draft August 17, 2021**

**MASTER TRUST INDENTURE**

**Among**

**KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC.**
**D/B/A KINGSWOOD SENIOR LIVING COMMUNITY,**
Obligated Group Member

**SUCH OTHER PERSONS**
**AS FROM TIME TO TIME**
**ARE OBLIGATED GROUP MEMBERS**

**and**

**UMB BANK, N.A.,**
**as Master Trustee**

**Dated as of November 15, 2021**

## TABLE OF CONTENTS

Parties .................................................................................................................... 1
Recitals.................................................................................................................... 1

## ARTICLE I

### DEFINITIONS AND OTHER PROVISIONS CONCERNING INTERPRETATION

Section 1.01.   Definitions ...................................................................................... 2
Section 1.02.   Interpretation................................................................................... 14

## ARTICLE II

### OBLIGATIONS, AUTHORIZATION, ISSUANCE AND TERMS OF OBLIGATIONS

Section 2.01.   Amount of Obligations .................................................................. 15
Section 2.02.   Form, Designation, Numbering and Registration of Obligations ................................... 15
Section 2.03.   Execution and Authentication of Obligations................................... 15
Section 2.04.   Supplement Creating Obligations ................................................... 16
Section 2.05.   Conditions to Issuance of Obligations Hereunder ........................... 16

## ARTICLE III

### PARTICULAR COVENANTS OF THE OBLIGATED GROUP

Section 3.01.   Nature of Obligations; Payment of Principal and Interest; Security; Further Assurances; Deposit of Gross Receipts.................................. 17
Section 3.02.   Covenants as to Corporate Existence, Maintenance of Properties, Etc. ........................... 18
Section 3.03.   Insurance ........................................................................................ 19
Section 3.04.   Insurance and Condemnation Proceeds ........................................... 21
Section 3.05.   Limitations on Creation of Liens .................................................... 21
Section 3.06.   Limitations on Incurrence of Indebtedness...................................... 23
Section 3.07.   Long-Term Debt Service Coverage Ratio ....................................... 25
Section 3.08.   Transfers of Property, Plant and Equipment; Transfers of Unrestricted Cash and Investments .................................................. 26
Section 3.09.   Consolidation, Merger, Sale or Conveyance ................................... 29
Section 3.10.   Financial Statements, Certificate of No Default and Other Information ........................ 30
Section 3.11.   Parties Becoming Obligated Group Members .................................. 32
Section 3.12.   Withdrawal from the Obligated Group ............................................ 33
Section 3.13.   After-Acquired, Replacement or Substituted Real Property............. 34
Section 3.14.   Liquidity Covenant ........................................................................ 35

## ARTICLE IV

### EVENTS OF DEFAULT AND REMEDIES

Section 4.01.   Events of Default ............................................................................ 36

Section 4.02.   Acceleration; Annulment of Acceleration ........................................................ 37
Section 4.03.   Additional Remedies and Enforcement of Remedies ...................................... 38
Section 4.04.   Application of Gross Receipts and Other Moneys after Default ...................... 39
Section 4.05.   Remedies Not Exclusive .................................................................................. 41
Section 4.06.   Remedies Vested in the Master Trustee ........................................................... 41
Section 4.07.   Holders' Control of Proceedings ...................................................................... 41
Section 4.08.   Termination of Proceeding ............................................................................... 41
Section 4.09.   Waiver of Event of Default ............................................................................... 42
Section 4.10.   Appointment of Receiver .................................................................................. 42
Section 4.11.   Remedies Subject to Provisions of Law ........................................................... 42
Section 4.12.   Notice of Default ............................................................................................... 43

# ARTICLE V

# THE MASTER TRUSTEE

Section 5.01.   Certain Duties and Responsibilities .................................................................. 43
Section 5.02.   Certain Rights of Master Trustee ...................................................................... 44
Section 5.03.   Right to Deal in Obligations and Related Bonds .............................................. 46
Section 5.04.   Removal and Resignation of the Master Trustee ............................................... 46
Section 5.05.   Compensation and Reimbursement .................................................................... 47
Section 5.06.   Recitals and Representations .............................................................................. 47
Section 5.07.   Separate or Co-Master Trustee .......................................................................... 48
Section 5.08.   Continuation of Financing Statements ............................................................... 49

# ARTICLE VI

# SUPPLEMENTS

Section 6.01.   Supplements Not Requiring Consent of Holders ............................................... 49
Section 6.02.   Supplements Requiring Consent of Holders ...................................................... 50
Section 6.03.   Execution and Effect of Supplements ................................................................ 51

# ARTICLE VII

# SATISFACTION AND DISCHARGE

Section 7.01.   Satisfaction and Discharge ................................................................................. 52
Section 7.02.   Payment of Obligations after Discharge of Lien ............................................... 52

# ARTICLE VIII

# CONCERNING THE HOLDERS

Section 8.01.   Evidence of Acts of Holders ............................................................................... 52
Section 8.02.   Obligations or Related Bonds Owned by Obligated Group Members ............... 53
Section 8.03.   Instruments Executed by Holders Bind Future Holders ..................................... 54

<div align="right"><u>Page</u></div>

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.01.    Amendments to the Deed of Trust .................................................................. 54
Section 9.02.    Limitation of Rights ............................................................................................ 54
Section 9.03.    Severability ........................................................................................................ 55
Section 9.04.    Holidays .............................................................................................................. 55
Section 9.05.    Governing Law .................................................................................................... 55
Section 9.06.    Counterparts; Electronic Transaction ............................................................. 55
Section 9.07.    Immunity of Individuals .................................................................................... 55
Section 9.08.    Binding Effect .................................................................................................... 55
Section 9.09.    Notices ................................................................................................................ 56
Section 9.10.    Consents and Approvals .................................................................................... 56
Section 9.11.    Appointment of Obligated Group Representative ......................................... 56

Appendix A       Permitted Exceptions

# MASTER TRUST INDENTURE

This **MASTER TRUST INDENTURE,** dated as of November 15, 2021 (the "Master Indenture"), by and among **KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. d/b/a Kingswood Senior Living Community,** a Missouri nonprofit corporation ("Kingswood"), all other Obligated Group Members (herein defined), and **UMB BANK, N.A.,** a national banking association duly incorporated and validly existing under the laws of the United States of America, having its principal corporate trust office in Kansas City, Missouri, as trustee (the "Master Trustee");

## RECITALS

1.      Kingswood is authorized by law, and deems it necessary and desirable, to enter into this Master Indenture for the purpose of providing for the incurrence of Indebtedness (as defined herein) and the issuance from time to time of Obligations (as defined herein) on behalf of Kingswood and the other Persons that may from time to time be members of the Obligated Group (each individually, an "Obligated Group Member," and collectively, the "Obligated Group Members" or the "Obligated Group") in furtherance of their respective and collective corporate purposes, to promote efficient and economical financing or refinancing of health care facilities and for other lawful and proper corporate purposes.

2.      All acts and things necessary to constitute this Master Indenture a valid indenture and agreement according to its terms having been done and performed, and Kingswood having duly authorized the execution and delivery of this Master Indenture in the exercise of the legal rights and powers vested in it, executes this Master Indenture and proposes to make, execute, issue and deliver Obligations hereunder.

3.      The Master Trustee agrees to accept and administer the trusts created hereby, subject to the terms hereof.

## GRANTING CLAUSES

To declare the terms and conditions upon which Obligations are to be authenticated, issued and delivered and to secure the payment of the Obligations and the performance and observance of all the covenants and conditions in this Master Indenture and the Obligations, and in consideration of the premises and of the purchase and acceptance of Obligations by the Holders thereof, Kingswood, and all other Persons that become Obligated Group Members, by these presents grant a security interest in, pledge, assign and transfer in trust to the Master Trustee, subject to Permitted Liens (herein defined), upon the terms set forth in this Master Indenture for the equal and proportionate benefit and security of all Holders of the Obligations without priority of any Obligation over any other Obligation, the following property (the "Trust Estate"):

(a)      all Gross Receipts of the Obligated Group Members;

(b)      all moneys and securities, if any, at any time held by the Master Trustee under the terms of this Master Indenture, including the Mortgaged Property and the Pledged Assets; and

(c)      any and all other real or personal property of every kind and nature from time to time by delivery or by writing of any kind conveyed, mortgaged, pledged, assigned or transferred, as and for additional security under this Master Indenture by the Obligated Group Members, or by anyone on their behalf and with their written consent, to the Master Trustee, which is authorized to receive any and all

such property at any and all times and to hold and apply the same subject to the terms of this Master Indenture.

**NOW, THEREFORE,** in consideration of the premises, of the acceptance by the Master Trustee of the trusts hereby created, and of the giving of consideration for and acceptance of Obligations issued hereunder by the Holders thereof, and for the purpose of fixing and declaring the terms and conditions upon which Obligations are to be issued, authenticated, delivered and accepted by all persons who shall from time to time be or become registered owners thereof, the Obligated Group Members covenant and agree with the Master Trustee, for the equal and proportionate benefit of the respective registered owners from time to time of Obligations issued hereunder, as follows:

# ARTICLE I

## DEFINITIONS AND OTHER PROVISIONS
## CONCERNING INTERPRETATION

**Section 1.01.    Definitions.**  For the purposes hereof unless the context otherwise indicates, the following words and phrases shall have the following meanings:

**"Accountant"** means an independent certified public accountant or a firm of independent certified public accountants that is a member of the American Institute of Certified Public Accountants (or its successor organization) and is licensed to practice in the State of Missouri.

**"Affiliate"** means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person through the ownership of not less than a majority of its voting securities (as defined in Section 2(a)(1) of the Securities Act of 1933, as amended) or the right to designate or elect not less than a majority of the members of its board of directors or other governing board or body by contract or otherwise.  "Affiliate" includes each Person who is an "affiliate" of an Obligated Group Member under generally accepted accounting principles.

**"Balloon Long-Term Indebtedness"** means Long-Term Indebtedness **25%** or more of the principal payments of which are due in a single year, which portion of the principal is not required by the documents pursuant to which such Indebtedness is incurred to be amortized by payment or redemption prior to such year.

**"Code"** means the Internal Revenue Code of 1986, as amended, and all regulations promulgated thereunder.

**"Corporate Charter"** means, with respect to any corporation, the articles of incorporation, certificate of incorporation, corporate charter or other organic document pursuant to which such corporation is organized and existing under the laws of the United States of America or any state thereof.

**"Corporate Trust Office"** means the office of the Master Trustee located in Kansas City, Missouri.

2

"**Days Cash on Hand**" means, as of the last day of the Fiscal year or the last date of the period for which such calculation is made, the number obtained by dividing (a) the amount of Unrestricted Cash and Investments of the Obligated Group as of that date by (b) the quotient resulting from dividing (1) the sum of Total Expenses of the Obligated Group for the most recent Fiscal Year for which Financial Statements are available plus the interest expense of the Obligated Group for that Fiscal Year by (2) **365;** provided, however, for purposes of any calculation of Days Cash On Hand required to be made on a monthly, quarterly or semi-annual basis the Total Expenses for the trailing 12 month period shall be used.

"**Deed of Trust**" means (i) the Kingswood Deed of Trust, and (ii) any other deed of trust, security agreement or mortgage substantially similar to the Kingswood Deed of Trust in form and substance or otherwise satisfactory to the Master Trustee executed by any Obligated Group Member as security for all Obligations issued under this Master Indenture, each as amended from time to time in accordance with its terms.

"**Deed of Trust Trustee**" means each trustee serving under a Deed of Trust.

"**Defeasance Obligations**" means (i) with respect to any Obligation that secures a series of Related Bonds, the obligations permitted to be used to defease such series of Related Bonds under the Related Bond Indenture, and (ii) with respect to any Obligation for which there are no Related Bonds, (A) noncallable Government Obligations, (B) evidences of ownership of a proportionate interest in specified noncallable Government Obligations, which Government Obligations are held by a bank or trust company organized and existing under the laws of the United States of America or any state thereof in the capacity of escrow agent, custodian or trustee, (C) Defeased Municipal Obligations and (D) evidences of ownership of a proportionate interest in specified Defeased Municipal Obligations, which Defeased Municipal Obligations are held by a bank or trust company organized and existing under the laws of the United States of America or any state thereof in the capacity of custodian, escrow agent or trustee.

"**Defeased Municipal Obligations**" means obligations of state or local government municipal bond issuers which are rated in the highest rating category by at least two Rating Agencies, provision for the payment of the principal of and interest on which shall have been made by deposit with a trustee or escrow agent of (i) noncallable Government Obligations, (ii) evidences of ownership of a proportionate interest in specified noncallable Government Obligations, which Government Obligations are held by a bank or trust company organized and existing under the laws of the United States of America or any state thereof in the capacity of custodian, escrow agent or trustee, (iii) cash or (iv) any combination of such noncallable Government Obligations, evidences of ownership and cash, which Government Obligations or evidences of ownership, together with any cash, are held by a bank or trust company organized and existing under the laws of the United States of America or any state thereof in the capacity of custodian, escrow agent or trustee, the maturing principal of and interest on such Government Obligations or evidences of ownership, when due and payable, being sufficient, together with any cash, to provide money to pay the principal of, premium, if any, and interest on such obligations of such state or local government municipal bond issuers.

"**Defeased Obligations**" means Obligations issued under a Supplement that has been discharged, or provision for the discharge of which has been made, pursuant to its terms.

"**Electronic Means**" means telecopy, telegraph, telex, internet, facsimile transmission or any other similar means of electronic communication.

"**EMMA**" means the Electronic Municipal Market Access system for municipal securities disclosures operated by the MSRB, which can be accessed at www.emma.msrb.org.

**"Entrance Fees"** means (a) fees, other than monthly rentals or monthly service charges, paid to an Obligated Group Member by residents of living units for the purpose of obtaining the right to reside in those living units, including any refundable resident deposits described in any lease or similar residency agreements with respect to those living units, but shall not include any such amounts held in escrow or otherwise set aside pursuant to the requirements of any such agreement prior to the occupancy of the living unit covered by such agreement (which amounts shall be included if and when occupancy occurs) and (b) all fees received pursuant to any agreement with respect to customized changes to any unit in Facilities that constitutes Mortgaged Property.

**"Equipment"** means those items constituting equipment as defined in the UCC used in connection with the Mortgaged Property, whether such equipment is now owned or hereafter acquired by any Obligated Group Member.

**"Event of Default"** means, with respect to this Master Indenture, any one or more of those events set forth in **Section 4.01**.

**"Facilities"** means the continuing care retirement facilities and health care delivery or residential facilities designed to provide services to the elderly and all facilities necessary for the operation of such facilities that are wholly-owned or leased pursuant to a capital lease by any Obligated Group Member and operated by or on behalf of any Obligated Group Member.

**"Financial Statements"** means consolidated financial statements of the Obligated Group and their Affiliates, if any, for a Fiscal Year, or for such other period for which an audit has been performed, prepared in accordance with generally accepted accounting principles consistently applied and including such statements as are necessary for a fair presentation of financial position, activities and changes in net assets and cash flows as of the end of such period, which have been audited and reported upon by an Accountant.  Financial Statements of any Obligated Group Member shall also include, in an additional information section, unaudited consolidating financial statements for the same Fiscal Year (or other period) from which the accounts of any Affiliate which is not an Obligated Group Member have been eliminated and to which the accounts of any Obligated Group Member which is not an Affiliate have been added by extracting the balances of such accounts from audited consolidated financial statements of such Obligated Group Member and its Affiliates, if any.

**"Fiscal Year"** means the fiscal year of each of the Obligated Group Members, which period commences on January 1 of each year and ends on the following December 31, unless the Master Trustee and each Related Bond Trustee is notified in writing by the Obligated Group Representative of a change in such period for all of the Obligated Group Members, in which case the Fiscal Year shall be the period set forth in such notice.

**"Fitch"** means Fitch Ratings, and its successors and assigns, or, if such firm shall be dissolved or liquidated or shall no longer perform the functions of a securities rating service, Fitch means any other nationally recognized securities rating service designated by the Obligated Group Representative with notice to the Master Trustee and each Related Bond Trustee.

**"Governing Body"** means, when used with respect to any Obligated Group Member, its board of directors, board of trustees or other board or group of individuals in which the powers of such Obligated Group Member are vested.

4

"**Government Obligations**" means direct obligations of, or obligations the timely payment of the principal of and interest on which is fully and unconditionally guaranteed by, the United States of America.

"**Gross Receipts**" means all rents, revenues, income, receipts, Entrance Fees and money (other than proceeds of borrowing and moneys received from residents that are held in escrow) received in any period by or on behalf of any Obligated Group Member, including (a) revenues derived from its operations, (b) gifts, grants, bequests, donations and contributions and the income therefrom, exclusive of any gifts, grants, bequests, donations and contributions to the extent specifically restricted by the donor to a particular purpose inconsistent with their use for the payment of Obligations, (c) proceeds derived from (i) insurance, except to the extent otherwise required by this Master Indenture to be used for a particular purpose inconsistent with their use for the payment of Obligations, (ii) accounts (as defined in the UCC), (iii) securities and other investments, (iv) inventory and other tangible and intangible Property, (v) medical or health care insurance, indemnity or reimbursement programs or agreements and (vi) contract rights and other rights and assets now or hereafter owned, held or possessed by each Obligated Group Member, and (d) rentals received from the leasing of real or tangible personal property.

"**Guaranty**" means any obligation of any Obligated Group Member guaranteeing in any manner, directly or indirectly, any obligation of any Person that is not an Obligated Group Member which obligation of such other Person would, if such obligation were the obligation of an Obligated Group Member, constitute Indebtedness hereunder.

"**Holder**" means the registered owner of any Obligation issued hereunder (or, in the case of an Obligation registered to a Related Bond Issuer and pledged and assigned to a Related Bond Trustee, such Related Bond Trustee).

"**Income Available for Debt Service**" means, with respect to the Obligated Group, as to any Fiscal Year or such other period for which such calculation is made, the increase (decrease) in net assets, to which shall be added (1) depreciation, amortization and interest and other non-cash expenses deducted from total revenues, all as determined in accordance with generally accepted accounting principles consistently applied, (2) Entrance Fees received (net of refunds), and (3) gifts, grants, bequests and donations actually received during that period of time not otherwise included in Income Available for Debt Service if not required to be excluded from Income Available for Debt Service by the remainder of this definition; and provided further that no determination thereof shall take into account:

(a)      any gain or loss resulting from either the extinguishment of Indebtedness or the sale, exchange or other disposition of capital assets not made in the ordinary course of business;

(b)      any nonrecurring items of an extraordinary nature which do not involve the receipt, expenditure or transfer of assets;

(c)      any unrealized gains or losses on investments, including any "other-than-temporary" impairment loss; provided that realized gains and losses on such investments shall be taken into account and, with respect to assets that suffer an other-than-temporary impairment loss, shall be determined using the basis for such asset without giving effect or any reduction in basis resulting from such other-than-temporary impairment loss; provided that the amount of such realized gains or losses taken into account shall not exceed the annual average of such realized gains or losses for the five most recent Fiscal Years for which Financial Statements are available;

5

(d)     any changes in temporarily and permanently restricted net assets, unless such restrictions allow for such assets to be used for the payment of Long-Term Indebtedness or operating expenses;

(e)     any increase or decrease in obligations to provide future services;

(f)     any losses incurred from development of additional facilities that the Governing Board of any Obligated Group Member later determines not to pursue;

(g)     any impairment charges;

(h)     investment income from any investment of funds held in a Qualified Escrow;

(i)     gifts, grants, bequests or donations restricted as to use by the donor or grantor for a purpose inconsistent with the payment of Debt Service or operating expenses; and

(j)     gifts, grants, bequests or donations pledged but not actually received during that period of time.

provided, however, any calculation of Income Available for Debt Service required to be made on a monthly, quarterly or semi-annual basis shall be calculated by using the trailing 12 month period.

**"Indebtedness"** means (i) all indebtedness of Obligated Group Members for borrowed money, (ii) all installment sales, conditional sales and capital lease obligations, incurred or assumed by any Obligated Group Member, and (iii) all Guaranties, whether constituting Long-Term Indebtedness or Short-Term Indebtedness.  Indebtedness shall not include obligations of any Obligated Group Member to another Obligated Group Member or obligations to refund Entrance Fees.

**"Insurance Consultant"** means a Person which is not, and no member, stockholder, director, officer or employee of which is, an officer or employee of any Obligated Group Member or an Affiliate, which is qualified to survey risks and to recommend insurance coverage for continuing care facilities and services and organizations engaged in such operations; provided; however, notwithstanding the foregoing, the Management Company or an Affiliate of Management Company may serve as the Institution's Insurance Consultant, unless otherwise expressly provided under this Master Indenture or other transaction documents.

**"Kingswood"** means Kansas City United Methodist Retirement Home, Inc. d/b/a Kingswood Senior Living Community, a nonprofit corporation duly incorporated and validly existing under and by virtue of the laws of the State of Missouri, and any successor or successors thereof.

**"Kingswood Deed of Trust"** means the Amended and Restated Deed of Trust and Security Agreement dated as of November 15, 2021, from Kingswood to the Deed of Trust Trustee thereunder, for the benefit of the Master Trustee, as security for all Obligations issued under this Master Indenture, as the same may be supplemented or amended from time to time.

**"Lien"** means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest arises by contract, statute or common law, including any mortgage, deed of trust or pledge of, security interest in or encumbrance on any Property which secures any Indebtedness or any other obligation of any Obligated Group Member or which secures any obligation of any Person.   The term "Lien" shall include any easements, covenants,

6

restrictions, conditions, encroachments, reservations, rights-of-way, leases and other title exceptions and encumbrances affecting real property.

"**Liquidity Testing Date**" has the meaning given such term in **Section 3.14(a)** hereof.

"**Long-Term Debt Service Coverage Ratio**" means, (i) for each Fiscal Year or such other period for which such calculation is made, the ratio determined by dividing the Income Available for Debt Service for such Fiscal Year or such other period for which such calculation is made (e.g., rolling four (4) quarter period for quarterly testing) by Maximum Annual Debt Service.

"**Long-Term Debt Service Requirement**" means, for each Fiscal Year or such other period for which such calculation is made, the aggregate of the payments to be made in respect of the principal of and interest on Outstanding Long-Term Indebtedness of the Obligated Group during such Fiscal Year, *provided* that interest shall be excluded from the determination of Long-Term Debt Service Requirement to the extent the same is provided from the proceeds of the Long-Term Indebtedness; *provided, further* that notwithstanding the foregoing, the aggregate of payments to be made with respect to principal of and interest on Outstanding Long-Term Indebtedness shall not include principal and interest payable from funds available (without reinvestment) in a Qualified Escrow (other than principal and interest so payable solely by reason of the Obligated Group's failure to make payments from other sources); and *provided, further* that the method for calculating the principal of and interest on any Outstanding Long-Term Indebtedness may be applied to a portion of the principal of such Indebtedness and in combination with any treatment afforded by any other provision of this definition; and provided further, for purposes of calculating Long-Term Debt Service Requirement, principal shall be based on stated principal amortization schedules included in the instruments for such Long-Term Indebtedness, without regard to tender or put rights, and Balloon Indebtedness may be assumed by the Obligated Group Members to be payable on a level annual debt service basis over 30 years from the date of issuance or incurrence of such Indebtedness based on the then current interest rate for such Indebtedness.  In calculating the Long-Term Debt Service Requirement and the Long-Term Debt Service Coverage Ratio for any purpose under this Master Indenture, (i) there shall be excluded from the calculation of Long-Term Debt Service Requirement the portion of debt service for the Indebtedness incurred for the Series 2021D Related Bonds and (ii) the Long-Term Debt Service Requirement for the Fiscal Year ending December 31, 2046 shall be deemed not to exceed $3,700,000.

"**Long-Term Indebtedness**" means all obligations for borrowed money incurred or assumed by any Obligated Group Member, including (a) Guaranties, (b) Short-Term Indebtedness if there exists a commitment by an institutional lender whose long-term, unsecured debt obligations are rated not less than "A" (without regard to any rating refinement or gradation by numerical modifier or otherwise) by at least two Rating Agencies to provide financing to retire such Short-Term Indebtedness and such commitment provides (i) terms and conditions that can be reasonably met by such Obligated Group Member to incur such Indebtedness, as certified in an Officer's Certificate filed with the Master Trustee, and (ii) for the repayment of principal on terms which would, if such commitment were implemented, constitute Long-Term Indebtedness, and (c) the current portion of Long-Term Indebtedness (this shall not be read to exclude any portion of Long-Term Indebtedness not constituting the current portion), for any of the following:

(i)      money borrowed for an original term, or renewable at the option of the borrower for a period from the date originally incurred, longer than one year;

(ii)     leases which are required to be capitalized in accordance with generally accepted accounting principles having an original term, or renewable at the option of the lessee for a period from the date originally incurred, longer than one year; and

(iii)     installment sale or conditional sale contracts having an original term in excess of one year;

*provided* that any Guaranty by any Obligated Group Member of any obligation of any Person which obligation would, if it were a direct obligation of such Obligated Group Member, constitute Short-Term Indebtedness (other than Short-Term Indebtedness described in subparagraph (b) of this definition) shall be excluded; and

*provided further* that Long-Term Indebtedness shall not include obligations that do not constitute Indebtedness (as defined herein) and shall not include obligations of any Obligated Group Member to another Obligated Group Member or obligations to refund Entrance Fees.

**"Management Company"** means any management company engaged by the Institution to manage the facilities and business owned and/or operated by the Institution, which Management Company is currently GMSC Missouri, LLC, a Missouri limited liability company.

**"Management Consultant"** has the meaning set forth in the Related Bond Indenture;

**"Marketing Consultant"** has the meaning set forth in the Related Bond Indenture;

**"Master Indenture"** means this Master Trust dated as of November 15, 2021, among Kingswood, such other persons as from time to time are Obligated Group Members and the Master Trustee, including all Supplements.

**"Master Trustee"** means UMB Bank, N.A., Kansas City, Missouri, and its successors serving as trustee of the trusts created hereunder.

**"Maximum Annual Debt Service"** means the highest Long-Term Debt Service Requirement for the current or any succeeding Fiscal Year (or such other current or succeeding period for which such calculation is made); *provided, however*, in calculating the Long-Term Debt Service Requirement the principal component of Long-Term Indebtedness shall be excluded to the extent such principal payment is the last maturing installment of principal of such Long-Term Indebtedness and is reasonably expected to be paid from the proceeds of moneys available in a debt service reserve fund and such debt service reserve fund is fully-funded; *provided, further, however*, any calculation of Maximum Annual Debt Service required to be made on a monthly, quarterly or semi-annual basis shall be calculated by using the trailing 12 month period.

**"Moody's"** means Moody's Investors Service, Inc., and its successors and assigns, or, if such firm shall be dissolved or liquidated or shall no longer perform the functions of a securities rating service, Moody's means any other nationally recognized securities rating service designated by the Obligated Group Representative with notice to the Master Trustee and each Related Bond Trustee.

**"Mortgaged Property"** means the real property, fixtures and personal property described in the Deed of Trust.

8

**"Net Book Value"** means, when used in connection with Property, Plant and Equipment or other Property of any Person, the value of such Property, Plant and Equipment or other Property, net of accumulated depreciation, as it is carried on the books of such Person in conformity with generally accepted accounting principles consistently applied, and when used in connection with Property, Plant and Equipment or other Property of the Obligated Group, means the aggregate of the values so determined with respect to such Property, Plant and Equipment or other Property of the Obligated Group determined in such a manner that no portion of such value of Property, Plant and Equipment or other Property is included more than once.

**"Non-Recourse Indebtedness"** means any Indebtedness to finance the purchase, acquisition or construction of Property, Plant and Equipment, the payment of which is limited to and secured by a Lien on such Property, Plant and Equipment with no recourse, directly or indirectly, to any other Property of any Obligated Group Member.

**"Obligated Group"** means, collectively, the Obligated Group Members.

**"Obligated Group Member"** means, initially, Kingswood and, thereafter, any Person which shall become an Obligated Group Member in accordance with **Section 3.11** and not including any Person which shall have withdrawn from the Obligated Group in accordance with **Section 3.12**.

**"Obligated Group Representative"** means initially, Kingswood, acting by and through the chairman of the Governing Body of Kingswood or the Executive Director of Kingswood, or any other Person at the time designated to act on behalf of the Obligated Group in a written certificate furnished to the Master Trustee, which certificate shall contain a specimen signature of such Person and shall be signed on behalf of the Obligated Group by the chairman of the Governing Body or Executive Director of each Obligated Group Member or such person's designee and which certificate may designate one or more alternates.

**"Obligations"** means the joint and several obligations of the Obligated Group Members issued from time to time under **Article II** and a Supplement to evidence or secure Indebtedness or other obligations incurred or to be incurred by one or more Obligated Group Members.

**"Obligation Register"** has the meaning given such term in **Section 2.02**.

**"Officer's Certificate"** means a certificate signed by (i) the chairman of the Governing Body, or the president or executive director, or the chief financial officer, or the chairman of the finance committee of the Governing Body of each Obligated Group Member or (ii) the Obligated Group Representative. Each Officer's Certificate presented under this Master Indenture shall state that it is being delivered pursuant to (and shall identify the section or subsection of) this Master Indenture and shall incorporate by reference and use in all appropriate instances all terms defined in **Section 1.01**. Each Officer's Certificate shall state (i) that the terms thereof are in compliance with the requirements of the section or subsection pursuant to which such Officer's Certificate is delivered, or shall state in reasonable detail the nature of any non-compliance and the steps being taken to remedy such non-compliance, and (ii) that it is being delivered together with any opinions, schedules, statements or other documents required in connection therewith.

**"Opinion of Bond Counsel"** means an opinion in writing signed by Gilmore & Bell, P.C. or another attorney or firm of attorneys acceptable to the Master Trustee and experienced in the field of municipal bonds whose opinions are generally accepted by purchasers of municipal bonds.

"**Opinion of Counsel**" means an opinion in writing signed by an attorney or firm of attorneys acceptable to the Master Trustee, who may be counsel for the Authority, the Master Trustee, a Related Bond Trustee or any Obligated Group Member or other counsel acceptable to the Master Trustee.

"**Outstanding,**" when used with reference to Indebtedness, means, as of any date of determination, all Indebtedness theretofore issued or incurred and not paid and discharged other than (i) Obligations theretofore cancelled by the Master Trustee or delivered to the Master Trustee for cancellation, (ii) Indebtedness deemed paid and no longer Outstanding under the documents pursuant to which such Indebtedness was incurred, and (iii) Obligations in lieu of which other Obligations have been authenticated and delivered or have been paid pursuant to the Supplement regarding mutilated, destroyed, lost or stolen Obligations unless proof satisfactory to the Master Trustee has been received that any such Obligation is held by a bona fide purchaser.

"**Permitted Liens**" means those Liens described in **Section 3.05(b)**.

"**Person**" means an individual, association, unincorporated organization, corporation, limited liability company, partnership, joint venture, business trust or a government or an agency or a political subdivision thereof, or any other entity.

"**Pledged Assets**" means all accounts, Equipment, Software, general intangibles, inventory, documents, instruments, chattel paper, deposit accounts, commercial tort claims, letter of credit rights and investment property of each Obligated Group Member, now owned or hereafter acquired, and all proceeds thereof, excluding, however, pledges, gifts, grants, bequests, donations and contributions to any Obligated Group Member that are specifically restricted by the donor, testator or grantor to a particular purpose that is inconsistent with their use for payments required under this Master Indenture or on the Obligations, and, if also so restricted, the income and gains derived therefrom. All terms used in this definition are used with the meanings given such terms, if any, in the UCC.

"**Property**" means any and all rights, titles and interests in and to any and all property whether real or personal, tangible or intangible and wherever situated, including, without limitation, all cash, cash equivalents and investments.

"**Property, Plant and Equipment**" means all Property of the Obligated Group Members which is property, plant and equipment under generally accepted accounting principles.

"**Put Indebtedness**" means Long-Term Indebtedness the principal of which is required, at the option of the owner thereof, to be purchased or redeemed at one time, which portion of the principal is not required by the documents pursuant to which such Indebtedness is issued to be amortized by redemption prior to that time.

"**Qualified Escrow**" means a segregated escrow fund or other similar fund or account which (a) is irrevocably established as security for Long-Term Indebtedness previously incurred and then Outstanding (herein referred to as "Prior Indebtedness") or for Long-Term Indebtedness, if any, then to be incurred to refund Outstanding Prior Indebtedness (herein referred to as "Refunding Indebtedness"), (b) is held by the holder of the Prior Indebtedness or Refunding Indebtedness secured thereby or by a trustee or agent acting on behalf of such holder and is subject to a perfected security interest in favor of such holder, trustee or agent, (c) is held in cash or invested in Obligations permitted to be used to defease such Prior Indebtedness or Refunding Indebtedness, and (d) is required by the documents establishing such fund or account to be applied toward the Obligated Group's payment obligations in respect of the Prior Indebtedness, provided that, if the fund or account is funded in whole or in part with the proceeds of

Refunding Indebtedness, the documents establishing the same may require specified payments of principal or interest (or both) in respect of the Refunding Indebtedness to be made from the fund or account prior to the date on which the Prior Indebtedness is repaid in full.

"**Rating Agency**" or "**Rating Agencies**" means Fitch, Moody's and/or S&P.

"**Related Bond Indenture**" means any indenture, bond resolution or other comparable instrument pursuant to which a series of Related Bonds is issued.

"**Related Bond Issuer**" means the issuer of any issue of Related Bonds.

"**Related Bond Trustee**" means the trustee and its successors in the trusts created under any Related Bond Indenture.

"**Related Bonds**" means (a) revenue bonds or similar obligations issued by any state, territory or possession of the United States or any municipal corporation or political subdivision formed under the laws thereof or any constituted authority or agency or instrumentality of any of the foregoing empowered to issue obligations on behalf thereof, and (b) any bonds issued by any other Person, in either case the proceeds of which are loaned or otherwise made available to an Obligated Group Member in consideration, whether in whole or part, of the execution, authentication and delivery of an Obligation to such governmental issuer or Person or in consideration of the execution and delivery of a Guaranty issued by an Obligated Group Member which Guaranty is represented by an Obligation.

"**Residency Agreement**" means an agreement entered into by an Obligated Group Member with respect to the granting rights to the exclusive use of any unit (or any bedroom in a shared or semi-private unit) in the Facilities, as the same may be amended from time to time.

"**Series 2021 Obligations**" means collectively the Series 2021A Obligation, the Series 2021B Obligation, the Series 2021C Obligation and the Series 2021D Obligation.

"**Series 2021 Related Bonds**" means, collectively, The Industrial Development Authority of the City of Kansas City, Missouri Senior Living Facilities Revenue Bonds (Kingswood Project) Series 2021A (Federally Taxable), The Industrial Development Authority of the City of Kansas City, Missouri Senior Living Facilities Revenue Bonds (Kingswood Project) Series 2021B, The Industrial Development Authority of the City of Kansas City, Missouri Senior Living Facilities Revenue Bonds (Kingswood Project) Series 2021C, and The Industrial Development Authority of the City of Kansas City, Missouri Senior Living Facilities Revenue Bonds (Kingswood Project) Series 2021D.

"**Series 2021A Obligation**" means the **Master Indenture Obligation No. 1 (Series 2021A Bonds)**, in the original principal amount of **$5,500,000**, including replacement obligations issued therefor.

"**Series 2021B Obligation**" means the **Master Indenture Obligation No. 2 (Series 2021B Bonds)**, in the original principal amount of **$27,000,000**, including replacement obligations issued therefor.

"**Series 2021C Obligation**" means the **Master Indenture Obligation No. 3 (Series 2021C Bonds)**, in the original principal amount of **$4,400,000**, including replacement obligations issued therefor.

11

"**Series 2021D Obligation**" means the **Master Indenture Obligation No. 4 (Series 2021D Bonds)**, in the original principal amount of **$12,050,000**, including replacement obligations issued therefor.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns, or, if such firm shall be dissolved or liquidated or shall no longer perform the functions of a securities rating service, S&P means any other nationally recognized securities rating service designated by the Obligated Group Representative with notice to the Master Trustee and each Related Bond Trustee.

"**Short-Term Indebtedness**" means all obligations, other than Non-Recourse Indebtedness, Subordinated Indebtedness and the current portion of Long-Term Indebtedness, incurred or assumed by one or more Obligated Group Members, for any of the following:

(i)      payments of principal and interest with respect to money borrowed for an original term, or renewable at the option of the borrower for a period from the date originally incurred, of one year or less;

(ii)     payments under leases which are capitalized in accordance with generally accepted accounting principles having an original term, or renewable at the option of the lessee for a period from the date originally incurred, of one year or less; and

(iii)    payments under installment purchase or conditional sale contracts having an original term of one year or less.

"**Software**" means those items constituting software as defined in the UCC used in connection with the Mortgaged Property, whether such software is now owned or hereafter acquired by any Obligated Group Member.

"**Subordinated Indebtedness**" means Indebtedness of an Obligated Group Member that by the terms thereof is specifically junior and subordinate to the Obligations with respect to payment of principal and interest thereon and that is evidenced by an instrument containing provisions substantially the same as those set forth in Section 3.06(h) of this Master Indenture.

"**Supplement**" means an indenture supplemental to, and authorized and executed pursuant to **Article VI**, which supplements or amends this Master Indenture.

"**Tax-Exempt Organization**" means a Person organized under the laws of the United States of America or any state thereof which is exempt from federal income taxes under Section 501(a) of the Code by virtue of being an organization described in Section 501(c)(3) of the Code, or corresponding provisions of federal income tax laws from time to time in effect.

"**Total Expenses**" means, for any period for which calculated, the total of all operating and non-operating expenses or losses of the Obligated Group during such period, as stated in the financial statements for such period, other than (a) depreciation, amortization (including but not limited to any amortization of Entrance Fees, deferred marketing expenses or original issue discount) and interest expense, (b) gains or losses resulting from the early extinguishment of debt, the sale or other disposition of assets not in the ordinary course of business or any reappraisal, revaluation or write-down of assets,

and any other extraordinary losses or expenses, (c) unrealized gains or losses (including those relating to hedging activities), (d) gains or losses associated with any refinancing, (e) any development, marketing, operating or other subordinated fees that have been deferred from the year in which they were originally due, and (f) any such expenses attributable to transactions between any Obligated Group Member and any other Obligated Group Member.

"**Total Revenues**" means, for any period for which calculated, the total revenues, gains and other support of the Obligated Group during such period, determined in accordance with generally accepted accounting principles, including (a) gross resident service revenues less contractual allowances, free care and discounted care, plus (b) other operating revenues, excluding amortization of deferred Entrance Fees, and less applicable allowances, plus (c) Entrance Fees received (net of refunds), plus (d) other non-operating revenues or gains, and excluding (1) income derived from Escrowed Obligations that are irrevocably deposited in escrow to pay the principal of or interest on Indebtedness or Related Bonds, (2) unrealized gains on investments, investment contracts or Interest Rate Agreements or changes in value of split interest gifts or adjustments of actuarial liabilities for annuity obligations, gains resulting from the early extinguishment of debt, the sale, exchange or other disposition of Property not in the ordinary course of business, or the reappraisal, reevaluation or write-up of assets, or any other extraordinary gains, (3) gifts, grants, bequests or donations restricted as to use by the donor or grantor for a purpose inconsistent with the payment of debt service on Indebtedness or operating expenses, (4) insurance (other than business interruption) and condemnation proceeds, (5) proceeds of borrowing, (6) payments or deposits under a Residency Agreement that by its terms or applicable law are required to be held in escrow or trust for the benefit of a resident until the conditions for the release of that payment or deposit have been satisfied, (7) all deposits and advance payments made in connection with Residency Agreements or leases respecting independent living units or other areas to be occupied by or leased to residents or tenants and received before receipt of any required occupancy certificates of those units or other areas, (8) payments or deposits under a Residency Agreement that by its terms or applicable law are required to be held in escrow or trust for the benefit of a resident until the conditions for the release of that payment or deposit have been satisfied, and (9) if the calculation is made with respect to the Obligated Group, any revenues attributable to transactions between any Member and any other Member. For purposes of any calculation made with reference to both Total Revenues and Total Expenses, any deduction or reduction from revenues otherwise required by the preceding provisions of this definition may not be made if and to the extent that the amount of such deduction is included in Total Expenses. For the purposes of calculations under this Master Indenture, an unrestricted contribution from an Affiliate shall be treated as being made during the period of the calculation so long as it is made prior to the date of certification.

"**Transfer**" means any act or occurrence the result of which is to dispossess any Person of any asset or interest therein, including specifically the forgiveness of any debt.

"**UCC**" means the Uniform Commercial Code of Missouri, or any successor statutes.

"**Unrestricted Cash and Investments**" means, as of the date of determination, the cash, cash equivalents, and marketable securities, and board designated or trustee held funds of the Obligated Group to the extent available for the payment of operating expenses and debt service on Indebtedness. The term "Unrestricted Cash and Investments" shall exclude the following items: (a) cash and investments held by a trustee or creditor in any debt service fund, debt service reserve fund, collateral account or similar account pledged to the payment of Indebtedness, but shall not exclude the proceeds of Long-Term Indebtedness; (b) any cash and investments required to be reserved by any Obligated Group Member under applicable state or federal regulations against such Obligated Group Member's obligation under Residency Agreements to provide nursing or other health care to residents; (c) cash and investments the

13

use of which is restricted by a donor or grantor to a particular use or purpose inconsistent with their use for the payment of Indebtedness; (d) any funds held by a self-insurance plan trustee, or any funds held by a trustee or other custodian for any pension plan or other employee benefit plan); (e) any loans or investments for which there is no established readily available market price, and (f) any other cash or investments not legally available for the payment of Indebtedness (or the purchase thereof) when due. The term "Unrestricted Cash and Investments" shall be reduced by the then Outstanding principal balance of any Short-Term Indebtedness or any other Indebtedness incurred to finance working capital.

**Section 1.02.    Interpretation.**

(a)    Any reference herein to any officer or member of the Governing Body of an Obligated Group Member shall include those Persons succeeding to their functions, duties or responsibilities pursuant to or by operation of law or who are lawfully performing their functions.

(b)    Unless the context otherwise indicates, words importing the singular shall include the plural and vice versa, and the use of the neuter, masculine, or feminine gender is for convenience only and shall be deemed to mean and include the neuter, masculine and feminine gender.

(c)    Where the character or amount of any asset, liability or item of income or expense is required to be determined or any consolidation, combination or other accounting computation is required to be made for the purposes hereof or of any agreement, document or certificate executed and delivered in connection with or pursuant to this Master Indenture, the same shall be done in accordance with generally accepted accounting principles consistently applied (except when such principles are inconsistent with the requirements of this Master Indenture), which "generally accepted accounting principles" shall be such principles in effect on the date of the determination, certification, computation or other action taken hereunder using or involving those principles.

(d)    Headings of articles and sections herein and in the table of contents hereof are solely for convenience of reference, do not constitute a part hereof and shall not affect the meaning, construction or effect hereof.  The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Master Indenture as a whole and not to any particular Article, Section or other subdivision. Reference herein to particular Articles, Sections or Appendices are references to Articles, Sections or Appendices of this Master Indenture unless some other reference is otherwise indicated.

(e)    Whenever an item or items are listed after the word "include" or "including," such listing is not intended to be a listing that excludes items not listed.

(f)    Any calculation required to be made or performed under this Master Indenture based on the financial statements of the Obligated Group that includes the financial results of an Affiliate of an Obligated Group Member who is not also an Obligated Group Member shall be made or performed based on the unaudited combining information of the Obligated Group without regard to the accounts of any such Affiliate by eliminating the balances of such accounts from audited combined or consolidated financial statements of such Obligated Group Member and its Affiliates, if any.

# ARTICLE II

## OBLIGATIONS, AUTHORIZATION, ISSUANCE

## AND TERMS OF OBLIGATIONS

**Section 2.01.    Amount of Obligations.**  Each Obligated Group Member may issue Obligations hereunder to evidence or secure Indebtedness or other obligations incurred or to be incurred by such Obligated Group Member. The number and principal amount of Obligations that may be created hereunder are not limited, except as limited by the provisions hereof, including **Section 3.06**, or of any Supplement.  Any Obligated Group Member proposing to incur Indebtedness to be evidenced and secured by an Obligation issued hereunder shall, at least **30** days prior to the date of the incurrence of such Indebtedness, give written notice of its intention to incur such Indebtedness and issue such Obligation, including in such notice the amount of Indebtedness to be incurred, to the other Obligated Group Members and to the Master Trustee.  The Master Trustee shall be under no obligation to verify that any such notice has been given to such other Obligated Group Members.  Pursuant to **Section 3.01**, each Obligated Group Member is jointly and severally liable for each and every Obligation.

**Section 2.02.    Form, Designation, Numbering and Registration of Obligations.**  Obligations shall be issued in such forms as may from time to time be created by Supplements permitted hereunder. Each Obligation or series of Obligations shall be designated in such a manner as will differentiate such Obligation from any other Obligation.  Obligations shall be issuable as fully registered Obligations and shall be numbered as provided in the Supplement creating such Obligation.  The Master Trustee shall keep at its Corporate Trust Office a register (the "Obligation Register"), in which the Master Trustee shall provide for the registration of transfer and exchange of each Obligation as provided in the Supplement creating such Obligation, subject to any additional reasonable regulations as it may prescribe.

**Section 2.03.    Execution and Authentication of Obligations.**    Each Obligation shall be executed for and on behalf of the issuer thereof, by the Chairman or Vice Chairman of its Governing Body or its President or Vice President.  The signatures of any of such officers may be mechanically or photographically reproduced on the Obligation.  If any officer whose signature appears on any Obligation ceases to be such officer before delivery thereof, such signature shall remain valid and sufficient for all purposes as if such officer had remained in office until such delivery.  Each Obligation shall be manually authenticated by an authorized officer of the Master Trustee, without which authentication no Obligation shall be entitled to the benefits hereof.

The Master Trustee's authentication certificate shall be substantially in the following form:

## MASTER TRUSTEE'S AUTHENTICATION CERTIFICATE

This Obligation No. __ is one of the Obligations described in the within-mentioned Master Indenture.

_____,

as Master Trustee

By _____

Authorized Signatory

15

     **Section 2.04.    Supplement Creating Obligations.**    Any Obligated Group Member and the Master Trustee may from time to time enter into a Supplement in order to create an Obligation hereunder. Such Supplement shall set forth the date of such Obligation, the date or dates on which the principal of, redemption premium, if any, and interest on such Obligation shall be payable, the form of such Obligation and such other terms and provisions as shall conform with the provisions hereof.

     **Section 2.05.    Conditions to Issuance of Obligations Hereunder.**    With respect to Obligations issued hereunder, simultaneously with or prior to the execution, authentication and delivery of an Obligation pursuant to this Master Indenture:

     (a)    All requirements and conditions to the issuance of such Obligation, if any, set forth in this Master Indenture and in the Supplement creating such Obligation shall have been complied with and satisfied, as provided in an Officer's Certificate, an original executed counterpart which Certificate shall be delivered to the Master Trustee, and upon which the Master Trustee may conclusively rely;

     (b)    The issuer of such Obligation shall have delivered to the Master Trustee an Opinion of Counsel to the effect that (i) registration of such Obligation under the Securities Act of 1933, as amended, and qualification of this Master Indenture or the Supplement creating such Obligation under the Trust Indenture Act of 1939, as amended, is not required, or, if such registration or qualification is required, that all applicable registration and qualification provisions of said acts have been complied with, and (ii) the Master Indenture, the Supplement creating such Obligation and such Obligation are authorized by the Master Indenture and are valid, binding and enforceable obligations of the Obligated Group Members in accordance with their terms, except as enforceability may be limited as set forth in **Appendix A**;

     (c)    Each Obligated Group Member shall have delivered to the Master Trustee an Officer's Certificate stating that, to the best of the knowledge of the signer thereof, the Person who is to be the Holder of such Obligation upon the original issuance thereof is not acquiring the interest represented by such Obligation directly or indirectly with the assets of, or in connection with any arrangement or understanding by it in any way involving, any employee benefit plan with respect to which (i) any employee of any Obligated Group Member or the Master Trustee, in its individual capacity, is a participant or (ii) any Obligated Group Member or the Master Trustee, in its individual capacity, or any of their affiliates is otherwise a party in interest, all within the meaning of the Employee Retirement Income Security Act of 1974, as amended; and

     (d)    Each Obligated Group Member who has previously executed and delivered a Deed of Trust to the Master Trustee (i) if required by law to secure future advances made under such Deed of Trust, shall have executed and delivered an amendment to such Deed of Trust to the Master Trustee, describing the terms of issuance of such Obligation and increasing the present amount of Obligations secured by such Deed of Trust, and shall have caused such amendment to be recorded with the appropriate governmental authority, accompanied by an Opinion of Counsel to the effect that such modification or amendment satisfies the requirements of this **Section 2.05(d)** and that it has been properly recorded with the appropriate governmental authority, or, if such modification, amendment or recording is not required by law, an Opinion of Counsel to such effect and (ii) shall have caused an endorsement to the mortgagee title insurance policy issued to the Master Trustee insuring such Deed of Trust (or if more than one mortgagee title insurance policy, together with tie-in endorsements, has been issued to the Master Trustee insuring such Deed of Trust, an endorsement to each such policy) that (A) amends the effective date and time of such policy to be the date and time of the recording of the amendment to such Deed of Trust, (B) increases the amount of such policy (if there is only one such policy) or increases the amount of all such policies in the aggregate (if there is more than one such policy) to an amount equal to the

16

principal amount of all Obligations then Outstanding (less any amount to be deposited into any debt service reserve funds for such Obligations or any Related Bonds related to such Obligations) or if the principal amount of all Obligations exceeds the value of the Mortgaged Property in an amount equal to the maximum policy amount that can be obtained, and (C) continues to insure that such Deed of Trust, as amended, is a first priority lien on the Mortgaged Property described therein, subject to Permitted Liens, accompanied by an Opinion of Counsel to the effect that such endorsement satisfies the requirements of this **Section 2.05(d)**.

## ARTICLE III

## PARTICULAR COVENANTS OF THE OBLIGATED GROUP

**Section 3.01.    Nature of Obligations; Payment of Principal and Interest; Security; Further Assurances; Deposit of Gross Receipts.**

(a)      Each Obligation issued pursuant to this Master Indenture shall be a general, joint and several obligation of each Obligated Group Member and shall be equally and ratably secured by this Master Indenture.  Each Obligated Group Member covenants promptly to pay or cause to be paid the principal of, redemption premium, if any, and interest on each Obligation issued hereunder, and any other payments, including the purchase or redemption price of Put Indebtedness, required to be made under the Supplement creating such Obligation and under said Obligation, at the place, on the dates and in the manner provided herein, in the Supplement creating such Obligation and in said Obligation according to the terms thereof whether at maturity, upon proceedings for redemption, by acceleration or otherwise.

(b)      To secure (i) the prompt payment of the principal of, redemption premium, if any, and the interest on the Obligations and any other payments required to be made under the Supplements creating the Obligations and under the Obligations, and (ii) the performance by each Obligated Group Member of its other obligations hereunder and under the Deed of Trust, each Obligated Group Member hereby grants to the Master Trustee a security interest in its Pledged Assets, Kingswood has executed and delivered the Kingswood Deed of Trust, and each Obligated Group Member covenants to execute and deliver a Deed of Trust or notice of amendment to the extent required under **Section 3.13**.  So long as no Event of Default or condition which with the giving of notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing, any Obligated Group Member may Transfer all or any part of its Pledged Assets and all or any portion of its Mortgaged Property, free of such security interest and free of the Lien of the Deed of Trust encumbering such Mortgaged Property, respectively, subject to **Sections 3.08** and **3.09** and any limitations contained in such Deed of Trust.  If any Pledged Assets or Mortgaged Property is Transferred pursuant to the terms of this Master Indenture and the Deed of Trust encumbering such Mortgaged Property, the Master Trustee shall, upon request of an Obligated Group Member, execute a release of its Liens with respect to the Pledged Assets or Mortgaged Property so Transferred.

(c)      Each Obligated Group Member shall also execute and deliver to the Master Trustee from time to time such Supplements as may be necessary or appropriate to include its Pledged Assets as security hereunder.  In addition, each Obligated Group Member will prepare and file such UCC-1 financing statements or amendments to or terminations of existing financing statements which shall be necessary to comply with applicable law or as required due to the occurrence of an event contemplated under **Section 3.13** or changes in the Obligated Group, including (i) any Person becoming an Obligated Group Member pursuant to **Section 3.11**, or (ii) any Obligated Group Member ceasing to be an Obligated Group Member pursuant to **Section 3.12**.  This Master Indenture shall be self-operative with respect to such property, but each Obligated Group Member will execute and deliver such security agreements, financing statements, continuation statements, deposit control agreements and other documents necessary

17

to perfect a security interest in such property or in order to impose or continue the lien and security interest hereof more specifically in any such property. If any Obligated Group Member fails to execute any of such instruments within 10 days after demand to do so, that Obligated Group Member irrevocably appoints the Master Trustee as its attorney-in-fact and in its name, place and stead so to do, and the Master Trustee may proceed in such fashion as may be advised by Counsel.

(d)     If an Event of Default shall have occurred and be continuing, the Master Trustee may require that each Obligated Group Member deliver all Gross Receipts to it. Each Obligated Group Member covenants that, if an Event of Default shall have occurred and be continuing, it will, immediately upon receipt of a written request from the Master Trustee, deliver or direct to be delivered to the Master Trustee all Gross Receipts thereafter received until such Event of Default has been waived, such Gross Receipts to be applied in accordance with **Section 4.04**.

**Section 3.02.     Covenants as to Corporate Existence, Maintenance of Properties, Etc.** Each Obligated Group Member hereby covenants as follows:

(a)     Except as otherwise expressly provided herein, to preserve its corporate or other legal existence, to procure and maintain all rights, licenses and permits necessary or desirable in the operation of its business and affairs and to be qualified to do business in each jurisdiction where the ownership of its Property or the conduct of its business requires such qualification; provided that nothing herein contained shall be construed to obligate it to maintain any of its rights, licenses or permits no longer necessary or desirable, in its judgment, in the operation of its business and affairs, if the failure to maintain such right, license or permit will not be disadvantageous in any material respect to the Holders.

(b)     At all times to cause its Property, Plant and Equipment to be maintained, preserved and kept in good repair, working order and condition, ordinary wear and tear excepted, and all needed and proper repairs, renewals and replacements thereof to be made; provided that nothing contained in this subsection shall be construed to (i) prevent it from ceasing to operate any portion of its Property, Plant and Equipment if in its judgment (evidenced, in the case of such cessation other than in the ordinary course of business, by an opinion of a Management Consultant) it is advisable not to operate the same, or if it intends to sell or otherwise Transfer the same in accordance with **Section 3.08** and within a reasonable time endeavors to effect such sale or other Transfer, or (ii) to obligate it to retain, preserve, repair, renew or replace any Property, Plant and Equipment no longer used or, in its judgment, useful in the conduct of its business.

(c)     To do all things reasonably necessary to conduct its affairs and carry on its business and operations in such manner as to comply with any and all applicable laws of the United States and the several states thereof and duly observe and conform to all valid orders, regulations or requirements of any governmental authority relative to the conduct of its business and the ownership of its Property including environmental orders, laws, regulations and requirements; provided that nothing herein contained shall require it to comply with, observe and conform to any such law, order, regulation or requirement of any governmental authority so long as the validity thereof or the applicability thereof to it shall be contested in good faith and the failure to comply will not have a material adverse effect on the financial condition of the Obligated Group.

(d)     To pay promptly all lawful taxes, governmental charges and assessments at any time levied or assessed upon or against it or its Property; provided that it shall have the right to contest in good faith any such taxes, charges or assessments or the collection of any such sums and pending the resolution of such contest may delay or defer payment thereof if such delay or deferral will not have a material adverse effect on the financial condition of the Obligated Group.

18

(e)     To pay promptly or otherwise satisfy and discharge all of its Indebtedness and all demands and claims against it as and when the same become due and payable or within any period of grace with respect thereto, other than any Indebtedness, demands or claims (exclusive of the Obligations created and Outstanding hereunder or any Related Bonds) whose validity, amount or collectability is being contested in good faith.

(f)     To comply with all terms, covenants and provisions of any Liens upon any of its Property.

(g)     Each Obligated Group Member which is a Tax-Exempt Organization at the time it becomes an Obligated Group Member, so long as all amounts due or to become due on any Related Bond have not been fully paid to the registered owner thereof, will not take any action or fail to take any action which action or failure to act (including any action or failure to act which would result in the alteration or loss of its status as a Tax-Exempt Organization), or which would, in the Opinion of Bond Counsel, result in the interest on any Related Bond which is not includable in the gross income of the registered owner thereof for federal income tax purposes becoming included in the gross income of the registered owner thereof for federal income tax purposes.

(h)     If, at any time during the term of this Master Indenture, an Obligated Group Member changes its state of incorporation, changes its form of organization, changes its name, or takes any other action which could affect the proper location for filing of Uniform Commercial Code financing statements or continuation statements or which could render existing filings seriously misleading or invalid, the Obligated Group Member shall immediately provide written notice of such change to the Master Trustee, and thereafter promptly deliver to the Master Trustee such amendments and/or replacement financing statements, together with an Opinion of Counsel to the effect that such amendments and/or replacement financing statements have been properly filed so as to create a perfected security interest in the collateral securing this Master Indenture, and such additional information or documentation regarding such change as the Master Trustee may reasonably request.

**Section 3.03.    Insurance.**

(a)     Each Obligated Group Member shall maintain insurance with respect to its property and operations covering such risks that are of an insurable nature and of the character customarily insured against by organizations operating similar properties and engaged in similar operations (including but not limited to property and casualty, business interruption, worker's compensation, general and professional liability and employee dishonesty) and in such amounts as, in its judgment, are adequate to protect the Obligated Group Member and its property and operations.  Each policy or other contract for such insurance shall contain an agreement by the insurer that, notwithstanding any right of cancellation reserved to such insurer, such policy or contract shall continue in force for at least **30** days after written notice of cancellation to the Obligated Group Member and the Master Trustee.

In addition to the foregoing, insurance coverage shall specifically include a full replacement cost casualty policy on the Mortgaged Property with the Master Trustee named as Mortgagee/Loss Payee.  The Master Trustee shall be named an additional insured on each public liability policy.

(b)     The Obligated Group shall retain an Insurance Consultant to review the coverages required by **subsection (a)** and the insurance requirements of the Obligated Group Members thereunder from time to time (but not less frequently than biennially and initially not later than December 31, 2022). If the Insurance Consultant makes recommendations for the increase of any coverage required by

**subsection (a)**, the Obligated Group shall increase, or cause to be increased, such coverage in accordance with such recommendations, subject to a good faith determination of the Obligated Group Representative that such recommendations, in whole or in part, are in the best interests of the Obligated Group. Notwithstanding the above provisions, each Obligated Group Member shall have the right, without giving rise to an Event of Default solely on such account, (i) to maintain insurance coverage below that most recently recommended by the Insurance Consultant, if the Obligated Group Representative furnishes to the Master Trustee a report of the Insurance Consultant to the effect that the insurance so provided affords either the greatest amount of coverage available for the risk being insured against at rates which in the judgment of the Insurance Consultant are reasonable in connection with reasonable and appropriate risk management, or the greatest amount of coverage necessary by reason of state or federal laws now or hereafter in existence limiting medical and malpractice liability, or (ii) to adopt alternative risk management programs which the Insurance Consultant determines to be reasonable, including to participate with other institutions in mutual or other cooperative insurance or other risk management programs, to participate in state or federal insurance programs, to take advantage of state or federal laws now or hereafter in existence limiting medical and malpractice liability, or to establish or participate in other alternative risk management programs; all as may be approved by the Insurance Consultant as reasonable and appropriate risk management by the Obligated Group.

(c)      In the event that any Obligated Group Member fails to maintain the insurance coverage or retain an Insurance Consultant required by this Master Indenture, the Master Trustee may purchase insurance or retain an Insurance Consultant, at the expense of the Obligated Group Member, to protect the interests of the Master Trustee and the Holders. If insurance is purchased, the insurance may, but need not, protect the interests of the Obligated Group Member. The coverage that the Master Trustee purchase may not pay any claim that the Obligated Group Member may make or that is made against the Obligated Group Member in connection with the property of the Obligated Group Member. The Obligated Group Member may later cancel or cause to be cancelled any insurance purchased by the Master Trustee, but only after providing evidence to the Master Trustee that the Obligated Group Member has obtained insurance as required by this Master Indenture. The Obligated Group Member will be responsible for all costs and expenses, including the insurance premium, interest and any other charges that the Master Trustee may impose in connection with the placement of the insurance and the retention of an Insurance Consultant. The costs of the insurance and the retention of an Insurance Consultant may be added to the total balance or obligation due hereunder. The costs of the insurance and the retention of an Insurance Consultant may be more than the cost that the Obligated Group Member may incur on its own.

The following notice is provided pursuant to Section 427.120, R.S.Mo. As used herein, "you" means an Obligated Group Member and "we" means Master Trustee: **Unless you provide evidence of the insurance coverage required by your agreement with us, we may purchase insurance at your expense to protect our interests in your collateral. This insurance may, but need not, protect your interests. The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral. You may later cancel any insurance purchased by us, but only after providing evidence that you have obtained insurance as required by our agreement. If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including the insurance premium, interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to your total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.**

20

**Section 3.04.   Insurance and Condemnation Proceeds.**  Proceeds received by any Obligated Group Member for casualty losses or condemnation awards may be used for such lawful corporate purposes as the recipient determines, including the replacement or repair of the damaged or taken Property, Plant and Equipment and the application of such proceeds to the payment or repayment of any Indebtedness in accordance with the terms thereof; provided that if the amount received exceeds **5%** of the Net Book Value of the Property, Plant and Equipment, the Obligated Group Representative shall immediately notify the Master Trustee, deposit the amount received with the Master Trustee or, if so provided in a Related Bond Indenture or a loan, lease, installment sale or similar agreement related thereto, with the applicable Related Bond Trustee thereunder to be disbursed by the Related Bond Trustee as provided therein, and, within 12 months after the casualty loss or taking and prior to expending such funds, deliver to the Master Trustee (a) an Officer's Certificate certifying that the Projected Long-Term Debt Service Coverage Ratio for each of the two full Fiscal Years following the expected date of application of such proceeds will be not less than **1.30** as shown by pro forma financial statements for each such period and a statement of relevant assumptions, including assumptions as to the use of such proceeds or awards, upon which such pro forma statements are based, and a written report of a Management Consultant confirming such certification; or (b) a written Management Consultant's report stating the Management Consultant's recommendations, including recommendations as to the use of such proceeds or awards, to cause the Long-Term Debt Service Coverage Ratio for each of the periods described in **clause (a)** above to be not less than **1.20**, or, if in the opinion of the Management Consultant the attainment of such level is impracticable, to the highest practicable level.  Each Obligated Group Member agrees that it will use such proceeds or awards, for any purpose that is permitted by law and is not contrary to the requirements of a Related Bond Indenture or a loan, lease, installment sale or similar agreement related thereto, only in accordance with the assumptions referred to in **clause (a)** above or the recommendations referred to in **clause (b)** above as evidenced by an Officer's Certificate submitted to the Master Trustee requesting the disbursement of such funds for such use.  In the event the Obligated Group Representative shall be unable to deliver an Officer's Certificate or report of a Management Consultant as provided in clause (a) or (b) of this Section, such proceeds shall be applied to the payment or repayment of any Indebtedness in accordance with the terms thereof.

**Section 3.05.   Limitations on Creation of Liens.**

(a)      Each Obligated Group Member agrees that it will not create or suffer to be created or permit the existence of any Lien upon Pledged Assets, Mortgaged Property or any other Property now owned or hereafter acquired by it other than Permitted Liens.

(b)      Permitted Liens shall consist of the following:

(i)      Liens on Pledged Assets, Mortgaged Property or other Property created by this Master Indenture or the Deed of Trust;

(ii)      Any Lien on the Property of Kingswood which existed on the date of authentication and delivery of the initial Obligation, was disclosed to the Master Trustee in the Kingswood Deed of Trust, the title insurance policy insuring the Kingswood Deed of Trust or in an Officer's Certificate delivered to the Master Trustee on that date; provided that no such Lien may be increased, extended, renewed or modified to apply to any Property of any Obligated Group Member not subject to such Lien on such date or to secure Indebtedness not Outstanding as of the date of delivery of the initial Obligation, unless such Lien as so extended, renewed or modified otherwise qualifies as a Permitted Lien;

21

(iii)    Any Lien on the Property of a Person in existence as of the date such Person becomes an Obligated Group Member that is disclosed to the Master Trustee in an Officer's Certificate; provided that no such Lien may be increased, extended, renewed or modified to apply to any Property of any Obligated Group Member not subject to such Lien on such date, unless such Lien as so extended, renewed or modified otherwise qualifies as a Permitted Lien;

(iv)    Liens arising by reason of good faith deposits with any Obligated Group Member in connection with leases of real estate, bids or contracts (other than contracts for the payment of money), deposits by any Obligated Group Member to secure public or statutory obligations, or to secure, or in lieu of, surety, stay or appeal bonds, and deposits as security for the payment of taxes or assessments or other similar charges;

(v)    Any Lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable any Obligated Group Member to maintain self-insurance or to participate in any funds established to cover any insurance risks or in connection with workers' compensation, unemployment insurance, pension or profit sharing plans or other social security, or to share in the privileges or benefits required for companies participating in such arrangements;

(vi)    Any judgment Lien against any Obligated Group Member so long as such judgment is being contested in good faith and execution thereon is stayed or the liability of such Obligated Group Member under such judgment is fully covered by insurance;

(vii)    (A) Rights reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit or provision of law, affecting any Property; (B) any Liens on any Property for taxes, assessments, levies, fees, water and sewer rents, and other governmental and similar charges; and (C) any Liens of mechanics, materialmen, laborers, suppliers or vendors for work or services performed or materials furnished in connection with such Property, which are not due and payable or which are not delinquent or which, or the amount or validity of which, are being contested and execution thereon is stayed and adequate reserves for payment maintained or, with respect to Liens of mechanics, materialmen, laborers, suppliers or vendors have been due for fewer than 90 days; (D) easements, rights-of-way, servitudes, restrictions, oil, gas or other mineral reservations and other minor defects, encumbrances, and irregularities in the title to any Property which, if such Lien arises after an Obligated Group Member has acquired such Property, do not materially impair the use of such Property or materially and adversely affect the value thereof; and (E) landlord's liens;

(viii)    [RESERVED];

(ix)    [RESERVED];

(x)    [RESERVED];

(xi)    Any Lien securing all Obligations on a parity basis;

(xii)    Any Lien in favor of a trustee on the proceeds of Indebtedness prior to the application of such proceeds;

(xiii)    Liens on Property received by any Obligated Group Member through gifts, grants or bequests, such Liens being due to restrictions on such gifts, grants or bequests of Property or the income thereon;

(xiv)    Any Lien on pledges, gifts or grants to be received in the future, such liens being due to restrictions on such pledges, gifts or grants, including any income derived from the investment thereof;

(xv)    Liens on moneys deposited by residents, patients or others with any Obligated Group Member as security for or as prepayment for the cost of care;

(xvi)    Liens on Property due to rights of third party payors for recoupment of amounts paid to any Obligated Group Member;

(xvii)    Any Lien securing Non-Recourse Indebtedness permitted by Section 3.06(e);

(xviii)    Any lease of Property other than the Mortgaged Property or any lease of the Mortgaged Property that is by its terms subordinate to the Lien created by the Deed of Trust;

(xix)    Any Lien on real property not included in the Facilities and not used in connection with the operation of the Facilities; and

(xx)    [RESERVED];

(xxi)    [RESERVED];

(xxii)    [RESERVED]

(xxiii)    Any Lien on property to be added to the Deed of Trust by amendment, which existed on the date of the Deed of Trust amendment adding such property, which was disclosed to the Master Trustee in the Deed of Trust amendment, the title insurance policy endorsement or amendment covering such Deed of Trust amendment or in an Officer's Certificate delivered to the Master Trustee on that date; provided that no such Lien may be increased, extended, renewed or modified to apply to any Property of any Obligated Group Member not subject to such Lien on such date or to secure Indebtedness not Outstanding as of the date of delivery of such amendment, unless such Lien as so extended, renewed or modified otherwise qualifies as a Permitted Lien.

**Section 3.06.    Limitations on Incurrence of Indebtedness.**  Each Obligated Group Member covenants and agrees that it will not incur any Indebtedness if, after giving effect to all other Indebtedness incurred by the Obligated Group, such Indebtedness could not be incurred pursuant to one or more of **subsections (a)** to **(j)**, inclusive.  Any Indebtedness may be incurred only in the manner and pursuant to the terms set forth as follows:

(a)    *Long-Term Indebtedness while Series 2021 Obligations are Outstanding.*  During any period the Series 2021 Obligations are Outstanding, Long-Term Indebtedness may be incurred with the consent of the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding.

23

(b)     *Long-Term Indebtedness while No Series 2021 Obligations are Outstanding.*  During any period that <u>no</u> Series 2021 Obligations are Outstanding (or upon incurrence of such Long-Term Indebtedness no Series 2021 Obligations will be Outstanding), Long-Term Indebtedness may be incurred if, prior to incurrence thereof, there is delivered to the Master Trustee an Officer's Certificate certifying that the Long-Term Debt Service Coverage Ratio, taking into account all Outstanding Long-Term Indebtedness and the Long-Term Indebtedness proposed to be incurred, for the most recent Fiscal Year preceding the date of delivery of the Officer's Certificate for which the Financial Statements are available is not less than **1.20**.

(c)     *Refunding Indebtedness.*  Long-Term Indebtedness may be incurred to refund any Outstanding Long-Term Indebtedness if, prior to the incurrence thereof, (i) the Master Trustee receives an Officer's Certificate stating that, taking into account the Long-Term Indebtedness proposed to be incurred, the existing Long-Term Indebtedness to remain Outstanding after the refunding and the refunding of the existing Long-Term Indebtedness to be refunded, there will be no increase in the Long-Term Debt Service Requirement in any Fiscal Year and (ii) the Master Trustee receives an Opinion of Counsel stating that upon the incurrence of such proposed Long-Term Indebtedness and the application of the proceeds thereof, the Outstanding Long-Term Indebtedness to be refunded will no longer be Outstanding.

(d)     *Short-Term Indebtedness while Series 2021 Obligations are Outstanding.*  During any period the Series 2021 Obligations are Outstanding, Short-Term Indebtedness may be incurred with the consent of the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding.

(e)     *Short-Term Indebtedness while No Series 2021 Obligations are Outstanding.*  During any period that <u>no</u> Series 2021 Obligations are Outstanding (or upon incurrence of such Short-Term Indebtedness no Series 2021 Obligations will be Outstanding), Short-Term Indebtedness may be incurred if, immediately after the incurrence of such Short-Term Indebtedness, the aggregate principal amount of Outstanding Short-Term Indebtedness does not exceed **15%** of Total Revenues for the most recent Fiscal Year for which the Financial Statements are available; provided that for a period of at least **30** consecutive calendar days in each Fiscal Year Short-Term Indebtedness shall not exceed the greater of (i) **3%** of Total Revenues as reflected in the Financial Statements of the Obligated Group for the most recent Fiscal Year for which Financial Statements are available or (ii) **50%** of the amount by which Unrestricted Cash and Investments exceed **25%** of all Outstanding Long Term Indebtedness, calculated as of the end of the most recent Fiscal Year for which Financial Statements are available.

(f)     *Non-Recourse Indebtedness.*  Non-Recourse Indebtedness may be incurred (i) for a term not in excess of five (5) years and in an amount up to but not in excess of (A) $250,000 through November 15, 2025 and (B) $350,000 thereafter, or (ii) with the consent of the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding.

(g)     *Series 2021 Related Bonds.*  Indebtedness may be incurred as evidenced by Obligations Nos. 1 through 4 (the "***Series 2021 Obligations***") to be issued under Supplemental Master Indenture No. 1 dated as of November 15, 2021 and the Indebtedness under the Loan Agreement dated as of November 15, 2021, between The Industrial Development Authority of the City of Kansas City, Missouri and Kingswood relating to the Series 2021 Related Bonds.

Indebtedness may be classified and incurred under any of the above-referenced subsections with respect to which the tests set forth in such subsections are met.  Each Obligated Group Member may elect to have Indebtedness that was classified and issued pursuant to one subsection reclassified as having been

incurred under another subsection by demonstrating compliance with such other subsection on the assumption that such Indebtedness is being reissued on the date of delivery of the materials required to be delivered under such other subsection.  From and after such demonstration, such Indebtedness shall be deemed to have been incurred under the subsection with respect to which such compliance has been demonstrated until any subsequent reclassification of such Indebtedness.

Each Obligated Group Member shall, prior to the incurrence of any Indebtedness by such Member, deliver to the Master Trustee an Officer's Certificate which identifies the Indebtedness to be incurred, identifies the subsection pursuant to which such Indebtedness was incurred and demonstrates compliance with such subsection.

### Section 3.07.    Long-Term Debt Service Coverage Ratio.

(a)    Each Obligated Group Member shall operate its facilities on a revenue producing basis and shall charge such rates, fees and charges for its facilities and services and shall exercise such skill and diligence as to provide income from its facilities together with other available funds sufficient for the Obligated Group to maintain the Long-Term Debt Service Coverage Ratio set forth below for the applicable rolling four (4) quarter period:

| Rolling 4 Quarters ending | Long-Term Debt Service Coverage Ratio |
|---|---|
| June 30, 2023 | 1.05 |
| September 30, 2023 | 1.10 |
| December 31, 2023 | 1.15 |
| March 31, 2024 | 1.15 |
| June 30, 2024 | 1.15 |
| September 30, 2024 | 1.15 |
| December 31, 2024 | 1.15 |
| March 31, 2025 | 1.15 |
| June 30, 2025 | 1.15 |
| September 30, 2025 | 1.15 |
| December 31, 2025 and each December 31 thereafter | 1.15 |

(b)    If the Long-Term Debt Service Coverage Ratio, as calculated at the end of any rolling four (4) quarter period (beginning with the quarter ending June 30, 2023) and set forth in the Officer's Certificate required by **Section 3.10(c)** of this Master Indenture, is less than the required amount, as set forth in **Section 3.07(a)** above, the Obligated Group Representative shall, if directed in writing by the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding (the "**Holders' DSCR Direction**"), retain a Management Consultant acceptable to the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding (which approval shall not be unreasonably withheld and which approval shall be deemed not given unless provided within 14 days), within **30** days after the date such Holders' DSCR Direction is delivered to the Obligated Group Representative, to make recommendations with respect to the rates, fees and charges of the Obligated Group and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase the Long-Term Debt Service Coverage Ratio for future rolling four (4) quarter periods to at least the required amounts of such respective periods.  A copy of such Management Consultant report and recommendations (the "**Management Consultant's DSCR Report**"), if any, shall be filed with the Master Trustee within **60** days after the date the Management Consultant is retained by the Obligated Group Representative.

In the event that the retention of a Management Consultant is required under the provisions of this subsection (b) but the Long-Term Debt Service Coverage Ratio that led to the retention of the Management Consultant remains unmet at the end of the second succeeding Fiscal Quarter after the Management Consultant's DSCR Report is filed with the Master Trustee, at the written direction of the

Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding, the Obligated Group Representative shall appoint an independent third party manager (or replace an existing independent third party manager, if any) within **60** days of receipt of such written direction, which third party manager shall be acceptable to the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding. If at the end of such second succeeding Fiscal Quarter, the Management Consultant certifies that the Obligated Group has reasonably complied with all of the recommendations contained in the Management Consultant's DSCR Report, then the period for compliance with such covenants shall be extended by two additional Fiscal Quarters; provided that if the Management Company fails to reasonably comply with such recommendations at any time during such extended two quarter period then at any such time, the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding may cause a replacement of the manager. For avoidance of doubt, failure to comply with such covenants after the extended period (if applicable) may result in a change of management if directed by a majority of the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding.

Each Obligated Group Member shall follow the recommendations of the Management Consultant applicable to it to the extent deemed feasible by its Governing Board and permitted by law. So long as the Obligated Group retains a Management Consultant and each Obligated Group Member follows such Management Consultant's recommendations to the extent feasible and permitted by law, this **Section 3.07** shall be deemed to be complied with even if the Long-Term Debt Service Coverage Ratio for any subsequent rolling four (4) quarter period is below the required amount set forth in **Section 3.07(b)** above.

Failure to achieve a Long-Term Debt Service Coverage Ratio of at least 1.00 at the end of any rolling four (4) quarter periods listed in **Section 307(a)** above, beginning with the quarter ending June 30, 2023 will be an Event of Default.

(c)      In calculating the Long-Term Debt Service Requirements and the Long-Term Debt Service Coverage Ratio for any purpose under this Master Indenture, there shall be excluded from the calculation of Long-Term Debt Service Requirements the portion of debt service for the Indebtedness incurred for the Series 2021D Related Bonds.

**Section 3.08.    Transfers of Property, Plant and Equipment; Transfers of Unrestricted Cash and Investments.**

(a)      The Obligated Group agrees that it will not Transfer in any Fiscal Year, Property, Plant and Equipment except for Transfers permitted by any one of the following clauses, provided, however, any Transfer of Property, Plant and Equipment that constitutes Mortgaged Property that is also real property shall comply with the requirements of subparagraph (c) of this **Section 3.08** prior to such Transfer:

(i)      to another Obligated Group Member, without limit;

(ii)      [RESERVED];

(iii)      the sale or lease of real property not included in the Facilities and not used in connection with the operation of the Facilities;

(iv)      to any Person provided such Transfer is in the ordinary course of business upon fair and reasonable terms;

26

(v)    to any Person in return for other Property of equal or greater value and usefulness;

(vi)    to any Person if, in the reasonable judgment of the Member, such Property, Plant and Equipment has, or within the next succeeding 24 calendar months is reasonably expected to, become inadequate, obsolete or worn out, or otherwise unsuitable, unprofitable, undesirable or unnecessary for the operation of the Member's primary business;

(vii)    to any Person, if such Property, Plant and Equipment consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on Long-Term Indebtedness of a Member;

(viii)    as part of a merger, consolidation, sale or conveyance permitted by **Section 3.09**;

(ix)    to any Person, for the fair market value thereof, provided that (A) the proceeds of such Transfer are used to purchase additional real property which, if functionally related to, and operated on an integrated basis with, the Facilities, shall be subjected to the Lien of the Deed of Trust, or to purchase Equipment which shall become subject to the security interest granted pursuant to **Section 3.01**, or to prepay, in whole or in part, *pro rata*, Outstanding Obligations or such proceeds shall be set aside and restricted by the Member and expended solely for either of such purposes, and (B) in the case of real property, ingress to and egress from the Facilities is not materially impaired;

(x)    [RESERVED];

(xi)    to lease any Property, Plant and Equipment not being used in the operation of the Facilities upon fair and reasonable terms;

(xii)    [RESERVED];

(xiii)    [RESERVED]; or

(xiv)    [RESERVED];

(b)    The Obligated Group agrees that it will not Transfer any cash, cash equivalents or marketable securities except for Transfers permitted by any one of the following clauses:

(i)    to any Obligated Group Member, without limit;

(ii)    to pay all reasonable and customary operating expenses of any Obligated Group Member and to invest in marketable securities;

(iii)    to refund Entrance Fees;

(iv)    so long as there are no deficiencies in any debt service fund or debt service reserve fund created with respect to Related Bonds or Obligations, to purchase real property for expansion of its Facilities or Equipment for use in its Facilities so long as prior to such Transfer there is delivered to the Master Trustee an Officer's Certificate certifying that the purchase is upon fair and reasonable terms and the Obligated Group Member determines that, after giving

27

effect to such purchase, the Obligated Group would not have had less than **125 Days Cash on Hand**;

(v)      to pay (only from Excess Cash) costs and expenses allowed under the provisions of Section 5.14 of the Loan Agreement;

(vi)      so long as there are no deficiencies in any debt service fund or debt service reserve fund created with respect to Related Bonds or Obligations, to any Person so long as prior to such Transfer there is delivered to the Master Trustee an Officer's Certificate certifying that such Transfer is in an amount not exceeding **3%** of Total Revenues (the **"Unrestricted Cash and Investments Basket Percentage"**); provided that, assuming the transfer occurred at the beginning of the most recent Fiscal Year for which Financial Statements are available, (i) the Long-Term Debt Service Coverage Ratio for that Fiscal Year would have been not less than **1.30**, and (ii) as of the end of the most recent fiscal quarter for which Financial Statements have been delivered under **Section 3.10(a)**, the Obligated Group would have not had less than **125 Days Cash on Hand**,

(A)      the Unrestricted Cash and Investments Basket Percentage will be increased to **5%** if the Unrestricted Cash and Investments of the Obligated Group would be not less than **250 Days Cash on Hand** after giving effect to the transfer,

(B)      the Unrestricted Cash and Investments Basket Percentage will be increased to **10%** if the Unrestricted Cash and Investments of the Obligated Group would not have been less than **500 Days Cash on Hand** after giving effect to the transfer, and

(C)      the Unrestricted Cash and Investments Basket Percentage will be increased to **15%** if the Unrestricted Cash and Investments of the Obligated Group would not have been less than **750 Days Cash on Hand** after giving effect to the transfer];

(vii)    to provide charity care and community benefits and make charitable donations and donations and voluntary payments to government agencies; or

(viii)    to the extent such Transfer constitutes a Permitted Lien.

(c)      Prior to any Transfer of Mortgaged Property consisting of real property pursuant to any clause in **Section 3.08(a)**, the Obligated Group Representative shall deliver to the Master Trustee the following items:

(i)      an Officer's Certificate to the effect that the Obligated Group is in compliance with all of the covenants contained in this Master Indenture and, if the Transfer had occurred on the last day of the preceding Fiscal Year, such Transfer would not have caused the Obligated Group to be in default under any covenant contained in this Master Indenture; and

(ii)      a written report of a Management Consultant confirming that:

(1)      after giving effect to such Transfer, the Long-Term Debt Service Coverage Ratio for each of the two full Fiscal Years following the expected date of such Transfer is not expected to be less than **1.30** as shown by pro forma financial statements prepared or reviewed by the Management Consultant for each such period and a

statement of relevant assumptions, including assumptions, upon which such pro forma statements are based; and

>    (2)    is not expected to reduce the Income Available for Debt Service of the Obligated Group for each of the two full Fiscal Years following the expected date of such Transfer by more than **5%** (increased to **10%** if the projected Long-Term Debt Service Coverage Ratio is expected to be more than **1.75**) as shown by pro forma financial statements prepared or reviewed by the Management Consultant for each such period and a statement of relevant assumptions, including assumptions, upon which such pro forma statements are based**.**

(d)    Without notice to or the necessity of obtaining the consent of any of the Holders of the Obligations, the Master Trustee shall consent to the removal from the coverage of the lien and security interest created by the Deed of Trust of: (i) any of the Mortgaged Property or Personal Property which has been subjected thereto by reason of an error or mistake provided the Obligated Group Representative files with the Master Trustee notice of its desire to release such property and an explanation of such error or mistake at least **15** business days prior to such proposed release date; and (ii) any tangible Mortgaged Property that is sold, leased or otherwise disposed of by an Obligated Group Member pursuant to any provision of this Master Indenture.

**Section 3.09.    Consolidation, Merger, Sale or Conveyance.**

(a)    Each Obligated Group Member covenants that it will not merge or consolidate with, or sell or convey all or substantially all of its assets to any Person that is not an Obligated Group Member unless:

>    (i)    either an Obligated Group Member will be the successor entity, or if the successor entity is not an Obligated Group Member such successor entity shall execute and deliver to the Master Trustee an appropriate instrument containing the agreement of such successor corporation (A) to become an Obligated Group Member and thereby become subject to compliance with this Master Indenture pertaining to an Obligated Group Member, including the security interest provided for in **Section 3.01** and the performance and observance of all covenants and obligations of an Obligated Group Member hereunder, and (B) all Obligations issued and then Outstanding or to be issued and Outstanding hereunder shall be general, joint and several obligations of such successor entity and the other Obligated Group Members;

>    (ii)    the successor entity has met all licensing requirements necessary for the operation of any Facilities and shall be qualified to do business in the State or shall consent to service of process in the State;

>    (iii)    the Obligated Group Representative has delivered to the Master Trustee a report of a Management Consultant, dated not more than **90** days prior to such consolidation, merger or transfer, to the effect that (i) the Projected Long-Term Debt Service Coverage Ratio for each of the two full Fiscal Years immediately following such merger, consolidation or transfer will be not less than **1.20** or greater than it would have been if such merger, consolidation or transfer had not taken place and (ii) upon completion of such consolidation, merger or transfer, the Obligated Group will not be in violation of any of the limitations on the incurrence of Indebtedness contained in **Section 3.06**; provided that if capital improvements consisting, in whole or in part, of independent or assisted living units or health care beds are under construction or available for initial occupancy on the date of such merger, consolidation or transfer, such forecast shall be for

the earlier to occur of (x) the first full Fiscal Year next succeeding the Fiscal Year in which the occupancy of such independent or assisted living units or health care beds is forecasted to reach **90%** or (y) the first full Fiscal Year following the Fiscal Year in which occurs that date which is **18** months from the date set forth in the forecast upon which substantially all of such independent or assisted living units or health care beds are forecasted to be placed in service;

(iv)     if all amounts due or to become due on any Related Bond, the interest on which is not includable in the gross income of the registered owner thereof for purposes of federal income taxation, have not been fully paid to the registered owner thereof, there shall have been delivered to the Master Trustee an Opinion of Bond Counsel to the effect that under then existing law the consummation of such merger, consolidation, sale or conveyance would not adversely affect the exclusion from gross income for purposes of federal income taxation of interest payable on such Related Bond; and

(v)     the Obligated Group Representative has delivered to the Master Trustee an Officer's Certificate and an Opinion of Counsel, each of which shall state that such consolidation, merger, conveyance or transfer and such instrument comply with this Article and the other provisions of this Master Indenture, and that all conditions precedent provided in this Master Indenture relating to such transaction have been satisfied.

(b)     In case of any such consolidation, merger, sale or conveyance and upon any such assumption by the successor corporation, such successor corporation shall succeed to and be substituted for its predecessor, with the same effect as if it had been named herein as such predecessor or had become an Obligated Group Member pursuant to **Section 3.11**, as the case may be.  Such successor corporation thereupon may cause to be signed, and may issue Obligations hereunder in its own name; and upon the order of such successor corporation and subject to all the terms, conditions and limitations in this Master Indenture prescribed, the Master Trustee shall authenticate and shall deliver Obligations that such successor corporation shall have caused to be signed and delivered to the Master Trustee.   All Outstanding Obligations so issued by such successor corporation hereunder shall in all respects have the same security position and benefit under this Master Indenture as Outstanding Obligations theretofore or thereafter issued in accordance with the terms of this Master Indenture as though all of such Obligations had been issued hereunder without any such consolidation, merger, sale or conveyance having occurred.

(c)     In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in Obligations thereafter to be issued as may be appropriate.

(d)     The Master Trustee may accept an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale or conveyance, and any such assumption, complies with the provisions of this Section and that it is proper for the Master Trustee under **Article VI** and of this Section to join in the execution of any instrument required to be executed and delivered by this Section.

**Section 3.10.    Financial Statements, Certificate of No Default and Other Information.**  The Obligated Group will:

(a)     As soon as practicable after they are available but in no event more than **45** days after the end of each month, commencing with the month ending December 31, 2021, the unaudited combined or consolidated financial statements of the Obligated Group for such period, including a combined or consolidated statement of revenues and expenses and statement of cash flows of the Obligated Group during such period, together with a comparison to budget (and explanation of any variances of more than

10% from budgeted amounts), and a combined or consolidated balance sheet as of the end of such period, an analysis of Entrance Fees, including information about any Entrance Fee discounts, a calculation of Days Cash on Hand as of the end of such monthly period, the Long-Term Debt Service Coverage Ratio for the rolling twelve-month period ending at the end of such month, and the information required to be provided by the Institution under **Section 5.11(d)** of the Loan Agreement, all in reasonable detail and certified, subject to year-end adjustment, by the chief financial officer or other authorized financial officer of the Obligated Group Representative.  Following the repayment in full of the Series 2021A Bonds and only so long as there is no Event of Default under any Financing Document, the Obligated Group may deliver the financial information described in this subsection on a quarterly basis within **45** days of the end of each Fiscal Quarter.

(b)     As soon as possible but in no event later than **150** days after the end of each Fiscal Year (commencing with the Fiscal Year ending December 31, 2021) or other period for which an audit has been performed, deliver by first-class mail, postage prepaid, or Electronic Means to the Master Trustee, and, to the extent not otherwise posted electronically on EMMA, each Holder and each registered owner of a Related Bond who may have so requested in writing or on whose behalf the Master Trustee may have so requested, a copy of the Financial Statements as of the end of such Fiscal Year or other period accompanied by the report of an Accountant;.

(c)     Simultaneously with filing the Financial Statements for a Fiscal Year (commencing with the Fiscal Year ending December 31, 2021) under **subsection (b)** above or the filing of the information required under **subsection (a)** above, deliver by first-class mail, postage prepaid, or Electronic Means to the Master Trustee and each Holder who may have so requested or on whose behalf the Master Trustee may have so requested, an Officer's Certificate stating (i) the Long-Term Debt Service Coverage Ratio and the ratio determined by dividing the Unrestricted Cash and Investments as of the end of such Fiscal Year or such other period by the principal amount of Outstanding Long-Term Indebtedness, as of the end of such Fiscal Year or such other period and whether the Obligated Group as a result thereof is required to retain a Management Consultant pursuant to **Section 3.07** and (ii) whether, to the best of the knowledge of the signer of such Officer's Certificate, any Obligated Group Member is not in compliance with any covenant contained in this Master Indenture and, if so, specifying each such failure to comply of which the signers may have knowledge and the steps that are being taken by the Obligated Group to cure such non-compliance.

(d)     If an Event of Default shall have occurred and be continuing, (i) file with the Master Trustee such other financial statements and information concerning its operations and financial affairs, including those of any Obligated Group Member, as the Master Trustee may from time to time reasonably request, excluding, specifically, donor records, patient records, personnel records and records subject to attorney-client privilege, and (ii) provide access to the Facilities, the Pledged Assets and the Mortgaged Property for the purpose of inspection by the Master Trustee during regular business hours or at such other times as the Master Trustee may reasonably request.

(e)     Unless required to be delivered at an earlier time, within **30** days after its receipt thereof, file with the Master Trustee a copy of each report which any provision of this Master Indenture requires to be prepared by a Management Consultant, Marketing Consultant or an Insurance Consultant.

(f)     [RESERVED].

(g)     Any calculation required to be made under this Master Indenture for a period other than a full Fiscal Year may be made using unaudited financial results of the Obligated Group.

(h)    Not less than once per month through November, 2022 and one per quarter thereafter while the Series 2021A Bonds and the Series 2021C Bonds remain Outstanding, the Obligated Group Representative will hold monthly update calls for the Holders of Related Bonds, *provided* that such call will continue to be monthly upon the request of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding.

Section 3.11.    **Parties Becoming Obligated Group Members.**    Persons which are not Obligated Group Members may, with the prior written consent of the current Obligated Group Members, become Obligated Group Members, if:

(a)    The Person that is becoming an Obligated Group Member shall execute and deliver to the Master Trustee a Supplement containing the agreement of such Person (i) to become an Obligated Group Member under this Master Indenture and thereby become subject to compliance with all provisions of this Master Indenture pertaining to an Obligated Group Member, including the security interest provided for in **Section 3.01** and the performance and observance of all covenants and obligations of an Obligated Group Member hereunder, and (ii) all Obligations issued and then Outstanding or to be issued and Outstanding hereunder shall be general, joint and several obligations of such successor entity and the other Obligated Group Members.

(b)    The Obligated Group Representative shall have delivered to the Master Trustee an Officer's Certificate which shall state that (i) such admission and such instrument comply with this Article and that all conditions precedent provided in this Master Indenture relating to such admission have been complied with and (ii) immediately after giving effect to such admission, no Event of Default hereunder shall have occurred and be continuing.

(c)    Each instrument executed and delivered to the Master Trustee in accordance with subsection (a), shall be accompanied by an Opinion of Counsel, addressed to and satisfactory to the Master Trustee, to the effect that such instrument complies with the requirements of this Master Indenture, has been duly authorized, executed and delivered by such Person and constitutes a valid and binding obligation of such Person enforceable in accordance with its terms, except as enforceability may be limited as set forth in Appendix B, and that all recordings and filings necessary to perfect the security interests in the Pledged Assets of such Person and any other personal property of such Person securing the Obligations to the extent those security interests can be perfected by filing have been completed.

(d)    There shall be filed with the Master Trustee a report of a Management Consultant to the effect that the Projected Long-Term Debt Service Coverage Ratio for each of the two Fiscal Years immediately succeeding the date of such action is greater than **1.20** or greater than it would have been if such action had not taken place and that such action will not reduce by more than **25%** the Projected Long-Term Debt Service Coverage Ratio for each of such periods assuming that such action had not taken place; provided that if capital improvements consisting, in whole or in part, of independent or assisted living units or health care beds are under construction or available for initial occupancy on the date of such action, such forecast shall be for the earlier to occur of (x) the first full Fiscal Year next succeeding the Fiscal Year in which the occupancy of such independent or assisted living units or health care beds is forecasted to reach **90%** or (y) the first full Fiscal Year following the Fiscal Year in which occurs that date which is **18** months from the date set forth in the forecast upon which substantially all of such independent or assisted living units or health care beds  are forecasted to be placed in service.

(e)    If all amounts due or to become due on any Related Bond, the interest on which is not includable in the gross income of the registered owner thereof for purposes of federal income taxation, have not been fully paid to the registered owner thereof, there shall be filed with the Master Trustee, an

Opinion of Bond Counsel, in form and substance satisfactory to the Master Trustee, to the effect that the admission of such Person to the Obligated Group would not adversely affect the exclusion from gross income for purposes of federal income taxation of the interest on any such Related Bond.

**Section 3.12.    Withdrawal from the Obligated Group.**

(a)    No Obligated Group Member may withdraw from the Obligated Group unless, prior to the taking of such action, there is delivered to the Master Trustee:

(i)    (A) An Officer's Certificate demonstrating that (I) all Obligations issued by such Obligated Group Member are no longer Outstanding or (II) an amount of cash or Defeasance Obligations, which together with the interest earned thereon, will be sufficient to accomplish the requirement of clause (A) (I) above has been transferred by such Obligated Group Member to the Master Trustee or all Outstanding Obligations issued by such Obligated Group Member have been assumed by another Obligated Group Member as the primary obligor, and (B), in either case, if all amounts due or to become due on any Related Bond, the interest on which is not includable in the gross income of the registered owner thereof for purposes of federal income taxation, have not been fully paid to the registered owner thereof, an Opinion of Bond Counsel, in form and substance satisfactory to the Master Trustee, to the effect that such Obligated Group Member's withdrawal from the Obligated Group would not adversely affect the exclusion from gross income for purposes of federal income taxation of the interest on any such Related Bond;

(ii)    For any Obligated Group Member other than Kingswood, the report of a Management Consultant to the effect that the Projected Long-Term Debt Service Coverage Ratio for each of the two Fiscal Years immediately succeeding the date of such action is greater than **1.20** or greater than it would have been if such action had not taken place and that such action will not reduce by more than **25%** the Projected Long-Term Debt Service Coverage Ratio for each of such periods assuming that such action had not taken place; and

(iiii)    If the withdrawing Obligated Group Member is Kingswood, the report of a Management Consultant to the effect that the Projected Long-Term Debt Service Coverage Ratio for each of the two Fiscal Years immediately succeeding the date of such action will be not be less than the average Long-Term Debt Service Coverage Ratio for the two Fiscal Years immediately preceding the date of such action and would not reduce the Days Cash on Hand below **180**; and

(iv)    An Officer's Certificate which shall state that (A) all conditions precedent provided in this Master Indenture relating to such withdrawal have been complied with and (B) immediately after giving effect to such withdrawal, no Event of Default hereunder shall have occurred and be continuing.

(b)    Upon the withdrawal of any Obligated Group Member from the Obligated Group pursuant to **subsection (a)**, all liability of such Obligated Group Member with respect to all Obligations Outstanding under this Master Indenture shall cease, the Master Trustee and the Deed of Trust Trustee shall execute and deliver to such Obligated Group Member a release in such form as may be reasonably requested of any Deed of Trust given by such Obligated Group Member, and the Master Trustee shall execute and deliver to such Obligated Group Member all UCC-3 termination statements in such form as may be reasonably requested to terminate the security interest in the Pledged Assets of such Obligated Group Member pursuant to **Section 3.01**.

**Section 3.13.    After-Acquired, Replacement or Substituted Real Property.**  In the event any Obligated Group Member shall acquire or construct real property, buildings, improvements and/or fixtures as an addition to or in replacement of or substitution for the Facilities, such Obligated Group Member will, upon closing of such acquisition or prior to commencement of such construction, record in the appropriate office of the county in which the property is located a Deed of Trust, or an amendment to a Deed of Trust previously recorded in that office, covering the property being acquired or constructed, if such Obligated Group Member has not previously executed and delivered a Deed of Trust to the Master Trustee that is recorded in that office which covers that property.  For purposes of this Section, real property, buildings, improvements and fixtures shall be deemed to be an addition to the Facilities if they comprise facilities that are functionally related to, and operated on an integrated basis with, the Facilities.

Any Obligated Group Member executing and delivering such Deed of Trust or notice of amendment pursuant to this Section shall (a) in the case of a Deed of Trust, (i) cause a mortgagee title insurance policy, together with a tie-in endorsement to such policy and each other mortgagee title insurance policy previously issued to the Master Trustee under the terms of this Master Indenture, to be issued and delivered to the Master Trustee in an amount equal to the principal amount of any Obligation to be issued in connection with acquiring or financing the real property or improvements to the real property described in such Deed of Trust (less any amount required to be deposited initially into a debt service reserve fund for such Obligation or any Related Bonds related to such Obligation), insuring that such Deed of Trust is a first priority Lien, subject to Permitted Liens, on the Mortgaged Property described therein or (ii) cause an endorsement to a mortgagee title insurance policy previously issued to the Master Trustee under this Master Indenture to be issued to the Master Trustee, that (A) amends the effective date and time of such policy to be the date and time of the recording of such Deed of Trust, (B) amends the description of the land insured by such policy to include the real property described in such Deed of Trust, (C) increases the amount of such policy by an amount equal to the principal amount of any Obligation issued in connection with acquiring or financing the real property or improvements to the real property described in such Deed of Trust (less any amount to be deposited into a debt service reserve fund for such Obligation or any Related Bonds related to such Obligation) and (D) continues to insure that the Deed(s) of Trust initially secured by such policy and the new Deed of Trust are first priority Liens on the Mortgaged Property described therein, subject to Permitted Liens, or (b) in the case of an amendment to an existing Deed of Trust, cause an endorsement to the mortgagee title insurance policy previously issued to the Master Trustee insuring the priority of the Deed of Trust to which such amendment relates to be issued and delivered to the Master Trustee that (i) amends the effective date and time of such policy to be the date and time of the recording of the amendment, (ii) amends the description of the land insured by such policy to include the real property described in the amendment, (iii) increases the amount of such policy by an amount equal to the principal amount of any Obligation issued in connection with acquiring or financing the real property or improvements to the real property described in such Deed of Trust (less any amount to be deposited into a debt service reserve fund for such Obligation or any Related Bonds related to such Obligation) and (iv) continues to insure that such Deed of Trust, giving effect to the amendment, is a first priority Lien on the Mortgaged Property described therein, subject to Permitted Liens.  Each title insurance policy or endorsement delivered to the Master Trustee pursuant to this Section shall be issued by a title insurance company and shall be accompanied by an Opinion of Counsel to the effect that such policy or endorsement satisfies the requirements of this Section.

34

Section 3.14.       **Liquidity Covenant.**

(a)       Each Obligated Group Member agrees to conduct its business so that the Obligated Group, on a consolidated or combined basis, on each of the following dates, commencing June 30, 2022 (each, a "**Liquidity Testing Date**"), has Days Cash on Hand as follows:

| Liquidity Testing Date | Days Cash on Hand |
| --- | --- |
| June 30, 2022 | 45 |
| December 31, 2022 | 45 |
| June 30, 2023 | 45 |
| December 31, 2023 | 50 |
| June 30, 2024 | 60 |
| December 31, 2024 | 65 |
| June 30, 2025 | 65 |
| December 31, 2025 and each June 30 and December 31 thereafter | 75 |

(b)       The Obligated Group covenants that it will calculate the Days Cash on Hand of the Obligated Group as of each Liquidity Testing Date.  The Obligated Group shall, not less than **45** days after each Liquidity Testing Date occurring on June 30 and not less than **125** days after each Liquidity Testing Date occurring on December 31, deliver an Officer's Certificate to the Master Trustee and the Holders setting forth the calculation for such Liquidity Testing Date; provided, however, any calculation for any unaudited period shall note that it is subject to year-end adjustment.

(c)       If the Days Cash on Hand on any Liquidity Testing Date (beginning with the June 30, 2022 Liquidity Testing Date) is less than the required amount for such Liquidity Test Date set forth in **Section 3.14(a)** above, as set forth in the Officer's Certificate delivered pursuant to **Section 3.14(b)** above, the Obligated Group Representative shall, if directed in writing by the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding (the "**Holders' DCH Direction**"), retain a Management Consultant (which is not the Management Company), acceptable to the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding (which approval shall not be unreasonably withheld and which approval shall be deemed not given unless provided within 14 days), within **30** days after the date Holders' DCH Direction is delivered to the Obligated Group Representative, to make recommendations to achieve the Days Cash on Hand set forth in **Section 3.14(a)** for all subsequent Liquidity Testing Dates.  A copy of the report of such Management Consultant's recommendations (the "**Management Consultant's DCH Report**"), if any, shall be filed with the Master Trustee within **60** days after the date the Management Consultant is retained by the Obligated Group Representative.

In the event that the retention of a Management Consultant is required under the provisions of this subsection (c) but the Days Cash on Hand provided in **Section 3.14(a)** that led to the retention of the Management Consultant remains unmet at the end of the second Liquidity Testing Date that succeeds the filing of the Management Consultant's DCH Report with the Master Trustee, at the written direction of the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding, the Obligated Group Representative shall appoint an independent third party manager (or replace an existing independent third party manager, if any) within **60** days of receipt of such written direction, which third party manager shall be acceptable to the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding.  If at the end of such second Liquidity Testing Date, the Management Consultant certifies that the Obligated Group has reasonably complied with all of the recommendations contained in the Management Consultant's DCH Report, then the period for compliance with such covenants shall be extended by two additional Liquidity Testing Dates;

35

*provided*, that if the Management Company fails to reasonably comply with such recommendations at any time during such extended Liquidity Testing Date period then at any such time, the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding may cause a replacement of the manager.  For avoidance of doubt, failure to comply with such covenants after the extended period (if applicable) may result in a change of management if directed by the Holders of at least **50%** in aggregate principal amount of the Series 2021 Obligations then Outstanding.

Each Obligated Group Member shall follow the recommendations of the Management Consultant applicable to it to the extent deemed feasible by its Governing Board and permitted by law.  So long as the Obligated Group retains a Management Consultant and each Obligated Group Member follows such Management Consultant's recommendations to the extent feasible and permitted by law, this **Section 3.14** shall be deemed to be complied with even if the Days Cash on Hand for any subsequent Liquidity Testing Date is below the required amount set forth in **Section 3.14(a)** above; except as provided in the next paragraph of this **Section 3.14**.

If Days Cash on Hand on any Liquidity Test Date (beginning with the June 30, 2022 Liquidity Testing Date) is less than 90% of the applicable Days Cash on Hand requirement set forth in **Section 3.14(a)** above as of any Liquidity Testing Date beginning with the June 30, 2022 Liquidity Test Date, such failure will be an Event of Default.

# ARTICLE IV

## EVENTS OF DEFAULT AND REMEDIES

**Section 4.01.    Events of Default.**  Event of Default, as used herein, means any of the following events:

(a)    The Obligated Group Members shall fail to make any payment of the principal of, the redemption premium, if any, or interest on any Obligation issued and Outstanding hereunder, and any other payments, including the purchase or redemption price of Put Indebtedness, required to be made under the Supplements creating such Obligations and under such Obligations, when and as the same shall become due and payable, whether at maturity, by proceedings for redemption, by acceleration or otherwise, in accordance with the terms thereof, of this Master Indenture or of any Supplement;

(b)    Any Obligated Group Member shall fail duly to perform, observe or comply with any covenant or agreement on its part under this Master Indenture, other than as otherwise described in this **Section 4.01**, for a period of **60** days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Obligated Group Members by the Master Trustee, or to the Obligated Group Members and the Master Trustee by the Holders of at least **50%** in aggregate principal amount of Obligations then Outstanding; provided that if said failure be such that it cannot be corrected within **60** days after the receipt of such notice, it shall not constitute an Event of Default if corrective action is instituted within such **60**-day period and diligently pursued until said failure is corrected and such curative action can be completed within **180** days after the foregoing notice unless such failure is not cured within that **180**-day period;

(c)    The failure of the Obligated Group Representative to obtain a Management Consultant's or Marketing Consultant's report, and failure of each Obligated Group Member to follow the recommendations of the Management Consultant or Marketing Consultant, all in the manner required by **Section 3.07** above, **Section 3.14** above, and **Section 5.11** of the Loan Agreement;

36

(d)     An "Event of Default" under a Related Bond Indenture or the Deed of Trust;

(e)     Any Obligated Group Member shall fail to pay promptly or otherwise satisfy and discharge any Outstanding Indebtedness (other than Obligations issued and Outstanding hereunder and Related Bonds) whether such Indebtedness now exists or shall hereafter be created, as and when the same becomes due and payable and any period of grace with respect thereto shall have expired, or another event of default as defined in any instrument, indenture or mortgage evidencing or securing such Indebtedness shall occur, which event of default shall not have been waived by the holder of such instrument, indenture or mortgage, and as a result of such failure to pay or other event of default, such Indebtedness shall have been accelerated; provided that such default shall not constitute an Event of Default if the validity, amount or collectability of such Indebtedness is being contested in good faith and such Obligated Group Member establishes and maintains reserves satisfactory to the Master Trustee for the payment of such Indebtedness pending the outcome of such contest, provided, however, a payment default thereunder shall not constitute an Event of Default unless the unpaid principal amount of such Indebtedness, together with the unpaid principal amount of all other Indebtedness so in default, exceeds the greater of **10%** of Book Value of all Property, Plant and Equipment of the Obligated Group or **5%** of the Total Revenues of the Obligated Group as shown on or derived from the most recent Financial Statements;

(f)     The entry of a decree or order by a court having jurisdiction in the premises for an order for relief against any Obligated Group Member, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of such Obligated Group Member under the United States Bankruptcy Code or any other applicable federal or state law, or appointing a receiver, liquidator, custodian, assignee, or sequestrator (or other similar official) of such Obligated Group Member or of any substantial part of its Property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of **90** consecutive days; and

(g)     The institution by any Obligated Group Member of proceedings for an order for relief, or the consent by it to an order for relief against it, or the filing by it of a petition or answer or consent seeking reorganization, arrangement, adjustment, composition or relief under the United States Bankruptcy Code or any other similar applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, custodian, assignee, trustee or sequestrator (or other similar official) of such Obligated Group Member or of any substantial part of its Property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by any Obligated Group Member in furtherance of any such action.

(h)     If, beginning with the quarter ending June 30, 2023, the Obligated Group shall fail to achieve a Long-Term Debt Service Coverage Ratio of at least 1.00 for any period set forth in **Section 3.07** above.

(i)     If, beginning with the June 30, 2022 Liquidity Testing Date, the Obligated Group shall fail to maintain Days Cash on Hand at least 90% of the amounts and as of the dates set forth in **Section 3.14** above.

**Section 4.02.   Acceleration; Annulment of Acceleration.**

(a)      Upon the occurrence and during the continuation of an Event of Default hereunder, the Master Trustee may and, upon the written request of (i) the Holders of not less than **50%** in aggregate principal amount of Obligations Outstanding or (ii) any Person properly exercising the right given to such Person under any Supplement to require acceleration of the Obligations issued pursuant to such Supplement, shall, by notice to the Obligated Group Members, declare all Obligations Outstanding immediately due and payable, whereupon such Obligations shall become and be immediately due and payable, anything in the Obligations or in any other section of this Master Indenture to the contrary notwithstanding; provided that if the terms of any Supplement give a Person the right to consent to acceleration of the Obligations issued pursuant to said Supplement, the Obligations issued pursuant to such Supplement may not be accelerated by the Master Trustee unless such consent is properly obtained pursuant to the terms of such Supplement.  In the event the Obligations are accelerated there shall be due and payable on such Obligations an amount equal to the total principal amount of all such Obligations, plus all interest accrued on such principal amount to the date of payment of such principal.

(b)      At any time after the Obligations shall have been declared to be immediately due and payable and before the entry of final judgment or decree in any suit, action or proceeding instituted on account of such Event of Default, if (i) the Obligated Group has paid or caused to be paid or deposited with the Master Trustee moneys sufficient to pay all matured installments of interest and all principal or redemption prices then due (other than the principal then due only because of such declaration) of all Obligations Outstanding; (ii) the Obligated Group has paid or caused to be paid or deposited with the Master Trustee money sufficient to pay the charges, compensation, expenses, disbursements, advances, fees and liabilities of the Master Trustee; (iii) all other amounts then payable by the Obligated Group hereunder shall have been paid or a sum sufficient to pay the same shall have been deposited with the Master Trustee; and (iv) every Event of Default (other than a default in the payment of such Obligations then due only because of such declaration) shall have been remedied, then the Master Trustee may, and upon the written request of Holders of not less than a majority in aggregate principal amount of the Obligations Outstanding shall, annul such declaration and its consequences with respect to any Obligations or portions thereof not then due by their terms.  No such annulment shall extend to or affect any subsequent Event of Default or impair any right consequent thereon.

### Section 4.03.    Additional Remedies and Enforcement of Remedies.

(a)      Upon the occurrence and continuance of any Event of Default, the Master Trustee may, and upon the written request of the Holders of not less than **50%** in aggregate principal amount of the Obligations Outstanding, together with indemnification of the Master Trustee to its satisfaction therefor as provided in **Section 5.02(e)**, shall, proceed forthwith to protect and enforce its rights and the rights of the Holders hereunder by such suits, actions or proceedings as the Master Trustee, being advised by counsel, shall deem expedient, including:

(i)      enforcement of the right of the Holders to collect and enforce the payment of amounts due or becoming due under the Obligations;

(ii)      suit upon all or any part of the Obligations;

(iii)      civil action to require any Person holding moneys, documents or other property pledged to secure payment of amounts due or to become due on the Obligations to account as if it were the trustee of an express trust for the Holders;

(iv)      civil action to enjoin any acts or things, which may be unlawful or in violation of the rights of the Holders;

38

(v)      enforcement of its rights as a secured party under the UCC;

(vi)     enforcement of any other right of the Holders conferred by law or hereby; and

(vii)    enforcement of any of its rights as beneficiary under the Deed of Trust.

(b)      Regardless of the happening of an Event of Default, the Master Trustee, if requested in writing by the Holders of not less than **50%** in aggregate principal amount of the Obligations then Outstanding, shall, upon being indemnified to its satisfaction therefor as provided in **Section 5.02(e)**, institute and maintain such suits and proceedings as it may be advised by counsel shall be necessary or expedient (i) to prevent any impairment of the security hereunder by any acts which may be unlawful or in violation hereof, or (ii) to preserve or protect the interests of the Holders, provided that such request and the action to be taken by the Master Trustee are not in conflict with any applicable law or the provisions hereof and, in the sole judgment of the Master Trustee, is not unduly prejudicial to the interest of the Holders not making such request.

**Section 4.04.    Application of Gross Receipts and Other Moneys after Default.**  During the continuance of an Event of Default, all Gross Receipts and other moneys received by the Master Trustee pursuant to any right given or action taken under the provisions of this Article, after payment of (i) the fees, costs and expenses of the proceedings resulting in the collection of such moneys and of the expenses and advances incurred or made by the Master Trustee with respect thereto and all other fees and expenses of the Master Trustee under this Master Indenture and (ii) in the sole discretion of the Master Trustee, the payment of the expenses of operating any Obligated Group Member, shall be applied as follows:

(a)      Unless the principal of all Outstanding Obligations shall have become or have been declared due and payable:

First:  To the payment to the Persons entitled thereto of all installments of interest then due on Series 2021A Obligation and the Series 2021C Obligation in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon to the persons entitled thereto, without any discrimination or preference;

Second:  To the payment to the Persons entitled thereto of the unpaid principal installments of any Series 2021A Obligation and the Series 2021C Obligation which shall have become due, whether at maturity or by call for redemption, in the order of their due dates, and if the amounts available shall not be sufficient to pay in full all Obligations due on any date, then to the payment thereof ratably, according to the amounts of principal installments due on such date, to the Persons entitled thereto, without any discrimination or preference;

Third:  To the payment to the Persons entitled thereto of all installments of interest then due on Series 2021B Obligation in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon to the persons entitled thereto, without any discrimination or preference;

Fourth:  To the payment to the Persons entitled thereto of the unpaid principal installments of any Series 2021B Obligation which shall have become due, whether at maturity or by call for redemption, in the order of their due dates, and if the amounts available shall not be sufficient to pay in full all

Obligations due on any date, then to the payment thereof ratably, according to the amounts of principal installments due on such date, to the Persons entitled thereto, without any discrimination or preference;

Fifth:  To the payment to the Persons entitled thereto of all installments of interest then due on Series 2021D Obligation in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon to the persons entitled thereto, without any discrimination or preference;

Sixth:  To the payment to the Persons entitled thereto of the unpaid principal installments of any Series 2021D Obligation which shall have become due, whether at maturity or by call for redemption, in the order of their due dates, and if the amounts available shall not be sufficient to pay in full all Obligations due on any date, then to the payment thereof ratably, according to the amounts of principal installments due on such date, to the Persons entitled thereto, without any discrimination or preference;

Seventh:  To the payment to the Persons entitled thereto of all installments of interest then due on any Obligation other than the Series 2021 Obligations in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon to the persons entitled thereto, without any discrimination or preference; and

Eighth:  To the payment to the Persons entitled thereto of the unpaid principal installments of any Obligation other than the Series 2021 Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates, and if the amounts available shall not be sufficient to pay in full all Obligations due on any date, then to the payment thereof ratably, according to the amounts of principal installments due on such date, to the Persons entitled thereto, without any discrimination or preference;

(b)      If the principal of all Outstanding Obligations shall have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon Obligations, first to the Series 2021A Obligation and the Series 2021C Obligation, ratably, then to the Series 2021B Obligation and then to the Series 2021D Obligation, according to the amounts due respectively for principal and interest, to the Persons entitled thereto;

(c)      If the principal of all Outstanding Obligations shall have been declared due and payable, and if such declaration shall thereafter have been rescinded and annulled under the provisions of this Article, then, subject to **paragraph (b)** in the event that the principal of all Outstanding Obligations shall later become due or be declared due and payable, the moneys shall be applied in accordance with **paragraph (a)**.

Whenever moneys are to be applied by the Master Trustee pursuant to this Section, such moneys shall be applied by it at such times, and from time to time, as the Master Trustee shall determine, having due regard for the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future.  Whenever the Master Trustee shall apply such moneys, it shall fix the date upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such dates shall cease to accrue.  The Master Trustee shall give such notice as it may deem appropriate of the deposit with it of any such moneys and of the fixing of any such date, and shall not be required to make payment to the Holder of any unpaid Obligation until such Obligation shall be presented to the Master Trustee for appropriate endorsement of any partial payment or for cancellation if fully paid.

40

Whenever all Obligations and interest thereon have been paid under this Section and all fees, expenses and charges of the Master Trustee have been paid or provided for, any balance remaining shall be paid to the Obligated Group Members, their respective successors, or as a court of competent jurisdiction may direct.

Section 4.05.    **Remedies Not Exclusive.**  No remedy by the terms hereof conferred upon or reserved to the Master Trustee or the Holders is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or existing at law or in equity or by statute on or after the date hereof.

Section 4.06.    **Remedies Vested in the Master Trustee.**  All rights of action (including the right to file proof of claims) hereunder or under any of the Obligations may be enforced by the Master Trustee without the possession of any of the Obligations or the production thereof in any trial or other proceedings relating thereto.  Any such suit or proceeding instituted by the Master Trustee may be brought in its name as the Master Trustee without the necessity of joining as plaintiffs or defendants any Holders.  Subject to **Section 4.04**, any recovery or judgment shall be for the equal benefit of the Holders.

Section 4.07.    **Holders' Control of Proceedings.**  If an Event of Default shall have occurred and be continuing, notwithstanding anything herein to the contrary, the Holders of not less than a majority in aggregate principal amount of Obligations then Outstanding shall have the right, at any time, by an instrument in writing executed and delivered to the Master Trustee and accompanied by indemnity satisfactory to the Master Trustee as provided in **Section 5.02(e)**, to direct the method and place of conducting any proceeding to be taken in connection with the enforcement of the terms and conditions hereof or for the appointment of a receiver or any other proceedings hereunder, provided that such direction is not in conflict with any applicable law or the provisions hereof, and provided further, that the Master Trustee shall have the right to decline to follow any such direction if the Master Trustee in good faith shall determine that the proceeding so directed would involve it in personal liability, and, in the sole judgment of the Master Trustee, is not unduly prejudicial to the interest of any Holders not joining in such direction and provided further that nothing in this Section shall impair the right of the Master Trustee in its discretion to take any other action hereunder which it may deem proper and which is not inconsistent with such direction by Holders.

Section 4.08.    **Termination of Proceeding.**  In case any proceeding taken by the Master Trustee on account of an Event of Default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Master Trustee or to the Holders, then the Obligated Group Members, the Master Trustee and the Holders shall be restored to their former positions and rights hereunder, and all rights, remedies and powers of the Master Trustee, the Obligated Group Members and the Holders shall continue as if no such proceeding had been taken.

**Section 4.09.     Waiver of Event of Default.**

(a)       No delay or omission of the Master Trustee or of any Holder to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein.  Every power and remedy given by this Article to the Master Trustee and the Holders, respectively, may be exercised from time to time and as often as may be deemed expedient by them.

(b)       The Master Trustee may waive any Event of Default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof, or before the completion of the enforcement of any other remedy hereunder.

(c)       Notwithstanding anything contained herein to the contrary, the Master Trustee, upon the written request of the Holders of not less than a majority of the aggregate principal amount of Obligations then Outstanding, shall waive any Event of Default hereunder and its consequences; provided that, (i) except under the circumstances set forth in **Section 4.02(b)**, a default in the payment of the principal of, premium, if any, or interest on any Obligation, when the same shall become due and payable by the terms thereof or upon call for redemption, may not be waived without the written consent of the Holders of all the Obligations (with respect to which such payment default exists) at the time Outstanding and (ii) the Master Trustee shall not be required to waive any Event of Default involving nonpayment of the fees, costs, charges or expenses of the Master Trustee.

(d)       In case of any waiver by the Master Trustee of an Event of Default hereunder, the Obligated Group Members, the Master Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereon.

**Section 4.10.    Appointment of Receiver.**  Upon the occurrence of any Event of Default, unless the same shall have been waived as herein provided, the Master Trustee shall be entitled as a matter of right if it shall so elect, (i) forthwith and without declaring the Obligations to be due and payable, (ii) after declaring the same to be due and payable, or (iii) upon the commencement of an action to enforce the specific performance hereof or in aid thereof or upon the commencement of any other judicial proceeding to enforce any right of the Master Trustee or the Holders, to the appointment of a receiver or receivers of any or all of the Property of the Obligated Group with such powers as the court making such appointment shall confer. Upon the occurrence of an Event of Default, each Obligated Group Member, respectively, hereby consents and agrees, and will if requested by the Master Trustee consent and agree at the time of application by the Trustee for appointment of a receiver of its Property, to the appointment of such receiver of its Property and that such receiver may be given the right, power and authority, to the extent the same may lawfully be given, to take possession of and operate and deal with such Property and the revenues, profits and proceeds therefrom, with like effect as such Obligated Group Member could do so, and to borrow money and issue evidences of indebtedness as such receiver.

**Section 4.11.    Remedies Subject to Provisions of Law.**  All rights, remedies and powers provided by this Article may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Article are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this instrument or the provisions hereof invalid or unenforceable under the provisions of any applicable law.

42

Section 4.12.    **Notice of Default.**  Promptly after obtaining knowledge of any Event of Default but in no event later than **5** business days after obtaining such knowledge, each Obligated Group Member shall deliver to the Master Trustee and each Related Bond Trustee a written notice specifying the nature and period of existence of such Event of Default and the action the Obligated Group is taking and proposes to take with respect thereto.

The Master Trustee shall, within 15 days after it has knowledge of the occurrence of an Event of Default, mail to each Obligated Group Member and all Holders as the names and addresses of such Holders appear upon the books of the Master Trustee, notice of such Event of Default known to the Master Trustee, unless such Event of Default shall have been cured before the giving of such notice; provided that, except in the case of default in the payment of the principal of, redemption premium, if any, or interest on any of the Obligations and the Events of Default specified in **Sections 4.01(e)** and **(f)**, the Master Trustee shall be protected in withholding such notice if and so long as the Master Trustee in good faith determines that the withholding of such notice is in the interests of the Holders.

For purposes of this Article, the Master Trustee shall not be deemed to have knowledge of an Event of Default hereunder unless written notice of any event which is an Event of Default is received by the Master Trustee and such notice references this Master Indenture.

## ARTICLE V

### THE MASTER TRUSTEE

Section 5.01.    **Certain Duties and Responsibilities.**  The Master Trustee accepts and agrees to execute the trusts imposed upon it by this Master Indenture, but only upon the following terms and conditions:

(a)    Except during the continuance of an Event of Default, the Master Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Master Indenture, and no implied covenants or obligations shall be read into this Master Indenture against the Master Trustee.

(b)    In the absence of bad faith on its part, the Master Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Master Trustee and conforming to the requirements of this Master Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Master Trustee, the Master Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Master Indenture.

(c)    In case an Event of Default of which the Master Trustee has received notice pursuant to **Section 4.12** has occurred and is continuing, the Master Trustee shall exercise such of the rights and powers vested in it by this Master Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of its own affairs.

(d)    No provision of this Master Indenture shall be construed to relieve the Master Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subsection shall not be construed to limit the effect of **subsection (a)**;

43

(ii)      the Master Trustee shall not be liable for any error of judgment made in good faith by the Master Trustee, unless it shall be proved that the Master Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Master Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Obligations relating to the time, method and place of conducting any proceeding for any remedy available to the Master Trustee, or exercising any trust or power conferred upon the Master Trustee, under this Master Indenture, except under the circumstances set forth in **Section 4.09(c)** requiring the consent of the Holders of all the Obligations at the time Outstanding; and

(iv)     no provision of this Master Indenture shall require the Master Trustee to expend or risk its own funds or otherwise incur any financial or other liability, directly or indirectly, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)      Whether or not therein expressly so provided, every provision of this Master Indenture relating to the conduct or affecting the liability of or affording protection to the Master Trustee shall be subject to this Article.

**Section 5.02.   Certain Rights of Master Trustee.**   Except as otherwise provided in **Section 5.01**:

(a)      The Master Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)      Any request, direction or statement of any Obligated Group Member mentioned herein shall be sufficiently evidenced by an Officer's Certificate and any action of the Governing Body may be sufficiently evidenced by a copy of a resolution certified as true and correct by the secretary or any assistant secretary of the Obligated Group Member to have been duly adopted by the Governing Body and to be in full force and effect on the date of such certification and delivered to the Master Trustee.

(c)      Whenever in the administration of this Master Indenture the Master Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Master Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate.

(d)      The Master Trustee may consult with counsel or independent auditor and the advice of such counsel or independent auditor or any Opinion of Counsel may be conclusively relied upon and shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(e)      Notwithstanding any provision of this Master Indenture to the contrary, the Master Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Master Indenture whether on its own motion or at the request or direction of any of the Holders pursuant to this Master Indenture, unless one or more Holders or such Holders making such request shall have offered and

44

furnished to the Master Trustee reasonable security or indemnity satisfactory to the Master Trustee against the fees, costs, expenses and liabilities (including liability related to environmental contamination and the remediation thereof) which might be incurred by it in compliance with such request or direction or otherwise in connection herewith.

(f)    The Master Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, but the Master Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Master Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of any Obligated Group Member, personally or by agent or attorney.

(g)    The Master Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys or receivers, and the Master Trustee shall not be responsible for any misconduct or negligence on the part of any agent, attorney or receiver selected by it with due care hereunder.

(h)    All moneys received by the Master Trustee shall, until used or applied or invested as provided, be held in trust for the purposes for which they were received.  Money held by the Master Trustee in trust hereunder need not be segregated from other funds, except to the extent required by law or this Master Indenture.  The Master Trustee shall be under no liability for interest on any money received by it hereunder except for accounting for earnings received on investments authorized and directed pursuant to this Master Indenture.

(i)    The Master Trustee shall not be required to give any bond or surety in respect of the execution of the powers and trusts of this Master Indenture or otherwise.

(j)    The Master Trustee shall not be responsible for the recording or rerecording, filing or refiling of this Master Indenture or any supplement or security instruments in connection therewith except as otherwise expressly provided in **Section 5.08**.  The Master Trustee shall not be responsible for the use of any of any Obligations authenticated and delivered hereunder or under any supplement.  Any action taken by the Master Trustee upon the request or authority or consent of any Person who, at the time of making such request or giving such authority or consent is the Holder of any Obligation, shall be conclusive and binding upon all future Holders of the same Obligation and upon Obligations issued in exchange therefor or upon transfer or in place thereof.  Notwithstanding any other provision of this Master Indenture to the contrary, any provision intended to provide authority to act, right to payment of fees and expenses, protection, immunity and indemnification to the Master Trustee, shall be interpreted to include any action of the Master Trustee whether it be deemed to be in its capacity as Master Trustee, Obligation registrar, or otherwise.  The Master Trustee may elect not to proceed in accordance with the directions of the Holders without incurring any liability to the Holders or otherwise, if, in the opinion of the Master Trustee, such direction may result in liability, including environmental liability, to the Master Trustee, in its individual or other capacity, for which the Master Trustee has not received indemnity satisfactory to it, and the Master Trustee may rely conclusively upon the opinion or advice of counsel in determining whether any action directed by the Holders may result in such liability.  The Master Trustee may inform Holders of environmental hazards that the Master Trustee has reason to believe exist, and the Master Trustee has the right to take no further action and, in such event, no fiduciary duty exists which imposes any obligation for further action with respect to the Property or any portion thereof if the Master Trustee, in its individual capacity, determines that any such action could materially and adversely subject the Master Trustee to environmental or other liability for which the Master Trustee has not received indemnity.

45

No permissive right of the Master Trustee hereunder, including the authority to enter into Supplements or take other actions, shall be construed as a duty, and the Master Trustee shall be under no obligations to take any such action or exercise any such right.

**Section 5.03.    Right to Deal in Obligations and Related Bonds.**  The Master Trustee may in good faith buy, sell or hold and deal in any Obligations and Related Bonds with like effect as if it were not such Master Trustee and may commence or join in any action which a Holder or holder of a Related Bond is entitled to take with like effect as if the Master Trustee were not the Master Trustee.

**Section 5.04.    Removal and Resignation of the Master Trustee.**  The Master Trustee may resign on its motion or may be removed at any time by an instrument or instruments in writing signed by the Holders of not less than a majority of the principal amount of Obligations then Outstanding or, if no Event of Default shall have occurred and be continuing, or no event has occurred or is continuing that, after notice or passage of time or both, would become an Event of Default, by an instrument in writing signed by the Obligated Group Representative.  If the Master Trustee has or shall acquire any conflicting interest, it shall, within 90 days after ascertaining that it has a conflicting interest, or within **30** days after receiving written notice from the Obligated Group Representative (so long as the Obligated Group is not in default under this Master Indenture) that it has a conflicting interest, either eliminate such conflicting interest or resign in the manner and with the effect specified in this Section.  No such resignation or removal shall become effective unless and until a successor Master Trustee (or temporary successor trustee as provided below) has been appointed and has assumed the trusts created hereby.  Written notice of such resignation or removal shall be given to the Obligated Group Members, and each Holder at the address then reflected on the books of the Master Trustee.

A successor Master Trustee may be appointed by the Obligated Group Representative or the Holders at the direction of the Holders of not less than a majority in aggregate principal amount of Obligations Outstanding.  In the event a successor Master Trustee has not been appointed and qualified within 60 days of the date notice of resignation or removal is given, the Master Trustee, any Obligated Group Member or any Holder may apply to any court of competent jurisdiction for the appointment of a temporary successor Master Trustee to act until such time as a successor is appointed as above provided.

There shall at all times be a Master Trustee hereunder, which shall be a bank or trust company organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, subject to supervision or examination by federal or state authority, and having a combined capital and surplus of at least $100,000,000, either directly or by a guarantee of a corporation related to the Master Trustee.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, then the combined capital and surplus of such corporation will be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Master Trustee ceases to be eligible as above provided, it shall resign immediately in accordance with the terms of this Section.

Every successor Master Trustee howsoever appointed hereunder shall execute, acknowledge and deliver to its predecessor and also to each Obligated Group Member an instrument in writing, accepting such appointment hereunder, and thereupon such successor Master Trustee, without further action, shall become fully vested with all the rights, immunities, powers, trusts, duties and obligations of its predecessor, and such predecessor shall, upon payment of the fees, costs, charges and expenses due to it, execute and deliver such instrument as may be reasonably requested transferring to such successor Master Trustee all the rights, powers and trusts of such predecessor.  The predecessor Master Trustee shall

46

execute any and all documents as may be reasonably requested necessary or appropriate to convey all interest it may have to the successor Master Trustee and the duties and obligations of the predecessor Master Trustee hereunder shall thereupon cease and terminate.  The predecessor Master Trustee shall promptly deliver all material records relating to the trust or copies thereof and, on request, communicate all material information it may have obtained concerning the trust to the successor Master Trustee.

Each successor Master Trustee, not later than 10 days after its assumption of the duties hereunder, shall mail a notice of such assumption to each registered Holder.

Section 5.05.    **Compensation and Reimbursement.**    Each Obligated Group Member, respectively, agrees:

(a)    To pay the Master Trustee from time to time reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust).

(b)    Except as otherwise expressly provided herein, to reimburse the Master Trustee upon its request for all reasonable expenses, disbursements and advances (with interest thereon at the prime rate of the Master Trustee plus 2%) incurred or made by the Master Trustee, including fees on collection and enforcement, in accordance with any provision of this Master Indenture (including the reasonable compensation and the expenses and disbursements of its counsel and its agents), except any such expense, disbursement or advance as may be attributable to its negligence or willful misconduct.

(c)    To indemnify the Master Trustee for, and to hold it harmless against, any loss, liability or expense incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of this trust or its duties hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

(d)    Except as otherwise provided in this Master Indenture, as security for the payment of compensation, reimbursements and indemnity, the Master Trustee shall be secured by a first lien on such money and property held hereunder prior to any lien thereon securing the payment of principal, interest, and premium if any, on the Obligations.

(e)    Notwithstanding anything otherwise provided in this Master Indenture, in each instance in which this Master Indenture provides for compensation, reimbursement or indemnification of the Master Trustee, whether or not expressly so stated, such provision shall be deemed to provide for the payment of all related fees, costs, charges, advance and expenses of the Master Trustee (including attorneys' fees and expenses) unless the context shall clearly indicate otherwise.

Section 5.06.    **Recitals and Representations.**    The recitals, statements and representations contained herein, or in any Obligation (excluding the Master Trustee's authentication on the Obligations) shall be taken and construed as made by and on the part of the Obligated Group Members, respectively, and not by the Master Trustee, and the Master Trustee neither assumes nor shall be under any responsibility for the correctness of the same.

The Master Trustee makes no representation as to, and is not responsible for, the validity or sufficiency hereof, of the Obligations, or the validity or sufficiency of insurance to be provided.  The Master Trustee shall be deemed not to have made representations as to the security afforded hereby or hereunder or as to the validity or sufficiency of such document.  The Master Trustee shall not be

concerned with or accountable to anyone for the use or application of any moneys which shall be released or withdrawn in accordance with the provisions hereof.  The Master Trustee shall have no duty of inquiry with respect to any default or Events of Default described herein without receipt by the Master Trustee of written notice of a default or an Event of Default from an Obligated Group Member or any Holder.

**Section 5.07.    Separate or Co-Master Trustee.**  At any time or times, for the purpose of meeting any legal requirements of any jurisdiction, the Master Trustee shall have power to appoint, and, upon the request of the Holders of at least **25%** in aggregate principal amount of Obligations Outstanding, shall appoint, one or more Persons approved by the Master Trustee either to act as co-trustee or co-trustees, jointly with the Master Trustee, or to act as separate trustee or separate trustees, and to vest in such person or persons, in such capacity, such rights, powers, duties, immunities, protections, indemnities, trusts or obligations as the Master Trustee may consider necessary or desirable, subject to the remaining provisions of this Section.  If no Event of Default shall have occurred and be continuing, or no event has occurred or is continuing that, after notice or passage of time or both, would become an Event of Default, any co-trustee or separate trustee appointed pursuant to this Section shall be subject to the written approval of the Obligated Group, evidenced by an instrument in writing signed by the Obligated Group Representative.

Every co-trustee or separate trustee shall, to the extent permitted by law but to such extent only, be appointed subject to the following terms, namely:

(a)    The Obligations shall be authenticated and delivered solely by the Master Trustee.

(b)    All rights, powers, trusts, duties, immunities, protections, indemnities and obligations conferred or imposed upon the trustees shall be conferred or imposed upon and exercised or performed by the Master Trustee, or by the Master Trustee and such co-trustee or co-trustees or separate trustee or separate trustees jointly, as shall be provided in the instrument appointing such co-trustee or co-trustees or separate trustee or separate trustees, except to the extent that, under the law of any jurisdiction in which any particular act or acts are to be performed, the Master Trustee shall be incompetent or unqualified to perform such act or acts, in which event such act or acts shall be performed by such co-trustee or co-trustees or separate trustee or separate trustees.

(c)    Any request in writing by the Master Trustee to any co-trustee or separate trustee to take or to refrain from taking any action hereunder shall be sufficient warrant for the taking, or the refraining from taking, of such action by such co-trustee or separate trustee.

(d)    Any co-trustee or separate trustee may, to the extent permitted by law, delegate to the Master Trustee the exercise of any right, power, trust, duty or obligation, discretionary or otherwise.

(e)    The Master Trustee at any time, by any instrument in writing, may accept the resignation of or remove any co-trustee or separate trustee appointed under this Section.  Upon the request of the Master Trustee, the Obligated Group Members shall join with the Master Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to effectuate such resignation or removal.

(f)    No trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder, nor will the act or omission of any trustee hereunder be imputed to any other trustee.

48

(g)      Any demand, request, direction, appointment, removal, notice, consent, waiver or other action in writing delivered to the Master Trustee shall be deemed to have been delivered to each such co-trustee or separate trustee.

(h)      Any moneys, papers, securities or other items of personal property received by any such co-trustee or separate trustee hereunder shall forthwith, so far as may be permitted by law, be turned over to the Master Trustee.

Upon the acceptance in writing of such appointment by any such co-trustee or separate trustee, it shall be vested with such rights, powers, trusts, immunities, protections, indemnities, duties or obligations, as shall be specified in the instrument of appointment jointly with the Master Trustee (except insofar as local law makes it necessary for any such co-trustee or separate trustee to act alone) subject to all the terms hereof. Every such acceptance shall be filed with the Master Trustee. To the extent permitted by law, any co-trustee or separate trustee may, at any time by an instrument in writing, constitute the Master Trustee its or his attorney-in-fact and agent, with full power and authority to perform all acts and things and to exercise all discretion on its or his behalf and in its or his name.

In case any co-trustee or separate trustee shall die, become incapable of acting, resign or be removed, all rights, powers, trusts, immunities, protections, indemnities, duties and obligations of said co-trustee or separate trustee shall, so far as permitted by law, vest in and be exercised by the Master Trustee unless and until a successor co-trustee or separate trustee shall be appointed in the manner herein provided.

**Section 5.08.    Continuation of Financing Statements**.  As provided in **Sections 3.01(c), 3.11, 3.12** and **3.13**, each Obligated Group Member shall prepare and file such UCC-1 financing statements, and such amendments to existing UCC-1 financing statements, as may be required to maintain at all times the perfection of the security interests created by this Master Indenture and the Deed of Trust to the extent those security interests can be perfected by filing; provided that, if the Obligated Group Representative delivers to the Master Trustee: (a) a file stamped counterpart of each UCC-1 financing statement together with any amendments thereto; and (b) an Opinion of Counsel identifying such UCC-1 financing statements and stating that such UCC-1 financing statements have been properly filed so as to create a perfected security interest in collateral securing this Master Indenture to the extent those security interests can be perfected by filing, the Master Trustee, at the expense of that Obligated Group Member, shall undertake to file such continuation statements as may be necessary to maintain the record of the UCC-1 financing statements as originally filed. Each Obligated Group Member shall cooperate with the Master Trustee in this regard by executing such continuation statements and amendments to the extent required or appropriate, and providing such information as the Master Trustee may require to continue UCC-1 financing statements.

## ARTICLE VI

### SUPPLEMENTS

**Section 6.01.    Supplements Not Requiring Consent of Holders.**  Each Obligated Group Member, when authorized by resolution or other action of equal formality by its Governing Body, and the Master Trustee may, without the consent of or notice to any of the Holders, enter into one or more Supplements for one or more of the following purposes:

(a)      To cure any ambiguity or formal defect or omission herein.

49

(b)      To correct or supplement any provision herein which may be inconsistent with any other provision herein; provided such action, in the judgment of the Master Trustee, shall not materially adversely affect the interests of the Holders of the Master Notes.

(c)      To grant or confer ratably upon all of the Holders any additional rights, remedies, powers or authority that may lawfully be granted or conferred upon them subject to **Section 6.02(a)**.

(d)      To qualify this Master Indenture under the Trust Indenture Act of 1939, as amended, or corresponding provisions of federal laws from time to time in effect.

(e)      To create and provide for the issuance of Obligations as permitted hereunder.

(f)      To obligate a successor to any Obligated Group Member as provided in **Section 3.09** or to evidence the addition of a new Obligated Group Member as provided in **Section 3.11**, or to release an Obligated Group Member as provided in **Section 3.12**.

(g)      To comply with the provisions of any federal or state securities law.

(h)      To make any changes necessitated by changes in generally accepted accounting principles which, in the sole judgment of the Master Trustee, do not materially and adversely affect the interests of the Holders (in making such determination, the Master Trustee may conclusively rely upon an Opinion of Counsel).

(i)      To make any other change which, in the sole judgment of the Master Trustee, does not materially and adversely affect the interests of the Holders (in making such determination, the Master Trustee may conclusively rely upon an Opinion of Counsel).

**Section 6.02.    Supplements Requiring Consent of Holders.**

(a)      Other than Supplements referred to in **Section 6.01** and subject to the provisions of this Article and not otherwise, the Holders of not less than a majority in aggregate principal amount of Obligations then Outstanding shall have the right, from time to time, anything contained herein to the contrary notwithstanding, to consent to and approve the execution by each Obligated Group Member, when authorized by resolution or other action of equal formality by its Governing Body, and the Master Trustee of such Supplements as shall be deemed necessary and desirable for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained herein; provided that nothing in this Section shall permit or be construed as permitting a Supplement which would:

(i)      Effect a change in the times, amounts or currency of payment of the principal of, redemption premium, if any, and interest on any Obligation or a reduction in the principal amount or redemption price of any Obligation or the rate of interest thereon, without the consent of the Holder of such Obligation;

(ii)      Permit the preference or priority of any Obligation over any other Obligation, without the consent of the Holders of all Obligations then Outstanding; or

(iii)      Reduce the aggregate principal amount of Obligations then Outstanding the consent of the Holders of which is required to authorize such Supplement without the consent of the Holders of all Obligations then Outstanding.

50

(b)     If at any time each Obligated Group Member shall request the Master Trustee to enter into a Supplement pursuant to this Section, which request is accompanied by a copy of the resolution or other action of its Governing Body certified by its secretary or any assistant secretary or if it has no secretary or assistant secretary, its comparable officer, and the proposed Supplement, the Master Trustee shall, at the expense of the Obligated Group, cause notice of the proposed execution of such Supplement to be mailed, postage prepaid, to all Holders.  Such notice shall briefly set forth the nature of the proposed Supplement and shall state that copies thereof are on file at the principal corporate trust office of the Master Trustee for inspection by all Holders.  The Master Trustee shall not, however, be subject to any liability to any Holder by reason of its failure to mail the notice required by this Section, and any such failure shall not affect the validity of such Supplement when approved and consented to as provided in this Section.  If, following such notice, the Master Trustee shall receive an instrument or instruments purporting to be executed by the Holders of not less than the aggregate principal amount or number of Obligations specified in **subsection (a)** for the Supplement in question which instrument or instruments shall refer to the proposed Supplement and shall specifically consent to and approve the execution thereof in substantially the form of the copy thereof as on file with the Master Trustee, thereupon, but not otherwise, the Master Trustee may execute such Supplement in substantially such form, without liability or responsibility to any Holder, whether or not such Holder shall have consented thereto.

(c)     Any such consent shall be binding upon the Holder giving such consent and upon any subsequent Holder of such Obligation and of any Obligation issued in exchange therefor (whether or not such subsequent Holder thereof has notice thereof), unless such consent is revoked in writing by the Holder of such Obligation giving such consent or by a subsequent Holder thereof by filing with the Master Trustee, prior to the execution by the Master Trustee of such Supplement, such revocation and, if such Obligation is transferable by delivery, proof that such Obligation is held by the signer of such revocation in the manner permitted by **Section 8.01**.  At any time after the Holders of the required principal amount or number of Obligations shall have filed their consents to the Supplement, the Master Trustee shall make and file with each Obligated Group Member a written statement to that effect.  Such written statement shall be conclusive that such consents have been so filed.

(d)     If the Holders of the required principal amount of the Obligations Outstanding shall have consented to and approved the execution of such Supplement as herein provided, no Holder shall have any right to object to the execution thereof, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Master Trustee or any Obligated Group Member from executing the same or from taking any action pursuant to the provisions thereof.

Section 6.03.    **Execution and Effect of Supplements.**

(a)     In executing any Supplement permitted by this Article, the Master Trustee shall receive and may conclusively rely upon an Opinion of Counsel stating that the execution of such Supplement is authorized or permitted hereby and by applicable law and that all conditions precedent thereto have been satisfied and, upon execution and delivery thereof, will be valid and binding upon each Obligated Group Member.  The Master Trustee may but shall not be obligated to enter into any such Supplement which affects the Master Trustee's own rights, duties or immunities.

(b)     Upon the execution and delivery of any Supplement in accordance with this Article, the provisions hereof shall be modified in accordance therewith and such Supplement shall form a part hereof for all purposes and every Holder of an Obligation theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

(c)      Any Obligation authenticated and delivered after the execution and delivery of any Supplement in accordance with this Article may, and if required by the issuer of such Obligation or the Master Trustee shall, bear a notation in form approved by the Master Trustee as to any matter provided for in such Supplement.  If the issuer of any Obligations then Outstanding or the Master Trustee shall so determine, new Obligations so modified as to conform in the opinion of the Master Trustee and the Governing Body of such issuer to any such Supplement may be prepared and executed by the issuer and authenticated and delivered by the Master Trustee in exchange for and upon surrender of Obligations then Outstanding.

## ARTICLE VII

## SATISFACTION AND DISCHARGE

**Section 7.01.    Satisfaction and Discharge.**  If (a) the Obligated Group Representative shall deliver to the Master Trustee for cancellation all Obligations theretofore authenticated (other than any Obligations which shall have been mutilated, destroyed, lost or stolen and which shall have been replaced or paid as provided in the Supplement) and not theretofore cancelled, or (b) all Obligations not theretofore cancelled or delivered to the Master Trustee for cancellation shall have become due and payable and money sufficient to pay the same shall have been deposited with the Master Trustee, or (c) all Obligations that have not become due and payable and have not been cancelled or delivered to the Master Trustee for cancellation shall be Defeased Obligations, and if in all cases the Obligated Group Members shall also pay or cause to be paid all other sums payable hereunder by the Obligated Group Members or any thereof, then this Master Indenture shall cease to be of further effect, and the Master Trustee, on demand of the Obligated Group Members, and at the cost and expense of the Obligated Group Members, shall execute proper instruments acknowledging satisfaction of and discharging this Master Indenture.  Each Obligated Group Member, respectively, hereby agrees to reimburse the Master Trustee for any costs or expenses theretofore and thereafter properly incurred by the Master Trustee in connection with this Master Indenture or such Obligations.

**Section 7.02.    Payment of Obligations after Discharge of Lien.**    Notwithstanding the discharge of the lien hereof as in this Article provided, the Master Trustee shall nevertheless retain such rights, powers, trusts, immunities, protections, indemnities, duties and obligations hereunder as may be necessary and convenient for the payment of amounts due or to become due on the Obligations and the registration, transfer, exchange and replacement of Obligations as provided herein and the fees, costs, charges, reimbursements and indemnities due the Master Trustee.

## ARTICLE VIII

## CONCERNING THE HOLDERS

**Section 8.01.    Evidence of Acts of Holders.**

(a)      In the event that any request, direction or consent is requested or permitted hereunder of the Holders, the Related Bond Trustee for a series of Related Bonds shall be deemed to be the Holder of the Obligations securing that series of Related Bonds for the purpose of any such request, direction or consent, provided that, if any registered owners of Related Bonds of that series provide directions to that Related Bond Trustee, then the registered owners of Related Bonds of that series then outstanding shall be deemed to be the Holders of the Obligations securing the Related Bonds of that series for the purpose of any such request, direction or consent in the proportion that the aggregate principal amount of Related

52

Bonds of that series then outstanding held by each such registered owner of Related Bonds of that series bears to the aggregate principal amount of all Related Bonds of that Series then outstanding; and provided further that, if the Related Bond Indenture so provides, at any time a letter of credit or bond insurance policy secures payment of the principal of and interest on such Related Bonds, the provider of such letter of credit or bond insurance policy shall be deemed to be the Holder of the Obligations securing the Related Bonds for the foregoing purposes except during any period when such provider has failed to honor its obligations under such letter of credit or bond insurance policy.  In connection with the initial offering and sale of Related Bonds, the underwriters (or their representative) of such Related Bonds shall be deemed to be the initial Holders of the Obligations securing the Related Bonds for such purpose or, if the Related Bond Indenture so provides, may be appointed as attorney-in-fact by the initial purchasers of such Related Bonds for such purpose.

(b)    As to any request, direction, consent or other instrument provided hereby to be signed and executed by the Holders, such action may be in any number of concurrent writings, shall be of similar tenor, and may be signed or executed by such Holders in person or by agent appointed in writing.

(c)    Proof of the execution of any such request, direction, consent or other instrument or of the writing appointing any such agent and of the ownership of Obligations, except the assignment of ownership of an Obligation, if made in the following manner, shall be sufficient for any of the purposes hereof and shall be conclusive in favor of the Master Trustee and the Obligated Group Members, with regard to any action taken by them, or either of them, under such request, direction or consent or other instrument, namely:

(i)    The fact and date of the execution by any person of any such writing may be proved by the certificate of any officer in any jurisdiction who by law has power to take acknowledgments in such jurisdiction, that the person signing such writing acknowledged before him the execution thereof, or by the affidavit of a witness of such execution; and

(ii)    The ownership of Related Bonds may be proved by the registration books for such Related Bonds maintained pursuant to the Related Bond Indenture.

(d)    Nothing in this Section shall be construed as limiting the Master Trustee to the proof herein specified, it being intended that the Master Trustee may accept any other evidence of the matters herein stated which it may deem sufficient.

(e)    Any action taken or suffered by the Master Trustee pursuant to any provision hereof upon the request or with the assent of any person who at the time is the Holder of any Obligation, shall be conclusive and binding upon all future Holders of the same Obligation and any Obligation issued in exchange therefor or in place thereof in accordance with this Master Indenture.

**Section 8.02.    Obligations or Related Bonds Owned by Obligated Group Members.**  In determining whether the Holders of the requisite aggregate principal amount of Obligations have concurred in any demand, direction, request, notice, consent, waiver or other action under this Master Indenture, Obligations or Related Bonds that are owned by any Obligated Group Member or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with such Obligated Group Member shall be disregarded and deemed not to be Outstanding or outstanding under the Related Bond Indenture, as the case may be, for the purpose of any such determination, provided that for the purposes of determining whether the Master Trustee shall be protected in relying on any such direction, consent or waiver, only such Obligations or Related Bonds with respect to which the Master Trustee has received written notice of such ownership shall be so disregarded.  Obligations or

Related Bonds so owned that have been pledged in good faith may be regarded as Outstanding or outstanding under the Related Bond Indenture, as the case may be, for purposes of this Section, if the pledgee shall establish to the satisfaction of the Master Trustee the pledgee's right to vote such Obligations or Related Bonds and that the pledgee is not a person directly or indirectly controlling or controlled by or under direct or indirect common control with any Obligated Group Member.  In case of a dispute as to such right, any decision by the Master Trustee taken upon the advice of counsel shall be full protection to the Master Trustee.

Section 8.03.    Instruments Executed by Holders Bind Future Holders.  At any time prior to (but not after) the Master Trustee takes action in reliance upon evidence, as provided in **Section 8.01**, of the taking of any action by the Holders of the percentage in aggregate principal amount of Obligations specified herein in connection with such action, any Holder of such an Obligation or Related Bond that is shown by such evidence to be included in Obligations the Holders of which have consented to such action may, by filing written notice with the Master Trustee and upon proof of holding as provided in **Section 8.01**, revoke such action so far as concerns such Obligation or Related Bond.  Except upon such revocation any such action taken by the Holder of an Obligation or Related Bond in any direction, demand, request, waiver, consent, vote or other action of the Holder of such Obligation or Related Bond which by any provision hereof is required or permitted to be given shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Obligation or Related Bond, and of any Obligation or Related Bond issued in lieu thereof or in exchange therefor, whether or not any notation in regard thereto is made upon such Obligation or Related Bond.  Any action taken by the Holders of the percentage in aggregate principal amount of Obligations specified herein in connection with such action shall be conclusively binding upon each Obligated Group Member, the Master Trustee and the Holders of all of such Obligations or Related Bonds.

# ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.01.    Amendments to the Deed of Trust.  The Master Trustee may, without the consent of or notice to any of the Holders, consent to one or more amendments or supplements to the Deed of Trust for one or more of the following purposes:  (a) to cure any ambiguity or formal defect or omission therein; (b) to correct or supplement any provision therein which may be inconsistent with any other provision therein; (c) to grant or confer to the Master Trustee or the Deed of Trust Trustee any additional rights, remedies, powers or authority that may lawfully be granted or conferred upon them; (d) to subject additional property to the Lien of the Deed of Trust; (e) to secure additional Obligations as permitted hereunder; (f) to obligate a successor to any Obligated Group Member as provided in **Section 3.09**; (g) to release any Property subject to the Deed of Trust pursuant to a Transfer of such Property permitted by **Section 3.08**, or (h) to make any other change which, in the sole judgment of the Master Trustee, does not materially and adversely affect the interests of the Holders (in making such determination, the Master Trustee may rely conclusively upon an Opinion of Counsel).  In addition to the foregoing amendments and supplements, the Master Trustee may enter into other amendments or supplements to the Deed of Trust with the consent of the Holders of not less than a majority in aggregate principal amount of Obligations then Outstanding.

Section 9.02.    Limitation of Rights.  With the exception of rights herein expressly conferred, nothing expressed or mentioned in or to be implied from this Master Indenture or the Obligations issued hereunder is intended or shall be construed to give to any Person other than each Obligated Group Member, the Master Trustee, and the Holders hereunder any legal or equitable right, remedy or claim under or in respect to this Master Indenture or any covenants, conditions and provisions herein contained;

this Master Indenture and all of the covenants, conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties mentioned in this Section.

Section 9.03.    **Severability.**  If any one or more sections, clauses, sentences or parts hereof shall for any reason be questioned in any court of competent jurisdiction and shall be adjudged invalid or unenforceable, such judgment shall not affect, impair or invalidate the remaining provisions hereof, or the Obligations issued pursuant hereto, but shall be confined to the specific sections, clauses, sentences and parts so adjudged.

Section 9.04.    **Holidays.**    Except to the extent a Supplement or an Obligation provides otherwise:

(a)    Subject to **subsection (b)**, when any action is provided herein to be done on a day or within a time period named, and the day or the last day of the period falls on a day on which banking institutions in the jurisdiction where the Corporate Trust Office is located are authorized by law to remain closed, the action may be done on the next ensuing day not a day on which banking institutions in such jurisdiction are authorized by law to remain closed with effect as though done on the day or within the time period named.

(b)    When the date on which principal of or interest or premium on any Obligation is due and payable is a day on which banking institutions at the place of payment are authorized by law to remain closed, payment may be made on the next ensuing day on which banking institutions at such place are not authorized by law to remain closed with the same effect as though payment were made on the due date, and, if such payment is made, no interest shall accrue from and after such due date.

Section 9.05.    **Governing Law.**  This Master Indenture is a contract made under the laws of the State of Missouri and shall be governed by and construed in accordance with such laws.

Section 9.06.    **Counterparts; Electronic Transaction.**    This Master Indenture may be executed in several counterparts, each of which shall be an original and all of which shall constitute one instrument.  In addition, the transaction described herein may be conducted and related documents may be signed, sent, received and stored electronically.  Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents are authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

Section 9.07.    **Immunity of Individuals.**    No recourse shall be had for the payment of the principal of, premium, if any, or interest on any Obligations issued hereunder or for any claim based thereon or upon any obligation, covenant or agreement herein against any past, present or future officer, director, trustee, member, employee or agent of any Obligated Group Member, and all such liability of any such individual as such is hereby expressly waived and released as a condition of and in consideration for the execution hereof and the issuance of Obligations issued hereunder.

Section 9.08.    **Binding Effect.**  This instrument shall inure to the benefit of and shall be binding upon each Obligated Group Member, the Master Trustee and their respective successors and assigns subject to the limitations contained herein.

**Section 9.09.    Notices.**

(a)    Unless otherwise expressly specified or permitted by the terms hereof, all notices, consents or other communications required or permitted hereunder shall be deemed sufficiently given or served if sent as set forth below addressed as follows:

(i)    If to any Obligated Group Member, addressed to the Obligated Group Representative, Kansas City United Methodist Retirement Home, Inc. d/b/a Kingswood Senior Living Community, 10000 Wornall Road, Kansas City, Missouri 64114, Attention: Executive Director;

(ii)    If to the Master Trustee, addressed to it at UMB Bank, N.A., 928 Grand Boulevard, 12th Floor, Kansas City, Missouri 64106, Attention:  Corporate Trust Department; or

(iii)    If to any Holder, addressed to such Holder at the address shown on the books of the Master Trustee kept pursuant hereto.

Any such notice, demand or request may be sent to the appropriate above-mentioned party by United States registered or certified mail, return receipt requested, postage prepaid, or by overnight delivery service for which receipt is acknowledged or by Electronic Means and shall be deemed to be properly given or made at the time sent (except that notice to the Master Trustee shall be effective only upon receipt).

(b)    Any Obligated Group Member, or the Master Trustee may from time to time by notice in writing to the other and to the Holders designate a different address or addresses for notice hereunder.

**Section 9.10.    Consents and Approvals.**  Whenever the written consent or approval of the Obligated Group or the Master Trustee shall be required under the provisions of this Master Indenture, such consent or approval shall not be unreasonably withheld or delayed.  Unless otherwise specified herein, consents of the Obligated Group shall be executed and delivered on behalf of the Obligated Group by the Obligated Group Representative.

**Section 9.11.    Appointment of Obligated Group Representative**    Each Obligated Group Member, by its execution hereof and by becoming an Obligated Group Member, irrevocably appoints Kingswood, as Obligated Group Representative, as its agent and true and lawful attorney in fact and grants to Kingswood, as Obligated Group Representative hereunder, full power to take any and all actions as may be permitted or required of the Obligated Group Representative or any Obligated Group Member under this Master Indenture, including but not limited to the giving of notices, approvals, consents or waivers on behalf of itself and the other Obligated Group Member.

[Remainder of page intentionally blank.]

**IN WITNESS WHEREOF,** Kingswood has caused these presents be signed in its name and on its behalf, and to evidence its acceptance of the trusts hereby created, the Master Trustee has caused these presents to be signed in its name and on its behalf by its duly authorized officer, all of as of the day and year first above written.

**KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC., D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**

By:_____

Ross P. Marine
Chair of the Board

S-1

**UMB BANK, N.A.,** as Master Trustee

By: _____
Name: _____
Title: _____

S-2

Master Trust Indenture

## APPENDIX A

## Permitted Exceptions

(a)      The enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights or general principles of equity or the exercise of judicial discretion in appropriate cases.

(b)      The provisions of the Master Indenture pursuant to which each Obligated Group Member covenants to pay any Note issued by an Obligated Group Member other than itself may not be enforceable if any such payment (1) is to be made on any such Note which was issued for a purpose which is not consistent with the charitable purpose of the Obligated Group Member from which such payment is sought or which was issued for the primary benefit of any entity other than a nonprofit corporation which is exempt from federal income taxes under Section 501(a) and 501(c)(3) of the Code and is not a "private foundation" as defined in Section 509(a) of the Code, (2) is to be made from any moneys or assets which are donor restricted or which is subject to a direct or express trust which does not permit the use of such moneys or assets for such a payment, (3) would result in the cessation or discontinuation of any material portion of the health care or related services previously provided by the Obligated Group Member from which such payment is sought, or (4) is to be made pursuant to any loan violating applicable usury laws.[1]

---

[1] Opinions regarding the enforceability of an instrument executed by a Person that is not a Tax-Exempt Organization may be subject only to the exceptions contained in (a) and (b)(4) above.

A-1

**Draft July 19, 2021**

## SUPPLEMENTAL MASTER TRUST INDENTURE NO. 1

**Among**

**KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD
SENIOR LIVING COMMUNITY,**

**Obligated Group Member**

**SUCH OTHER PERSONS AS FROM TIME TO TIME
ARE OBLIGATED GROUP MEMBERS**

**and**

**UMB BANK, N.A.,
as Master Trustee**

**Dated as of November 15, 2021**

**Supplementing**

**Master Trust Indenture
Dated as of November 15, 2021**

**Relating to**

**$5,500,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021A**

**$27,000,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021B**

**$4,400,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021C**

**$12,050,000
Senior Living Facilities Revenue Bonds
(Kingswood Project)
Series 2021D**

## SUPPLEMENTAL MASTER TRUST INDENTURE NO. 1

This **SUPPLEMENTAL MASTER TRUST INDENTURE NO. 1** dated as of November 15, 2021 (the "Supplemental Master Indenture No. 1"), by and among **KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**, a Missouri nonprofit corporation ("Kingswood"), and all other persons who may from time to time become Obligated Group Members (as defined in the hereinafter referred to Master Indenture), and **UMB BANK, N.A.,** a national banking association duly incorporated and validly existing under the laws of the United States of America, having its principal corporate trust office in Kansas City, Missouri, as master trustee (the "Master Trustee");

## RECITALS

1.        This Supplemental Master Indenture No. 1 amends and supplements the Master Trust Indenture dated as of November 15, 2021, among Kingswood, the other Obligated Group Members and the Master Trustee (said Master Trust Indenture being referred to herein as the "Original Master Indenture" and, with all amendments and supplements thereto, including this Supplemental Master Indenture No. 1, being referred to herein as the "Master Indenture").

2.        Kingswood currently is the only Obligated Group Member under the Master Indenture.

3.        Concurrently with the execution and delivery of this Supplemental Master Indenture No. 1:

(a)        The Industrial Development Authority of the City of Kansas City, Missouri ("Related Bond Issuer") and UMB Bank, N.A., as bond trustee ("Related Bond Trustee"), will enter into a Bond Trust Indenture, even date herewith ("Related Bond Indenture"), under which the Related Bond Issuer will issue the following series of Bonds, which Bonds will constitute Related Bonds under the Master Indenture (the "Series 2021 Related Bonds"):

(1)        $5,500,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021A (the "Series 2021A Related Bonds").
(2)        $27,000,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021B (the "Series 2021B Related Bonds").
(3)        $4,400,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021C (the "Series 2021C Related Bonds").
(4)        $12,050,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021D (the "Series 2021D Related Bonds").

(b)        The Related Bond Issuer will enter into a Loan Agreement of even date herewith with Kingswood, as the borrower, respectively, relating to the Series 2021 Related Bonds (the "Related Bond Loan Agreement"), under which the Related Bond Issuer will loan the proceeds of the Related Bonds to Kingswood to provide funds for the purposes set forth in the Related Bond Indenture and the Related Bond Loan Agreement. The Related Bond Indenture and the Related Bond Loan Agreement are referred to herein collectively as the "Related Bond Documents".

4.        Kingswood, as the Obligated Group Representative, desires that the Original Master Indenture be amended and supplemented by the execution and delivery of this Supplemental Master

Indenture No. 1 as authorized under **Section 6.01(e)** of the Original Master Indenture to authorize the issuance and delivery of new Obligations to evidence and secure the obligations of Kingswood under the Related Bond Loan Agreement.

5.      All acts and things necessary to make the Obligations authorized by this Supplemental Master Indenture No. 1, when executed by Kingswood, and authenticated and delivered by the Master Trustee as provided in the Original Master Indenture and this Supplemental Master Indenture No. 1, the valid, binding and legal obligations of the Obligated Group Members, and to constitute these presents, together with the Original Master Indenture, a valid indenture and agreement according to its terms, have been done and performed, and the execution of this Supplemental Master Indenture No. 1 and the issuance hereunder and under the Original Master Indenture of the Obligations authorized by this Supplemental Master Indenture No. 1 have in all respects been duly authorized, and Kingswood has executed this Supplemental Master Indenture No. 1 and proposes to make, execute, issue and deliver the Obligations authorized hereunder.

**NOW, THEREFORE,** in order to declare the terms and conditions upon which the Obligations authorized by this Supplemental Master Indenture No. 1 are authenticated, issued and delivered, and in consideration of the premises and the acquisition and acceptance of such Obligations by the Holders thereof, and in consideration of the mutual covenants, conditions and agreements which follow, Kingswood, as Obligated Group Representative acting on behalf of the Obligated Group, covenants and agrees with the Master Trustee as follows:

**Section 1.      Definitions**. All capitalized terms used herein (including the defined terms contained in the above Recitals) shall have the meanings given such terms in the Master Indenture unless the context clearly indicates otherwise.  For the purposes hereof unless the context otherwise indicates the following words and phrases shall have the following meanings:

**Section 2.      Issuance of Series 2021 Obligations.** There is hereby created and authorized to be issued under the Master Indenture the following Obligations:

(a)      **"Master Indenture Obligation No. 1 (Series 2021A Bonds)"**, in the original principal amount of **$5,500,000** ("Obligation No. 1"), to evidence and secure the obligations of the Institution under the applicable Related Bond Documents, dated November 15, 2021, and shall be payable in such amounts, at such times and in such manner and shall have such other terms and provisions as are set forth in the form Obligation No. 1 attached hereto as **Exhibit A**.

(b)      **"Master Indenture Obligation No. 2 (Series 2021B Bonds)"**, in the original principal amount of **$27,000,000** ("Obligation No. 2"), to evidence and secure the obligations of the Institution under the applicable Related Bond Documents, dated November 15, 2021, and shall be payable in such amounts, at such times and in such manner and shall have such other terms and provisions as are set forth in the form Obligation No. 2 attached hereto as **Exhibit B**.

(c)      **"Master Indenture Obligation No. 3 (Series 2021C Bonds)"**, in the original principal amount of **$4,400,000** ("Obligation No. 3"), to evidence and secure the obligations of the Institution under the applicable Related Bond Documents, dated November 15, 2021, and shall be payable in such amounts, at such times and in such manner and shall have such other terms and provisions as are set forth in the form Obligation No. 3 attached hereto as **Exhibit C**.

(d)      **"Master Indenture Obligation No. 4 (Series 2021D Bonds)"**, in the original principal amount of **$12,050,000** ("Obligation No. 4" and together with Obligations Nos. 1, 2 and

3, the "Series 2021 Obligations"), to evidence and secure the obligations of the Institution under the applicable Related Bond Documents, dated November 15, 2021, and shall be payable in such amounts, at such times and in such manner and shall have such other terms and provisions as are set forth in the form Obligation No. 4 attached hereto as **Exhibit D**.

The aggregate principal amount for each of the Series 2021 Obligations is limited to the amount stated in this Section except for any Obligation authenticated and delivered in lieu of another Obligation as provided in Section 6 with respect to any Obligation destroyed, lost or stolen, or, subject to the provisions of Section 5, upon transfer of registration of any of such Series 2021 Obligations.

Section 3.    **Payments on Series 2021 Obligations.** Except as provided in **Section 4**, payments of the principal of, redemption premium, if any, and interest on the Series 2021 Obligations and the Related Bond Loan Agreement shall be made at the times and in the amounts specified in the respective Series 2021 Obligations in federal or other same day funds by the Obligated Group Representative depositing the same with or to the account of the Holder at or prior to the opening of business on the day such payments shall become due or payable (or the next succeeding Business Day if such date is not a Business Day as defined in the Related Bond Indenture). For each such payment the Obligated Group Representative agrees to give notice to the Master Trustee of each payment of principal, interest or premium on Series 2021 Obligations, specifying the amount paid and identifying such payment as a payment on Series 2021 Obligations. Notwithstanding the foregoing, the relative rights, remedies and payment priorities among the Series 2021 Related Bonds are subject to the provisions of the Related Bond Indenture.

Section 4.    **Prepayment of the Series 2021 Obligations**. The principal of and interest and any applicable redemption premium on the Series 2021 Obligations are subject to prepayment and redemption prior to maturity as provided in the Original Master Indenture and, to the extent and with respect to the corresponding redemption or prepayment provisions of the applicable Related Bond Documents, by paying the amount necessary to provide for the payment, prepayment, redemption, refunding or advance defeasance of the Related Bonds or any portion of the Related Bonds.

Section 5.    **Registration, Numbers, Negotiability and Transfer of Series 2021 Obligations.**

(a)    Each of the Series 2021 Obligations shall be registered on the register maintained by the Master Trustee for that purpose at the Corporate Trust Office of the Master Trustee. Each of the Series 2021 Obligations is transferable by the Holders in person or by duly authorized attorney at the principal corporate trust office of the Master Trustee, but only in the manner, subject to the limitations and upon payment of the charges provided in the Master Indenture, and upon surrender and cancellation of such Series 2021 Obligations to be transferred. Upon such transfer a new registered Series 2021 Obligation of the same series and maturity and of authorized denomination or denominations for the same aggregate principal amount will be issued to the transferee in exchange therefor. The Master Trustee may deem and treat the Holder of each of Series 2021 Obligations as the absolute owner thereof for the purpose of receiving payment of or on account of principal thereof and premium, if any, thereon and interest due thereon and for all other purposes and the Master Trustee shall not be affected by any notice to the contrary.

(b)    Prior to due presentment by the owner for registration of transfer, the Obligated Group Members and the Master Trustee may deem and treat the person in whose name a Series 2021 Obligation is registered on the books maintained by the Master Trustee as the absolute owner of such Series 2021 Obligation for all purposes except as otherwise provided in **Section 8.02** of the Master

-3-

Indenture; and neither the Obligated Group Members nor the Master Trustee shall be affected by any notice to the contrary. All payments made to the Holder shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable on such Series 2021 Obligations.

Section 6.   **Execution and Authentication of Series 2021 Obligations.** Each of the Series 2021 Obligations shall be manually executed for and on behalf of each Member of the Obligated Group by their respective Chairman, Executive Director or Chief Financial Officer and attested by their respective Secretary or any Assistant Secretary. If any officer whose signature appears on such Series 2021 Obligations ceases to be such officer before delivery thereof, such signature shall remain valid and sufficient for all purposes as if such officer had remained in office until such delivery. Each of the Series 2021 Obligations shall be manually authenticated by an authorized signatory of the Master Trustee, without which authentication the Series 2021 Obligations shall not be entitled to the benefits hereof.

Section 7.   **Security for Series 2021 Obligations.** Each of the Series 2021 Obligations authorized hereunder stands on a parity with all Obligations issued and Outstanding under the Master Indenture and is equally and ratably secured by the Master Indenture, including the pledge and assignment of a security interest in the Trust Estate pursuant to the Granting Clauses of the Original Master Indenture, including a pledge and assignment of all Gross Receipts of the Obligated Group. The Series 2021 Obligations are further secured by a Deed of Trust (as defined in the Original Master Indenture). Notwithstanding the foregoing, the relative rights, remedies and payment priorities among the Series 2021 Related Bonds are subject to the provisions of the Related Bond Indenture.

Section 8.   **Ratification of Master Indenture.** As supplemented hereby, the Master Indenture is in all respects ratified and confirmed and the Master Indenture as so supplemented hereby shall be read, taken and construed as one and the same instrument. Except as herein otherwise expressly provided, all the provisions, definitions, terms and conditions of the Original Master Indenture, as amended and supplemented by this Supplemental Master Indenture No. 1 and as otherwise amended and supplemented, shall be deemed to be incorporated in, and made a part of, this Supplemental Master Indenture No. 1. All references to "this Master Indenture" in the Original Master Indenture shall be to the Original Master Indenture as amended and supplemented by this Supplemental Master Indenture No. 1 and as otherwise amended and supplemented from time to time.

Section 9.   **Severability.** If any provision of this Supplemental Master Indenture No. 1 shall be held or deemed to be or shall, in fact, be inoperative or unenforceable as applied in any particular case and any jurisdiction or jurisdictions or in all jurisdictions, or in all cases, because it conflicts with any other provision or provisions hereof or any constitution, statute, rule or public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatever.

The invalidity of any one or more phrases, sentences, clauses, sections or subsections contained in this Supplemental Master Indenture No. 1 shall not affect the remaining portions of this Supplemental Master Indenture No. 1 or any part thereto.

Section 10.   **Counterparts.** This Supplemental Master Indenture No. 1 may be executed in several counterparts, each of which shall be an original and all of which shall constitute one instrument.

Section 11.   **Electronic Transactions.** The transactions described herein may be conducted and related documents may be signed, sent, received and stored electronically. Copies, telecopies,

facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

      **Section 12.**    **Governing Law.** This Supplemental Master Indenture No. 1 shall be governed by and construed in accordance with the laws of the State of Missouri.

[The remainder of this page left blank intentionally.]

**IN WITNESS WHEREOF,** Kingswood has caused these presents to be signed in its name and on its behalf by its duly authorized officer, and to evidence its acceptance of the trusts hereby created the Master Trustee has caused these presents to be signed in its name and on its behalf by its duly authorized officer, all as of the day and year first above written.

**KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**

By:_____
        Chairman

S-1

**UMB BANK,** N.A., as Master Trustee


By:_____

Name: _____

Title:_____

Supplemental Master Trust Indenture No. 1

**EXHIBIT A**

**No. R-1** $5,500,000

**MASTER INDENTURE OBLIGATION NO. 1
(SERIES 2021A BONDS)**

| Final Maturity Date | Dated Date |
|---|---|
| **November 15, 2037** | **November 15, 2021** |

**REGISTERED OWNER:**   **THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI**

**PRINCIPAL AMOUNT:**   **FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS**

      **FOR VALUE RECEIVED, KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**, a Missouri nonprofit corporation ("Kingswood"), and all other persons who may from time to time become Obligated Group Members (as defined in the hereinafter referred to Master Indenture), jointly and severally and each as principal, promise to pay to The Industrial Development Authority of the City of Kansas City, Missouri (the "Related Bond Issuer"), or registered assigns, the principal sum of Fifty Million Five Hundred Thousand Dollars ($5,500,000), together with (a) interest thereon at such rate or rates as in the aggregate will produce an amount equal to the total of all interest becoming due and payable on the Related Bond Issuer's $5,500,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021A (the "Related Bonds"), issued pursuant to the Bond Trust Indenture dated as of November 15, 2021 (as amended or supplemented from time to time in accordance with its terms, the "Related Bond Indenture"), between the Related Bond Issuer and UMB Bank, N.A., as trustee (the "Related Bond Trustee"), which is incorporated herein by reference and made a part hereof, and (b) such redemption premiums and other amounts as are required to be paid by the Kingswood to the Related Bond Issuer as part of the Loan Payments as provided in the Loan Agreement, dated as of November 15, 2021 (as amended and supplemented from time to time in accordance with its terms, the "Related Bond Loan Agreement"), between Kingswood and the Related Bond Issuer, which is incorporated herein by reference and made a part hereof. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Related Bond Indenture and the Master Indenture.  Kingswood is sometimes referred to herein as the "Borrower."

      The principal of, redemption premium, if any, and interest on this Obligation No. 1 shall be paid by means of the Loan Payments which shall be due and payable as set forth in the Related Bond Loan Agreement. The Obligated Group shall receive certain credits against the amounts payable on this Obligation No. 1 to the extent Kingswood receives credit against the payment of Loan Payments under the Related Bond Loan Agreement.

      This Obligation No. 1 is a single Obligation of the Obligated Group Members limited to $5,500,000 in principal amount, designated as Master Indenture Obligation No. 1 (Series 2021A Bonds)" ("Obligation No. 1," and together with all other Obligations issued under the Master Trust Indenture hereinafter identified, the "Obligations") issued under and pursuant to Supplemental Master Trust

Indenture No. 1 dated as of November 15, 2021 ("Supplemental Master Indenture No. 1"), supplementing the Master Trust Indenture dated as of November 15, 2021, among Kingswood, such other persons as may from time to time become Obligated Group Members and UMB Bank, N.A., as trustee (the "Master Trustee"). The Master Trust Indenture, as so supplemented and amended, is hereinafter referred to as the "Master Indenture." This Obligation No. 1, together with all other Obligations outstanding under the Master Indenture, is equally and ratably secured by the Master Indenture.

As provided by **Section 3.01** of the Master Indenture, each Obligated Group Member (as defined in the Master Indenture) is jointly and severally liable on this Obligation No. 1.

This Obligation No. 1 is issued for the purpose of evidencing and securing the indebtedness of the Borrower resulting from the making available to the Borrower of the proceeds of the issuance and sale of the Related Bonds. If and when the Related Bonds are no longer Outstanding under the Related Bond Indenture, this Obligation No. 1 shall be deemed to have been paid and to be no longer Outstanding under the Master Indenture.

Copies of the Master Indenture are on file at the Corporate Trust Office of the Master Trustee and reference is hereby made to the Master Indenture for the provisions, among others, with respect to the nature and extent of the rights of the owners of Obligations issued under the Master Indenture, the terms and conditions on which, and the purpose for which, Obligations are to be issued and the rights, duties and obligations of the Obligated Group Members and the Master Trustee under the Master Indenture, to all of which the registered owner hereof, by acceptance of this Obligation No. 1, assents.

The Master Indenture permits the issuance of additional Obligations under the Master Indenture to be secured by the covenants made therein, all of which, regardless of the times of issue or maturity, are to be of equal rank without preference, priority or distinction of any Obligation issued under the Master Indenture over any other such Obligation except as expressly provided or permitted in the Master Indenture.

To the extent permitted by and as provided in the Master Indenture, modifications or changes of the Master Indenture, of any indenture supplemental thereto, and of the rights and obligations of the Obligated Group Members and of the owners of Obligations in any particular may be made by the execution and delivery of an indenture or indentures supplemental to the Master Indenture or any supplemental indenture.

This Obligation No. 1 is subject to prepayment, redemption and advance defeasance, in whole or in part, prior to its maturity date, in the manner, under the circumstances, and upon such notice set forth in the Master Indenture, the Related Bond Indenture and the Related Bond Loan Agreements.

Any redemption, either in whole or in part, shall be made upon notice thereof in the manner and upon the terms and conditions provided in the Related Bond Indenture. If this Obligation No. 1 shall have been duly called for redemption and payment of the redemption price, together with interest accrued thereon to the date fixed for redemption, shall have been made or provided for, as more fully set forth in Supplemental Master Indenture No. 1 and the Related Bond Indenture, interest on this Obligation No. 1 shall cease to accrue from the date fixed for redemption, and from and after such date this Obligation No. 1 shall be deemed not to be Outstanding, as defined in the Master Indenture, and shall no longer be entitled to the benefits of the Master Indenture, and the registered owner hereof shall have no rights in respect of this Obligation No. 1 other than payment of the redemption price, together with accrued interest to the date fixed for redemption.

Upon the occurrence of certain Events of Default (as defined in the Master Indenture), the principal of all Obligations then Outstanding may be declared, and the same shall become, due and payable as provided in the Master Indenture.

The registered owner of this Obligation No. 1 shall have no right to enforce the Master Indenture, or to institute any action to enforce the covenants therein, or to take any action with respect to any default under the Master Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Master Indenture.

This Obligation No. 1 is issuable only as a fully registered obligation. This Obligation No. 1 shall be registered on the registration books to be maintained for that purpose at the Corporate Trust Office of the Master Trustee and the transfer of this Obligation No. 1 shall be registrable only upon presentation of this Obligation No. 1 at said office by the registered owner or by his duly authorized attorney and subject to the limitations, if any, set forth in Supplemental Master Indenture No. 1. Such registration of transfer shall be without charge to the registered owner hereof, but any taxes or other governmental charges required to be paid with respect to the same shall be paid by the registered owner requesting such registration of transfer as a condition precedent to the exercise of such privilege. Upon any such registration of transfer, the Obligated Group Members shall execute and the Master Trustee shall authenticate and deliver in exchange for this Obligation No. 1 a new Obligation, registered in the name of the transferee.

Prior to due presentment hereof for registration of transfer, the Obligated Group Members and the Master Trustee may deem and treat the person in whose name this Obligation No. 1 is registered as the absolute owner hereof for all purposes; and neither the Obligated Group Members nor the Master Trustee shall be affected by any notice to the contrary. All payments made to the registered owner hereof shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable on this Obligation No. 1.

No covenant or agreement contained in this Obligation No. 1 or the Master Indenture shall be deemed to be a covenant or agreement of any director, officer, agent or employee of the Obligated Group Members, any other Obligated Group Member or of the Master Trustee in his individual capacity, and no incorporator, member, officer or member of the Governing Body of the Obligated Group Members or any other Obligated Group Member shall be liable personally on this Obligation No. 1 or be subject to any personal liability or accountability by reason of the issuance of this Obligation No. 1.

This Obligation No. 1 shall not be entitled to any benefit under the Master Indenture, or be valid or become obligatory for any purpose, until this Obligation No. 1 shall have been authenticated by execution by the Master Trustee, or its successor as Master Trustee, of the Certificate of Authentication inscribed hereon.

**IN WITNESS WHEREOF,** the Borrower, in its capacity as Obligated Group Member, has caused this Obligation No. 1 to be executed in its name and on its behalf by its duly authorized officer all as of the dated date hereof.

**KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**

By: _____

Name: _____

Title: _____

A-3

**MASTER TRUSTEE'S AUTHENTICATION CERTIFICATE**

This Obligation No. 1 is one of the Obligations described in the within-mentioned Master Indenture and Supplemental Master Indenture No. 1.

**UMB BANK, N.A.,**
as Master Trustee


By:_____
          Authorized Signatory

**ASSIGNMENT**

For value received, the undersigned hereby pledges and assigns all of its right, title and interest in and to the above Obligation to UMB Bank, N.A., as Bond Trustee under that certain Bond Trust Indenture dated as of November 15, 2021, between the undersigned and said Bond Trustee, or to its successor or successors as Bond Trustee under said Bond Trust Indenture, for the benefit and security of the Registered Owners of the Related Bonds from time to time issued and Outstanding thereunder. This assignment shall be without recourse against or warranty of any nature or description by the undersigned.

Dated as of _____, 2021.

**THE INDUSTRIAL DEVELOPMENT AUTHORITY
OF THE CITY OF KANSAS CITY, MISSOURI**

By:_____

Name:_____

Title:_____

**EXHIBIT B**

No. R-1                                                                                                    $27,000,000

**MASTER INDENTURE OBLIGATION NO. 2
(SERIES 2021B BONDS)**

| Final Maturity Date | Dated Date |
|---|---|
| **November 15, 2046** | **November 15, 2021** |

REGISTERED OWNER:    THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY
                    OF KANSAS CITY, MISSOURI

PRINCIPAL AMOUNT:    TWENTY-SEVEN MILLION DOLLARS

     FOR VALUE RECEIVED, KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY, a Missouri nonprofit corporation ("Kingswood"), and all other persons who may from time to time become Obligated Group Members (as defined in the hereinafter referred to Master Indenture), jointly and severally and each as principal, promise to pay to The Industrial Development Authority of the City of Kansas City, Missouri (the "Related Bond Issuer"), or registered assigns, the principal sum of Twenty-Seven Million Dollars ($27,000,000), together with (a) interest thereon at such rate or rates as in the aggregate will produce an amount equal to the total of all interest becoming due and payable on the Related Bond Issuer's $27,000,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021B (the "Related Bonds"), issued pursuant to the Bond Trust Indenture dated as of November 15, 2021 (as amended or supplemented from time to time in accordance with its terms, the "Related Bond Indenture"), between the Related Bond Issuer and UMB Bank, N.A., as trustee (the "Related Bond Trustee"), which is incorporated herein by reference and made a part hereof, and (b) such redemption premiums and other amounts as are required to be paid by the Kingswood to the Related Bond Issuer as part of the Loan Payments as provided in the Loan Agreement, dated as of November 15, 2021 (as amended or supplemented from time to time in accordance with its terms, the "Related Bond Loan Agreement"), between Kingswood and the Related Bond Issuer, which is incorporated herein by reference and made a part hereof. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Related Bond Indenture and the Master Indenture.  Kingswood is sometimes referred to herein as the "Borrower."

     The principal of, redemption premium, if any, and interest on this Obligation No. 2 shall be paid by means of the Loan Payments which shall be due and payable as set forth in the Related Bond Loan Agreement. The Obligated Group shall receive certain credits against the amounts payable on this Obligation No. 2 to the extent Kingswood receives credit against the payment of Loan Payments under the Related Bond Loan Agreement.

     This Obligation No. 2 is a single Obligation of the Obligated Group Members limited to $27,000,000 in principal amount, designated as Master Indenture Obligation No. 2 (Series 2021B Bonds)" ("Obligation No. 2," and together with all other Obligations issued under the Master Trust Indenture hereinafter identified, the "Obligations") issued under and pursuant to Supplemental Master Trust Indenture No. 1 dated as of November 15, 2021 ("Supplemental Master Indenture No. 1"),

supplementing the Master Trust Indenture dated as of November 15, 2021, among Kingswood, such other persons as may from time to time become Obligated Group Members and UMB Bank, N.A., as trustee (the "Master Trustee"). The Master Trust Indenture, as so supplemented and amended, is hereinafter referred to as the "Master Indenture." This Obligation No. 2, together with all other Obligations outstanding under the Master Indenture, is equally and ratably secured by the Master Indenture.

As provided by **Section 3.01** of the Master Indenture, each Obligated Group Member (as defined in the Master Indenture) is jointly and severally liable on this Obligation No. 2.

This Obligation No. 2 is issued for the purpose of evidencing and securing the indebtedness of the Borrower resulting from the making available to the Borrower of the proceeds of the issuance and sale of the Related Bonds.  If and when the Related Bonds are no longer Outstanding under the Related Bond Indenture, this Obligation No. 2 shall be deemed to have been paid and to be no longer Outstanding under the Master Indenture.

Copies of the Master Indenture are on file at the Corporate Trust Office of the Master Trustee and reference is hereby made to the Master Indenture for the provisions, among others, with respect to the nature and extent of the rights of the owners of Obligations issued under the Master Indenture, the terms and conditions on which, and the purpose for which, Obligations are to be issued and the rights, duties and obligations of the Obligated Group Members and the Master Trustee under the Master Indenture, to all of which the registered owner hereof, by acceptance of this Obligation No. 2, assents.

The Master Indenture permits the issuance of additional Obligations under the Master Indenture to be secured by the covenants made therein, all of which, regardless of the times of issue or maturity, are to be of equal rank without preference, priority or distinction of any Obligation issued under the Master Indenture over any other such Obligation except as expressly provided or permitted in the Master Indenture.

To the extent permitted by and as provided in the Master Indenture, modifications or changes of the Master Indenture, of any indenture supplemental thereto, and of the rights and obligations of the Obligated Group Members and of the owners of Obligations in any particular may be made by the execution and delivery of an indenture or indentures supplemental to the Master Indenture or any supplemental indenture.

This Obligation No. 2 is subject to prepayment, redemption and advance defeasance, in whole or in part, prior to its maturity date, in the manner, under the circumstances, and upon such notice set forth in the Master Indenture, the Related Bond Indenture and the Related Bond Loan Agreements.

Any redemption, either in whole or in part, shall be made upon notice thereof in the manner and upon the terms and conditions provided in the Related Bond Indenture. If this Obligation No. 2 shall have been duly called for redemption and payment of the redemption price, together with interest accrued thereon to the date fixed for redemption, shall have been made or provided for, as more fully set forth in Supplemental Master Indenture No. 1 and the Related Bond Indenture, interest on this Obligation No. 2 shall cease to accrue from the date fixed for redemption, and from and after such date this Obligation No. 2 shall be deemed not to be Outstanding, as defined in the Master Indenture, and shall no longer be entitled to the benefits of the Master Indenture, and the registered owner hereof shall have no rights in respect of this Obligation No. 2 other than payment of the redemption price, together with accrued interest to the date fixed for redemption.

Upon the occurrence of certain Events of Default (as defined in the Master Indenture), the principal of all Obligations then Outstanding may be declared, and the same shall become, due and payable as provided in the Master Indenture.

The registered owner of this Obligation No. 2 shall have no right to enforce the Master Indenture, or to institute any action to enforce the covenants therein, or to take any action with respect to any default under the Master Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Master Indenture.

This Obligation No. 2 is issuable only as a fully registered obligation. This Obligation No. 2 shall be registered on the registration books to be maintained for that purpose at the Corporate Trust Office of the Master Trustee and the transfer of this Obligation No. 2 shall be registrable only upon presentation of this Obligation No. 2 at said office by the registered owner or by his duly authorized attorney and subject to the limitations, if any, set forth in Supplemental Master Indenture No. 1. Such registration of transfer shall be without charge to the registered owner hereof, but any taxes or other governmental charges required to be paid with respect to the same shall be paid by the registered owner requesting such registration of transfer as a condition precedent to the exercise of such privilege. Upon any such registration of transfer, the Obligated Group Members shall execute and the Master Trustee shall authenticate and deliver in exchange for this Obligation No. 2 a new Obligation, registered in the name of the transferee.

Prior to due presentment hereof for registration of transfer, the Obligated Group Members and the Master Trustee may deem and treat the person in whose name this Obligation No. 2 is registered as the absolute owner hereof for all purposes; and neither the Obligated Group Members nor the Master Trustee shall be affected by any notice to the contrary. All payments made to the registered owner hereof shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable on this Obligation No. 2.

No covenant or agreement contained in this Obligation No. 2 or the Master Indenture shall be deemed to be a covenant or agreement of any director, officer, agent or employee of the Obligated Group Members, any other Obligated Group Member or of the Master Trustee in his individual capacity, and no incorporator, member, officer or member of the Governing Body of the Obligated Group Members or any other Obligated Group Member shall be liable personally on this Obligation No. 2 or be subject to any personal liability or accountability by reason of the issuance of this Obligation No. 2.

This Obligation No. 2 shall not be entitled to any benefit under the Master Indenture, or be valid or become obligatory for any purpose, until this Obligation No. 2 shall have been authenticated by execution by the Master Trustee, or its successor as Master Trustee, of the Certificate of Authentication inscribed hereon.

**IN WITNESS WHEREOF,** the Borrower, in its capacity as Obligated Group Member, has caused this Obligation No. 2 to be executed in its name and on its behalf by its duly authorized officer all as of the dated date hereof.

**KANSAS      CITY      UNITED      METHODIST
RETIREMENT HOME, INC. D/B/A KINGSWOOD
SENIOR LIVING COMMUNITY**

By: _____

Name: _____

Title: _____

B-3

**MASTER TRUSTEE'S AUTHENTICATION CERTIFICATE**

This Obligation No. 2 is one of the Obligations described in the within-mentioned Master Indenture and Supplemental Master Indenture No. 1.

**UMB BANK, N.A.,**
as Master Trustee

By:_____
 Authorized Signatory

**ASSIGNMENT**

For value received, the undersigned hereby pledges and assigns all of its right, title and interest in and to the above Obligation to UMB Bank, N.A., as Bond Trustee under that certain Bond Trust Indenture dated as of November 15, 2021, between the undersigned and said Bond Trustee, or to its successor or successors as Bond Trustee under said Bond Trust Indenture, for the benefit and security of the Registered Owners of the Related Bonds from time to time issued and Outstanding thereunder. This assignment shall be without recourse against or warranty of any nature or description by the undersigned.

Dated as of _____, 2021.

**THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI**

By:_____

Name:_____

Title:_____

B-5

**EXHIBIT C**

No. R-1                                                                                    $4,400,000

### MASTER INDENTURE OBLIGATION NO. 3
### (SERIES 2021C BONDS)

| Final Maturity Date | Dated Date |
|---|---|
| **November 15, 2046** | **November 15, 2021** |

REGISTERED OWNER:    **THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI**

PRINCIPAL AMOUNT:    **FOUR MILLION FOUR HUNDRED THOUSAND DOLLARS**

  **FOR VALUE RECEIVED, KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**, a Missouri nonprofit corporation ("Kingswood"), and all other persons who may from time to time become Obligated Group Members (as defined in the hereinafter referred to Master Indenture), jointly and severally and each as principal, promise to pay to The Industrial Development Authority of the City of Kansas City, Missouri (the "Related Bond Issuer"), or registered assigns, the principal sum of Four Million Four Hundred Thousand Dollars ($4,400,000), together with (a) interest thereon at such rate or rates as in the aggregate will produce an amount equal to the total of all interest becoming due and payable on the Related Bond Issuer's $4,400,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021C (the "Related Bonds"), issued pursuant to the Bond Trust Indenture dated as of November 15, 2021 (as amended or supplemented from time to time in accordance with its terms, the "Related Bond Indenture"), between the Related Bond Issuer and UMB Bank, N.A., as trustee (the "Related Bond Trustee"), which is incorporated herein by reference and made a part hereof, and (b) such redemption premiums and other amounts as are required to be paid by the Kingswood to the Related Bond Issuer as part of the Loan Payments as provided in the Loan Agreement, dated as of November 15, 2021 (as amended or supplemented from time to time in accordance with its terms, the "Related Bond Loan Agreement"), between Kingswood and the Related Bond Issuer, which is incorporated herein by reference and made a part hereof. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Related Bond Indenture and the Master Indenture.  Kingswood is sometimes referred to herein as the "Borrower."

  The principal of, redemption premium, if any, and interest on this Obligation No. 3 shall be paid by means of the Loan Payments which shall be due and payable as set forth in the Related Bond Loan Agreement. The Obligated Group shall receive certain credits against the amounts payable on this Obligation No. 3 to the extent Kingswood receives credit against the payment of Loan Payments under the Related Bond Loan Agreement.

  This Obligation No. 3 is a single Obligation of the Obligated Group Members limited to $4,400,000 in principal amount, designated as Master Indenture Obligation No. 3 (Series 2021C Bonds)" ("Obligation No. 3," and together with all other Obligations issued under the Master Trust Indenture hereinafter identified, the "Obligations") issued under and pursuant to Supplemental Master Trust

Indenture No. 1 dated as of November 15, 2021 ("Supplemental Master Indenture No. 1"), supplementing the Master Trust Indenture dated as of November 15, 2021, among Kingswood, such other persons as may from time to time become Obligated Group Members and UMB Bank, N.A., as trustee (the "Master Trustee"). The Master Trust Indenture, as so supplemented and amended, is hereinafter referred to as the "Master Indenture." This Obligation No. 3, together with all other Obligations outstanding under the Master Indenture, is equally and ratably secured by the Master Indenture.

As provided by **Section 3.01** of the Master Indenture, each Obligated Group Member (as defined in the Master Indenture) is jointly and severally liable on this Obligation No. 3.

This Obligation No. 3 is issued for the purpose of evidencing and securing the indebtedness of the Borrower resulting from the making available to the Borrower of the proceeds of the issuance and sale of the Related Bonds.  If and when the Related Bonds are no longer Outstanding under the Related Bond Indenture, this Obligation No. 3 shall be deemed to have been paid and to be no longer Outstanding under the Master Indenture.

Copies of the Master Indenture are on file at the Corporate Trust Office of the Master Trustee and reference is hereby made to the Master Indenture for the provisions, among others, with respect to the nature and extent of the rights of the owners of Obligations issued under the Master Indenture, the terms and conditions on which, and the purpose for which, Obligations are to be issued and the rights, duties and obligations of the Obligated Group Members and the Master Trustee under the Master Indenture, to all of which the registered owner hereof, by acceptance of this Obligation No. 3, assents.

The Master Indenture permits the issuance of additional Obligations under the Master Indenture to be secured by the covenants made therein, all of which, regardless of the times of issue or maturity, are to be of equal rank without preference, priority or distinction of any Obligation issued under the Master Indenture over any other such Obligation except as expressly provided or permitted in the Master Indenture.

To the extent permitted by and as provided in the Master Indenture, modifications or changes of the Master Indenture, of any indenture supplemental thereto, and of the rights and obligations of the Obligated Group Members and of the owners of Obligations in any particular may be made by the execution and delivery of an indenture or indentures supplemental to the Master Indenture or any supplemental indenture.

This Obligation No. 3 is subject to prepayment, redemption and advance defeasance, in whole or in part, prior to its maturity date, in the manner, under the circumstances, and upon such notice set forth in the Master Indenture, the Related Bond Indenture and the Related Bond Loan Agreements.

Any redemption, either in whole or in part, shall be made upon notice thereof in the manner and upon the terms and conditions provided in the Related Bond Indenture. If this Obligation No. 3 shall have been duly called for redemption and payment of the redemption price, together with interest accrued thereon to the date fixed for redemption, shall have been made or provided for, as more fully set forth in Supplemental Master Indenture No. 1 and the Related Bond Indenture, interest on this Obligation No. 3 shall cease to accrue from the date fixed for redemption, and from and after such date this Obligation No. 3 shall be deemed not to be Outstanding, as defined in the Master Indenture, and shall no longer be entitled to the benefits of the Master Indenture, and the registered owner hereof shall have no rights in respect of this Obligation No. 3 other than payment of the redemption price, together with accrued interest to the date fixed for redemption.

Upon the occurrence of certain Events of Default (as defined in the Master Indenture), the principal of all Obligations then Outstanding may be declared, and the same shall become, due and payable as provided in the Master Indenture.

The registered owner of this Obligation No. 3 shall have no right to enforce the Master Indenture, or to institute any action to enforce the covenants therein, or to take any action with respect to any default under the Master Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Master Indenture.

This Obligation No. 3 is issuable only as a fully registered obligation. This Obligation No. 3 shall be registered on the registration books to be maintained for that purpose at the Corporate Trust Office of the Master Trustee and the transfer of this Obligation No. 3 shall be registrable only upon presentation of this Obligation No. 3 at said office by the registered owner or by his duly authorized attorney and subject to the limitations, if any, set forth in Supplemental Master Indenture No. 1. Such registration of transfer shall be without charge to the registered owner hereof, but any taxes or other governmental charges required to be paid with respect to the same shall be paid by the registered owner requesting such registration of transfer as a condition precedent to the exercise of such privilege. Upon any such registration of transfer, the Obligated Group Members shall execute and the Master Trustee shall authenticate and deliver in exchange for this Obligation No. 3 a new Obligation, registered in the name of the transferee.

Prior to due presentment hereof for registration of transfer, the Obligated Group Members and the Master Trustee may deem and treat the person in whose name this Obligation No. 3 is registered as the absolute owner hereof for all purposes; and neither the Obligated Group Members nor the Master Trustee shall be affected by any notice to the contrary. All payments made to the registered owner hereof shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable on this Obligation No. 3.

No covenant or agreement contained in this Obligation No. 3 or the Master Indenture shall be deemed to be a covenant or agreement of any director, officer, agent or employee of the Obligated Group Members, any other Obligated Group Member or of the Master Trustee in his individual capacity, and no incorporator, member, officer or member of the Governing Body of the Obligated Group Members or any other Obligated Group Member shall be liable personally on this Obligation No. 3 or be subject to any personal liability or accountability by reason of the issuance of this Obligation No. 3.

This Obligation No. 3 shall not be entitled to any benefit under the Master Indenture, or be valid or become obligatory for any purpose, until this Obligation No. 3 shall have been authenticated by execution by the Master Trustee, or its successor as Master Trustee, of the Certificate of Authentication inscribed hereon.

**IN WITNESS WHEREOF,** the Borrower, in its capacity as Obligated Group Member, has caused this Obligation No. 3 to be executed in its name and on its behalf by its duly authorized officer all as of the dated date hereof.

**KANSAS      CITY      UNITED      METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**

By: _____

Name: _____

Title: _____

**MASTER TRUSTEE'S AUTHENTICATION CERTIFICATE**

     This Obligation No. 3 is one of the Obligations described in the within-mentioned Master Indenture and Supplemental Master Indenture No. 1.

               **UMB BANK, N.A.,**
               as Master Trustee


               By:_____
                       Authorized Signatory

**ASSIGNMENT**

For value received, the undersigned hereby pledges and assigns all of its right, title and interest in and to the above Obligation to UMB Bank, N.A., as Bond Trustee under that certain Bond Trust Indenture dated as of November 15, 2021, between the undersigned and said Bond Trustee, or to its successor or successors as Bond Trustee under said Bond Trust Indenture, for the benefit and security of the Registered Owners of the Related Bonds from time to time issued and Outstanding thereunder. This assignment shall be without recourse against or warranty of any nature or description by the undersigned.

Dated as of _____, 2021.

**THE INDUSTRIAL DEVELOPMENT AUTHORITY
OF THE CITY OF KANSAS CITY, MISSOURI**

By:_____

Name:_____

Title:_____

C-5

**EXHIBIT D**

No. R-1                                                                                                                    $12,050,000

## MASTER INDENTURE OBLIGATION NO. 4
### (SERIES 2021D BONDS)

| Final Maturity Date | Dated Date |
|:---:|:---:|
| **November 15, 2046** | **November 15, 2021** |

REGISTERED OWNER:   **THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, MISSOURI**

PRINCIPAL AMOUNT:   **TWELVE MILLION FIFTY THOUSAND DOLLARS**

      **FOR VALUE RECEIVED, KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**, a Missouri nonprofit corporation ("Kingswood"), and all other persons who may from time to time become Obligated Group Members (as defined in the hereinafter referred to Master Indenture), jointly and severally and each as principal, promise to pay to The Industrial Development Authority of the City of Kansas City, Missouri (the "Related Bond Issuer"), or registered assigns, the principal sum of Twelve Million Fifty Thousand Dollars ($12,050,000), together with (a) interest thereon at such rate or rates as in the aggregate will produce an amount equal to the total of all interest becoming due and payable on the Related Bond Issuer's $12,050,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021D (the "Related Bonds"), issued pursuant to the Bond Trust Indenture dated as of November 15, 2021 (as amended or supplemented from time to time in accordance with its terms, the "Related Bond Indenture"), between the Related Bond Issuer and UMB Bank, N.A., as trustee (the "Related Bond Trustee"), which is incorporated herein by reference and made a part hereof, and (b) such redemption premiums and other amounts as are required to be paid by the Kingswood to the Related Bond Issuer as part of the Loan Payments as provided in the Loan Agreement, dated as of November 15, 2021 (as amended or supplemented from time to time in accordance with its terms, the "Related Bond Loan Agreement"), between Kingswood and the Related Bond Issuer, which is incorporated herein by reference and made a part hereof. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Related Bond Indenture and the Master Indenture.  Kingswood is sometimes referred to herein as the "Borrower."

      The principal of, redemption premium, if any, and interest on this Obligation No. 4 shall be paid by means of the Loan Payments which shall be due and payable as set forth in the Related Bond Loan Agreement. The Obligated Group shall receive certain credits against the amounts payable on this Obligation No. 4 to the extent Kingswood receives credit against the payment of Loan Payments under the Related Bond Loan Agreement.

      This Obligation No. 4 is a single Obligation of the Obligated Group Members limited to $12,050,000 in principal amount, designated as Master Indenture Obligation No. 4 (Series 2021D Bonds)" ("Obligation No. 4," and together with all other Obligations issued under the Master Trust Indenture hereinafter identified, the "Obligations") issued under and pursuant to Supplemental Master

Trust Indenture No. 1 dated as of November 15, 2021 ("Supplemental Master Indenture No. 1"), supplementing the Master Trust Indenture dated as of November 15, 2021, among Kingswood, such other persons as may from time to time become Obligated Group Members and UMB Bank, N.A., as trustee (the "Master Trustee"). The Master Trust Indenture, as so supplemented and amended, is hereinafter referred to as the "Master Indenture." This Obligation No. 4, together with all other Obligations outstanding under the Master Indenture, is equally and ratably secured by the Master Indenture.

As provided by **Section 3.01** of the Master Indenture, each Obligated Group Member (as defined in the Master Indenture) is jointly and severally liable on this Obligation No. 4.

This Obligation No. 4 is issued for the purpose of evidencing and securing the indebtedness of the Borrower resulting from the making available to the Borrower of the proceeds of the issuance and sale of the Related Bonds.  If and when the Related Bonds are no longer Outstanding under the Related Bond Indenture, this Obligation No. 4 shall be deemed to have been paid and to be no longer Outstanding under the Master Indenture.

Copies of the Master Indenture are on file at the Corporate Trust Office of the Master Trustee and reference is hereby made to the Master Indenture for the provisions, among others, with respect to the nature and extent of the rights of the owners of Obligations issued under the Master Indenture, the terms and conditions on which, and the purpose for which, Obligations are to be issued and the rights, duties and obligations of the Obligated Group Members and the Master Trustee under the Master Indenture, to all of which the registered owner hereof, by acceptance of this Obligation No. 4, assents.

The Master Indenture permits the issuance of additional Obligations under the Master Indenture to be secured by the covenants made therein, all of which, regardless of the times of issue or maturity, are to be of equal rank without preference, priority or distinction of any Obligation issued under the Master Indenture over any other such Obligation except as expressly provided or permitted in the Master Indenture.

To the extent permitted by and as provided in the Master Indenture, modifications or changes of the Master Indenture, of any indenture supplemental thereto, and of the rights and obligations of the Obligated Group Members and of the owners of Obligations in any particular may be made by the execution and delivery of an indenture or indentures supplemental to the Master Indenture or any supplemental indenture.

This Obligation No. 4 is subject to prepayment, redemption and advance defeasance, in whole or in part, prior to its maturity date, in the manner, under the circumstances, and upon such notice set forth in the Master Indenture, the Related Bond Indenture and the Related Bond Loan Agreements.

Any redemption, either in whole or in part, shall be made upon notice thereof in the manner and upon the terms and conditions provided in the Related Bond Indenture. If this Obligation No. 4 shall have been duly called for redemption and payment of the redemption price, together with interest accrued thereon to the date fixed for redemption, shall have been made or provided for, as more fully set forth in Supplemental Master Indenture No. 1 and the Related Bond Indenture, interest on this Obligation No. 4 shall cease to accrue from the date fixed for redemption, and from and after such date this Obligation No. 4 shall be deemed not to be Outstanding, as defined in the Master Indenture, and shall no longer be entitled to the benefits of the Master Indenture, and the registered owner hereof shall have no rights in respect of this Obligation No. 4 other than payment of the redemption price, together with accrued interest to the date fixed for redemption.

Upon the occurrence of certain Events of Default (as defined in the Master Indenture), the principal of all Obligations then Outstanding may be declared, and the same shall become, due and payable as provided in the Master Indenture.

The registered owner of this Obligation No. 4 shall have no right to enforce the Master Indenture, or to institute any action to enforce the covenants therein, or to take any action with respect to any default under the Master Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Master Indenture.

This Obligation No. 4 is issuable only as a fully registered obligation. This Obligation No. 4 shall be registered on the registration books to be maintained for that purpose at the Corporate Trust Office of the Master Trustee and the transfer of this Obligation No. 4 shall be registrable only upon presentation of this Obligation No. 4 at said office by the registered owner or by his duly authorized attorney and subject to the limitations, if any, set forth in Supplemental Master Indenture No. 1. Such registration of transfer shall be without charge to the registered owner hereof, but any taxes or other governmental charges required to be paid with respect to the same shall be paid by the registered owner requesting such registration of transfer as a condition precedent to the exercise of such privilege. Upon any such registration of transfer, the Obligated Group Members shall execute and the Master Trustee shall authenticate and deliver in exchange for this Obligation No. 4 a new Obligation, registered in the name of the transferee.

Prior to due presentment hereof for registration of transfer, the Obligated Group Members and the Master Trustee may deem and treat the person in whose name this Obligation No. 4 is registered as the absolute owner hereof for all purposes; and neither the Obligated Group Members nor the Master Trustee shall be affected by any notice to the contrary. All payments made to the registered owner hereof shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable on this Obligation No. 4.

No covenant or agreement contained in this Obligation No. 4 or the Master Indenture shall be deemed to be a covenant or agreement of any director, officer, agent or employee of the Obligated Group Members, any other Obligated Group Member or of the Master Trustee in his individual capacity, and no incorporator, member, officer or member of the Governing Body of the Obligated Group Members or any other Obligated Group Member shall be liable personally on this Obligation No. 4 or be subject to any personal liability or accountability by reason of the issuance of this Obligation No. 4.

This Obligation No. 4 shall not be entitled to any benefit under the Master Indenture, or be valid or become obligatory for any purpose, until this Obligation No. 4 shall have been authenticated by execution by the Master Trustee, or its successor as Master Trustee, of the Certificate of Authentication inscribed hereon.

**IN WITNESS WHEREOF,** the Borrower, in its capacity as Obligated Group Member, has caused this Obligation No. 4 to be executed in its name and on its behalf by its duly authorized officer all as of the dated date hereof.

**KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**

By: _____
Name: _____
Title: _____

D-3

**MASTER TRUSTEE'S AUTHENTICATION CERTIFICATE**

This Obligation No. 4 is one of the Obligations described in the within-mentioned Master Indenture and Supplemental Master Indenture No. 1.

**UMB BANK, N.A.,**
as Master Trustee

By:_____
            Authorized Signatory

**ASSIGNMENT**

For value received, the undersigned hereby pledges and assigns all of its right, title and interest in and to the above Obligation to UMB Bank, N.A., as Bond Trustee under that certain Bond Trust Indenture dated as of November 15, 2021, between the undersigned and said Bond Trustee, or to its successor or successors as Bond Trustee under said Bond Trust Indenture, for the benefit and security of the Registered Owners of the Related Bonds from time to time issued and Outstanding thereunder. This assignment shall be without recourse against or warranty of any nature or description by the undersigned.

Dated as of _____, 2021.

**THE INDUSTRIAL DEVELOPMENT AUTHORITY
OF THE CITY OF KANSAS CITY, MISSOURI**

By:_____
Name:_____
Title:_____

Draft 8/16/2021

**AMENDED AND RESTATED DEED OF TRUST AND SECURITY AGREEMENT**
**Dated as of November 15, 2021**

| GRANTOR: | KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY a Missouri nonprofit corporation, 10000 Wornall Road Kansas City, Missouri 64114 |
|---|---|
| GRANTEE: | BRIAN P. KRIPPNER a resident of the State of Missouri, as deed of trust trustee for the benefit of UMB BANK, N.A., as Master Trustee 2 South Broadway, Suite 600 St. Louis, MO 63102 Attention: Corporate Trust Department |
| LEGAL DESCRIPTION: | See attached **Schedule 1** |
| REFERENCE BOOK & PAGE: | **Instrument Number 2016E0001165** (recorded 01/06/2016); **Instrument Number 2016E0011756** (recorded 02/10/2016); and **Instrument Number 2016E0119729** (recorded 12/20/2016). |

THIS AMENDED AND RESTATED DEED OF TRUST AND SECURITY AGREEMENT (THIS "DEED OF TRUST") SECURES AMONG OTHER THINGS FUTURE ADVANCES AND FUTURE OBLIGATIONS AND IS A SECURITY INSTRUMENT GOVERNED BY SECTION 443.055 OF THE REVISED STATUTES OF MISSOURI. THE "FACE AMOUNT" OF THIS SECURITY INSTRUMENT IS **$48,950,000**.

THIS DEED OF TRUST IS A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER THE UNIFORM COMMERCIAL CODE OF MISSOURI.

THIS DEED OF TRUST IS SUPPLEMENTAL TO AND MODIFIES, AMENDS AND RESTATES THE TERMS OF AN EXISTING DEED OF TRUST AND SECURITY AGREEMENT DATED AS OF JANUARY 1, 2016 (THE "ORIGINAL DEED OF TRUST") RECORDED JANUARY 6, 2016 AS INSTRUMENT NUMBER 2016E0001165 IN THE ORIGINAL FACE AMOUNT OF **$51,770,000**, AS AMENDED BY SUPPLEMENTAL DEED OF TRUST AND SECURITY AGREEMENT NO. 1, DATED AS OF FEBRUARY 10, 2016, RECORDED FEBRUARY 10, 2016 AS INSTRUMENT NUMBER 2016E0011756, AS MODIFIED BY MODIFICATION NO

1 TO SUPPLEMENTAL DEED OF TRUST AND SECURITY AGREEMENT NO. 1 dated effective FEBRUARY 10, 2016 recorded on DECEMBER 20, 2016 as INSTRUMENT NUMBER 2016E0119729, each from KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY, a MISSOURI NONPROFIT CORPORATION, as GRANTOR, to BRIAN P. KRIPPNER, a RESIDENT OF THE STATE OF MISSOURI, as DEED OF TRUST TRUSTEE, FOR THE USE AND BENEFIT OF UMB BANK, N.A., as MASTER TRUSTEE UNDER THE MASTER INDENTURE (HEREIN DEFINED), as BENEFICIARY AND SECURED PARTY, and recorded with the RECORDER OF DEEDS OF JACKSON COUNTY, MISSOURI.



# TABLE OF CONTENTS

**Page**

Recitals..................................................................................................................... 1
Granting Clauses...................................................................................................... 2
Deed of Trust with Respect to Real Property ........................................................ 2
Assignment and Security Agreement with Respect to Personal Property .............. 3

Section 1.    Definitions of Words and Terms................................................ 4
Section 2.    General Covenants........................................................................ 4
Section 3.    Conditions for Release of Portions of the Mortgaged Property
             and the Personal Property ......................................................... 5
Section 4.    Payment of Costs, Charge, Etc.................................................... 7
Section 5.    No Waiver ................................................................................... 7
Section 6.    Event of Default; Remedies ........................................................ 7
Section 7.    Special Remedies ........................................................................ 8
Section 8.    Uniform Commercial Code, Rights of a Secured Creditor ......... 9
Section 9.    Waivers ....................................................................................... 9
Section 10.   No Remedy Exclusive.................................................................. 10
Section 11.   Covenants Run with the Land ..................................................... 10
Section 12.   Power of Sale; Purchase by Master Trustee................................ 10
Section 13.   Applications of Proceeds ............................................................ 11
Section 14.   Warranties, Covenants and Indemnities Regarding Environmental Matters .......... 11
Section 15.   Covenants of the Deed of Trust Trustee; Substitutions............... 13
Section 16.   Lease to Kingswood.................................................................... 13
Section 17.   Warranty of Title........................................................................ 14
Section 18.   Obligations Effective upon Issuance, Sale and Delivery of Bonds........................ 14
Section 19.   Severability ................................................................................. 14
Section 20.   Notices ........................................................................................ 14
Section 21.   Missouri Law Governs................................................................ 14
Section 22.   Amendments, Changes and Modifications .................................. 14
Section 23.   Consent by Master Trustee.......................................................... 14
Section 24.   Right to Entry by Master Trustee ............................................... 14
Section 25.   Insurance ..................................................................................... 15
Section 26.   Type of Loan............................................................................... 15

Signatures and Acknowledgments .......................................................................... 16

Schedule 1 - The Site

## AMENDED AND RESTATED DEED OF TRUST AND SECURITY AGREEMENT

**THIS AMENDED AND RESTATED DEED OF TRUST AND SECURITY AGREEMENT** (the "Deed of Trust") dated as of November 15, 2021, from **KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY,** a Missouri nonprofit corporation (the "Kingswood"), as grantor, whose address is 10000 Wornall Road, Kansas City, Missouri 64114, to **BRIAN P. KRIPPNER,** a resident of the State of Missouri, as deed of trust trustee (the "Deed of Trust Trustee"), for the use and benefit of **UMB BANK, N.A.,** as master trustee under the Master Indenture (hereinafter defined), as beneficiary and secured party (the "Master Trustee"), whose address is 2 South Broadway, Suite 600, St. Louis, Missouri 63102.

### RECITALS:

1.      Kingswood has entered into a Master Trust Indenture (the "Master Indenture"), dated as of November 15, 2021, and a Supplemental Master Trust Indenture No. 1, also dated as of November 15, 2021 ("Supplement No. 1"), with UMB Bank, N.A., as master trustee (the "Master Trustee"). Under the terms of the Master Indenture, Kingswood constitutes an Obligated Group Member and together with such other persons who from time to time may join the Obligated Group is referred to as the "Obligated Group Members." Said Master Trust Indenture as supplemented by Supplement No. 1 and as further supplemented and amended from time to time is referred to herein as the "Master Indenture." Kingswood is the owner of the real property located in Kansas City, Jackson County, Missouri, legally described on the attached Schedule 1 (the "Site"), and this Deed of Trust is given to secure all Obligations (including future additional Obligations) as defined in the Master Indenture.

2.      In order to provide funds for The Industrial Development Authority of the City of Kansas City, Missouri, a public corporation organized and existing under the laws of the State of Missouri (the "Authority") to make a loan to Kingswood under the terms of the Loan Agreement dated as of November 15, 2021, between the Authority and Kingswood (the "Loan Agreement"), the Authority is issuing its

   (a)   $5,500,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021A (the "Series 2021A Bonds");
   (b)   $27,000,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021B (the "Series 2021B Bonds");
   (c)   $4,400,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021C (the "Series 2021C Bonds"); and
   (d)   $12,050,000 Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2021D (the "Series 2021D Bonds" and collectively with the Series 2021A Bonds, the Series 2021B Bonds, and the Series 2021C Bonds, the "Series 2021 Bonds"),

pursuant to a Bond Trust Indenture, dated as of November 15, 2021 (the "Bond Indenture"), between the Authority and UMB Bank, N.A., as bond trustee (the "Bond Trustee").

3.      The Series 2021B Bonds and the Series 2021D Bonds are being issued in exchange for the $51,770,000 aggregate outstanding principal amount of the Authority's Senior Living Facilities Revenue Bonds (Kingswood Project), Series 2016 (the "Series 2016 Bonds"). Subsequent to the issuance of the Series 2016 Bonds, Kingswood defaulted on certain of its obligations in connection with the Series 2016 Bonds, including without limitation its obligations under the Original Bond Indenture and the Original Loan Agreement (each as defined in the Master Indenture), and entered into negotiations with certain owners of a majority of principal amount of the Series 2016 Bonds to address the issues.  On

_____, 2021, Kingswood filed its voluntary petition under Chapter 11 of the Bankruptcy Code in the bankruptcy case styled In re: Kansas City United Methodist Retirement Home Inc. Case No. 21-_____ (___) (the "*Bankruptcy Proceedings*") in the United States Bankruptcy Court for the Western District of Missouri (the "*Bankruptcy Court*").  On _____, 2021, Kingswood filed its reorganization plan which included the restructuring of the Series 2016 Bonds (the "*Bankruptcy Plan*"). On _____, 2021, the Bankruptcy Court issued its order (the "*Order*") confirming the Bankruptcy Plan.  The Order and the Bankruptcy Plan provide that all of the payment obligations of the Authority under the outstanding Series 2016 Bonds are to be restructured by having the owners of all of the Series 2016 Bonds exchange such outstanding Series 2016 Bonds for Series 2021B Bonds and Series 2021D Bonds (the "*Bond Exchange*").

4.      The Original Deed of Trust was granted to secure the Series 2016 Bonds and the related Obligations under the Original Master Indenture (as defined in the Master Indenture).

5.      The Series 2021A Bonds and the Series 2021C Bonds are being issued to fund certain costs of Kingswood and its Facilities in order to effectuate the Bond Exchange and the Bankruptcy Plan.

6.      The aggregate principal amount of the Series 2016 Bonds is $51,770,000. The initial aggregate principal amount of the Series 2021 Bonds is $48,950,000.

7.      Pursuant to Supplement No. 1, to evidence their obligations to make Loan Repayments under the Loan Agreement and to secure and further provide for the payment of the principal of and premium, if any, and interest on the Series 2021 Bonds, and to induce the Authority to issue the Series 2021 Bonds and to induce the purchasers of the Series 2021 Bonds to purchase them, Kingswood, as an Obligated Group Member, has issued:

**Obligation No. 1** (Master Indenture Obligation No. 1 (Series 2021A Bonds));

**Obligation No. 2** (Master Indenture Obligation No. 2 (Series 2021B Bonds));

**Obligation No. 3** (Master Indenture Obligation No. 3 (Series 2021C Bonds));

**Obligation No. 4** (Master Indenture Obligation No. 4 (Series 2021D Bonds));

dated November 15, 2021 (the "Series 2021 Bond Obligations"), to the Authority, and the Authority has pledged and assigned the Series 2021 Bond Obligations to the Series 2021 Bond Trustee.

8.      The Master Trustee has certified each of the Series 2021 Bond Obligations as an Obligation under the Master Indenture. Pursuant to Supplement No. 1, the Authority, the Series 2021 Bonds, the Bond Indenture, and the Bond Trustee constitute, respectively, a Related Bond Issuer, Related Bonds, Related Bond Indenture, and a Related Bond Trustee. Under the Master Indenture, Obligated Group Members may, from time to time, issue additional Obligations to evidence and secure additional Indebtedness and obligations of the issuing Obligated Group Member, and all Obligated Group Members are and will be jointly and severally liable for each and every Obligation.

9.      Kingswood desires to make and enter into this Deed of Trust (by amending and restating the Original Deed of Trust related to the Series 2016 Bonds being exchanged for a portion of the Series 2021 Bonds) for the benefit of the Master Trustee and the holders of the Obligations (including the Series 2021 Bond Obligations and any future additional Obligations) from time to time outstanding under the Master Indenture to secure the payment and performance of the duties and obligations of the Obligated

Group under the Obligations and the Master Indenture, including the principal of, premium, if any, and interest on the Obligations as the same become due and payable.

**NOW, THEREFORE, THIS DEED OF TRUST WITNESSETH;**

**GRANTING CLAUSES**

**DEED OF TRUST WITH RESPECT TO REAL PROPERTY**

That Kingswood, in consideration of the premises and the sum of One Dollar duly paid to Kingswood by the Deed of Trust Trustee, and of other good and valuable consideration, the receipt of which is hereby acknowledged, and in order to secure the payment and performance of the duties and obligations of Kingswood under the Obligations, the Master Indenture and this Deed of Trust does hereby **GRANT, BARGAIN AND SELL, CONVEY AND CONFIRM** unto the Deed of Trust Trustee, and its successors in trust, forever, with power of sale, for the benefit of Master Trustee as beneficiary, all and singular the following described real property (said property being herein referred to as the "Mortgaged Property"), subject only to Permitted Liens not required by the Master Indenture to be subordinated this Deed of Trust:

      1.     The Site and all right, title and interest of Kingswood in and to all tenements, hereditaments, appurtenances, rights, privileges and immunities thereunto belonging or appertaining, together with all after-acquired property and any replacements, substitutions or additions of any kind whatsoever.

      2.     All buildings, improvements, fixtures and other property constituting real property or real estate under the laws of the State now located, or hereafter erected, upon the Site, and all right, title and interest of Kingswood, now owned or hereafter acquired, in and to any and all strips and gores of land, in and to all real property upon which any such buildings or improvements may now or hereafter encroach, and in, to and under the real property within the streets, roads and alleys adjoining all such real property, and in and to all and singular the tenements, hereditaments, privileges, easements, franchises, rights, appendages and appurtenances whatsoever belonging to or in any way appertaining to all such real property.

**TO HAVE AND TO HOLD** all and singular the Mortgaged Property with all rights and privileges hereby mortgaged, conveyed, pledged and assigned or agreed or intended so to be, to the Deed of Trust Trustee and its successors and assigns forever;

**IN TRUST NEVERTHELESS,** upon the terms and subject to the conditions hereinafter set forth.

**ASSIGNMENT AND SECURITY AGREEMENT
WITH RESPECT TO PERSONAL PROPERTY**

In order to further secure the payment and performance of the duties and obligations of Kingswood under the Obligations, the Master Indenture and this Deed of Trust, Kingswood does hereby pledge and assign unto the Master Trustee and its successors and assigns forever, and grants a security interest in the personal property of Kingswood, the creation of a security interest in which is governed by the Uniform Commercial Code of the State of Missouri (the "UCC"), whether now owned or hereafter acquired by Kingswood, described in the following paragraphs 1 through 6 (said property being referred to herein as the "Personal Property"), subject only to Permitted Liens not required by the Master Indenture to be subordinated to this Deed of Trust:

1.      All tangible personal property, including without limitation, all fixtures, machinery, equipment, inventory and other goods (all as defined in the UCC) of any nature whatsoever now or hereafter owned by Kingswood and located on the Mortgaged Property or constituting part of the Mortgaged Property, except motor vehicles.

2.      All building materials, fixtures, building machinery and building equipment owned by Kingswood and delivered to the Mortgaged Property during the course of, or in connection with, construction of the Project.

3.      All equipment (as defined in the UCC) used in connection with the Mortgaged Property, whether such equipment is now owned or hereafter acquired by Kingswood.

4.      All accounts, general intangibles, inventory, documents, instruments, chattel paper, deposit accounts, commercial tort claims, letter of credit rights and investment property of each Obligated Group Member, now owned or hereafter acquired, and all proceeds thereof, excluding, however, pledges, gifts, grants, bequests, donations and contributions to any Obligated Group Member that are specifically restricted by the donor, testator or grantor to a particular purpose that is inconsistent with their use for payments required under the Master Indenture or on the Obligations, and, if also so restricted, the income and gains derived therefrom ("Pledged Assets"). All terms used in this paragraph are used with the meanings given such terms, if any, in the UCC.

5.      All right, title and interest of Kingswood in, to and under any residence agreements, leases or other contracts now, heretofore or hereafter entered into respecting rights to reside at, use or occupy a portion of the Mortgaged Property and all renewals or extensions thereof ("Resident Contracts"), subject to any obligation of Kingswood to refund any refundable deposits in accordance with the terms of the residence agreements or other contracts.

6.      All leases, rents, issues and profits arising out of the Mortgaged Property.

7.      All proceeds from the sale or other disposition of any of the above and all replacements, substitutions or additions of any kind whatsoever for or to the above.

Notwithstanding the assignment, and grant of a security interest in, leases, rents, issues and profits arising out of the Mortgaged Property in item (6) above, Kingswood shall have a license and shall be permitted to collect and retain the rents, issues and profits accruing from the Mortgaged Property until the occurrence of an Event of Default under the Master Indenture. Upon the occurrence of an Event of Default under the Master Indenture and Kingswood's receipt of written notice thereof, such license and permission to collect rents, issues and profits accruing from the Mortgaged Property shall immediately terminate and, thereafter, all rents, issues and profits shall be payable directly to the Master Trustee.

**NOW, THEREFORE,** the condition of this Deed of Trust is such that if Kingswood shall well and truly pay unto the Master Trustee, its successors and assigns the indebtedness evidenced by the Obligations and shall perform, comply with and abide by each and every of the agreements, conditions and covenants contained and set forth in the Master Indenture, the Obligations and this Deed of Trust, then this Deed of Trust and the estate hereby created shall be released, without warranty, at the request and at the cost of Kingswood.

**AGREEMENTS:**

**Section 1.  Definitions of Words and Terms.**  In addition to words and terms defined herein, capitalized words and terms used in this Deed of Trust shall have the meanings set forth in the Master Indenture, unless some other meaning is plainly indicated.  A copy of the Master Indenture and the Deed of Trust shall be kept on file at the principal corporate trust office of the Master Trustee.

**Section 2.  General Covenants.**

(a)      Kingswood will perform, comply with and abide by all of the agreements, conditions and covenants contained and set forth in the Master Indenture, the Obligations and this Deed of Trust, and in every other document evidencing, securing or otherwise relating to the debt hereby secured, all incorporated herein by reference. This Deed of Trust secures to the Master Trustee: (a) the repayment of all obligations evidenced by the Obligations, including interest; (b) the payment of all other sums now or in the future advanced by the Master Trustee, any Related Bond Issuer, any Related Bond Trustee, or any other Holder, under the Master Indenture, any Obligation, this Deed of Trust or the other related documents, and the performance of all present and future obligations of Kingswood thereunder.

(b)      THIS DEED OF TRUST SECURES FUTURE ADVANCES AND FUTURE OBLIGATIONS AND IS A "SECURITY INSTRUMENT" GOVERNED BY SECTION 443.055, RSMO, AS AMENDED; PROVIDED THAT KINGSWOOD HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO TERMINATE THIS INSTRUMENT AS SECURITY FOR FUTURE ADVANCES OR FUTURE OBLIGATIONS AT ANY TIME PRIOR TO THE TERMINATION OF ALL OBLIGATIONS AND THE MASTER INDENTURE, AND IF KINGSWOOD SHALL GIVE ANY NOTICE OF TERMINATION UNDER THE PROVISIONS OF SECTION 443.055(6) OR 443.055(8), RSMO CONCERNING THE EFFECTIVENESS OR PRIORITY OF THIS DEED OF TRUST WITH RESPECT TO FUTURE ADVANCES OR FUTURE OBLIGATIONS, SUCH ACT SHALL CONSTITUTE AN EVENT OF DEFAULT UNDER THE MASTER INDENTURE AND UNDER THIS DEED OF TRUST. THIS DEED OF TRUST SECURES ANY CONTRACTUAL FUTURE ADVANCES TO KINGSWOOD OR ANY FUTURE CONTRACTUAL OBLIGATIONS OF KINGSWOOD TO THE MASTER TRUSTEE, WITHOUT REGARD TO WHETHER ANY SUCH ADVANCES OR OBLIGATIONS ARE OPTIONAL OR OBLIGATORY; AND THE TOTAL PRINCIPAL AMOUNT OF OBLIGATIONS SECURED BY THIS DEED OF TRUST MAY DECREASE OR INCREASE FROM TIME TO TIME, PROVIDED THAT THE TOTAL PRINCIPAL AMOUNT OUTSTANDING AT ANY ONE TIME, NOT INCLUDING SUMS ADVANCED TO PROTECT THE SECURITY OF THIS DEED OF TRUST, OR FOR ANY OTHER PURPOSES SPECIFIED IN SECTION 443.055(3) RSMO, SHALL NOT EXCEED THE "FACE AMOUNT" STATED ON THE RECORDING COVER PAGE OF THIS DEED OF TRUST. NOTHING IN THIS SUBSECTION SHALL BE DEEMED TO OBLIGATE ANY PARTY TO MAKE ANY FUTURE ADVANCES TO KINGSWOOD.

**Section 3.  Conditions for Release of Portions of the Mortgaged Property and the Personal Property.**

(a)      *General Provisions for Release.*  So long as no Event of Default or condition which with the giving of notice or the passage of time, or both, would constitute a default or an Event of Default shall have occurred and be continuing under the Master Indenture, the Master Trustee shall release, without the consent of any of the Holders of the Obligations (except consents, if any, described in 3(c) below), any of the Mortgaged Property or the Personal Property subject to the lien of this Deed of Trust, except Pledged Assets, upon receipt by the Master Trustee of the following:

(1)      Written Request of Kingswood.  A written request of Kingswood for such release, describing the property to be released (referred to in this Section as the "Released Property") specifying the applicable Section of the Master Indenture pursuant to which Kingswood intends to rely in authorizing such release.

(2)  Satisfaction of Master Indenture Property Transfer.  A Certificate of Kingswood satisfactory to the Master Trustee that the Property to be released could be sold, leased or otherwise disposed of by Kingswood pursuant to the Master Indenture, specifying the applicable Section of the Master Indenture and attaching any computations, opinions or reports required by that Section.

(3)  Record of Released Property.  An up-to-date record of property released from the lien of this Deed of Trust, which list shall identify such Released Property by description, serial number or other particular identifying designation.

(4)  Documents of Conveyance.  A supplement to this Deed of Trust and other documents necessary to subject the substituted property (if any) to the liens and security interest created by this Deed of Trust and, if the substituted property (if any) is real property, an amendment to the existing mortgagee's title insurance policy, evidencing that the substituted property (if any) is subject to the lien of this Deed of Trust subject only to Permitted Liens not required by the Master Indenture to be subordinated to the Deed of Trust.

(5)  Opinion of Counsel.  A letter of opinion addressed to the Master Trustee from Counsel who is satisfactory to the Master Trustee to the effect that:

(i)  The release of the property requested by Kingswood is authorized hereunder and under the Master Indenture (in delivering such opinion, Counsel may rely on the reports required by the Master Indenture);

(ii)  any substituted property is subject to the terms of the Master Indenture and this Deed of Trust as supplemented by any supplement to this Deed of Trust and to the liens and security interests created by the Master Indenture and by this Deed of Trust, subject only to Permitted Liens, as to which the attorney rendering such opinion may rely on a mortgagee's title insurance policy;

(iii)  The execution and delivery of the requested release and, if applicable, the acceptance of the substituted property will not violate any provision of the Master Indenture, the Obligations or this Deed of Trust (in delivering such opinion, Counsel may rely on the reports required by the Master Indenture); all necessary action required to be taken by Kingswood and by the Master Trustee to effect the release of the Released Property and the conveyance of the substituted property, if any, has been taken, including, without limitation, the obtaining of any consents to such action required by Section 3(c) below;

(iv)  A supplement to this Deed of Trust and all other documents necessary to effect the release of the Released Property and, if necessary, substitution of the substituted property have been duly authorized, executed and delivered and are binding upon the parties executing and delivering the same in accordance with their respective terms; and

(v)  To Counsel's knowledge all required permits and authorizations of all federal, state and local governmental bodies and agencies for the release and disposition of the Released Property and the acquisition and substitution of the substituted property, if any, have been granted, or that no such permits or authorizations, other than those granted, are required.

(b)      *Instruments Evidencing Release or Permitted Liens.*  Upon the satisfaction of the conditions for the release of any Mortgaged Property or Personal Property from the lien of this Deed of Trust, the Master Trustee, at the request of and at the expense of Kingswood, shall execute and deliver to Kingswood any and all instruments necessary or appropriate to effect or evidence such release or the granting of any Permitted Lien not required by the Master Indenture to be subordinated to this Deed of Trust as may be requested by Kingswood including without limitation deeds of release, and Uniform Commercial Code termination statements.

(c)      *Additional Consents may be Required.*  In addition to the requirements set forth in subparagraphs (a) and (b) above, prior to releasing any Mortgaged Property or Personal Property from the lien of this Deed of Trust the Master Trustee shall provide each Related Bond Trustee with a notice of such proposed release and each Bond Trustee shall have not less than 10 Business Days to notify the Master Trustee that additional consents are required under the documents authorizing and securing the Related Bonds.

(d)      *Unauthorized Transfers.*  Any transfer or conveyance of the Mortgaged Property in violation of the foregoing terms, or which would not otherwise be permitted by the terms of this Deed of Trust or by the terms of the Master Indenture (an "Unauthorized Transfer"), shall constitute an immediate Event of Default under this Deed of Trust. Any and all proceeds of an Unauthorized Transfer shall be remitted immediately to the Master Trustee to be applied to the Obligations according to the terms of the Master Indenture.

**Section 4.  Payment of Costs, Charges, Etc.**  Kingswood agrees to pay all and singular the reasonable costs, charges, fees and expenses, including, without limitation, attorneys' fees and expenses and abstract costs, reasonably incurred or paid at any time by the Master Trustee or the Deed of Trust Trustee as a result of the performance of the functions of either the Master Trustee or the Deed of Trust Trustee hereunder or because of the failure of Kingswood to perform, comply with, and abide by each and every one of the agreements, conditions and covenants of the Master Indenture, the Obligations, this Deed of Trust or any other document evidencing, securing or otherwise relating to the debt hereby secured.

**Section 5.  No Waiver.**  Any failure by the Master Trustee to insist upon the strict performance by Kingswood of any of the terms and provisions hereof shall not be deemed to be a waiver of any of the terms and provisions hereof, and the Master Trustee, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Kingswood of any and all of the terms and provisions of this Deed of Trust to be performed by Kingswood; and the Master Trustee may resort for the payment of the indebtedness secured by this Deed of Trust to any security therefor held by the Master Trustee in such order and manner as the Master Trustee may elect.

**Section 6.  Event of Default; Remedies.**  At any time after an Event of Default under the Master Indenture or any breach or failure to observe the terms of this Deed of Trust has occurred and is continuing as provided therein or herein, the Master Trustee may immediately or at any time thereafter at the continuing option of the Master Trustee, declare the Obligations forthwith due and payable as if all of the sums of money payable thereunder were originally stipulated to be paid on such accelerated payment date; and thereupon the Master Trustee without notice or demand, to the extent permitted by the law of the State, may exercise any right, power or remedy permitted to it by law or by contract, and in particular, without limiting the generality of the foregoing, have the absolute right, at its option, to pursue one or more of the following remedies:

(a)      The Master Trustee shall be entitled, immediately or thereafter, without notice or demand, to the extent permitted by the laws of the State, (i) to institute suit to enforce the rights of the Master Trustee and (ii) to enforce, at the Master Trustee's continuing option, payment of

Deed of Trust                                        7

all Obligations by action to foreclose this Deed of Trust, either or both, concurrently or otherwise; and one action or suit shall not abate or be a bar to or waiver of the Master Trustee's right to institute or maintain the other, provided that the Master Trustee shall have only one payment and satisfaction of the Obligations.

(b)    The Master Trustee shall have the right from time to time to take action to recover any sums, whether interest, principal or any installment of either, or any other sums required to be paid under the terms of this Deed of Trust as the same become due, without regard to whether or not the principal sum secured, or any other sums secured, by this Deed of Trust shall be due, and without prejudice to the right of the Master Trustee thereafter to bring an action of foreclosure, or any other action, or commence foreclosure proceedings under the power of sale, for a default or defaults by Kingswood existing at the time such earlier action was commenced.

(c)    The Master Trustee may commence foreclosure under the power of sale provided for by **Section 12**.

(d)    Any court of competent jurisdiction may, at any time or times, either before or after a foreclosure sale, without notice and without requiring bond, without regard to the solvency or insolvency of any person liable for payment of the Obligations, and without regard to whether the Master Trustee has exercised or is exercising any other available remedy, appoint, as a matter of strict right and as an admitted equity, a receiver for the benefit of the Master Trustee, with power to collect the rents, issues, and profits of the Mortgaged Property, due and to become due. These provisions for the appointment of a receiver and assignment of rents are an express condition upon which the financial accommodations to Kingswood have been made. The receiver, out of such rents, issues, and profits when collected, may pay all attorneys' fees and expenses; may pay all costs and operating expenses incurred in the management and operation of the Mortgaged Property; may pay and secure the release of prior or coordinate liens, if any; may pay taxes, assessments, water and other utility charges, and insurance premiums, then due or thereafter accruing; may make and pay for any repairs to the Mortgaged Property deemed advisable to the Master Trustee; and may pay all or any part of the Obligations then due and payable, or other sums secured hereby or any deficiency decree entered in any foreclosure proceedings or otherwise as the Master Trustee may direct, all in such order of application as the Master Trustee may direct.

(e)    The Master Trustee shall have the option to proceed with foreclosure in satisfaction of any part of the Obligations without declaring the whole of the Obligations as immediately matured, and such foreclosure may be made subject to the unmatured part of the Obligations, and it is agreed that such foreclosure, if so made, shall not in any manner affect the unmatured part of the Obligations, but as to such unmatured part this Deed of Trust, shall remain in full force and effect just as though no foreclosure had been made. Several foreclosures may be made without exhausting the right of foreclosure for any unmatured part of the Obligations, it being the intention of the parties to provide for a foreclosure and sale of the security for any matured portion of the Obligations without exhausting the power of foreclosure and power to sell the Mortgaged Property for any other part of the Obligations. If more than one property, lot, or parcel is encumbered by this Deed of Trust, and if this Deed of Trust is foreclosed upon, or judgment is entered upon any obligation secured by this Deed of Trust, or if the Master Trustee exercises its power of sale, execution may be made upon, or the Master Trustee may exercise its power of sale against, any one or more of the properties, lots, or parcels and not upon the others, or upon all of such properties or parcels, either together or separately, and at different times or at the same time, and execution sales or sales by advertisement likewise may be conducted separately or concurrently, in each case at the Master Trustee's election.

**Section 7.  Special Remedies.**

(a)      *Master Trustee May Occupy and Take Possession*.  During the continuance of any Event of Default under the Master Indenture, the Master Trustee personally or by its agents or attorneys may enter into and upon all or any part of the Mortgaged Property or take possession of the Personal Property, and each and every part thereof, and may exclude Kingswood, its agents and servants wholly therefrom, and having and holding the same, may use, occupy and control the Mortgaged Property and the Personal Property, either personally or by its superintendents, managers, agents, servants, attorneys or receivers. Upon every such entry, the Master Trustee at the expense of the Mortgaged Property or Kingswood, from time to time, either by purchase, repairs or construction, may maintain and restore the Mortgaged Property, whereof it shall become possessed as aforesaid, may complete the construction or development of the improvements and in the course of such completion may make such changes in the contemplated improvements as it may deem desirable and may insure the same.  Likewise, from time to time, the Master Trustee at the expense of the Mortgaged Property or Kingswood, the Master Trustee may make all necessary or proper repairs, renewals and replacements and such alterations, additions, betterments and improvements thereto and thereon as to it may deem advisable; and in every such case the Master Trustee shall have the right to manage and operate the Mortgaged Property and exercise all rights and powers of Kingswood with respect thereto either in the name of Kingswood or otherwise as it shall deem best; and the Master Trustee shall be entitled to collect and receive all earnings, revenues, rents, issues, profits and income of the Mortgaged Property and the Personal Property and every part thereof.  After deducting the fees, costs, charges and expenses of conducting the business thereof and of all maintenance, repairs, renewals, replacements, alterations, betterments and improvements and amounts necessary to pay for taxes, assessments, insurance and prior or other proper charges upon the Mortgaged Property and the Personal Property, or any part thereof, as well as just and reasonable compensation for the services of the Master Trustee and for all attorneys, counsel, agents, clerks, servants and other employees by it properly engaged and employed, the Master Trustee shall apply the moneys arising as aforesaid as provided in **Section 13**.

(b)      *Collection of Rents, Etc.*  During the continuance of an Event of Default under the Master Indenture, the Master Trustee personally or by its agents or attorneys may in person or by agent, with or without taking possession of or entering the Mortgaged Property, with or without bringing any action or proceeding, give or require Kingswood to give, notice to any or all tenants and residents under the Resident Contracts authorizing and directing tenants and residents to pay all amounts due thereunder directly to the Master Trustee; collect all said amounts; enforce the payment thereof and exercise any or all of the rights of Kingswood under any Resident Contract and any or all of the rights of the Master Trustee under this Deed of Trust; do all things permitted a receiver by statute or by this Deed of Trust; and do any acts which the Master Trustee deems proper to protect the security of this Deed of Trust.

**Section 8.  Uniform Commercial Code, Rights of a Secured Creditor.**  To the extent any of the property covered by this Deed of Trust consists of property, rights or interests covered by the UCC, this Deed of Trust shall constitute a security agreement and a present unconditional assignment of, and is intended to create a security interest in, such property in favor of the Master Trustee.  Some of the items of the Mortgaged Property are goods that are or are to become fixtures related to the Site, and it is intended that as to those goods, this Deed of Trust shall be effective as a financing statement filed as a fixture filing from the date of its filing for record in the real estate records of the county in which the Mortgaged Property is situated. Information concerning the security interest created by this instrument may be obtained from the Master Trustee, as secured party, at the address of the Master Trustee stated on the recording information cover page attached to this Deed of Trust, and incorporated herein by this reference. The mailing address of Kingswood, as debtor, is as stated on said cover sheet. During the continuance of any Event of Default under the Master Indenture, the Master Trustee shall have all the

Deed of Trust                                    9

rights of and remedies with regard to the Personal Property available to a secured creditor under the UCC. This Deed of Trust shall be self-operative with respect to such property, but Kingswood shall execute as appropriate and deliver such security agreements, financing statements, continuation statements, deposit or securities account control agreements and other documents necessary to create or perfect a security interest in the Personal Property, and from time to time will perform or cause to be performed any other act as provided by law.  In the event that Kingswood fails to execute any of such instruments within 10 days after demand to do so, Kingswood does hereby make, constitute and irrevocably appoint the Master Trustee as its attorney-in-fact and in its name, place and stead so to do.  Kingswood hereby authorizes the Master Trustee to file or record all UCC financing statements and continuation statements from time to time as it deems necessary to perfect the security interest granted herein and to continue the perfection of such security interest.

Section 9.  **Waivers.**  To the extent permitted by law, Kingswood agrees not at any time to insist upon, plead, claim or take any benefit or advantage, in any way whatsoever, whether now or in the future, of any of the following: (a) any stay, extension or moratorium law, under the Bankruptcy Code or otherwise, or any exemption from execution or sale of all or any part of the Mortgaged Property which may affect the covenants and terms of performance of this Deed of Trust; (b) any law providing for the valuation or appraisal of all or any part of the Mortgaged Property prior to or after any sale or sales made pursuant to this Deed of Trust, or pursuant to the decree, judgment, or order of any court of competent jurisdiction; or (c) any right under any statute to redeem all or any part of the property so sold. Kingswood wholly waives, for Kingswood and those who claim under Kingswood (a) all rights and periods of redemption provided under Missouri law, (b) all statutory rights to redeem, and (c) all right to have the Mortgaged Property or any other assets which secure the Obligations marshaled upon any foreclosure under this Deed of Trust.

Section 10.  **No Remedy Exclusive.**  No remedy conferred upon or reserved to the Master Trustee herein, or in the Obligations, or any other document or instrument evidencing, securing or otherwise relating to the debt hereby secured is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative and shall be in addition to every remedy given to the Master Trustee or now or hereafter existing at law or in equity or by statute.  No delay or omission of the Master Trustee to exercise any right or power accruing upon any default herein, in the Obligations, or in any other document or instrument evidencing, securing or otherwise relating to the debt hereby secured, shall impair any such right or power, or shall be construed to be a waiver of any such default or any acquiescence therein; and every power and remedy given by the Master Indenture, the Obligations, this Deed of Trust or any other document or instrument evidencing, securing or otherwise relating to the debt hereby secured, to the Master Trustee may be exercised from time to time as often as may be deemed expedient by the Master Trustee.  Nothing in this Deed of Trust or the Master Indenture or in the Obligations or in any other document or instrument evidencing, securing or otherwise relating to the debt hereby secured shall affect the obligation of Kingswood to pay the principal of and interest on the Obligations in the manner and at the time and place therein respectively expressed.

Section 11.  **Covenants Run with the Land.**  All of the grants, covenants, terms, rights, immunities, provisions and conditions herein shall run with the land and shall apply to, bind and inure to the benefit of Kingswood, the Master Trustee and the Deed of Trust Trustee, and their respective successors and assigns.

Section 12.  **Power of Sale; Purchase by Master Trustee.**  If default be made in the payment of the Obligations, any part thereof or any of the interest or premium thereon when due, or if any other Event of Default under the Master Indenture or under this Deed of Trust exists and such default or Event of Default has not been expressly waived in writing, then the Obligations shall become due at the Master Trustee's option as herein provided, and this Deed of Trust shall remain in force, and the Deed of Trust

Deed of Trust                                    10

Trustee, or a successor trustee as hereinafter described, may proceed to sell the Mortgaged Property and Personal Property and any and every part thereof, at public venue, to the highest bidder, at the then customary place in Jackson County, Missouri, for cash, first giving the public notice required by law of the time, terms and place of sale, and of the property to be sold, by advertisement in a newspaper printed and published in Jackson County, Missouri, and upon such sale shall execute and deliver a deed of conveyance and bill of sale of the property sold to the purchaser or purchasers thereof, and any statement or recital of fact in such deed in relation to the non-payment of money hereby secured to be paid, existence of the indebtedness so secured, notice of advertisement, sale, receipt of money, and the happening of any of the aforesaid events whereby the successor trustee became successor as herein provided, shall be *prima facie* evidence of the truth of such statement or recital.  The proceeds of such sale shall be applied as provided for in **Section 13**.

Upon any sale pursuant to this Section, the Master Trustee may bid for and purchase the property being sold, and upon compliance with the terms of sale, subject to applicable rights of redemption, the Master Trustee may hold, retain, possess and dispose of such property in its own absolute right without further accountability; the Master Trustee at any such sale may, in paying the purchase price, turn in any Obligation for value in lieu of cash equal to the amount of such purchase price.  In case the amount of such purchase price shall be less than the amount due on that Obligation, that Obligation shall be returned to the Master Trustee after a notation of such partial payment shall have been made thereon.

All rights, remedies and powers provided by this Deed of Trust may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law in the premises, and all the provisions of this Deed of Trust are intended to be subject to all applicable mandatory provisions of law which may be controlling in the premises and to be limited to the extent necessary so that they will not render this Deed of Trust invalid or unenforceable under the provisions of any applicable law.

Section 13.  **Applications of Proceeds.**  Moneys collected by the Deed of Trust Trustee pursuant to the sale or other disposition of the Mortgaged Property or the Personal Property shall be paid over to the Master Trustee and shall be applied as follows:

FIRST:    Pro rata to the payment of all fees, costs, charges and expenses (including, without limitation, but not limited to attorneys' fees and expenses) and disbursements associated with the collection of such moneys incurred by or on behalf of the Master Trustee or the Deed of Trust Trustee.

SECOND:    In accordance with **Section 4.04** of the Master Indenture.

**Section 14.  Warranties, Covenants and Indemnities Regarding Environmental Matters.**

(a)    Kingswood warrants and represents that, except as otherwise disclosed in the Phase I and other environmental and asbestos reports delivered by Kingswood in connection with the issuance of the Series 2016 Bonds,  to the best of its knowledge:  (i) there has not, at any time during Kingswood's ownership of the Mortgaged Property, nor at any time prior to Kingswood's ownership of the Mortgaged Property, been any "release" (as defined in 42 U.S.C. Section 9601(22)) or threat of a "release" by Kingswood or any third party of any Hazardous Substances as hereinafter defined on, about, or near the Mortgaged Property (including adjacent or nearby properties) which could have come to be located upon the Mortgaged Property or in the water or the groundwater thereon or thereunder; (ii) except in the ordinary course of the operation of Kingswood's business and in compliance with all Environmental Laws, no part of the Mortgaged Property is or has been used at any time during Kingswood's ownership of the Mortgaged Property for any handling, transportation, treatment, storage, refining or disposal of any Hazardous Substances; (iii) no part of the Mortgaged Property is or has been at any time during

Kingswood's ownership of the Mortgaged Property, nor at any time prior to Kingswood's ownership of the Mortgaged Property, a "facility" (as defined in 42 U.S.C. Section 9601(9)(B)); (iv) there are not now, nor has there been during Kingswood's ownership of the Mortgaged Property, nor at any time prior to Kingswood's ownership of the Mortgaged Property, any underground storage tanks located in or on any of the Mortgaged Property that are in violation of applicable Environmental Laws; (v) no asbestos or asbestos-containing materials are located in or have been installed, used, incorporated into or disposed of on or about the Mortgaged Property except to the extent conforming with all Environmental Laws as hereinafter defined; (vi) there are no conditions on or about the Mortgaged Property which are violative of any Environmental Laws; (vii) no claims or demands have been asserted or made by any third parties arising out of, relating to or in connection with any Hazardous Substances on or about or allegedly on or about the Mortgaged Property for any injuries suffered or incurred or allegedly suffered or incurred by reason of any of the foregoing; (viii) no notices of any violation of any of the matters referred to in the foregoing sections relating to the Mortgaged Property or its use have been received by Kingswood and there are no writs, injunctions, decrees, orders or judgments outstanding, and no lawsuits, claims, proceedings or investigations pending or threatened, relating to the ownership, use, maintenance or operation of the Mortgaged Property, nor is there any basis for any such lawsuit, claim, proceeding or investigation being instituted or filed; and (ix) the Mortgaged Property is not listed in the United States Environmental Protection Agency's National Priorities List of Hazardous Waste Sites nor any other log, list, schedule, inventory or record of Hazardous Materials or Hazardous Waste sites whether maintained by the United States, or any state or local governmental unit.

(b)     Kingswood will provide the Master Trustee with copies of any notifications of releases of Hazardous Substances or of any environmental hazards or potential hazards which are given by or on behalf of Kingswood to any federal, state or local or other agencies or authorities or which are received by Kingswood from any federal, state or local or other agencies or authorities with respect to the Mortgaged Property. Such copies shall be sent to the Master Trustee concurrently with their being mailed or delivered to the governmental agencies or authorities or within ten days after they are received by Kingswood.

(c)     Kingswood warrants and represents that no emergency and hazardous chemical inventory forms (hereinafter "Environmental Notices") that relate to the Mortgaged Property have been previously given by Kingswood to any federal, state or local governmental authority or agency as required pursuant to the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C.A. Section 11001 *et seq*., or any other Environmental Laws. Kingswood will provide the Master Trustee with copies of all Environmental Notices that relate to the Mortgaged Property subsequently sent to any such governmental authority or agency as required pursuant to the Emergency Planning and Community Right-to-Know Act of 1986 or any other Environmental Laws. Such copies of subsequent Environmental Notices shall be sent to the Master Trustee concurrently with their being mailed to any such governmental authority or agency.

(d)     Kingswood will comply with and operate and at all times use, keep and maintain the Mortgaged Property and every part thereof (whether or not such property constitutes a facility, as defined in CERCLA) in conformance with all Environmental Laws. Without limiting the generality of the foregoing, Kingswood will not, nor will it permit any third party to, use, generate, treat, store, transport, dispose of or otherwise introduce any Hazardous Substance into or on the Mortgaged Property or any part thereof nor cause, suffer, allow or permit anyone else to do so except in the ordinary course of the operation of Kingswood's business and in compliance with all Environmental Laws.

(e)     Kingswood agrees to indemnify, protect and hold harmless the Master Trustee, the Deed of Trust Trustee, the Holders of the Obligations and each Related Bond Trustee from and against any and all claims, demands, costs, liabilities, suits, damages or expenses, including, without limitation, attorneys'

fees and expenses, arising from (i) any release (as defined above) or threat of a release, actual or alleged, of any Hazardous Substances, upon or about the Mortgaged Property or respecting any products or materials previously, now or thereafter located upon, delivered to or in transit to or from the Mortgaged Property, regardless of whether such release or threat of release or alleged release or threat of release has occurred prior to the date hereof or hereafter occurs (but only during such time as Kingswood holds title to the affected Property) and regardless of whether such release occurs as the result of any act, omission, negligence or misconduct of Kingswood or any third party or otherwise, (ii) (A) any violation now existing (actual or alleged) of, or any other liability under or in connection with, any Environmental Laws relating to affecting the Mortgaged Property, or (B) any now-existing or hereafter arising violation, actual or alleged, or any other liability, under or in connection with, any Environmental Laws relating to any products or materials previously, now or hereafter located upon, delivered to or in transit to or from the Mortgaged Property, regardless of whether such violation or alleged violation or other liability is asserted or has occurred or arisen prior to the date hereof or hereafter is asserted or occurs or arises and regardless of whether such violation or alleged violation or other liability occurs or arises, as the result of any act, omission, negligence or misconduct of Kingswood or any third party or otherwise, (iii) any assertion by any third party of any claims or demands for any loss or injury arising out of, relating to or in connection with any Hazardous Substances on or about or allegedly on or about the Mortgaged Property, or (iv) any breach, falsity or failure of any of the representations, warranties, covenants and agreements contained in this Section.  This subsection shall survive any termination of this Deed of Trust.

(f)     As used in this Section, the following terms have the following meanings:

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Section 9601, *et seq*.).

"Environmental Laws" means any now-existing or hereafter enacted or promulgated federal, state, local, or other law, statute, ordinance, rule, regulation or court order pertaining to (i) environmental protection, regulation, contamination or clean-up, (ii) toxic waste, (iii) underground storage tanks, (iv) asbestos or asbestos-containing materials, or (v) the handling, treatment, storage, use or disposal of Hazardous Substances, including without limitation, CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, *et seq*.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6901, *et seq*.), the Toxic Substances Control Act, as amended (15 U.S.C. Sections 2601, *et seq*.), the Clean Air Act, the Federal Water Pollution Control Act of 1972, and the Superfund Amendments and Reauthorization Act of 1986, all as exist from time to time.

"Hazardous Substances" means all (i) "hazardous substances" (as defined in 42 U.S.C. Section 9601(14)), (ii) chemicals subject to regulation under Title III of the Superfund Amendments and Reauthorization Act of 1986, as amended from time to time, (iii) natural gas liquids, liquefied natural gas or synthetic gas, (iv) any petroleum, petroleum-based products or crude oil or any fraction, or (v) any other hazardous or toxic substances, wastes or materials, pollutants, contaminants or any other substances or materials which are included under or regulated by any Environmental Law.

**Section 15.  Covenants of the Deed of Trust Trustee; Substitutions.**  The Deed of Trust Trustee covenants faithfully to perform the trust herein created.  The Master Trustee may, from time to time, remove the Deed of Trust Trustee and substitute another trustee in place of the then current Deed of Trust Trustee.  Upon such appointment, and without conveyance to the successor trustee, the latter shall be vested with all the title, estate, rights, powers and trusts conferred upon the Deed of Trust Trustee. Such appointment shall be made by written instrument executed by the Master Trustee which shall be recorded among the public records of Jackson County, Missouri, and shall be conclusive proof of the proper appointment of the successor deed of trust trustee.

Deed of Trust                                        13

**Section 16.  Lease to Kingswood.**  The Deed of Trust Trustee hereby leases and lets the Mortgaged Property to Kingswood until a sale be had under the foregoing provisions therefor, upon the following terms and conditions, to wit:

Kingswood, and every and all persons claiming or possessing the Mortgaged Property, and any part thereof, by, through or under it shall or will pay rent therefor during said term at the rate of one cent per month, payable monthly upon demand and shall and will surrender peaceable possession of the Mortgaged Property, and any and every part thereof, sold under said provisions, to the Deed of Trust Trustee, its successors, assignees, or purchasers thereof under such sale, within ten days after making of such sale without notice or demand therefor.

**Section 17.  Warranty of Title.**  Kingswood warrants that it has good and marketable title (as defined by the Title Standards of the Missouri Bar) to the Mortgaged Property in fee simple absolute subject only to Permitted Liens, that it owns the Personal Property free and clear of all liens and claims except Permitted Liens and that this Deed of Trust constitutes a valid first mortgage lien upon such Mortgaged Property and a security interest in the Personal Property, subject only to Permitted Liens not required by the Master Indenture to be subordinated to this Deed of Trust, which security interest is perfected to the extent the same may be perfected by filing under the UCC.  Kingswood shall preserve such title and shall forever warrant and defend the Mortgaged Property and the Personal Property against all claims other than those constituting Permitted Liens.

**Section 18.  Obligations Effective upon Issuance, Sale and Delivery of Bonds.**  The several obligations of Kingswood hereunder shall arise absolutely and unconditionally when the Bonds shall have been issued, sold and delivered by the Authority and the proceeds thereof paid to and received by the Bond Trustee.

**Section 19.  Severability.**  The invalidity or unenforceability of any one or more phrases, sentences, clauses or sections in this Deed of Trust shall not affect the validity or enforceability of the remaining portions of this Deed of Trust or any part thereof.

**Section 20.  Notices.**  It shall be sufficient service of any notice, request, complaint, demand or other paper required by this Deed of Trust to be given to or filed with the Master Trustee, Kingswood or the Deed of Trust Trustee if the same is given or filed in the manner and at the addresses specified in **Section 9.09** of the Master Indenture.

**Section 21.  Missouri Law Governs.**  This Deed of Trust shall be governed by and construed and interpreted in accordance with the laws of the State.

**Section 22.  Amendments, Changes and Modifications.**  Subsequent to the issuance of any Obligations and prior to their payment in full (or provision thereof having been made in accordance with the provisions of the Master Indenture), this Deed of Trust may not be amended, changed, modified, altered or terminated without the written consent of the Master Trustee.

**Section 23.  Consent by Master Trustee.**  Whenever the consent or approval of the Master Trustee is required under this Deed of Trust or the Master Indenture, the granting or withholding of such consent or approval shall be governed by the standard of conduct imposed upon the Master Trustee in the Master Indenture.

**Section 24.  Right to Entry by Master Trustee.**  Whether or not an Event of Default has occurred and is continuing, the duly authorized agents of the Master Trustee shall have the right at all

Deed of Trust                                              14

reasonable times to enter the Mortgaged Property, or any parts thereof, for the purpose of inspecting the Mortgaged Property and the Personal Property to insure compliance with this Deed of Trust.

In addition, whether or not an Event of Default has occurred and is continuing, the Master Trustee or its duly authorized agents shall have the right to enter the Mortgaged Property at reasonable times to conduct appraisals, environmental reviews, assessments or audits, and to perform such acts and collect such samples (including borings of land) as the Master Trustee or its agents shall determine in its reasonable judgment are necessary for the proper protection of the Holders of the Obligations.  If the cost of any appraisal, environmental review, assessment, audit or act shall exceed $2,500, Kingswood shall first be notified and may seek competitive bids from such providers of the service determined to be necessary that the Master Trustee may approve, which approval shall not be unreasonably withheld.

**Section 25.   Insurance.**  Unless Kingswood provides evidence of the insurance coverage required by the Master Indenture or any of the other documents evidencing or securing the Obligations, Master Trustee may purchase insurance at Kingswood's expense to protect Master Trustee's interest in the Mortgaged Property. This insurance may, but need not protect Kingswood's interest. The coverage that Master Trustee purchases may not pay any claim that Kingswood makes or claim that is made against Kingswood in connection with the Mortgaged Property. Kingswood may later cancel any insurance purchased by Master Trustee, but only after providing evidence that Kingswood has obtained insurance as required by this Deed of Trust  If Master Trustee purchases insurance for the Mortgaged Property, Kingswood will be responsible for the costs of that insurance, including the insurance premium, interest and any other charges Master Trustee may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Kingswood's total outstanding balance or Indebtedness. The costs of the insurance may be more than the cost of insurance Kingswood may be able to obtain on its own.

**Section 26.  Type of Loan.**  The loan secured by this Deed of Trust is made to a corporation, is a business loan of more than five thousand dollars, and is a real estate loan of more than five thousand dollars that is not a residential real estate loan nor a loan used for an agricultural activity, and as such comes within the purview of Section 408.035, RSMo.

**Section 27.  Reaffirmation of the Original Deed of Trust, as Amended.**  The grants, terms and provision of the Original Deed of Trust, as supplemented and amended by this Deed of Trust, are hereby ratified, approved and confirmed and incorporated herein. Kingswood acknowledges and agrees that the Original Deed of Trust, as supplemented and amended by this Deed of Trust, represents a valid and enforceable obligation of Kingswood.  Kingswood further acknowledges that there are no existing claims, defenses, personal or otherwise, or rights of setoff whatsoever with respect to the Original Deed of Trust, as previously supplemented and amended, and amended and restated by this Deed of Trust. Kingswood hereby agrees that this Deed of Trust in no way acts as a release or relinquishment of the security interest and lien and rights securing payment of the obligations set forth in the Original Deed of Trust. The security interest and lien securing payment of the obligations set forth in the Original Deed of Trust are hereby ratified and confirmed by Kingswood in all respects and Kingswood reaffirms its obligation to perform all of its covenants in the Original Deed of Trust, as supplemented and amended by this Deed of Trust.

*[Remainder of Page Intentionally Left Blank]*

Deed of Trust                                                      15

**KANSAS CITY UNITED METHODIST
RETIREMENT HOME, INC. D/B/A
KINGSWOOD**


By: _____
    Ross P. Marine
    Chair of the Board


[SEAL]


**ACKNOWLEDGMENT**


**STATE OF MISSOURI**       )
                            ) SS.
**COUNTY OF JACKSON**      )


On this ___ day of November, 2021, before the undersigned, a Notary Public in and for said State, personally appeared Ross P. Marine, to me personally known, who, being by me duly sworn, did say that he is the Chair of the Board of **KANSAS CITY UNITED METHODIST RETIREMENT HOME, INC. D/B/A KINGSWOOD SENIOR LIVING COMMUNITY**, a Missouri nonprofit corporation, and that the seal affixed to the foregoing instrument is the corporate seal of said corporation, and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said officer acknowledged said instrument to be executed for the purposes therein stated and as the free act and deed of said corporation.

**IN WITNESS WHEREOF,** I have hereunto set my hand and affixed my notarial seal, the day and year last above written.


_____
           Notary Public


[SEAL]
My commission expires: _____.

Deed of Trust

## SCHEDULE 1

### THE SITE

**Real Property located in Kansas City, Jackson County, Missouri legally described as follows:**

TRACT 1:

ALL OF LOT 1, EXCEPT THE NORTH 207.3 FEET OF THE WEST 191 FEET OF SAID LOT 1; AND ALL OF LOT 2, EXCEPT THE NORTH 220 FEET MEASURED ON THE EAST LINE THEREOF, AND ALL OF LOTS 7 AND 8, PIONEER HILLS, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI, ACCORDING TO THE RECORDED PLAT THEREOF, AND THAT PART OF VACATED 99TH STREET TERRACE LYING SOUTH OF AND ADJACENT TO SAID LOTS 1 AND 2.

TRACT 2:

LOT 1, KINGSWOOD VILLAS, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI.

TRACT 3:

LOT 1 KINGSWOOD MANOR, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI.

TRACT 4:

TRACT A, KINGSWOOD MANOR, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI.

TRACT 5:

THE WEST 93 FEET OF THE SOUTH 120 FEET OF LOT 12, FUQUA PLACE, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI.

TRACT 6:

THE EAST 67 FEET OF THE WEST 160 FEET OF THE SOUTH 120 FEET OF LOT 12, FUQUA PLACE, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI.

TRACT 7:

LOT 30, INDIAN GROVE, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI.

TRACT 8:

LOT 31, INDIAN GROVE, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI.

TRACT 9:

THE NORTH 140 FEET OF THE WEST 120 FEET OF LOT 2, AND THE NORTH 140 FEET OF THE EAST 49 FEET OF LOT 3, EDEN, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI.

TRACT 10:

ALL OF LOT 32 AND THE WEST 10 FEET OF LOT 33, INDIAN GROVE, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI.

TRACT 11:

ALL OF LOT 33, EXCEPT THE WEST 10 FEET THEREOF, INDIAN GROVE, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI

## **Exhibit D**

**Financial Projections**

**Kingswood Projections 8-17-2021**

| | Aug Filing - Dec 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| **Cash Flow Summary:** | | | | | |
| Operating Revenue | $5,498 | $18,298 | $19,844 | $20,512 | $21,040 |
| Operating Expenses | 6,006 | 17,697 | 18,461 | 19,093 | 19,665 |
| **Net Operating Margin** | **(507)** | **601** | **1,383** | **1,419** | **1,374** |
| Turnover Entrance Fees Received | 2,654 | 6,238 | 5,225 | 4,827 | 4,972 |
| Entrance Fees Refunded | (2,011) | (4,702) | (3,820) | (3,163) | (3,163) |
| Additional Refunds Funded by Working Capital | (1,000) | 0 | 0 | 0 | 0 |
| **Net Cash Flow From Entrance Fees** | **(357)** | **1,536** | **1,405** | **1,665** | **1,809** |
| Investment Income | 0 | 17 | 54 | 53 | 54 |
| **Cash Available for Debt Service** | **(864)** | **2,154** | **2,842** | **3,136** | **3,238** |
| | | | | | |
| Debt Modification Fees funded by ops | (485) | 0 | 0 | 0 | 0 |
| Interest Expense | (186) | (2,230) | (2,230) | (2,230) | (2,230) |
| Principal Amortization | 0 | 0 | 0 | 0 | (225) |
| Capital Expenditures | (510) | (1,329) | (987) | (974) | (709) |
| Reimbursed Capital Expenditures | 500 | 1,329 | 987 | 974 | 210 |
| Trustee Fees | 0 | (26) | (26) | (26) | (26) |
| Working Capital Timing Differences | (677) | 0 | 0 | 0 | 0 |
| **Other Operating Cash Items** | **(1,358)** | **(2,256)** | **(2,256)** | **(2,256)** | **(2,980)** |
| **Annual Net Cash From Oper before Debt Service** | **($2,222)** | **($103)** | **$586** | **$880** | **$258** |
| | | | | | |
| **Cash Reserves Summary:** | | | | | |
| Beginning Cash Balance From Operations | 1,320 | 1,751 | 780 | 808 | 834 |
| Add: Annual Net Cash from Operations | (2,222) | (103) | 586 | 880 | 258 |
| Financing Proceeds (net of COI, R&R & DSRF funding) | 4,000 | 0 | 0 | 0 | 0 |
| Add: Transfer from Revenue Fund | 0 | 23,667 | 24,511 | 24,485 | 25,283 |
| Less: Transfer to Revenue Fund | (1,347) | (24,536) | (25,069) | (25,339) | (26,012) |
| **Ending Cash Balance From Operations** | **$1,751** | **$780** | **$808** | **$834** | **$363** |
| | | | | | |
| Revenue Fund Beginning Balance | - | 1,347 | 2,216 | 2,774 | 3,628 |
| Transfer to Operating Account  - Refunds | - | (4,702) | (3,820) | (3,163) | (3,163) |
| Transfer to Operating Account  - Operating Expenses | - | (17,221) | (18,461) | (19,093) | (19,665) |
| Transfer to Interest Account | - | (1,744) | (2,230) | (2,230) | (2,230) |
| Transfer to Principal Account | - | 0 | 0 | 0 | (225) |
| Transfer from Operations | 1,347 | 24,536 | 25,069 | 25,339 | 26,012 |
| **Revenue Fund Ending Balance** | **1,347** | **2,216** | **2,774** | **3,628** | **4,356** |
| | | | | | |
| **Ending Operating Account & Revenue Fund** | **3,098** | **2,996** | **3,581** | **4,462** | **4,719** |
| | | | | | |
| Repair & Replacement Fund Beginning Balance | - | 3,500 | 2,171 | 1,184 | 210 |
| Additions | 4,000 | - | - | - | - |
| Transfers Out | (500) | (1,329) | (987) | (974) | (210) |
| Repair & Replacement Ending Balance | 3,500 | 2,171 | 1,184 | 210 | - |
| | | | | | |
| DSRF Beginning Balance | 1,163 | 1,472 | 1,472 | 1,472 | 1,472 |
| Less: Professional Fees | (591) | - | - | - | - |
| Add: Funding | 900 | - | - | - | - |
| **Ending DSRF Balance** | **1,472** | **1,472** | **1,472** | **1,472** | **1,472** |
| | | | | | |
| **Total Cash excluding DSRF** | **6,598** | **5,166** | **4,766** | **4,671** | **4,719** |
| | | | | | |
| **Ratios Summary:** | | | | | |
| **Annual Debt Service Requirement** | | **2,230** | **2,230** | **2,230** | **2,455** |
| **Debt Service Coverage Ratio w/o Net Entrance Fees** | | **0.28** | **0.64** | **0.66** | **0.58** |
| **Debt Service Coverage Ratio** | | **0.97** | **1.27** | **1.41** | **1.32** |
| **Daily Operating Expenses** | **55** | **55** | **57** | **58** | **60** |
| **Days Cash on Hand (Oper Cash & Revenue Fund)** | **57** | **55** | **63** | **76** | **79** |

## <u>Exhibit E</u>

## Liquidation Analysis

**Kingswood**
**Liquidation Anaysis**
**000s**

| | Notes | Actual 6/30/2021 | Adjustment | Liquidation Recovery Percentage Low | High | Chapter 7 Liquidation Low | High |
|---|---|---|---|---|---|---|---|
| **Asset Liquidation** | | | | | | | |
| Cash and Cash Equivalents | A | $ 1,858 | $ (1,642) | 100% | 100% | $ 216 | $ 216 |
| Current Assets Whose Use is Limited | B | 10 | | 100% | 100% | 10 | 10 |
| Net A/R Residents | C | 417 | | 30% | 70% | 125 | 292 |
| Other Receivables | D | 374 | | 0% | 0% | - | - |
| Inventory | E | 109 | | 5% | 10% | 5 | 11 |
| Prepaid Expenses and Deposits | F | 223 | | 0% | 0% | - | - |
| CIP | G | 360 | | 15% | 40% | 54 | 144 |
| Fixed Assets, net | H | 40,348 | | 19% | 42% | 7,633 | 17,088 |
| Long-term Assets Whose Use is Limited | I | 6,101 | | 0% | 0% | - | - |
| Other Assets | J | 98 | | 0% | 0% | - | - |
| **Total Proceeds Available** | | **$ 49,898** | | | | **$ 8,044** | **$ 17,761** |
| | | | | | | | |
| **Net Proceeds for Available for Wind Down/Closure Cost and Secured Claims** | | | | | | **$ 8,044** | **$ 17,761** |
| | | | | | | | |
| **Wind Down/Closure Cost** | | | | | | | |
| Wind Down/Closure | K | | | | | $ (3,452) | $ (3,452) |
| Liquidating Trustee | L | | | | | (241) | (533) |
| Professional Fees | M | | | | | $ (125) | $ (125) |
| Chapter 7 Trustee Fees | N | | | | | (50) | (50) |
| **Total Wind Down/Closure Cost** | | | | | | **$ (3,868)** | **$ (4,160)** |
| | | | | | | | |
| **Net Proceeds for Available for Secured Claims** | | | | | | **$ 4,176** | **$ 13,602** |
| | | | | | | | |
| **Estimated Senior Secured Claims** | | | | | | | |
| Bonds Payable | O | $ 51,055 | | | | $ (51,055) | $ (51,055) |
| Accrued Bond Inerest | O | 4,849 | | | | (4,849) | (4,849) |
| **Subtotal Senior Secured Claims** | | $ 55,904 | | | | $ (55,904) | $ (55,904) |
| | | | | | | | |
| **Average Recovery on Senior Secured Claims** | | | | | | **7.5%** | **24.3%** |
| | | | | | | | |
| **Net Proceeds Available for Administrative Claims** | | | | | | **$ -** | **$ -** |
| | | | | | | | |
| **Administrative Claims** | | | | | | | |
| Payroll Liabilities | P | | | | | (327) | (327) |
| Accrued Expenses/Post-Petition Trade/AP | Q | | | | | (497) | (497) |
| Professional Fees and UST Fees | R | | | | | $ (485) | $ (485) |
| **Total Administrative Claims** | | | | | | **$ (1,309)** | **$ (1,309)** |
| | | | | | | | |
| **Average Recovery on Administrative Claims** | | | | | | **0%** | **0%** |
| | | | | | | | |
| **Net Proceeds Available for Unsecured Claims** | | | | | | **$ -** | **$ -** |
| | | | | | | | |
| Trade Creditors | S | | | | | $ (676) | $ (676) |
| Refundable Entrance Fees | T | | | | | (34,857) | (34,857) |
| Litigation Claims | U | | | | | unknown | unknown |
| Rejection Damages/Other (Contingency) | V | | | | | unknown | unknown |
| **Total Unsecured Claims** | | | | | | **$ (35,533)** | **$ (35,533)** |
| | | | | | | | |
| **Average Recovery on Total Unsecured Claims** | | | | | | **0%** | **0%** |
| | | | | | | | |
| **Shortfall** | | | | | | **$ (88,570)** | **$ (79,145)** |
| | | | | | | | |
| | | | | | | **$ (88,570)** | **$ (79,145)** |
| | | | | | | $ - | $ - |